# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**No. 05-243 C**

| | | |
|---|---|---|
| ************************* | ) | |
| EDWARD KEETER and | ) | |
| KEETER TRADING COMPANY, INC., | ) | |
| *Plaintiffs* | ) | **Case 1:05-cv-00243-LJB** |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| *Defendant* | ) | |
| ************************* | ) | |

**DEFENDANT'S APPLICATION FOR**
**LEAVE TO FILE SUMMARY JUDGMENT MOTION OUT OF TIME**

Pursuant to RCFC 6(b) and 6.1, the undersigned counsel for defendant hereby requests that defendant be granted leave to submit its Motion for Summary Judgment out of time. In support of this Application, counsel offers (under penalty of perjury) the following sad story, in the hope that it will evoke the Court's indulgence.

1. This Application is being drafted late on the evening of Friday, February 2, 2007 – the date by which the Court instructed that Rule 56 motions must be filed. Counsel worked diligently to prepare defendant's Motion, mindful of its due date and because he must also prepare to try a case in Louisville, Kentucky for three days, beginning on February 6 (in which 17 witnesses have been listed to testify, eight of whom are Postal Service employees). Substantial time has been (and still is) needed to

work with witnesses and prepare for examination. Counsel has been acutely conscious of the risk of a mutually destructive collision between these two commitments, but as of his retiring after 3:00 A.M. this morning, he was confident that matters were under control.

2, Counsel returned to his office at 9:00 A.M today (Friday), ready to complete the reasonable remaining amount of work required for the Motion papers and Appendix in this case. The major tasks left were final editing of the Motion, assembly of the Appendix, and compliance with the requisites of RCFC 56(h).

3. Virtually all paperwork in the Office of the General Counsel at the Postal Service is maintained in electronic form, as pdf files. The work itself is done on a vast computer network, to which are connected a huge number of dispirited, underpowered computers lacking sufficient memory to work on large files at more than all deliberate speed. Beginning in mid-morning, the part of that system on which counsel depends has crumbled around him.

4. First, counsel's computer began to freeze, crash, and/or disconnect from the network without provocation, in the middle of any task it was asked to perform. It restarted glacially, often taking more time to do so than it remained usable when it did finally restart. At around noon, the computer began to clacked and moan its last throes, and after intermittent total failures it died. From all indications, the hard drive expired, taking with it the non-network copies of counsel's files.

5. Counsel immediately, and perhaps a bit frantically, looked for an office whose owner was away where he could use the computer to reconnect to the system and finish the Motion. Only one office was available, and its computer could access the

documents, but could not run either Microsoft Word or Acrobat, both essential to the work.

6. Counsel summonsed the resident IT Help person, who eventually came up with an alternative computer supposedly equipped with the necessary software. Unfortunately, he forgot to provide a power adapter for it. That computer declined to mate with the docking station in counsel's office, but the Help person eventually came back with a power supply. Counsel discovered a few minutes later that it was a wrong and unusable power supply, by which time the Help person had left the building. The battery on the rescue computer was soon depleted. Nothing was getting done.

7. Counsel eventually found another office, where the incumbent computer was available but turned out to be "locked" and thus unavailable. That machine was evicted from its dock and the rescue machine was installed in its place. Counsel then discovered that while this computer can access Word and Acrobat Professional, it lacks the requisite "authority" for converting files to pdf. This "Help" computer also has only half of the memory that was installed in counsel's own computer after it was discovered that without more memory it could only feebly deal with large pdf files. This computer is game, but astonishingly slow. Counsel therefore planned to finish and print the Appendix, already in pdf, and then to take the Motion papers home to be completed, converted to pdf, and submitted electronically.

8. Counsel remained foolishly hopeful regarding this scenario, but after the Appendix and its Table of Contents were prepared and one set was printed, this computer let him down. It began spontaneously to disconnect from parts of the network (or perhaps they-go off-line on Friday nights, for their own reasons, and then started to

reboot without provocation, each time then creeping through restart in its petty pace from day to day to the last instant of filing time . . . . Counsel vaguely recalled that he had not eaten since the early morning, long ago. Indeed, he has been tethered to failing machines all day...

10. By 10:00 P.M., with no end in sight, the undersigned decided to give up. It should be possible to mail one copy of the Appendix to the Court before midnight (in 42 minutes), and if this Application can be printed it will be placed with the Appendix in a mailbox by then. Counsel reluctantly accepts that he cannot beat the system, certainly not the Postal Service version of it. In the last 14 1/2 hours at the office, counsel estimates that he has actually been able to work on the Motion for somewhere between three and four hours.

11. Counsel apologizes if the tone of this Application seems slightly hysterical, but the only alternative attitudes hover somewhere in the neighborhood of horror, rage, and despair.

12. Counsel managed to save what should be the Motion papers on a "flash drive." He proposes now to go home, to finish the Motion after a nice rest, and to submit it before leaving town on Sunday. Additional copies of the Appendix will have to be prepared and submitted to the Court and plaintiff's counsel in his absence on Monday.

For all of these reasons, the undersigned sincerely and respectfully asks the Court to allow defendant's Motion for Summary Judgment to be filed electronically, and its Appendix to be served, out of time. Counsel also apologizes in advance for the errors in this document that he is sure he is unable to see any more.

Post Script, Feb. 3, 2007, 2:00 P.M.:

An envelope containing this Application, and the Appendix was taken at the stroke of midnight to the outgoing mailboxes in front of USPS Headquarters. Of course, then envelope would not quite fit into the mailbox slot, and then ripped open, and counsel discovered that there are no Saturday pickups from these boxes. Counsel gathered his materials, and a few shreds of his dignity, and (with fleeting thoughts of trial preparation) went home. This Application (*sans* PostScript or corrections) and the Appendix were taken to a real Post Office, to be filed and served by mail, on Saturday afternoon.

Upon reviving on Saturday morning, counsel discovered the attached email from plaintiff's counsel, sent on Friday morning (Feb. 2), but only to counsel's personal/home email address, and thus unknown during Friday's travails. In it, plaintiff admits facts in defendant's Requests Admission, and proposed that this case be submitted on stipulated facts. Defendant had prepared Requests, in case stipulations were not reached. Stipulations based on the Requests may be possible, but counsel did not know that while preparing its Rule 56 Motion. The form of submission may not affect legal analysis of any issues in this case, but stipulations might have rendered most of the Appendix (and thus annotating the papers with citations to it) unnecessary. Counsel has by now squandered so much time on this project that it seems wrong not to continue doing so until it is completed and submitted as a Rule 56 Motion.

Counsel again seeks the Court's understanding regarding the tone of this Application and its undercurrent of existential bewilderment.

February 2 (and 3), 2007

Respectfully submitted:

/s/ DOUGLAS J. COLTON

DOUGLAS J. COLTON
U.S. Postal Service
475 L'ENFANT PLAZA, SW
ROOM 6323
WASHINGTON, DC 20260-1127
TEL: (202) 268-6408
FAX: (202) 268-5287
*douglas.j.colton@usps.gov*

**COUNSEL FOR DEFENDANT**
**THE UNITED STATES POSTAL SERVICE**

## CERTIFICATE OF SERVICE

I certify that on February 3, 2007, the non-electronic original version of the foregoing DEFENDANT'S APPLICATION FOR LEAVE TO FILE SUMMARY JUDGMENT MOTION OUT OF TIME was served on plaintiff herein, by placing a true and correct copy thereof in the United States Mail, First Class postage prepaid, addressed to:

**CHRISTOPHER O'HARA CARTER, ESQ.**
**215 OLD MAIN STREET**
**YELLVILLE, ARKANSAS 72687**

Subject: Keeter v. USPS/stipulated facts/requests
From: Carter Law Office <carterlaw@yellville.net>
Date: Fri, 02 Feb 2007 08:04:41 -0600
To: douglas.colton@gmail.com

I can agree to all to move this along.

On #26 there might have been an earlier phone call, but there is no question there wasone held on 1-28. Regardless both parties positions were the same whether in was December or January. So we admit.

On 46 and 47 they are technically true statements. It just depends on the spin one wants to put on them. We will admit just so get to the point of submitting this on stipulated facts.

Christopher Carter
Attorney at Law
P.O. Box 300
Yellville, AR 72687-0300

Phone 870-449-2100

 

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**No. 05-243 C**

| | | |
|---|---|---|
| *************************** | ) | |
| EDWARD KEETER and | ) | |
| KEETER TRADING COMPANY, INC., | ) | |
| *Plaintiffs* | ) | **CASE 1:05-CV-00243-LJB** |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| *Defendant* | ) | |
| *************************** | | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**and**

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

February 4, 2007

/S/ DOUGLAS J. COLTON

**DOUGLAS J. COLTON**

U.S. POSTAL SERVICE
475 L'ENFANT PLAZA, SW
ROOM 6323
WASHINGTON, DC 20260-1127
TEL: (202) 268-6408
FAX: (202) 268-5287

**COUNSEL FOR DEFENDANT**

# DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant the United States hereby moves for summary judgment, pursuant to **RCFC 56**. This Motion is based upon the accompanying Memorandum of Points and Authorities in Support of Motion; upon the Document Appendix submitted herewith; and upon all of the pleadings and records on file herein.

Grounds for this Motion are (1) that undisputed facts establish that plaintiff abandoned performance of its contract with defendant, thereby warranting its default termination; and (2) that plaintiff lacked capacity under the laws of its domiciliary state to bring suit at the time it commenced this action.

For the reasons more fully explained in the accompanying Memorandum, defendant respectfully requests that the Complaint herein be dismissed with prejudice, and that plaintiff take nothing by this action.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No. 05-243 C**

| | | |
|---|---|---|
| ******************************* | ) | |
| EDWARD KEETER and | ) | |
| KEETER TRADING COMPANY, INC., | ) | |
| *Plaintiffs* | ) | **Case 1:05-cv-00243-LJB** |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| *Defendant* | ) | |
| ******************************* | ) | |

# DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS


| | |
|---|---|
| MOTION | (1) |
| MEMORANDUM OF POINTS AND AUTHORITIES | |
| QUESTIONS PRESENTED | 1 |
| SUMMARY OF THE CASE | 2 |
| RELEVANT FACTS | 2 |
| A. CONTEXT AND BACKGROUND | 2 |
| 1. Universal Service | 2 |
| 2. HCR Contract Administration | 5 |
| B. WHAT OCCURRED IN THIS CASE | 7 |
| POINTS AND AUTHORITIES | 10 |
| I CONTRACT PROVISIONS | 10 |
| II ARGUMENT | 12 |
| A. PLAINTIFF'S INEXCUSABLE DEFAULT | 12 |
| B. PLAINTIFF LACKED CAPACITY TO SUE | 16 |
| CONCLUSION | 17 |

# TABLE OF AUTHORITIES AND EVIDENCE


| AUTHORITY | MOTION PAGE |
|---|---|
| *The Tester Corporation v. The United States,* 227 Ct. Cl. 648 (1981) | 12 |
| *DWS, Inc.,* ASBCA No. 33245, 87-3 B.C.A. (CCH) P19,960 | 13, 14 |
| *Mancini*, B.C.A. (CCH) P30,577; 1999 PSBCA LEXIS 26 | 14 |
| *Altina Trucking*, PSBCA No. 3341, 93-3 B.C.A. (CCH) P26,256 (1993) | 15 |
| *Terry v. Rice (In re Cheqnet Sys.), 246 Bankr. 873 (Bankr. E.D. Ark. 2000* | 16 |

**RECORD REFERENCES**

| | |
|---|---|
| **REQUESTS FOR ADMISSION (FACTS V2) ("R*n*")** | **2, 7, 8, 9** |
| **APPENDIX DOCUMENTS ("AP *n*")** | |
| **AP 18-24** | **3** |
| **AP 25-88** | **2** |
| **AP 89** | **7** |
| **AP 122** | **8** |
| **AP 92** | **8** |
| **AP 134-48** | **8** |
| **AP 90-91** | **9** |
| **AP 115** | **9** |
| **AP 58** | **9** |
| **AP 98-102** | **9** |
| **AP 30** | **10** |
| **AP 66** | **10** |
| **AP 62-63** | **10, 11** |
| **AP 67** | **11** |
| **AP 63,64** | **11** |

# DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## QUESTIONS PRESENTED

**1**. Did the Contracting Officer abuse his discretion by terminating its contract with plaintiff for default, after plaintiff stated that it would no longer perform, and then did cease all performance and did not resume performance after despite being ordered by the Contracting Officer to do so within three days or the contract would be terminated?

**2**. Did plaintiff have the capacity to bring this action while its Arkansas corporate charter was in revoked status?

## SUMMARY OF THE CASE

This is a suit for damages brought by plaintiff "KEETER, INC." (hereafter "KI") following its default termination from a contract[1] with defendant, the United States Postal Service ("USPS" or the "Postal Service"). The terminated contract provided for plaintiff to receive and sort mail for, and make deliveries to, residential mail boxes located along a route in Marion County, Arkansas centered on the town of Yellville, Arkansas. The Contract operated and was administratively supervised from the Post Office in Yellville.

The Contract became effective on July 1, 2002 ***R6*** Its stated term was to run through June 30, 2006, ***R7*** but performance and pay under it ceased on February 20, 2004. ***R10*** On April 28, 2004, the Contract was terminated for default, retroactive to February 20.

## I . RELEVANT FACTS

### A. <u>CONTEXT AND BACKGROUND</u>

A compilation of actions and events sufficient to support this Motion is available through defendant's REQUESTS FOR ADMISSION (FACTS)[2] and REQUESTS FOR ADMISSION

[1] This contract (hereafter "the Contract") bears the same number as the route for which it procures services, HCR 72665. The Contract, with associated materials, is found at AP25-88

[2] Defendant's REQUESTS FOR ADMISSION (FACTS V2) are at **AP1-8**. They were sent to plaintiff on January 9, 2007 containing minor revisions to 5 (of the 58) requests that had been served on December 5, 2006. **AP10-17**. In early January, 2007, plaintiff suggested slight rewording of Requests nos. 3, 4, 5, 15, and 53, which all were incorporated into the version ("v2") that was transmitted to plaintiff on January 9. Thereafter, defendant received no response to its revisions to those five Requests, nor comments on any others, until February 3 after these papers were substantially prepared but lacked Record references. , By way of an email message sent on February 2, but not seen that day, plaintiff accepted and thus admitted all of the Requests using the wording in v2. **AP 9a** The Requests are all thus established as fact, but no

(DOCUMENTS)[3] **AP 18-24** Plaintiff's default is so clearly established by the factual Requests that consideration of any documents in the Appendix other the Contract and the Requests should be superfluous

Defendant nonetheless does not encourage the Court to decide this Motion in the abstract, without some explication of what lead up to termination of the Contract. A narrative of sorts can be constructed from the Appendix documents through inferences about roles and nomenclature. The following information and observations are offered, without Record citation, to minimize the required conjecture by sketching the context within which this dispute arose. The Appendix documents exemplify, but do not explain, some Postal Service vocabulary, organizational structure, practices, and concerns that inhere in these materials without explanation. This section is intended very briefly to offer some of that information. It can be disregarded if the Court prefers to confine its knowledge to the narrower scope of the Record.

1. **UNIVERSAL SERVICE**

The world of Postal Service (retail) customers is potentially comprised of everyone in the United States who wants residential mail delivery. Universal service is

---

effort is here made to remove Record references that were intended to prove facts that no longer require proof.

[3] Defendant's Requests for Admission (Documents), **AP18-24**, were served on December 1, 2006. They all pertain to the admissibility of documents found in the Appendix, and are admitted pursuant to RCFC 36(a),because plaintiff did not admit, deny, or object to any of them. These admissions lead to admission, if offered, of the Appendix documents by establishing that they meet the criteria for inclusion in various descriptive categories that are based on legal grounds for finding documents admissible. Grounds for admitting a document can be determined by noting the "*USPS nnnn*" number, found (twice) on its Appendix page and then locating the group(s) under that USPS number is listed in the Requests. The Requests contain definitions of the grounds invoked. On some reflection, counsel feels there are few if any documents in the Appendix whose admissibility is not facially obvious.

organic to defendant's existence, and it means that wherever in the (continental) United States people may live, USPS will try to bring their mail to them.

In a nation whose population is large, growing, mobile, and dispersed over a wide area, the Postal Service often has to arrange for service to new retail delivery sites, primarily residential mail boxes. New delivery points are constantly being added to the system. Service in a some instances may grow by one or a few boxes at a time within a delivery route, but sometimes dozens of new boxes demand service over a brief time along a single route, because of new residential development, changes in housing patterns, or other reasons.

Defendant provides residential deliveries through the work of its own employees and work performed by independent suppliers, who functionally provide the same services as defendant's employees but do so under contract[4]. The contracts used with these suppliers are "(HCR) box delivery" contracts, and they procure service for "(HCR) box routes."[5]

The box routes in an area can, when necessary, be reconfigured to rebalance work loads and reflect accumulated changes in demand, but it is neither efficient nor practical to do so each time new boxes on a route require service. New demand cannot be met every time by soliciting bids, or by relying on the voluntary assistance of incumbent suppliers. Those approaches both carry the inherent risk that no one will appear to take on the work voluntarily at a reasonable cost, as well as the possibility of

[4] Residential service provided by defendant's own employees plays no role in this case or Motion.

[5] The term "HCR contract" is also used for defendant's contracts with truckers who carry mail between Postal facilities.

service being provided by a tangle of overlapping suppliers on overlapping routes, with attendant administrative complexity and cost.

The Postal Service must have a means to assure that new residential boxes can reliably be served, with a minimal administrative complication and at a reasonable cost. The most logical and efficient way to do so will most often be to have the new boxes be served by the existing supplier for the route where they are located. That supplier is entitled to fair compensation for the added work, but cannot refuse to do it. If the Post Office really is to provide universal service, it must be able to require existing suppliers to take on this sort of added work. Not surprisingly, HCR contracts provide for this need.

### 2. HCR Contract Administration

HCR contracts are awarded and administered by contracting officers working at USPS "Distribution Networks Offices" ("DNOs"). Routine supervision of the operational performance of the contract is delegated to a Postal Service employee, usually located at the largest Postal facility from which mail is transferred to the supplier for delivery, which becomes the administrative site of the contract. The USPS employee who provides on-site supervision is the contract's Administrative Official ("A.O."), who may have other duties at the facility as well.

A.O.s usually are not direct subordinates of the contract's contracting officer ("C.O."), but they have assigned duties to assist DNO functions, and regularly communicate and cooperate with the C.O. regarding supplier contract performance. The A.O. cannot award, terminate, or amend an HCR contract, but does speak with the authority of the C.O. concerning most operational matters. The A.O. is the C.O.'s means

of directly supervising operational performance and enforcing contract terms. *See,* **AP 40-41, 60**

A.O.s endeavor to enforce performance through discussion and persuasion, but sometimes must rely also on formal interactions and communications with suppliers that are regularly memorialized in writing. Those writings may comprise the most accurate history of a controversy, and the C.O. may need to rely upon them in making contract decisions. The records of the A.O.'s dealings with a supplier are usually maintained by the A.O.s in the local files, unless and until problems arise with supplier performance that cannot be resolved locally. If those problems may require some action by the C.O. the A.O.'s local file is sent to the DNO. Further action regarding the problem is taken there.

The C.O. is assisted by a "contract specialist" assigned for each contract. The specialist for a contract has primary responsibility for its non-operational oversight and administration.. The specialist usually keeps in frequent contact with the A.O. assigned to the same contract, but can also deal directly with the supplier or others if the situation warrants. The specialist may have broad discretion regarding contract interpretation, but cannot terminate a contract or make most compensation decisions about it. The A.O. keeps the C.O. informed about pending or emerging concerns involving HCR suppliers and contracts. The specialist assigned to an HCR contract will usually be the person within USPS who knows the most about the contract and its supplier.

**B. WHAT OCCURRED IN THIS CASE**

In 2002, the Postal Service needed to arrange service for a rural "retail" route in the area around Yellville, Arkansas. A solicitation was issued by defendant's Southwestern Area DNO in Dallas, resulting in award of the contract to an entity called "Keeter, Inc." ("KI"), an Arkansas corporation ***R1*** wholly owned and operated by Edward L .Keeter ("Keeter") ***R3,4,5*** The contract awarded to KI was HCR 72665 ("the Contract"), with performance to commence July 1, 2002.***R6***

During 2002 and 2003, KI performed adequately. In December of 2003, defendant needed to procure delivery service to 52 additional mail boxes located along a branch of the existing route covered by the Contract.[6] On December 24, 2003, the C.O. issued a Route Service Order ("RSO") assigning them for servicing by KI under the Contract, beginning on January 24, 2004. The C.O. also adjusted KI's rate of compensation by $1087.56 to reflect the added duties. ***R12, 14; AP 89***

When he learned of the December 24 RSO, Keeter immediately stated that plaintiff did not want to do this added work. Various explanations were provided, but whatever the reasons KI was unwavering in its refusal to acknowledge that the Contract required it to service the AMBs. The assigned specialist, Jeannette Wofford, had

---

[6] The boxes added to plaintiff's route on December 24, 2003 are abbreviated as the "AMBs." Prior to their assignment, KI's route serviced 250 boxes. The AMBs increased that number by 52, to 302. The AMBs were on the route's existing line of travel, so they did not increase route time by the same proportion (since "overhead" such as travel to and from Yellville, and other daily functions not tied to delivery might not be affected by this change). More boxes would necessitate more time for sorting and actual delivery but not for everything done under the Contract by the supplier. The A.O. serviced the AMBs when plaintiff would not, but to make special trips to do so. She estimated that service for the AMBs would have added about 35-40 minutes per day to KI's work, but that time would not necessarily be added to plaintiff's daily work hours, because the Contract's daily schedule unintentionally included too much internal slack time. The C.O. concluded that most, and perhaps, all of the time needed to service the AMBs could be recovered from that slack and took that into account is determining how much compensation to add to the Contract along with the AMBs.

repeated telephone conversations with Keeter, starting in late December or early January, in which Keeter emphatically stated that KI would not deliver mail to the AMBs. He also said this to the A.O. ***R15*** These statements were repeated by plaintiff to other specialists, and to the C.O., prior to the January 24 start date.

The C.O.'s representatives responded with explicit instruction that KI was required to provide service to the AMBs, whether it wanted to or not. ***R16-20*** Plaintiff was also clearly informed told that if KI failed to comply with this instruction and did not service the AMBs, defendant's costs for finding some other way to provide that service could be charged against KI's contract payments. ***R21,22,24*** And the Contract could be terminated**.** ***R20, 23*** Plaintiff was told that KI could submit its "grievances" about the AMBs in writing, for consideration by the C.O. **AP 122** In any event, KI had to perform under the Contract, as modified, while it tried to have the AMBs removed from its duties. Plaintiff puts its grievances, explanations, and views of various rights and duties of the parties into a letter, dated January 31, 2004, that it submitted to defendant. ***R37, 38***

On January 24, 2004, KI refused accept, for sorting or delivery, mail addressed to any of the AMBs. KI never serviced the AMBs in any way. ***R43, 44, 45, 55***

Plaintiff's objections regarding the AMBs were considered, and resulted in an RSO issued on February 19, 2004 increasing the compensation by another $1,602.72 per year. **AP 92** Because KI would not provide this service, it was provided instead by the Yellville Postmaster. This was not a part of the Postmaster's regular duties, and she was entitled to be paid for her time and use of her car to do so. Her payment requests were sent to the DNO. **AP 134-148**

Defendant's costs for obtaining this alternative service resulted in issuance of an RSO on February 9, 2004, for deduction of $424.80 from payment otherwise due to KI, as authorized by the Contract to protect it in the event of claims against the supplier. **AP 90-91; § F.1.d**, **AP 58; §H.18, AP 70**.

On February 20, Keeter found that plaintiff's pay was reduced for this reason. Keeter told the A.O. that KI would no longer perform any work under the Contract. That statement was also made in a letter that was submitted both to the A.O. and the DNO. ***R40, 41, 54*** Keeter walked away from the Post Office and never again provided any service under the Contract. A "cure letter" was sent to KI on February 24, 2004, to no effect. **AP 115**

Performance ended and pay was suspended on February 20, 2004. On March 10, 2004, the lawyer for KI submitted certified claims on behalf of KI for breach of contract and other damages incurred. ***R10*** On April 28, 2004, the C.O. in separate decisions terminated the Contract for default, effective February 20, 2004, and denied all claims submitted by plaintiff. ***R10, 1;*** **AP 98-102** This suit followed.

At the time this case was filed, plaintiff's corporate charter had been revoked by the Secretary of State of Arkansas and had not been reinstated. ***R56,57***

# POINTS AND AUTHORITIES

## I. CONTRACT PROVISIONS

**A**. The Postal Service HCR Contract contains a mandate underscoring the reason these contracts exist by proclaiming reliable performance to be virtually the supplier's sacred obligation::

> §**B.3.**A. SANCTITY OF THE MAIL
> The supplier shall carry all mail tendered for transportation under this contract . . . with certainty, celerity, and security . . . between the points fixed in the schedule, as modified from time to time pursuant to this CONTRACT.
>
> **APP 30**

**B**. Modifications of the Contract by the contracting officer that increase the supplier's responsibilities are authorized under the ***CHANGES*** provisions, Contract §H.8.a. **AP 66** If the supplier is dissatisfied with a particular modification and believes that the C.O. exceeded his authority in ordering it, or that a modification is somehow inconsistent with the rights or duties of either party, a mechanism is provided through which the supplier may argue and receive eventual adjudication of its position, *after* the C.O. has had the opportunity to consider that position first. do so. The *sole* means permitted for seeking such vindication is the process specified in the Contract's ***Claims and Disputes*** provisions, §**H.2 AP 62-63** that end with this requirement:, that states in its final section:

> ***The supplier must proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal or action under the contract, and comply with any decision of the contracting officer.***
>
> §**H.2.**J, **AP 63** (*emphasis added*)

The principle of perform-while-you-dispute is so crucial to the Contract, and particularly to additional duties ordered under it by the C.O., that it is stated again in the provisions regarding modifications, §**H.8**. A supplier can challenge a new assignment, but (absent circumstances that just are not present in this case), the supplier may not avoid performing while its challenge is being considered. This provision directs that

> ***The supplier shall proceed diligently in accordance with service changes and extra trips ordered by the contracting officer. Disputes concerning such orders shall be resolved pursuant to the <u>Claims and Disputes</u> clause.***
>
> §**H.8.D AP 67**

**C.** The C.O. may terminate for default if the supplier "endangers performance or completion," "fails to perform any provision of the contract," or "fails to perform service according to the terms of the contract." The contracting officer has authority to instruct the supplier as to what those terms mean, and what constitutes performance of them, and can enforce those instructions: default termination is authorized if the supplier "fails to follow the instructions of the contracting officer." §**H.5**, **AP 63-64.**

Plaintiff defaulted its most fundamental obligation under the Contract, the duty to carry and deliver the mail reliably. In doing so, plaintiff violated numerous specific provisions of the contract it entered with the Postal Service. One way to characterize this total rejection of contractually-assumed responsibilities is to refer to it by the term ***ABANDONMENT***. Plaintiff utterly, and unashamedly, abandoned this Contract.

## II. ARGUMENT

### A. <u>PLAINTIFF'S INEXCUSABLE DEFAULT: ABANDONMENT</u>

Abandonment is a recognized basis for default termination. In ***The Tester Corporation v. The United States,*** 227 Ct. Cl. 648; (1981), this Court's predecessor reviewed a default termination based on the contractor's refusal to comply with instructions to complete and correct deficiencies in a construction project. The Court found that refusal fully to justify the termination:

> The contracting officer had ample authority under the contract to issue directives in connection with performance of the contract. We find that the directives issued herein were amply justified by the contract. Plaintiff was under a duty to follow these directives. Instead, plaintiff simply chose to ignore them. The Board correctly found that plaintiff's refusal to perform **and** abandonment of its duties were adequate bases for termination for default. [*citation omitted]*
>
> *227 Ct Cl. at 650*

Although defendant has not found any generally acknowledged definition of "abandonment" of a public contract, the circumstances in which a government contract tribunal has found abandonment a cause for default termination tend to have common elements. They are likely to involve a contractor that stopped working because it found continued performance to be difficult, or onerous, or undesirable -- but not because performance had become impossible. These are not instances in which an imposed change is of such a nature or magnitude that it alters the fundamental agreement the

parties had previously reached[7] or was outside of the scope of the contract they had entered.. These contractors may later assert grievances that they claim justify, or even require, them to cease performance, but those grievances have not been presented for resolution through the contract's specified mechanisms, and they do not suffice to prove that performance was either impossible or beyond the scope of the work contemplated when the contract was entered.

***DWS, Inc.***, ASBCA No. 33245, 87-3 B.C.A. (CCH) P19,960, arose from a contract to provide helicopter pilot training services for the Army. Changes in public policy caused a reduction of the number of participat ing students and a consequent loss of revenues paid to DWS, the contractor, rendering the contract uneconomic for it. The contractor sought additional financing, and transfer of its contract duties, as well as additional payments by the Army, all to no avail. When it could not increase its revenue, DWS gave notice to its employees who actually provided the services, and eventually ceased performing any of the training called for in its contract. The contract was then terminated for default. DWS claimed that the Army had breached its duty to produce sufficient students, or funds, to make the program viable, and that it should be excused from performing because the government would not live up to the payment "responsibilities" that DWS said the Army owed it. When it ceased performance, DWS held, and was performing and profiting from, twenty-one other government contracts. The Armed Forces BCA considered the contractor's appeal of its termination, and noted that:

[7] The "cardinal change" doctrine may apply in such situations. That doctrine has no bearing on this case, involving not a change in the fundamental agreement but rather a "within-route" and "within-schedule" modification of plaintiff's Contract – a modification that even using plaintiff's computations would result in changing the annual contract compensation by less than 10%.

> In order to carry its default burden, the Government must make out a showing, by a preponderance of the evidence, of anticipatory repudiation. That is, the Government must prove that DWS manifested an unequivocal intent not to continue performance of the contract. *Fairfield Scientific Corp., ASBCA No. 21151, 78-1 BCA P13,082.* The Government has presented a classic case of anticipatory repudiation. It is clear that DWS abandoned the contract. Indeed, DWS did not present any evidence to the contrary. ***Once the Government proves this anticipatory repudiation, it has a summary right to terminate the contract for default and the burden falls on the contractor to prove that its abandonment was excusable within the meaning of the Default clause or was caused by a material breach of the contract.*** [citations omitted] [emphasis supplied]
>
> *87-3 B.C.A, at 35-36*

The AFBCA also rejected the contractor's attempt to use its supposed complaints of unfair treatment (non-payment, failure to increase payments) by the government as a shift responsibility for its own cessation of performance:

> The case law is clear, a contractor may not condition its continued performance on the payment, or partial payment, of a claim. The contractor must continue performance pending resolution of the dispute.
>
> *Id, at p. 45*

For the Postal Service, the right to add duties to a contract, and the obligation of the supplier to continue performing even if it disputes that it must perform those duties, are both firmly embedded in the language of the contracts it uses and are acknowledged and enforced by the courts. The tribunal most familiar with these Postal Service provisions, the PSBCA, has several times reviewed default termination of a contractor that argued it was entitled to cease performance because the Postal Service was not standing by its own obligations even as it imposed unreasonable duties on its supplier.

In ***Mancini***, B.C.A. (CCH) P30,577; 1999 PSBCA LEXIS 26, the supplier would not accept that the Contracting Officer had the right to demand that she provide medical

proof that she was fit to resume driving following an accident, and did not provide an alternative driver. Rather than invoke either of those alternatives, she elected not to perform under the contract at all. The PSBCA sustained default termination of that contract, saying:

> Appellant's primary "excusable cause" argument is that the contracting officer improperly required her to provide documentation showing that she was physically able to **perform** the contract **duties** before he would allow her to resume performance. . . . . Whether or not the contracting officer had the right to insist on this documentation, the fact that he did so did not relieve Appellant from her obligations under the contract. . . .. If she believed that the contracting officer's directive was unreasonable and increased her costs, she could have filed a claim seeking to recover those costs. [citations omitted] She was not, however, entitled to refuse to resume service.

Similarly, in ***Altina Trucking,*** PSBCA No. 3341, 93-3 B.C.A. (CCH) P26,256 (1993) involving an HCR box route, the contractor claimed that the Postal Service had failed to provide promised training, and breached other duties owed to the supplier, to such an extant that she should be excused from perform under her contract virtually from the first moment performance was required. When she refused to perform, the contract was terminated. The Board found no merit to her arguments, first observing that some training had been provided, and that she probably did not need it anyway since she had experience on the route. The Board disapproved of what it considered to be her impermissible attempt to compel action by the C.O. through withholding of services:

> Its refusal to perform because the contracting officer would not accede to Appellant's stated condition of continued performance does not save the refusal from being considered an abandonment.
>
> * * * *
>
> Appellant has not met its burden of demonstrating that its unequivocal refusal to perform was justified or that the contracting officer abused his discretion in terminating Appellant's contract for default based on the refusal to perform the service required under the contract. <u>See Pamela J. Sutton,</u>

*PSBCA No. 1622, 88-2 BCA P 20,680 at 104,539, aff'd on recon. 88-3 BCA P 21,031; Paul C. Popiel, PSBCA No. 3150, 93-2 BCA P 25,603 at 125,458; B & E Mail Transport, Inc., PSBCA Nos. 971, 973, 974, 82-2 BCA P 15,965 at 79,133.*

***Id, at 12***

---

There simply is no excuse for plaintiff's abandonment of the Contract. Defendant attempted to resolve plaintiff's complaints amicably, such as by increasing the payment rate for the AMB's and showing considerable forebearance when plaintiff refused to provide service to them. Plaintiff showed no reciprocal interest in the needs and interests of the Postal Service, nor in what the Contract plainly required. It chose not to use the remedy the Contract mandated for disputes. Instead, plaintiff just stopped performing. That it must not do.

## B. PLAINTIFF LACKED CAPACITY TO SUE

When its corporate charter is revoked., an Arkansas corporation loses its capacity to sue: A lawsuit filed by the corporation while its charter is defunct must be dismissed., and subsequent reinstatement of its charter does not apply retroactively to save a suit that it started before reinstatement. *See, Terry v. Rice (In re Cheqnet Sys.),* 246 Bankr. 873 (Bankr. E.D. Ark. 2000).

There is no dispute that plaintiff's charter was revoked before it filed this action, and was not restored until afterwards. This Court determines capacity to sue based on the law of the state where a party resides. **RCFC 17**. In Arkansas, KI could not bring suit

in February of 2005, so it may not do so here either.[8]

## CONCLUSION

Defendant had ample justification for, and no alternative to, terminating the Contract when it was repudiated and abandoned by plaintiff. Given the circumstances, the Contracting Officer acted reasonably and fairly, and did not abuse his discretion.

For the reasons stated herein, defendant respectfully asks that summary judgment be granted dismissing this action with prejudice.

FEBRUARY 4, 2007

/S/ DOUGLAS J. COLTON
**DOUGLAS J. COLTON**
U.S. POSTAL SERVICE
475 L'ENFANT PLAZA, SW
ROOM 6323
WASHINGTON, DC 20260-1127
TEL: (202) 268-6408
FAX: (202) 268-5287

**COUNSEL FOR DEFENDANT**
**THE UNITED STATES POSTAL SERVICE**

[7] The "cardinal change" doctrine applies in such situations. That doctrine has no bearing on this case, that involves a within-route, within-schedule, modification of plaintiff's Contract, having a compensation value by plaintiff's own calculations of less than 10% of the rate being paid before change was ordered.

[8] [8] Edward L. Keeter, although also named as a plaintiff, neither was a party to the Contract nor otherwise had privity with it, or with defendant. He lacks any standing to assert the claims of the corporation that he owns.