# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**No. 05-243 C**

| | | |
|---|---|---|
| ************************************) | | |
| EDWARD KEETER AND | ) | |
| KEETER TRADING COMPANY, INC., | ) | |
| *Plaintiffs* | ) | **Case 1:05-cv-00243-LJB** |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| *Defendant* | ) | |
| ************************************) | | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

AND

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

February 10, 2007
*(resubmitted)*

/s/ Douglas J. Colton

**Douglas J. Colton**

U.S. Postal Service
475 L'Enfant Plaza, SW
Room 6323
Washington, DC 20260-1127
Tel: (202) 268-6408
Fax: (202) 268-5287

**Counsel for Defendant**

# MOTION FOR SUMMARY JUDGMENT

Defendant the United States hereby moves for summary judgment pursuant to **RCFC 56**. This Motion is based upon the accompanying Memorandum of Points and Authorities in Support of Motion; upon the Defendant's Appendix of evidentiary materials submitted herewith; and upon all of the pleadings and documents on file herein.

Grounds for this Motion are (1) that uncontroverted facts establish that plaintiff abandoned performance of its contract with defendant, thereby warranting its default termination; and (2) that plaintiff lacked capacity under the laws of its domiciliary state to bring suit at the time it commenced this action.

For the reasons more fully explained in the Memorandum of Points and Authorities, defendant respectfully requests that the Complaint herein be dismissed, with prejudice, and that plaintiff take nothing by this action.

February 10, 2007‡

/s/ DOUGLAS J. COLTON

U.S. POSTAL SERVICE
475 L'ENFANT PLAZA, SW
ROOM 6323
WASHINGTON, DC 20260-1127
TEL: (202) 268-6408
FAX: (202) 268-5287

**COUNSEL FOR DEFENDANT**

‡ This motion was originally submitted electronically on February 4, 2007, together with defendant's Application for Leave to File Out of Time. The Court granted the Application on February 5, 2007, and ordered that the Motion be resubmitted. Counsel learned of the Order on the evening of February 7, and returned from trial in Kentucky late on February 8. Defendant has corrected several errors, and added Record and case citations that were omitted from the original submission. No substantive additions or other changes have been made to these papers, but Proposed Findings are now included. The Appendix will be resubmitted with its corrected Table of Contents.

# TABLE OF CONTENTS


## MOTION for SUMMARY JUDGMENT

TABLE OF CONTENTS OF DEFENDANT'S MOTION PAPERS *i*

TABLE OF AUTHORITIES AND EVIDENCE CITED *ii*

TABLE OF CONTENTS OF APPENDIX TO DEFENDANT'S MOTION *iv*

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

QUESTIONS PRESENTED 1

SUMMARY OF THE CASE 1

RELEVANT FACTS 2

A. CONTEXT AND BACKGROUND 2

1. Universal Service 3

2. HCR Contract Administration 5

B. WHAT OCCURRED IN THIS CASE 6

POINTS AND AUTHORITIES 10

I CONTRACT PROVISIONS 10

II ARGUMENT 12

A. PLAINTIFF'S INEXCUSABLE DEFAULT 12

B. PLAINTIFF LACKED CAPACITY TO SUE 17

## CONCLUSION 18

DEFENDANT'S **PROPOSED FINDINGS OF UNCONTROVERTED FACT** *nn*

# TABLE OF AUTHORITIES AND EVIDENCE


| LAWS and PRECEDENTS | MOTION PAGE |
|---|---|
| *Altina Trucking*, PSBCA No. 3341, 93-3 B.C.A. (CCH) P26,256 (1993) | 15 |
| *DWS, Inc.*, ASBCA No. 33245, 87-3 B.C.A. (CCH) P19,960 | 13, 14 |
| *In Re Boston Shipyard Corp.*, 886 F.2d 451, 456*ff* (1st Cir 1989) | 13 |
| *Mancini*, B.C.A. (CCH) P30,577; 1999 PSBCA LEXIS 26 | 14 |
| *Terry v. Rice (In re Cheqnet Sys.), 246 Bankr. 873 (Bankr. E.D. Ark. 2000)* | 16 |
| *The Tester Corporation v. The United States*, 227 Ct. Cl. 648 (1981) | 12 |
| ARK CODE ANN. §26-54-112 | 17 |

**CONTRACT PROVISIONS**

| | | |
|---|---|---|
| **SECTION**: | **B.3.a** | **10** |
| | **F.1.d** | **9** |
| | **H.2, H.2.j** | **10** |
| | **H.5** | **11** |
| | **H.8.a** | **10** |
| | **H.8.d** | **11** |
| | **H.18** | **9** |

**APPENDIX REFERENCES**

| | |
|---|---|
| REQUESTS FOR ADMISSION (FACTS V2) ("R*n*") | 1, 2, 6, 7, 8, 9 |
| DOCUMENTS ("AP *n*") | |
| AP 1-8 | 2, 7 |
| AP 18-24 | 2 |
| AP 25-88 | 1, 5, 9, 10, 11 |
| AP 58 | 9 |

| | |
|---|---|
| AP 30 | 10 |
| AP 66 | 10 |
| AP 62-63 | 10, 11 |
| AP 67 | 11 |
| AP 89 | 7, 8 |
| AP 90-91 | 9 |
| AP 92 | 8 |
| AP 98-99 | 9 |
| AP 115 | 9 |
| AP 116 | 9 |
| AP 117-118 | 7, 8 |
| AP 119 | 9 |
| AP 122 | 8 |
| AP 134 -148 | 8 |

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No. 05-243 C**

| | | |
|---|---|---|
| ******************************* | ) | |
| EDWARD KEETER and | ) | |
| KEETER TRADING COMPANY, INC., | ) | |
| *Plaintiffs* | ) | **Case 1:05-cv-00243-LJB** |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| *Defendant* | ) | |
| ******************************* | ) | |

**APPENDIX TO**

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**


| APPENDIX PAGE(S) | DESCRIPTION | MEMORANDUM PP |
|---|---|---|
| **1 – 24** | DEFENDANT'S DISCOVERY REQUESTS ( 3 SETS) | |
| **1 – 8** | Requests For Admission (Fact V2) 01/09/07 | 1, 2, 7 |
| **9a, 9b** | Emails from counsel for plaintiff regarding Requests for Admission (Facts) 01/04/07, 02/02/07 | 2 |
| **10 – 17** | Requests for Admission (Facts) 12/05/06 | |
| **18 - 24** | Requests for Admission (Documents) 12/01/06 | 2 |
| **25 – 97** | CONTRACT AND CONTRACT MODIFICATIONS | |
| **25 – 88** | CONTRACT | 1, 5, 9, 10, 11 |
| **89** | ROUTE SERVICE ORDER 12/24/03 | 7, 8 |
| **90-91** | ROUTE SERVICE ORDER 02/09/04 | 9 |
| **92** | ROUTE SERVICE ORDER 02/19/04 | 8 |
| 93 | ROUTE SERVICE ORDER 02/24/04 | |
| **94** | ROUTE SERVICE ORDER 04/29/04 | |
| **95-97** | ROUTE SERVICE ORDER 06/10/04 (WITH REPROCUREMENT WORKSHEETS) | |
| 98 – 99 | CONTRACTING OFFICER'S NOTICE TO PLAINTIFF OF TERMINATION OF CONTRACT 04/28/04 | 9 |

| | | |
|---|---|---|
| **100 – 102** | CONTRACTING OFFICER'S FINAL DECISION DENYING PLAIINTIFF'S CLAIMS 04/28/04 | 9 |
| **103- 115** | COMMUNICATIONS SENT TO PLAINTIFF REGARDING CONTRACT PERFORMANCE AND CONCERNS | |
| **103** | ORAL COMMUNICATION RECORD FOR 01/24/04 | |
| **104** | ORAL COMMUNICATION RECORD FOR 01/24/04 | |
| **105 – 106** | A.O. REQUEST FOR FORMAL CONFERENCE AND LIST OF RECENT INFRACTIONS 01/28/041 | |
| **107- 111** | A.O. NOTE TO PLAINTIFF AND UNDELIVERED MAIL 01/29/04 | |
| **112** | A.O FINAL REQUEST FOR SERVICE IMPROVEMENT 02/02/04 | |
| **113 – 114** | HANDWRITTEN AND TYPED NOTES OF CONFERENCE 01/30/04 | |
| **115** | CURE LETTER FOLLOWING ABANDONMENT 02/24/04 | 9 |
| **116 – 118** | LETTERS FROM PLAINTIFF TO DEFENDANT REGARDING CONTRACT | |
| **116** | REFUSAL TO PERFORM CONTRACT 02/20/04 | 2, 9 |
| **117 – 118** | EXPLANATIONS RE REFUSAL TO SERVE AMBS 01/30/04 | 7, 8 |
| **119 – 148** | DEFENDANT'S INTERNAL EMAILS, FILE MEMORANDA AND WORK NOTES REGARDING DISPUTE | |
| **119** | FILE MEMO 01/02/04 | 7 |
| **120** | NOTES 01/28/04 | |
| 121 | NOTES 01/27, 28/04 | |
| **122** | NOTES 01/28/04 | 8 |
| **123** | EMAIL 01/26/04 | |
| **124** | FILE MEMO 02/10/04 | |
| **125** | EMAIL CIRCA 01/28/04 | |
| **126** | EMAIL CIRCA 02/06/04 | |
| **127** | NOTES 02/09/04 | |
| **128** | EMAILS CIRCA 02/10/04 | |
| **129** | NOTE FROM AO TO SPECIALIST 02/06/04 | |
| **130 -131** | EMAILS 02/20/04 | |
| **132** | FILE MEMO 02/23/04 | |
| **133** | EMAIL 03/02/04 | |
| **134 – 148** | A.O. REQUESTS FOR REIMBURSEMENT: JAN. 27, 28, 29, 30; FEB. 4, 6, 9, 10, 11, 12, 13, 14, 17, 18, 19, 20, 2004 | 8 |

# DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## QUESTIONS PRESENTED

**1**. Did the Contracting Officer abuse his discretion by terminating its contract with plaintiff for default, after plaintiff stated that it would no longer perform, and then did cease all performance and did not resume performance after despite being ordered by the Contracting Officer to do so within three days or the contract would be terminated?

**2**. Did plaintiff have the capacity to bring this action while its Arkansas corporate charter was in revoked status?

## SUMMARY OF THE CASE

This is a suit for damages brought by plaintiff "KEETER, INC." (hereafter "KI") following its default termination from a contract[1] with defendant, the United States Postal Service ("USPS" or the "Postal Service"). The terminated contract[1] provided for plaintiff to receive and sort mail for, and make deliveries to, residential mail boxes located along a route in Marion County, Arkansas centered on the town of Yellville, Arkansas. The Contract operated and was administratively supervised from the Post Office in Yellville.

The Contract became effective on July 1, 2002 ***R6*** Its stated term was to run through June 30, 2006, ***R7*** but performance and pay under it ceased on

[1] This contract (hereafter "the Contract") bears the same number as the route for which it procures services, HCR 72665. The Contract, with associated materials, is found at *AP25-88*

February 20, 2004. ***R10*** On April 28, 2004, the Contract was terminated for default, retroactive to February 20.

## I . RELEVANT FACTS

### A. CONTEXT AND BACKGROUND

A compilation of actions and events sufficient to support this Motion is available through defendant's REQUESTS FOR ADMISSION (FACTS)[2] and REQUESTS FOR ADMISSION (DOCUMENTS)[3] ***AP 18-24*** Plaintiff's default is so clearly established by the factual REQUESTS that consideration of any documents in the Appendix beyond the Contract and the Requests might be superfluous.

Defendant nonetheless does not propose that the Court decide this Motion wholly in the abstract, without some consideration of the circumstances leading to plaintiff's default and consequent termination of the Contract. The Appendix contains documents memorializing all essential events, and a narrative can be extracted from it, if the reader draws inferences about roles and terminology. The Appendix documents embody, but generally do not define or explain, Postal

---

[2] DEFENDANT'S REQUESTS FOR ADMISSION (FACTS v2) are at ***AP 1-8.*** By way of an email message sent to defendant on February 2, 2007 (but not received by counsel until the following day), these Admissions have all been acknowledged as true by plaintiff. ***AP 9a, b***

[3] DEFENDANT'S REQUESTS FOR ADMISSION (DOCUMENTS), ***AP18-24***, were served on December 1, 2006. They all pertain to the admissibility of documents found in the Appendix, and are admitted pursuant to *RCFC* 36(a),because plaintiff did not admit, deny, or object to any of them. Grounds for admitting a document can be determined by noting the "*USPS nnnn*" number found on it in the Appendix, then locating that number under one or more of the group(s) listed in the Requests. The Requests provide definitions for the corresponding groups that essentially restate the legal grounds on which documents of that sort are accepted into evidence. For most of these documents, the basis for admission seems facially evident.

Service vocabulary, organizational structure, practices, and concerns that together are the context within which these events took place. The following explanations and observations are offered, without Record citation, to facilitate understanding of what the Record evidences. This section can be disregarded if the Court prefers to confine its knowledge to the narrower scope of the Record.

### 1. UNIVERSAL SERVICE

The world of Postal Service (retail) customers is potentially comprised of everyone in the United States who wants residential mail delivery. Universal service is organic to defendant's existence, and it means that wherever in the (continental) United States people may live, USPS will try to bring their mail to them.

In a nation whose population is large, growing, mobile, and dispersed over a wide area, the Postal Service often has to arrange for service to new retail delivery sites, primarily residential mail boxes. New delivery points are constantly being added to the system. Service in a some instances may grow by one or a few boxes at a time within a delivery route, but sometimes dozens of new boxes demand service over a brief time along a single route, because of new residential development, changes in housing patterns, or other reasons.

Defendant provides residential deliveries through the work of its own employees and work performed by independent suppliers, who functionally

provide the same services as defendant's employees but do so under contract.[4] The contracts used with these suppliers are "(HCR) box delivery" contracts, and they procure service for "(HCR) box routes."[5]

The box routes in an area can, when necessary, be reconfigured to rebalance work loads and reflect accumulated changes in demand, but it is neither efficient nor practical to do so each time new boxes on a route require service. New demand cannot be met every time by soliciting bids, or by relying on the voluntary assistance of incumbent suppliers. Those approaches both carry the inherent risk that no one will appear to take on the work voluntarily at a reasonable cost, as well as the possibility of service being provided by a tangle of overlapping suppliers on overlapping routes, with attendant administrative complexity and cost.

The Postal Service must have a means to assure that new residential boxes can reliably be served, with a minimal administrative complication and at a reasonable cost. The most logical and efficient way to do so will most often be to have the new boxes be served by the existing supplier for the route where they are located. That supplier is entitled to fair compensation for the added work, but cannot refuse to do it. If the Post Office really is to provide universal service, it must be able to require existing suppliers to take on this sort of added work. Not surprisingly, HCR contracts provide for this need.

---

[4] Residential service provided by defendant's own employees plays no role in this case or Motion.

[5] The term "HCR contract" is also used for defendant's contracts with truckers who carry mail between postal facilities.

**2. HCR CONTRACT ADMINISTRATION**

HCR contracts are awarded and administered by contracting officers working at USPS "Distribution Networks Offices" ("DNOs"). Routine supervision of the operational performance of the contract is delegated to a Postal Service employee, usually located at the largest Postal facility from which mail is transferred to the supplier for delivery, which becomes the administrative site of the contract. The USPS employee who provides on-site supervision is the contract's Administrative Official ("A.O."), who may have other duties at the facility as well.

A.O.s usually are not direct subordinates of the contract's contracting officer ("C.O."), but they have assigned duties to assist DNO functions, and regularly communicate and cooperate with the C.O. regarding supplier contract performance. The A.O. cannot award, terminate, or amend an HCR contract, but does speak with the authority of the C.O. concerning most operational matters. The A.O. is the C.O.'s means of directly supervising operational performance and enforcing contract terms. ***See, AP 40-41, 60***

A.O.s endeavor to enforce performance through discussion and persuade, but sometimes must rely also on formal interactions and communications with suppliers that are regularly memorialized in writing. Those writings may comprise the most accurate history of a controversy, and the C.O. may need to rely upon them in making contract decisions. The records of the A.O.'s dealings with a supplier are usually maintained by the A.O.s in the local files, unless and until problems arise with supplier performance that cannot be resolved locally. If those

problems may require some action by the C.O. the A.O.'s local file is sent to the DNO. Further action regarding the problem is taken there.

The C.O. is assisted by a "contract specialist" assigned for each contract. The specialist for a contract has primary responsibility for its non-operational oversight and administration.. The specialist usually keeps in frequent contact with the A.O. assigned to the same contract, but can also deal directly with the supplier or others if the situation warrants. The specialist may have broad discretion regarding contract interpretation, but cannot terminate a contract or make most compensation decisions about it. The A.O. keeps the C.O. informed about pending or emerging concerns involving HCR suppliers and contracts. The specialist assigned to an HCR contract will usually be the person within USPS who knows the most about the contract and its supplier.

**B. <u>WHAT OCCURRED IN THIS CASE</u>**

In 2002, the Postal Service needed to arrange service for a rural "retail" route in the area around Yellville, Arkansas. A solicitation was issued by defendant's Southwestern Area DNO in Dallas, resulting in award of the contract to an entity called "Keeter, Inc." ("KI"), an Arkansas corporation ***[R1]*** wholly owned and operated by Edward L .Keeter ("Keeter") ***R3,4,5*** The contract awarded to KI was HCR 72665 ("the Contract"), with performance to commence July 1, 2002. ***R6***

During 2002 and 2003, KI performed adequately. In December of 2003, defendant needed to procure delivery service to 52 additional mail boxes located

along a branch of the existing route covered by the Contract. On December 24, 2003, the C.O. issued a Route Service Order ("RSO") assigning them for servicing by KI under the Contract, beginning on January 24, 2004.[6] The C.O. also adjusted KI's rate of compensation by $1087.56 to reflect the added duties. ***R12, 14; AP 89***

When he learned of the December 24 RSO, Keeter immediately stated that plaintiff did not want to, and would not, do this added work. Various explanations were provided, but whatever its reasons KI was unwavering in its refusal to acknowledge that the Contract required it to service the AMBs. The assigned specialist, Jeannette Wofford, had repeated telephone conversations with Keeter, starting in late December or early January, in which Keeter emphatically stated that KI would not deliver mail to the AMBs. He also said this to the A.O. ***R15*** These statements were repeated by plaintiff to other specialists, and to the C.O., prior to the January 24 start date.

The C.O.'s representatives responded with explicit instruction that KI was required to provide service to the AMBs, whether it wanted to or not. ***R16-20*** Plaintiff was also clearly informed told that if KI failed to comply with this

[6] The boxes added to plaintiff's route on December 24, 2003 are abbreviated as the "AMBs." Prior to their assignment, KI's route serviced 250 boxes. The AMBs increased that number by 52, to 302, or by about 20%. Because the AMBs were on the route's existing line of travel, they did not increase route time to the same degree. The A.O. serviced the AMBs when plaintiff would not, but she needed to make a special trips from the Post Office to do so. She estimated that for KI, service for the AMBs would have added about 35-40 minutes per day to KI's work. That time would not necessarily be added to plaintiff's daily work hours, because the Contract's daily schedule unintentionally had included too much intermediate time between assigned duties. The specialist and C.O. originally concluded that most of the time needed to service the AMBs could be recovered from that excess and considered that when setting compensation for the AMBs, but later increased the amount when plaintiff provided his explanation of the time required. The total

instruction and did not service the AMBs, defendant's costs for finding some other way to provide that service could be charged against KI's contract payments. ***R21, 22, 24*** And the Contract could be terminated**.** ***R20, 23*** Plaintiff was told that KI could submit its "grievances" about the AMBs in writing, for consideration by the C.O. ***AP 122*** In any event, KI had to perform under the Contract, as modified, while it tried to have the AMBs removed from its duties. Plaintiff puts its grievances, explanations, and views of various rights and duties of the parties into a letter, dated January 31, 2004, that it submitted to defendant. ***R37, 38; AP***

On January 24, 2004, KI refused to accept, for sorting or delivery, mail addressed to any of the AMBs. KI never serviced the AMBs in any way. ***R43, 44, 45, 55***

Plaintiff's objections regarding the AMBs were considered, and resulted in an RSO issued on February 19, 2004 increasing the compensation by another $1,602.72 per year. ***AP 92*** Because KI would not provide this service, it was provided instead by the Yellville Postmaster. This was not a part of the Postmaster's regular duties, and she was entitled to be paid for her time and for use of her car to do so. Her payment requests were sent to the DNO. ***AP 134-148***

Defendant's costs for obtaining this alternative service resulted in issuance of an RSO on February 9, 2004, specifying that $424.80 be deducted from payment otherwise due to KI. Such deductions from payments due are

---

adjustment amount was less than 10% of the Contract's final annual compensation rate. A*P 89-*

authorized by the Contract to offset actual or anticipated claims by the Postal Service against the supplier. ***AP 90-91; CONTRACT §F.1.d, AP 58; CONTRACT §H.18, AP 70.***

On February 20, Keeter found that KI's Contract payment had been reduced for this reason. Keeter then told the A.O. that KI would no longer perform any work under the Contract. That statement was also contained in a letter that Keeter submitted both to the A.O. and the DNO. ***R40, 41, 54*** Keeter walked away from the Post Office on February 20, 2004, and never again provided, or stated its willingness to provide, any service under the Contract. A "cure letter" was sent by defendant to KI on February 24, 2004, to no effect. ***AP 115***

Performance ended and pay was suspended on February 20, 2004. On March 10, 2004, the lawyer for KI submitted to the C.O. KI's certified claims breach of contract and other damages incurred. ***R10*** On April 28, 2004, the C.O. in separate decisions terminated the Contract for default, effective February 20, 2004, and denied all claims submitted by plaintiff. ***R10, 11; AP 98-102*** This suit followed.

At the time this case was filed, plaintiff's corporate charter had been revoked by the Secretary of State of Arkansas and had not been reinstated. ***R56, 57***

---

*92, 117-119, 124, 132, 142-143*

# POINTS AND AUTHORITIES

## I. CONTRACT PROVISIONS

**A**. The Postal Service HCR Contract contains a mandate underscoring the reason these contracts exist by proclaiming reliable performance to be virtually the supplier's sacred obligation::

> §**B.3.A. SANCTITY OF THE MAIL**
>
> The supplier shall carry all mail tendered for transportation under this contract . . . with certainty, celerity, and security . . . between the points fixed in the schedule, as modified from time to time pursuant to this contract.
>
> ***AP 30***

**B**. Modifications of the Contract by the contracting officer that increase the supplier's responsibilities are authorized under the ***CHANGES*** provisions, ***CONTRACT §H.8.a, AP 66*** If the supplier is dissatisfied with a particular modification and believes that the C.O. exceeded his authority in ordering it, or that a modification is somehow inconsistent with the rights or duties of either party, a mechanism is provided through which the supplier may argue and receive eventual adjudication of its position, *after* the C.O. has had the opportunity to consider that position first. do so. The *sole* means permitted for seeking such vindication is the process specified in the Contract's ***Claims and Disputes*** provisions, ***CONTRACT §H.2 AP 62-63,*** that end with this requirement:, that states in its final section:

> ***The supplier must proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal or action under the contract, and comply with any decision of the contracting officer.***
>
> ***CONTRACT §H.2.J, AP 63*** *(emphasis added)*

The principle of perform-while-you-dispute is so crucial to the Contract, and particularly to additional duties ordered under it by the C.O., that it is stated again in the provisions regarding modifications. A supplier can challenge a new assignment, but (absent circumstances that just are not present in this case), the supplier may not avoid performing while its challenge is being considered. This provision directs that

> The supplier shall proceed diligently in accordance with service changes and extra trips ordered by the contracting officer. Disputes concerning such orders shall be resolved pursuant to the *Claims and Disputes* clause.
>
> ***CONTRACT §H.8.d, AP 67***

**C.** The C.O. may terminate for default if the supplier "endangers performance or completion," "fails to perform any provision of the contract," or "fails to perform service according to the terms of the contract." The contracting officer has authority to instruct the supplier as to what those terms mean, and what constitutes performance of them, and can enforce those instructions: default termination is authorized if the supplier "fails to follow the instructions of the contracting officer." ***CONTRACT §H.5, AP 63-64.***

Plaintiff defaulted its most fundamental obligation under the Contract, the duty to carry and deliver the mail reliably. In doing so, plaintiff violated numerous specific provisions of the contract it entered with the Postal Service. One way to characterize this total rejection of contractually-assumed responsibilities is to refer to it by the term ***ABANDONMENT***: Plaintiff wholly abandoned this Contract.

## II. ARGUMENT

### A. PLAINTIFF'S INEXCUSABLE DEFAULT: ABANDONMENT

Abandonment is a recognized basis for default termination. In ***The Tester Corporation v. The United States,*** 227 Ct. Cl. 648; (1981), this Court's predecessor reviewed a default termination based on the contractor's refusal to comply with instructions to complete and correct deficiencies in a construction project. The Court found that refusal fully to justify the termination:

> The contracting officer had ample authority under the contract to issue directives in connection with performance of the contract. We find that the directives issued herein were amply justified by the contract. Plaintiff was under a duty to follow these directives. Instead, plaintiff simply chose to ignore them. The Board correctly found that plaintiff's refusal to perform **and** abandonment of its duties were adequate bases for termination for default. [*citation omitted]*
>
> 227 Ct Cl., at 650

Although defendant has not found any generally acknowledged definition of "abandonment" of a public contract, the circumstances in which a government contract tribunal has found abandonment a cause for default termination tend to have common elements. They are likely to involve a contractor that stopped working because it found continued performance to be difficult, or onerous, or undesirable -- but not because performance had become impossible. These are not instances in which an imposed change is of such a nature or magnitude that it alters the fundamental agreement the parties had previously reached[7] or was outside of the scope of the contract they had entered.. These contractors may later assert grievances that they claim justify, or even require, them to cease

performance, but those grievances have not been presented for resolution through the contract's specified mechanisms, and they do not suffice to prove that performance was either impossible or beyond the scope of the work contemplated when the contract was entered.[7]

***DWS, Inc.***, ASBCA No. 33245, 87-3 B.C.A. (CCH) P19,960, arose from a contract to provide helicopter pilot training services for the Army. Changes in public policy caused a reduction of the number of participating students and a consequent loss of revenues paid to DWS, the contractor, rendering the contract uneconomic for it. The contractor sought additional financing, and transfer of its contract duties, as well as additional payments by the Army, all to no avail. When it could not increase its revenue, DWS gave notice to its employees who actually provided the services, and eventually ceased performing any of the training called for in its contract. The contract was then terminated for default. DWS claimed that the Army had breached its duty to produce sufficient students, or funds, to make the program viable, and that it should be excused from performing because the government would not live up to the payment "responsibilities" that DWS said the Army owed it. When it ceased performance, DWS held, and was performing and profiting from, twenty-one other government contracts. The Armed Forces BCA considered the contractor's appeal of its

[7] The "cardinal change" doctrine may apply in such situations. *See ,e.g., In Re Boston Shipyard Corp.*, 886 F.2d 451, 456*ff* (1[st] Cir 1989). That doctrine does not apply to this case, involving as it does ***not*** a change in the fundamental agreement reached by the parties, but rather a "within-route" and "within-schedule" modification of plaintiff's contract that, even using plaintiff's computations, resulted in changing the annual contract compensation by less than 10%.

termination, and noted that:

> In order to carry its default burden, the Government must make out a showing, by a preponderance of the evidence, of anticipatory repudiation. That is, the Government must prove that DWS manifested an unequivocal intent not to continue performance of the contract. *Fairfield Scientific Corp., ASBCA No. 21151, 78-1 BCA P13,082.* The Government has presented a classic case of anticipatory repudiation. It is clear that DWS abandoned the contract. Indeed, DWS did not present any evidence to the contrary. ***Once the Government proves this anticipatory repudiation, it has a summary right to terminate the contract for default and the burden falls on the contractor to prove that its abandonment was excusable within the meaning of the Default clause or was caused by a material breach of the contract.*** *[citations omitted][emphasis supplied]*
>
> *87-3 B.C.A, at 35-36*

The AFBCA also rejected the contractor's attempt to use its supposed complaints of unfair treatment (non-payment, failure to increase payments) by the government as being no more than an effort to shift responsibility for its own cessation of performance:

> The case law is clear, a contractor may not condition its continued performance on the payment, or partial payment, of a claim. The contractor must continue performance pending resolution of the dispute.
>
> *Id, at p. 45*

The right of the Postal Service to add services (such as those regarding the AMBs) to an existing contract, and the reciprocal duty of the supplier to perform both the pre-existing and added services and *to continue performing even while disputing the new services,* are matters that are essential to USPS, are contemplated by the parties, and are firmly embedded in the language of the Contract. The possibility of defendant needing to add services was sufficiently within the parties' expectations that the Contract addresses it twice, once in the general *Disputes* provisions, and explicitly again in the provisions under which

unilateral changes are ordered. Plaintiff's declaration that defendant's invocation of its modification rights creates an excuse for it to stop performing ignores and renders meaningless the clear contractual language specifying its continuing duty to perform.

The duty of a supplier to continuing performing even though it disputes the instructions of the contracting officer (and thus the government's interpretations of the parties' respective contractual rights and obligations) is acknowledged and enforced by courts. The tribunal most familiar with application of these rights and duties in the context of contracts to carry and deliver the mail is, not surprisingly, the Postal Service Board of Contract Appeals. The PSBCA has more than once reviewed the default termination of a contractor that argued it was relieved of its obligation to perform because the Postal Service had first made unreasonable demands on it.

In ***Mancini***, B.C.A. (CCH) P30,577; 1999 PSBCA LEXIS 26, the supplier did not accept that the C.O. had a right to demand that she provide medical proof of her capacity to drive following an accident. She did not provide the proof, nor an alternative driver. With no driver, she could not and did not perform the contracted services. The PSBCA saw no need to decide whether the C.O.'s demand for medical proof was appropriate. Instead, the Board sustained default termination based on failure to perform the contracted mail services, saying:

> Appellant's primary "excusable cause" argument is that the contracting officer improperly required her to provide documentation showing that she was physically able to perform the contract duties before he would allow her to resume performance. . . . . Whether or not the contracting

> officer had the right to insist on this documentation, the fact that he did so did not relieve Appellant from her obligations under the contract. . . .. If she believed that the contracting officer's directive was unreasonable and increased her costs, she could have filed a claim seeking to recover those costs. [citations omitted] She was not, however, entitled to refuse to resume service.
>
> *Id, at 17*

Similarly, in ***Altina Trucking,*** PSBCA No. 3341, 93-3 B.C.A. (CCH) P26,256 (1993), involving an HCR box route terminated for default, the contractor claimed that the Postal Service had failed to provide promised training, and breached other duties owed to her, so that her refusal to perform virtually from the first moment performance was required should be excused. The Board found no merit in her arguments. While the Board discusses (and disputes) the validity of her various excuses, its decision sustaining default termination does not rest on findings as to just how much training the contract required the Postal Service to provide, nor on how much it actually did provide or how much training the supplier may actually have needed. Although it touches on these points, the Board's decision rests firmly on rejection of the supplier's attempt to use refusal to perform as bargaining leverage:

> Its refusal to perform because the contracting officer would not accede to Appellant's stated condition of continued performance does not save the refusal from being considered an abandonment.
>
> * * * *
>
> Appellant has not met its burden of demonstrating that its unequivocal refusal to perform was justified or that the contracting officer abused his discretion in terminating Appellant's contract for default based on the refusal to perform the service required under the contract. *See*, *Pamela J. Sutton*, PSBCA No. 1622, 88-2 BCA P 20,680 *at 104,539, aff'd on recon*. 88-3 BCA P 21,031*; Paul C. Popiel,* PSBCA No. 3150, 93-2 BCA P 25,603 at 125,458; *B & E Mail Transport, Inc.,* PSBCA Nos. 971, 973, 974, 82-2 BCA P 15,965 at 79,133.
>
> ***Id, at 12***

There simply is no tenable excuse for plaintiff's abandonment of the Contract. Defendant attempted to resolve plaintiff's complaints amicably, by heeding plaintiff's explanations regarding the time involved to service the AMBs and thus increasing the specified compensation for including them in the Contract. Moreover, defendant exhibited a considerable amount of patience and forbearance when plaintiff refused to service the AMBs for almost a month before it abandoned the Contract completely. Plaintiff demonstrated no reciprocal concern for the needs of the Postal Service, nor about what the Contract plainly required that it do. Plaintiff disregarded without comment the remedy the Contract mandated for resolving disputes over its service obligations. Instead, plaintiff just stopped performing.

Whatever the C.O.'s authority to add servicing of the AMBs to the Contract may or may not have been, plaintiff's response of abandonment was something that under the Contract it could not do.

## B. <u>PLAINTIFF LACKED CAPACITY TO SUE</u>

When its corporate charter is revoked., an Arkansas corporation loses its capacity to sue: A lawsuit filed by the corporation while its charter is defunct must be dismissed., and subsequent reinstatement of its charter does not apply retroactively to save a suit that it started before reinstatement. ARK CODE ANN. §26-54-112; *See, Terry v. Rice (In re Cheqnet Sys.),* 246 Bankr. 873 (Bankr. E.D. Ark. 2000).

There is no dispute that plaintiff's charter was revoked before it filed this

action, and was not restored until afterwards. This Court determines capacity to sue based on the law of the state where a party resides. *RCFC 17*. In Arkansas, KI could not bring suit in February of 2005, so it could not do so here either.

## CONCLUSION

Defendant had ample justification for, and no alternative to, terminating the Contract when it was repudiated and abandoned by plaintiff. Given the circumstances, the Contracting Officer acted reasonably and fairly, and did not abuse his discretion.

For the reasons stated herein, defendant respectfully asks that summary judgment be granted, and that plaintiff's suit be dismissed with prejudice in its entirety.

February 10, 2007
*(resubmitted)*

Respectfully submitted:
*/s/ Douglas J. Colton*

**Douglas J. Colton**
U.S. Postal Service
475 L'Enfant Plaza, SW , Room 6323
Washington, DC 20260-1127
Tel: (202) 268-6408
Fax: (202) 268-5287

**Counsel for Defendant**
**The United States Postal Service**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**No. 05-243 C**

| | | |
|---|---|---|
| ************************* | ) | |
| EDWARD KEETER and | ) | |
| KEETER TRADING COMPANY, INC., | ) | |
| *Plaintiffs* | ) | **Case 1:05-cv-00243-LJB** |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| *Defendant* | ) | |
| ************************* | ) | |

**DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**[1]

1. In 2002, USPS awarded to plaintiff Keeter, Inc. ("KI"), an Arkansas corporation, a contract (hereafter "the Contract") to service its HCR Route No.72665 ***R 6***

2. The President and sole owner of KI was Mr. Edward L. Keeter ***R 3, 4***

3. The Contract's stated term commenced on July 1, 2002, and would run until June 30, 2006. ***R 6, 7***

4. The Contract procured the services of KI to deliver mail to residential mail boxes along the route in Marion County, Arkansas, described in its Statement of Work, and to perform associated duties. ***AP 27-29***

5. The administrative place of performance for the Contract was the Post Office in Yellville, Arkansas, where the Contract route started and ended. ***AP 40-41***

[1] Citations are to defendant's APPENDIX IN SUPPORT OF R. 56 MOTION ("***AP n***"), and to specific Requests ("***R n***") in DEFENDANT'S REQUESTS FOR ADMISSION (FACTS v2), at ***AP 1-8***

6. The Administrative Official for the Contract was the Postmaster for Yellville, Arkansas. ***AP 41***

7. On December 24, 2003 the C.O issued a Route Service Order ("RSO") amending the Contract to include within plaintiff's duties service for 52 additional residential mail boxes (the "AMBs"), with that service to begin on January 24, 2004. ***R 12***

8. The December 24, 2003 Contract amendment added 52 boxes to the approximately 250 boxes already specified for the route. ***R 12; AP 89***

9. The December 24, 2003 Route Service Order that added the AMBs to the Contract also adjusted plaintiff's compensation upward by $1,087.56 per year, effective January 24, 2004. ***R 12, 13, 14; AP 89***

10. By January 2, 2004, defendant had on one or more occasions informed that the Contract required KI to provide service to the AMBs, regardless of KI's preferences. ***R 15, 16, 17***

11. Multiple conversations occurred during January of 2004 between Keeter, speaking for KI, and representatives of the C.O., in the course of which KEETER repeatedly stated that KI would not service the AMBs. ***R, 19, 20, 21; AP 117-118***

12. KI variously asserted that the specified additional pay for servicing the AMBs was insufficient, that the additional duties infringed Keeter's non-Postal business, and that the Contract did not require KI to provide service to the 52 additional boxes without KI's consent.. ***R 37, 38, 48, 51, 52; AP 116, 117-118, 119***

13. In communications with plaintiff during January and February, 2004, defendant repeatedly informed KI that it was obligated to provide service to the AMBs, and that failure to do so could result in termination of the Contract. ***R 49, 50, 16-27, 34, 35***

14. In communications with plaintiff during January and February, 2004, defendant repeatedly informed KI that failure by it to provide service to the

AMBs could result in defendant deducting from payments to KI defendant's costs for arranging alternative servicing of the AMBs. ***R 20, 32, 33.***

15. On January 24 and 27, 2004, KI was instructed by the Administrative Official at the Yellville Post Office that it must accept, sort, and deliver mail for the AMBs. KI acknowledged these instructions but did not comply with them, and performed none of those services.: ***R 28, 29; AP 103, 121***

16. At no time did KI accept, sort, or deliver mail addressed to the AMBs. ***R 43, 44, 45.***

17. Defendant made alternative arrangements for servicing the AMBs, starting on January 24, 2004. Those services were provided by the Postmaster for Yellville, Arkansas, sometimes with assistance from clerks who worked at that facility. The Yellville Postmaster submitted to the DNO a claim for each day on which she provided that service. ***R 46, 47***

18. KI was required to attend a meeting with the A.O. on January 30, 2004 to discuss its refusal to service the AMBs. At that meeting, KI was again instructed that it must serve the AMBs or the Contract could be terminated.. ***R 30, 31, 32, 33, 34, 35.***

19. On January 31, 2004, plaintiff sent a letter to USPS stating that it was not required to service the AMBs because its additional pay for doing so was inconsistent with the Contract, and that the amount that KI was entitled to receive ($2,798.60) was above the $2,500 threshold for a "major change" to the Contract that could not be made without its agreement. ***AP 117-118;. R 37, 38***

20. KI stated that defendant was breaching the Contract by attempting to compel it to service the AMBs, because the Contract specified additional compensation for those services in excess of $2500 a year. KI asserted that modification of the Contract to include service for the AMBs was a "major change" of the Contract, and that defendant had no right to force KI to accept that change. ***R 48-50; AP 117-118***

21. On February 20, 2004, following plaintiff's receipt of reduced payment, Keeter notified defendant, orally and in writing, that KI and Keeter had "*worked*

*[their] last day for the United States Postal Service*" and would no longer provide any service at all under the Contract. ***AP 116***

22. KI did not accept or deliver any mail, or perform any of its duties specified in the Contract, on February 20, 2004 or on any day thereafter. ***R 40, 41, 42***

23. On March 10, 2004, KI submitted certified claims to the Contracting Officer. ***R 9***

24. On April 28, 2004, the C.O. issued a Final Decision terminating the Contract for default as of the close of business on February 20, 2004. ***R 10.***

25. On April 28, 2004, the C.O. issued a Final Decision denying plaintiff's claims for damages and other relief. ***R 11;***

26. The corporate charter of KI was revoked by the Arkansas Secretary of State on December 31, 2004, and was not reinstated until April 27, 2005. ***R 56, 57.***

27. This action was filed on February 22, 2005.