**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No. 05-243 C**

| | | |
|---|---|---|
| ******************************************** | ) | |
| EDWARD KEETER and | ) | |
| KEETER TRADING COMPANY, INC., | ) | |
| *Plaintiffs* | ) | **CASE 1:05-CV-00243-LJB** |
| | ) | |
| v. | ) | |
| THE UNITED STATES, | ) | |
| *Defendant* | ) | |
| ******************************************** | ) | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

AND

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

March 19, 2007

_/S/ DOUGLAS J. COLTON___

**DOUGLAS J. COLTON**
U.S. POSTAL SERVICE
475 L'ENFANT PLAZA, SW
ROOM 6323
WASHINGTON, DC 20260-1127
TEL: (202) 268-6408
FAX: (202) 268-5287
*douglas.j.colton@usps.gov*

COUNSEL FOR DEFENDANT

# TABLE OF CONTENTS


| | AT PAGE |
|---|---|
| **QUESTIONS PRESENTED** | 3 |
| **STATUTORY AND CONTRACTUAL PROVISIONS** | 3 |
| STATUTORY LANGUAGE | 3 |
| CONTRACT PROVISIONS | 4 |
| **STATEMENT REGARDING THE RECORD** | 7 |
| **STATEMENT OF THE CASE** | 8 |
| SUMMARY | 8 |
| RELEVANT FACTS | 8 |
| A. CONTEXT AND BACKGROUND | 8 |
| B. THE EVENTS OF THIS CASE | 13 |
| **ARGUMENT** | 16 |
| **STANDARDS FOR SUMMARY JUDGMENT** | 16 |
| **GROUNDS FOR GRANTING SUMMARY JUDGMENT** | 17 |
| **PLAINTIFF LACKED CAPACITY TO BRING THIS ACTION** | 17 |
| **TERMINATION OF THE CONTRACT WAS APPROPRIATE** | 19 |
| WHAT THE CONTRACT TERMS MEAN | 19 |
| 1. DUTIES IMPOSED | 19 |
| 2. PLAINTIFF'S APPARENT POSITION | 20 |
| 3. WHAT THE CONTRACT MEANS | 22 |
| **PLAINTIFF WAS REQUIRED TO PERFORM** | 27 |
| **THE CARDINAL CHANGE DOCTRINE** | 30 |
| 1. *CHANGE IN THE MAGNITUDE OF THE WORK TO BE PERFORMED* | 32 |
| 2. *A DIFFERENT ITEM OR DRASTIC ALTERATION OF WORK ORIGINALLY CONTEMPLATED* | 34 |
| 3. *COST OF ADDED WORK GREATLY EXCEEDING ORIGINAL COST* | 35 |

**CONCLUSION AND RELIEF SOUGHT** 35

## TABLE OF AUTHORITIES

**AT PAGE**

**LAWS AND RULES OF COURT**

39 U.S.C. §101 3, 8

ARK CODE ANN. §26-54-112 19

*RCFC 17(a)* 17

*RCFC 56* *16*

**CASES**

*Alliant Techsystems, Inc. v. United States,*
*178 F.3d 1260 (Fed. Cir. 1999)* 31

*Allied Materials & Equip. Co., Inc. v. United States,*
*215 Ct. Cl. 406, 569 F.2d 562 (Ct. Cl.1978);* 31

*Becho, Inc. v. United States,*
*47 Fed. Cl. 595 (2000),* 16, 29, 32

*In re Boston Shipyard Corp., Debtor,*
*886 F.2d 451 ( 1st Cir. 1989)* 35

*BLH, Inc. v United States*,
2 Cl Ct. 463 (1983)blh 17

*Computer Products International, Inc v. United States,*
*26 Cl. Ct. 518 (1992)* 17, 18

*Moore v. Rommel,*

*233 Ark. 989; 350 S.W.2d 190 (1961)* 18

*North Star Alaska Housing Corporation, v. United States*
*30 Fed. Cl. 259 (1993)* 25

*Saddler v. United States,*
*152 Ct. Cl. 557, 287 F.2d 411, 413 (Ct. Cl. 1961)* 31

*Terry v. Rice (In re Cheqnet Sys.),*
*246 Bankr. 873 (Bankr. E.D. Ark. 2000)* *18*

*Thoen v. United States,*
*5 Cl. Ct. 823 (1984)* 27 28

*Tribco Manufacturing Co., Inc. v. People's Bank of Imboden,*
*67 Ark. App. 268, 998 S.W.2d 756(Ark App 1999)* 18

*Wunderlich Contracting Co. v. United States,*
*173 Ct. Cl. 180, 351 F.2d 956, 966 (Ct. Cl. 1965)* 31

# APPENDIX TABLE OF CONTENTS


| APPENDIX PAGE(S) | DESCRIPTION | CITED AT MOTION PAGE(S) |
|---|---|---|
| _ 1 – 24 | DEFENDANT'S DISCOVERY REQUESTS ( 3 SETS) | |
| 1 – 8 | Requests For Admission (Fact V2) 01/09/07 | 7 |
| 9**a, b** | Email from counsel for plaintiff regarding original Requests for Admission (Facts) 01/04/07 | 7 |
| 10 – 17 | Requests for Admission (Facts) 12/05/06 | 7 |
| 18 - 24 | Requests for Admission (Documents) 12/01/06 | 7 |
| 25 – 97 | CONTRACT AND CONTRACT MODIFICATIONS | |
| 25 – 88 | CONTRACT | 4, 5 6, 8, 10, 13, 15, 20, 33 |
| 89 | ROUTE SERVICE ORDER 12/24/03 | 13, 33 |
| 90-91 | ROUTE SERVICE ORDER 02/09/04 | 15, 21 |
| 92 | ROUTE SERVICE ORDER 02/19/04 | 13,15, 34 |
| 93 | ROUTE SERVICE ORDER 02/24/04 | |
| 94 | ROUTE SERVICE ORDER 04/29/04 | |
| 95-97 | ROUTE SERVICE ORDER 06/10/04J WITH REPROCUREMENT WORKSHEETS | |
| 98 – 99 | CONTRACTING OFFICER'S NOTICE TO PLAINTIFF OF TERMINATION OF CONTRACT 04/28/04 | 16 |
| 100 – 102 | CONTRACTING OFFICER'S FINAL DECISION DENYING PLAIINTIFF'S CLAIMS 04/28/04 | |
| 103- 115 | COMMUNICATIONS SENT TO PLAINTIFF REGARDING CONTRACT PERFORMANCE AND CONCERNS | |
| 103 | ORAL COMMUNICATION RECORD FOR 01/24/04 | |
| 104 | ORAL COMMUNICATION RECORD FOR 01/24/04 | |
| 105 – 106 | A.O. REQUEST FOR FORMAL CONFERENCE AND LIST OF RECENT INFRACTIONS 01/28/041 | |
| 107- 111 | A.O. NOTE TO PLAINTIFF AND UNDELIVERED MAIL 01/29/04 | |
| 112 | A.O FINAL REQUEST FOR SERVICE IMPROVEMENT 02/02/04 | |
| 113 – 114 | HANDWRITTEN AND TYPED NOTES OF CONFERENCE 01/30/04 | |
| 115 | CURE LETTER FOLLOWING ABANDONMENT 02/24/04 | 115 |

| | | |
|---|---|---|
| 116 – 118 | LETTERS FROM PLAINTIFF TO DEFENDANT REGARDING CONTRACT | |
| 116 | REFUSAL TO PERFORM CONTRACT 02/20/04 | 34 |
| 117 – 118 | EXPLANATIONS RE REFUSAL TO SERVE AMBS 01/30/04 | 33, 34 |
| 119 – 148 | DEFENDANT'S INTERNAL EMAILS, FILE MEMORANDA AND WORK NOTES REGARDING DISPUTE | |
| 119 | FILE MEMO 01/02/04 | |
| 120 | NOTES 01/28/04 | |
| 121 | NOTES 01/27, 28/04 | |
| 122 | NOTES 01/28/04 | 14 |
| 123 | EMAIL 01/26/04 | |
| 124 | FILE MEMO 02/10/04 | |
| 125 | EMAIL CIRCA 01/28/04 | |
| 126 | EMAIL CIRCA 02/06/04 | |
| 127 | NOTES 02/09/04 | |
| 128 | EMAILS CIRCA 02/10/04 | |
| 129 | NOTE FROM AO TO SPECIALIST 02/06/04 | |
| 130 -131 | EMAILS 02/20/04 | |
| 132 | FILE MEMO 02/23/04 | 33 |
| 133 | EMAIL 03/02/04 | |
| 134 – 148 | A.O. REQUESTS FOR REIMBURSEMENT: JAN. 27, 28, 29, 30, AND FEB. 4, 6, 9, 10, 11, 12, 13, 14, 17, 18, 19, 20, 2004 | 15, 33 |

## **MOTION FOR SUMMARY JUDGMENT**

Defendant the United States hereby moves for summary judgment pursuant to *RCFC 56*. This Motion is based upon the accompanying Memorandum of Points and Authorities in Support of Motion; upon Defendant's Appendix of evidentiary materials submitted herewith; and upon all of the pleadings and documents on file herein.

Grounds for this Motion are *(1)* that plaintiff lacked capacity under the laws of its domiciliary state to bring suit at the time it commenced this action, and *(2)* that uncontroverted facts establish that plaintiff refuse to provide service and abandoned its contract with defendant, thereby warranting default termination of the contract.

For the reasons more fully explained in the following Memorandum of Points and Authorities, defendant respectfully requests that the Complaint herein be dismissed, with prejudice, and that plaintiff take nothing by this action.

March 19, 2007

/s/_DOUGLAS J. COLTON

U.S. POSTAL SERVICE
475 L'ENFANT PLAZA, SW
ROOM 6323
WASHINGTON, DC 20260-1127
TEL: (202) 268-6408 FAX: (202) 268-5287
*douglas.j.colton@usps.gov*

**COUNSEL FOR DEFENDANT**

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

## QUESTIONS PRESENTED

1. Did plaintiff have the legal capacity to institute this action?

2. Did the Contracting Officer act arbitrarily or abuse his discretion when he terminated HCR 72665 for default, based on plaintiff's failure to provide service to the 52 mail boxes added to the Contract by the Contracting Officer on December 24, 2003?

3. Did the Contracting Officer act arbitrarily or abuse his discretion when he terminated HCR 72665 for default, based on plaintiff's failure to provide any service under the Contract on or after February 20, 2004?

4. Did the Contracting Officer act arbitrarily or abuse his discretion when he terminated HCR 72665 for default, based on plaintiff's failure to comply with his instructions to service provide service to the 52 mail boxes added to the Contract on December 24, 2003, and to resume service after plaintiff ceased all performance under the Contract on February 20, 2004?

## STATUTORY AND CONTRACTUAL PROVISIONS

For the convenience of the Court, the initial section of defendant's organic legislation and the contractual provisions primarily relied upon in this motion are quoted in relevant part::

### STATUTORY LANGUAGE

***39 U.S.C. §101***:

The United States Postal Service shall be operated as a basic and fundamental service provided to the people by the Government of the United States, authorized by the Constitution, created by Act of Congress, and supported by the people. The Postal Service shall have as its basic function the obligation to provide postal services to bind the Nation together . . . It shall provide prompt, reliable, and efficient services to patrons in all areas and shall render postal services to all communities. . .
(b) The Postal Service shall provide a maximum degree of effective and regular postal services to rural areas, communities, and small towns . . . it being the specific intent of the Congress that effective postal services be insured to residents of both urban and rural communities.

*39 U.S.C. 101 (a), (b) (Aug. 12, 1970, P.L. 91-375, § 2, 84 Stat. 719.)*

**CONTRACT PROVISIONS**

Section B. STATEMENT OF WORK AND SPECIFICATIONS[1]

b.1.3. Service Requirements

* * * * * *

ADJUSTMENTS FOR ROUTE EXTENSIONS OR EN ROUTE BOXES: Adjustments for extensions and en route boxes will be processed using the following formula. [Description regarding computations omitted] . . .

***AP28***

B.3 GENERAL REQUIREMENTS AND PROHIBITIONS:

The supplier shall provide transportation services as specified in this Statement of Work and Specifications

***AP 30***

§B.3.A. SANCTITY OF THE MAIL
The supplier shall carry all mail tendered for transportation under this contract . . . with certainty, celerity, and security, in accordance with the operating schedule and between the points fixed in the schedule, as modified from time to time pursuant to this contract.

***AP30***

B.3.b Extra Trips
Supplier will be required to perform additional trips of service pursuant to the Changes clause. The supplier must proceed to perform any extra trips ordered by the contracting officer or authorized representative.

***AP30***

[1] These references are to Contract clauses, paragraphs, and sections. Citation to the location of the provision in defendant's separate Appendix follows each excerpt, as "***AP nn"*** with ***nn*** being the page number(s) in the Appendix***.***

B.3.j Box Delivery[2]

. . .the supplier shall, when so directed by the contracting officer, perform any or all of the following:

B.3.j(1)(a) Deposit all mail matter received for that purpose . . . into the appropropriate customer mail boxes . . .

(c) Receive all mail properly tendered by customers. Collect all mail from or about mail boxes place along the line of route . . . .

(d) Deliver all mail received or collected along the route to the next post office . . . .

***AP32***

F.1 PAYMENT (HIGHWAY)

F.1.d.

Deductions may be made from payments otherwise due the supplier under this contract or any other contracts held by the supplier, for any amounts for which the supplier is liable as damages or otherwise.

***AP58***

H.2. CLAIMS AND DISPUTES

b. Except as provided in the [Contract Disputes Act of 1978], all disputes arising under or relating to this contract must be resolved under this clause.

***AP 62***

j. The supplier must proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal or action under the contract, and comply with any decision of the contracting officer.

***AP 63***

H.4 TERMINATION FOR DEFAULT

a.(1) The Postal Service may, subject to paragraphs c and d below, by written notice of default to the supplier, terminate this contract in whole or in part if the supplier fails to:

(a) Complete the requirements of this contract within the time specified in the contract or any extension;

(b) Make progress, so as to endanger performance of this contract. . .;

(c) Perform any of the other provisions of this contract . . .

(2) The Postal Service's right to terminate this contract under [¶ ¶(b) and (c) above] may be exercised if the supplier does not cure the failure within three days . . .after receipt of notice from the contracting officer specificy the failure.

***AP 64***

[2] *See also,* ¶¶ *B.3.j(4)* and *(5),* requiring the supplier to if necessary dismount from a vehicle to make deliveries to boxes along the route, or to deviate from the route within stated limits.

H.5 EVENTS OF DEFAULT

. . .The follow constitute events of default, and this contract may be terminated pursuant to [H.4, supra]

a. The supplier's failure to perform service according to the terms of the contract;

c. Failure to follow the instructions of the contracting officer

o. If the supplier materially breaches any other requirement or clause of this contract.

***AP64, 65***

H.8 CHANGES (TRANSPORTATION)

a. Service Changes

(1) Minor Service Changes. The contracting officer may, at any time, without consulting the supplier, issue orders directing . . . an increase or decrease in frequency of service or number of trips and fixing an adjust in the supplier's compensation which increases the supplier's rate of pay by no more than $2,500. If the supplier believes the increased cost of providing the service required by the order exceeds the increase made in compensation, it may request an adjustment of cmopensation for the service change.

(2) Other Service Changes. Service Changes other than minor service changes, including increaes or decreases in compensation, may be made by mutual agreeoment of the contracting office and the supplier. Such changes shall be memorialzied by formal amendment of the contract.

b. Extra Trips

. . . Extra trips shall be negotiated in advance of the performance when the contracting officer deems it appropriate. However, the contracting officer may order the supplier to perform such service at pro rata pay. If no rate of pay for extra trips has been negotiated in advance, the contractor shall nevertheless perform such extra trips as are ordered by the contracting officer and may, on an after-the-fact basis, obtain a lump sum reimbursement . . . Failure to agree to such compensation abouve pro rata pay shall be resolved under the *Claims and Disputes* clause.

d. The supplier shall proceed diligently in accordance with service changes and added trips ordered unilaterally by the contract officer. Disputes concerning such orders shall be resolved pursuan to the *Claims and Disputes* clause.

***AP66,67***

## STATEMENT REGARDING THE RECORD

Although this case is not being submitted for decision on stipulated facts, that distinction may be technical The Appendix to this motion includes two sets of Requests for Admission promulgated by defendant, and documents created in the course of the events that gave rise to this action. There are two versions of DEFENDANT'S REQUESTS FOR ADMISSION (FACTS), of which the Court need only consider the second, later , set (FACTS V2) ***AP 1-8***, because plaintiff has agreed to the truth of the facts it recites. See, ***AP 9a, 9b***. These 58 factual statements are established for the purposes of this case.

DEFENDANT'S REQUESTS FOR ADMISSION (DOCUMENTS), ***AP 18-24,*** were not responded to in any fashion by plaintiff. They are thereby admitted, and those admission serve to qualify the documents that they identify as true copies business records, party admissions, or other categories of evidence that are not considered hearsay and can be accepted into evidence. The Requests establish the authenticity of the Appendix documents and permits acceptance of the truth of their contents without the need for any additional foundation.

Accordingly, the facts relied upon in this Motion are both unidisputed and undisputable. To the extent that details of possible use in deciding this motion have not expressly been admitted by plaintiff, they can found in or derived from the underlying documents, as is discussed below.

# STATEMENT OF THE CASE

## SUMMARY

This is a suit for damages brought by plaintiff "KEETER, INC." (hereafter "KI") following its default termination from a contract[1] with defendant, the United States Postal Service ("USPS" or the "Postal Service"). The terminated contract[3] provided for plaintiff to receive and sort mail for, and make deliveries to, residential mail boxes located along a route in Marion County, Arkansas centered on the town of Yellville, Arkansas. The Contract operated and was administratively supervised from the Post Office in Yellville. The Contract became effective on July 1, 2002 ***R6*** Its stated term was to run through June 30, 2006, ***R7*** but performance and pay under it ceased on February 20, 2004. ***R10*** On April 28, 2004, the Contract was terminated for default, retroactive to February 20.

## RELEVANT FACTS

### A. CONTEXT AND BACKGROUND

This case arises from a contract awarded by the U.S. Postal Service for local mail delivery services by plaintiff in a rural area. Before examining the particular facts of the case, it may be useful to have in mind the context in which the parties made their agreement. The starting point for the following discussion, and for application of the governing contract terms to the facts of this dispute, is the purpose for which the Postal Service was established and exists. That purpose was most recently expressed in law by Congress in *39 U.S.C. § 101*, set out above, and is relevant to consideration of the only excuse that plaintiff might attempt to invoke for its defaults.

---

[3] This contract (hereafter "the Contract") bears the same number as the route for which it procures services, HCR 72665. The Contract, with associated materials, is found at ***AP 25-88***

This statutory mandate for USPS requires that its services be provided comparably in cities, with their high density of customers, as in areas with low population density and dispersed delivery points. The Postal Service must, to the extent possible, provide equivalent services everywhere. Residential deliveries are provided through the work of Postal Service employees, and also by independent suppliers, who functionally provide the same services as Postal employees but do so under contract. This case involves delivery service provided by a contractor.[4] For the services involved in this case, the Postal Service agreement at issue is its "(HCR) box delivery" contract, that procure service for an "(HCR) box routes." An HCR box route traverses public roads, and service is thereby brought to the "delivery points" – mailboxes – that residents (and businesses) are permitted to put up along it.

The Postal Service does not (cannot) discriminate between its mailbox customers on a route, delivering to some but skipping others. It cannot refuse to serve someone who builds a house that the existing route passes. People who live on the same street on the same route are entitled to the same service.[5] USPS' (retail) delivery

---

[4] The bases for deciding whether to serve delivery points with USPS employees or with contractors are complex and not pertinent here, other than to note that switching between these modes for a given route is not lightly done. A switch in method probably can mean that a carrier job is eliminated from one mode and added to the other – but the carriers lost and gained are not likely to be the same person. The Postal Service does not easily add employees, and its labor contracts (and Congressional directives) virtually eliminate layoffs as a means of adjusting to routine local fluctuations in demand. Over the long term, substitution of employees for contractors, or vice-versa, may be a sensible way to adjust to changing circumstances, but it is not a viable response to immediate needs. Postal Service employees can sometimes fill in for absent contractors to maintain service in a pinch, but reliable universal service cannot be built on Postmasters and clerks who are willing to skip lunch to deliver mail.

[5] This statement is somewhat an over-simplification, but its exceptions are irrelevant because there is no reason to think they apply here. Plaintiff has never said that he

"customers" are everyone in the United States who wants to receive mail, and its delivery points are essentially all places where those customers live or work (here called "service points"). In a huge nation with a large, growing, and mobile population, and a strong disposition towards new residential construction and business formation, defendant's service points are not a static list.

Residential growth is a likely occurrence in much of the United States, whether at the margins of existing developed areas or through in-filling previously undeveloped spaces in them. The Postal Service thus often must arrange for service to new retail delivery points, including those added in areas where service is already provided to others. This need is sufficiently foreseeable that it is addressed in box delivery contracts such as plaintiff's ("the Contract"). Addition of mail boxes at the margins of a route is "extension" of the route, and new delivery points created at in-filling locations are "en route" additions. ***[Contract] §B.1.3, AP 28*** Additions from organic growth along a route may occur in increments of one or a few boxes at a time, but if there is a new development or apartment or other clustering of new construction, several dozen or several score new boxes may be added to demand on a route at essentially the same time.

Accumulated additions to the delivery points on a route may eventually warrant creation of "daughter routes" or other reconfigurations that will involve multiple routes in the same area. However, until that time growth may occurred in increments that do not justify creating a separate route just to serve them; the owners of those boxes cannot

---

refused to service added boxes because they did not belong on his route. He refused to service them because he did not want to, and he does not acknowledge that the contract required him to do so nonetheless.

just be instructed that they have to drive to the Post Office for their mail, when nearby neighbors have the mail brought to them instead. Even if not immediately, service to new residents on that route will have to be provided soon. These increments of demand are driven by a myriad of factors, and even if fairly certain in the aggregate they are not easily predicted for a given route. Box delivery contracts thus need to include some mechanism that grants the Postal Service flexibility in its responses to organic growth along a route, whenever and wherever it.

A contracting regime that requires a C.O. to procure service for new boxes on an existing route, but does not grant him authority to compel the incumbent to provide it, cannot assure that the added service will be available when it is needed. Even if non-mandatory service can be arranged, the price that must be paid for it and the associated delays and transactional costs cannot easily be controlled by the C.O. If an incumbent does not have to provide new service until it receives an offer that it likes, the C.O. will have little or no bargaining leverage but will still be faced with a primary obligation of ensuring that the mail will be moved reliably, including to new customers. Appropriate compensation must be paid for this service -- but absent peculiar circumstances, the most efficient way to respond to routine increments of demand will be to incorporate the added delivery points into the route where they are found.[6]

---

[6] Neither would it make sense to require the Postal Service to procure service for these routine additions by awarding new contracts. New demand along a route is unlikely immediately to support a route of its own. To operate at an economically efficient scale, a new route serving incremental demand would have to be assembled out of pieces plucked from several existing routes. A supplier no doubt can be found to service any route – at a price. Defendant has no mandate to create and pay for inefficient routes lacking internal coherence. New contracting in this situation could easily lead to having to choose between very expensive service or none at all.

The HCR box delivery contract that plaintiff entered includes provisions that anticipate this need and authorize mandatory additions to plaintiff's route. The contract also provides methodology for determining a compensation adjustment appropriate for the increase in work demanded, and specification of what the supplier must do to contest the USPS-stated adjustment amount. The right to contest is subordinate to the supplier's unequivocal obligation to perform both the added services and the pre-existing ones, whether the added compensation is contested or not.

While compensation can be challenged, performance is not a matter of choice and cannot be postponed while the parties try to resolve disagreement about them. Nor may the contractor try to enhance its bargaining leverage by withholding performance of the contractual duties it had before the new ones were added. The contractual language that embodies these rights and duties is not convoluted nor buried in fine print. They are clearly expressed, and are essential elements of the contract if it is to serve its intended purpose.

Given the legal and social underpinnings of the Postal Service, and its ubiquitous, familiar role in American life, plaintiff must be charged at least with awareness of the fundamental purpose of the contract he entered. No specialized or arcane knowledge is needed to understand why the particular contractual terms here involved here are included, nor of what they must mean if they are to further that purpose. This case arises because plaintiff chose to ignore both the spirit and the letter of the Contract it agreed to honor.

**B. THE EVENTS OF THIS CASE**

In 2002, the Postal Service needed to arrange service for a rural box delivery route in the area of Yellville, Arkansas. A solicitation was issued by defendant's Southwestern Area DNO[7] in Dallas, resulting in award of the contract for HCR 72665 ("the Contract"), to an entity called "Keeter, Inc." ("KI"), an Arkansas corporation ***R1.*** KI was wholly owned and operated by Edward L .Keeter ("Keeter") ***R3, 4, 5*** Performance of the Contract commenced on July 1, 2002, and an annual compensation rate of $38,487.92 ***AP 51,. R6***

During 2002 and 2003, KI performed adequately. In December of 2003, defendant needed to procure delivery service to 52 additional mail boxes located along a branch of the existing route covered by the Contract. On December 24, 2003, the C.O. issued a Route Service Order ("RSO") assigning them for servicing by KI under the Contract, beginning on January 24, 2004.[8] The C.O. also adjusted KI's rate of compensation by $1087.56 to reflect the added duties. ***R12, 14; AP 89***

When he learned of the December 24 RSO, Keeter immediately stated that

---

[7] A Contracting Officer ("C.O.") at one of defendant's eleven regional "Distribution Networks Offices" awards and administers HCR contracts for that region, assisted by a "[Contract] Specialist" who is assigned to each contract and handles issues concerning it that do not require C.O. authority. Operational monitoring and supervision of contract performance is assigned to an "Administrative Official: ("AO"), usually located at the head-out or origination facility on the contract route. The AO may be a USPS employee who has other responsibilities at that facility, including being its Postmaster.

[8] The boxes added to plaintiff's route on December 24, 2003 are abbreviated throughout this motion as the "AMBs." Prior to their assignment, KI's route serviced 250 boxes. The AMBs increased that number by 52, to 302. The AMBs were on the route's existing line of travel. ***AP 89, 92***

plaintiff did not want to, and would not, perform the added work. This position was reiterated several times in January, 2004, and KI offered economic, legalistic, and "moral" grounds for rejection the additional work. Whatever its reasons, KI was unwavering in its refusal to accept that the Contract required it to service the AMBs. The assigned Specialist, Jeannette Wofford, had repeated telephone conversations with Keeter, starting in late December or early January, in which Keeter emphatically stated that KI would not deliver mail to the AMBs. He also said this to the A.O. ***R15*** These statements were repeated by plaintiff to other Specialists at the DNO, and to the C.O., prior to the January 24, 2004 start date.

The C.O.'s representatives responded with explicit instruction that KI was required to provide service to the AMBs, whether it wanted to or not. ***R16-20*** Plaintiff was also clearly informed told that if KI failed to comply with this instruction and did not service the AMBs, defendant's costs for finding some other way to provide that service could be charged against KI's contract payments, ***R21,22,24,*** and the Contract could be terminated. ***R20, 23*** Plaintiff was told that KI could submit its grievances about the AMBs in writing for consideration by the C.O. ***AP 122*** KI was informed that in any event it had to perform under the Contract, as modified, while it tried to have the AMBs removed from its duties. Plaintiff puts its grievances, explanations, and its views on the rights and duties of the parties, into the January 31, 2004 letter that it submitted to defendant. ***R37, 38***

On January 24, 2004, KI refused to accept, for sorting or delivery, any mail addressed to any of the AMBs. KI never serviced the AMBs in any way. ***R43, 44, 45, 55***

Plaintiff's objections regarding the AMBs were considered at the DNO, and

resulted in an RSO issued on February 19, 2004 increasing the compensation associated with the AMBs by another $1,602.72 per year. ***AP 92*** However, because KI would not provide this service, defendant had to arrange for an alternative and the service was provided instead by the Yellville Postmaster, who was also the AO. This was not a part of the Postmaster's regular duties (nor those of the clerk who sometimes assisted her). She was entitled to be paid for her time and for use of her car, and she submitted her resulting reimbursement requests to the DNO for payment. ***AP 134-148***

Defendant's costs for this alternative service were charged to plaintiff and resulted in issuance of an RSO on February 9, 2004, specifying that $424.80 be deducted from payment otherwise due to KI. Such deductions from payments due are authorized by the Contract to offset Postal Service claims against the supplier. ***AP 90-91; § F.1.d, AP 58; §H.18, AP 70.***

On February 20, Keeter found that KI's Contract payment had been reduced for this reason. Keeter then told the AO that KI would no longer perform any work under the Contract. That intention was also expressed in a letter that Keeter submitted to the AO that was also both mailed and sent by facsimile to the DNO. ***R40, 41, 54*** Keeter left the Yellville Post Office on February 20, 2004, and KI never thereafter provided, or stated its willingness to provide, any service under the Contract. A cure letter regarding this abandonment, demanding prompt restoration of service, was sent to KI on February 24, 2004, but no cure was effected and service was never restored. ***AP 115***

Performance ended, and KI's pay was suspended, on February 20, 2004. On March 10, 2004, the attorney for KI submitted certified claims by KI for breach of

contract and other damages incurred.[9] ***R10*** In separate decisions issued on April 28, 2004, the C.O. terminated the Contract for default, effective February 20, 2004, and denied all of plaintiff's claims. ***R10, 1; AP 98-102*** This suit was filed on February 22, 2005.

At the time this case was filed, plaintiff's corporate charter had been revoked by the Secretary of State of Arkansas, and had not been reinstated. ***R56, 57***

## ARGUMENT

### STANDARDS FOR SUMMARY JUDGMENT

The standards governing motions for summary judgment pursuant to *RCFC 56* are frequently stated and well established. A comprehensive recent expression of them is found in *Becho, Inc. v.United States, 47 Fed. Cl. 595 (2000),* a decision that is also pertinent to this motion because of its discussion of substantive contract law issues. For these purposes, it suffices to note here that the party seeking summary judgment must provide undisputed factual support for the elements needed to establish its postion, but if does so, the adversary must raise doubt concerning *material* facts to defeat the motion. No description of these standards offered by defendant here could be as complete or useful to the Court as that it provides itself in *Becho*, particularly at *47 Fed. Cl. 599-600.*

[9] That letter is attached to the Complaint.

## GROUNDS FOR GRANTING SUMMARY JUDGMENT

### A. PLAINTIFF LACKED CAPACITY TO BRING THIS ACTION

There is no dispute that plaintiff's charter was revoked before it filed this action, and was not restored until afterwards. This Court determines capacity to sue based on the law of the state where a party resides. ***RCFC 17.*** In Arkansas, KI could not bring suit in February of 2005, so it may not do so here either.

In order for this Court to have subject matter jurisdiction to hear a claim, the party asserting it must have the legal capacity to sue. If the plaintiff is a corporation, its capacity to sue is governed by the law of its state of incorporation. *BLH, Inc. v. United States, 2 Cl. Ct. 463 (1983)* This Court has held that a corporate plaintiff's lack of capacity may be raised as late as the eve of trial and will still require dismissal of the action.[10]

In *Computer Products International, Inc v. United States, 26 Cl. Ct. 518 (1992)***,** the Court carefully reviewed California law concerning the capacity of a California corporation whose charter had been suspended at the time its suit was instituted, but was later reinstated. The Court reaffirmed its preliminary dismissal, saying *" . . . the court holds that [plaintiff corporation] does not have the capacity to bring this case*

---

[10] Plaintiff cannot escape its lack of capacity to sue by bringing suit through its owner, Edward L. Keeter, even though the Complaint names him as a co-plaintiff. The Contract was awarded to Keeter, Inc., not to Mr. Keeter, and defendant's business dealings were with the entity that sought the contract rather than an individual. The *Computer Products International* decision, *supra*, also considers this issue, and follow consistent precedent in holding that in these circumstances only the corporation, and not its stockholders, has standing to sue the United States. *26 Cl. Ct,.at 528-529.* All claims here asserted by the individual Edward L. Keeter should be dismissed, because he is not a real party in interest as required by *RCFC 17(a)*.

*because the corporate powers of [plaintiff] had been suspended when it filed this lawsuit." Id,at 529.*

The position of plaintiff here is the same as that of the plaintiff in *Computer Products International*. Plaintiff admits that its corporate charter was revoked by the Arkansas Secretary of State on December 31, 2004, and was reinstated on April 27, 2005. R 56, 57. Nothing in the Record would support assertion that KI's charter was in effect and unimpaired when this suit was filed on February 12, 2005. In *Terry v. Rice (In re Cheqnet Sys.), 246 Bankr. 873 (Bankr. E.D. Ark. 2000),* the court had to determine a corporation's capacity after its charter was suspended for failure to pay the state franchise tax, and it reached the same conclusion under Arkansas corporate law as did this Court applying California law in *Computer Products, Inc.* The court applied the provisions found at *Ark Code Ann. §26-54-112* consonantly with state court rulings (under earlier versions of these provisions) that held a corporation whose charter had been revoked could not bring a suit, even though its charter was reinstated after the suit was filed.

Arkansas courts have interpreted their corporate law as depriving a suspended corporation of the ability to sue. When the corporation is reinstated it can assert any claims that have not expired, but subsequent reinstatement cannot retroactively validate an action that the corporation was not entitled to bring, but did. *See, Tribco Manufacturing Co.,Inc. v. People's Bank of Imboden, 67 Ark. App. 268, 998 S.W.2d 756(Ark App 1999); Moore v. Rommel, 233 Ark. 989; 350 S.W.2d 190 (1961),* that are respectively decisions by the Arkansas Court of Appeals applying the recent iteration of

*Ark Code Ann. §26-54-112,* and a similar result reached by the Arkansas Supreme Court under an earlier version.

The Legislature of Arkansas has limited the acts permitted by corporations whose charters have been revoked. The Record here establishes beyond dispute that plaintiff's corporate charter was revoked prior to February of 2005, and that it was reinstated several months later. Arkansas law provides that a corporation in this status does not have the legal authority to bring a lawsuit. This Court therefore lacks subject matter because the corporation asserting the claim is not permitted to assert it (and the claim is thus not properly before the Court

Defendant accordingly requests dismissal of this action for lack of jurisdiction.

## TERMINATION OF THE CONTRACT WAS APPROPRIATE

### WHAT THE CONTRACT TERMS MEAN

#### 1. DUTIES IMPOSED

Contract provisions that are set out above state in both general and specific terms the authority of the C.O. to add to the Contract new work that must be performed. The Contract itself provides a context within which all of its terms must be viewed in its ***§B.3.a***, that is rather unusually entitled "*THE SANCTITY OF THE MAIL*," that requires any supplier accepting such a contract to *". . . carry all mail tendered for transportation under this contract . . . with certainty, celerity, and security. . .*." Other contracts do not presume to attribute "sanctity" to their purpose, but this clause appropriately does because of the social and political importance of the Postal system in the United States.

The first two duties associated with that sanctity that are imposed on all suppliers are to carry ***all*** mail tendered, and to do so with ***certainty***.

The detailed description of the services to be provided by the supplier, the Contract's "STATEMENT OF WORK AND SPECIFICATIONS," includes a list of duties associated with mail boxes that the supplier may be required to perform. Paragraph ***B.3.j*** states that, on direction by the C.O. the supplier *shall* deposit, receive, and deliver *all* mail directed to or coming from the assigned boxes. This language does not itself specify which boxes it refers to, but it emphasizes the inclusiveness of the service being provided. The boxes to be served do not need individual enumeration in the Contract: they are the boxes placed or found "*along the line of route*" that the Contract applies to.

The route itself is precisely described, by road segment, sequence, and distance, in ***§B.1.3***, and the number of boxes along the route is stated. That section also contains a brief paragraph that assumes there may be "*route extensions or en route boxes*" ***[AP 28]*** requiring adjustment of compensation, meaning that addition to the number of served boxes is an event contemplated when the contract is entered. This paragraph discusses computation of the adjustment, but does not in any way differentiate the duties associated with added boxes from any others. Boxes added, whether by extension or along the line of the route, are simply more boxes to which all of the Contract's demands for certain and reliable service will attach when the C.O. directs that they be served.

2. **PLAINTIFF'S APPARENT POSITION**

Plaintiff's justification for refusing first to serve the AMBs, and then to provide any service at all, seems to be based more Mr. Keeter's personal inclinations than on what

the Contract says. Plaintiff's contractual explanation rests entirely on its reading of the first section in *CHANGES* clause, ***§H.8.1***

Plaintiff has fastened on the distinction between "*MINOR*" service changes in **¶*H.8.a (1)***, and "*OTHER*" service changes in **¶*H.8.a.(2)***. The former says that service can be changed and compensation increased by the C.O., without prior consultation with the supplier, if the amount of additional compensation ordered does not exceed $2,500.[11]

"*OTHER CHANGES*," discussed in the following paragraph and including changes in compensation of more than $2500, "*may be made by mutual agreement*" between the parties. Plaintiff says that because *(1)* it did not agree to addition of the AMBs, and *(2)* the compensation increase properly associated with service for the AMBs was more than $2,500, the C.O. could not either compel service to the additional boxes, or take action against plaintiff for failing to provide that service.

Moreover, plaintiff apparently believes that it can extend this interpretation of **¶*H.8.a (2)*** to establish that its compensation may not be reduced to offset costs incurred by defendant (to have someone else service the AMBs), because the AMBs could not become plaintiff's responsibility without its agreement. By this reasoning, when defendant deducted an offset (of $341.60, ***AP 90-91***) from plaintiff's payment for the services it did provide, that act so fundamentally breached defendant's obligations to plaintiff as to relieve KI of any further duty to perform under the Contract at all.

[11] The Contract is here silent about the time period during which that increase is measured: if it applied per trip, per day, per month, or per pay period, then in this case that limit was not approached: the changes at issue have not been valued even by plaintiff at more than perhaps $3,000 a year. Defendant uniformly considers this language as referring to annualized amounts.

This interpretation cannot be reconciled with what the Contract actually says. An interpretation that first allows the supplier to turn down a routine modification, and then to abandon all performance because of an offset, is inconsistent with the Contract's language and antithetical to its purpose.

3. **WHAT THE CONTRACT MEANS**

Section ***H.8.a*** does not say that a contract adjustment may *not* be made without mutual agreement. It does not say that mutual agreement is required regarding the supplier's obligation to perform the added duties. Both within the clause where they are found and when read together with the rest of the Contract, these provisions do not make performance of "other" changes contingent on the supplier's acceptance of them. Rather, they deal with the determination of appropriate changes in compensation when the C.O. orders changes in the work to be performed.

Paragraph ***H.a.8.(1)*** says that the C.O. can impose changes in work *and the consequent changes in compensation,* without prior notice to or consultation with the supplier. This allows rapid response to small changes in the scope or extent or nature of work needed, not known about when the contract was awarded but likely arise after performance starts. In a contract for box delivery services, the need to add boxes to the route is fairly likely to arise sooner or later. Requiring a process of prior notice and negotiation each time this occurred would be a distraction of no benefit. Authority for the C.O. just to notify the supplier of the compensation change that will go along with added work avoids delay and wasted time, but does not deprive the supplier of its right to dispute that amount through a request for adjustment. If that does not resolve the

matter, nothing precludes the supplier from invoking the *Claims and Disputes* clause to seek satisfaction.

Larger changes justify the time needed for negotiation of the associated change in compensation -- but the Contract expressly provides that the supplier's obligation to perform the changed duties is ***not*** contingent on reaching agreement about the compensation for those duties. This is shown by considering more than just the language plaintiff has pointed to.

The Contract includes several provisions that address "*extra trips,*" a service primarily associated with deliveries between Postal Service facilities rather than with box deliveries. Extra trips, both occasional and regular, can be ordered and are governed by the *CHANGES* clause in the same way that additional box deliveries are. Section ***B.3.b*** says that the supplier is ***required*** to perform extra trips, and that "*the supplier must proceed to perform any extra trips ordered by the contracting officer* ."

If plaintiff's reading of the Changes provisions were correct, then this quoted contract language would be surplusage because it would mean only that "the supplier must proceed to perform, unless it doesn't want to." If ***any*** kind of agreement by the supplier is required before performance becomes mandatory, then the C.O. has no authority to mandate changes in duties. A supplier could just refuse to accept any offer of additional compensation the C.O., for whatever reason it chose, and the C.O. would then have no way to have the work performed without terminating the contract for convenience and hiring someone else to perform it.[12] Mandatory language stating that

---

[12] The C.O. could hire another contractor to provide the limited set of services rejected by the existing supplier, but that is precisely the economically impractical situation that

the supplier "must proceed" would not merely be qualified, but completely negated, by this interpretation.

Indeed, the same ***§H.8*** that plaintiff relies upon for its assertion that changes valued at more than $2,500 require its prior agreement also includes several provisions that state the opposite. The "*mutual agreement*" language that plaintiff invokes is in ***¶a.(2)*** of the *CHANGES* clause. Immediately following the ***§H.8.a*** ("SERVICES CHANGES") terms is ***§H.8.b***, that addresses the *"extra trips*" that are also covered in ***¶B.3.b***, *supra*. ***H.8.b*** provides a definition of an extra trip indicating that it refers to non-regular performance of the services that the supplier ordinarily provides under the Contract. The Contract says that extra trips "*shall be negotiated in advance*" – but immediately qualifies that requirement by continuing "*when the contracting officer deems it appropriate.*" And even though ***¶B.3.b*** already has stated the supplier's paramount obligation to perform the extra trips ordered by the C.O., that obligation is reiterated in ***§H.8.b*** following the "negotiation" language:

> If no rate of pay for extra trips has been negotiated in advance, the contractor shall nonetheless perform such extra trips as are ordered by the contracting officer and may, on an after-the-fact basis, obtain [compensation for the extra trip above the amount determined by the C.O., with appropriate documentation.]

Again, if ***§H.8.a.(2)***, that by its terms is not confined to particular kinds of service changes, is read to require supplier consent for a change that is not "minor," then it is contradicted by the next paragraph in the same clause. And should plaintiff try to argue for a special rule applying to extra trips but not to other service changes, it must then

---

the Contract is designed to avoid. Apart from the cost of an inefficient contract, the necessity to hire contracts to provide services that would physically overlap those of existing contracts would make no logistic or practical sense.

find a way to explain ***§ H.8.d***, that quite clearly rejects that distinction:

> The supplier shall proceed diligently **in accordance with service changes and extra trips** ordered unilaterally by the contracting officer. Disputes concerning such orders shall be resolved pursuant to the *Claims and Disputes* clause.
> (*emphasis added*)

Plaintiff's acknowledgment of what the Contract says about additional services is barricaded on all sides. If KI's reading of ***¶H.8.a.(2)*** is correct, then a number of provisions before and after it cannot mean what their words say, even though those words are important enough to be repeated in different places in the Contract.

Defendant's interpretation presents no such contradictions in the Contract, and do not require mental gymnastics to find a way to keep all of the *CHANGES* terms consistent with each other. Basic rules of interpretation applied by this Court require that contract terms be viewed within the contract *as a whole*, not as isolated language disconnected from its larger context. *North Star Alaska Housing Corporation, v. United States, 30 Fed. Cl. 259 (1993),* was a decision on summary judgment in which the plaintiff was seeking allocation of responsibility for trash collection at a housing facility to the government, rather than itself. The plaintiff's argument was based on wording in a specific provision, out of the many in the lease and other documents that established the parties' duties concerning services provided at the facility. The Court rejected plaintiff's narrow view of the contract::

> Even if the court were to accept that refuse collection could reasonably be included on the list of utilities, plaintiffs interpretation still ignores other sections of the contract which *expressly* define refuse collection as an "operational service." A contract must be read as a whole when interpreting different provisions. [*citations omitted*] ***Provisions must be read***

> ***harmoniously, and not conflicting, to avoid rendering any portion of the contract meaningless.*** [*citation omitted*].[13]
>
> *Id, at 267 (emphasis added)*

*Northstar* and the authorities that it cites require whenver possible readings that do not create conflict between terms of the same contract that then must be resolved by assigning precedence to one provision or the other. Courts are enjoined instead accept an interpretation that avoids that conflcit if the plain language before them allows it. Defendant's reading of the *CHANGES* provisions is does not require that the contract language be tortured to make the terms work together: This interpretation is consistent with the plain meaning of the words; creates no conflict between Contract terms; does not render any Contract term meaningless surplusage; and preserves a logical and reasonable way for the parties to deal with an anticipated contingency in a manner that serves the Contract's basic purpose.

Plaintiff's reading achieves none of these benefits and satisfies none of the conventions of contract interpretation rules. It contradicts the purpose of the Contract, and would lead to its being a muddle of incompatible or meaningless terms impossible to harmonize. Worse still, that reading would denies the C.O. the authority needed to respond to certain anticipated events in a way that furthers the Contract's purpose. A contract interpretation having these results, when the language permits a different outcome, is at once both myopic and selfish. The language of this Contract cannot support it.

---

[13] This paragraph also restates the contract law canon that specific provisions prevail when they conflict with general provisions. That rule of interpretation offers no guidance when, as here, the conflict (if one exists) would be between different general provisions.

**PLAINTIFF WAS REQUIRED TO PERFORM**

The foregoing analysis shows that plaintiff's reading of the Contract was wrong, and that defendant had the authority to add service for the AMBs to its contractual responsibilities, notwithstanding plaintiff's preferences. The same analysis shows that the added work ***must*** be performed, and that plaintiff's protests of it were required to be directed first to the C.O., and then through the Contract Disputes Act mechanisms incorporated in the Contract's *Disputes and Claims* clause. Protest by non-performance is not an option that can be exercised – or at least, not without breaching the Contract.

A supplier's "obligation to perform" its government contract notwithstanding the existance of a disagreement about the obligations it imposes (on either party) is not a requirement unique to Postal Service HCR contracts. In *Thoen V.United States, 5 Cl. Ct. 823 (1984)***,** this Court reviewed claims asserted by a consultant who had contracted to prepare a technical report for the Army, with payment due on completion. The consultant found that meeting the due-date was inconvenient for him, and in his view was not required. He told the contracting officer that the project had taken more time than he expected, and that he "could of course have terminated the contract" when he realized that this "overrun" was occurring. *Id., at 825* Thus, he informed the Army that without additional compensation "*it should not expect [him] to put aside other work just to wrap up a contract that would pay [him] only a small fraction of what [he] spent.*" *Id., n.3*

When the contract was terminated for default, and the fee not paid, fee, the consultant sued for payment and damages[14] The Court emphatically rejected his view of contractual duties, ruling about his refusal to prepare and submit the final report that "*[w]ithout more, termination of the contract for default was proper.* "*Id., at 826* The Court then considered justifications the consultant offered for his non-performance:

> It is important to note that plaintiff does not allege in his complaint that his failure to submit the [Report] was beyond his control and without his negligence. . . .[H]e could have submitted said report but refused to do so since he felt he was entitled to receive [compensation above the] contract price. . . [P]laintiff deliberately refused to complete the contract and this breach justified the default termination of said contract.
>
> * * * * *
>
> It is settled that under the Disputes clause of the contract[15], plaintiff was required to complete the contract regardless of disputes or disagreements that arose during performance [citation omitted]XX These disputes and disagreements were to be resolved later under the provisions of the contract. Plaintiff agreed to these provisions when he executed the contract. Plaintiff cannot justify abandoning performance of the contract because of any disagreement whether it be compensation or something else. [citation omitted] Plaintiff's failure to fulfill its contractual obligations [as established on the Record, shows] that the contract was properly terminated for plaintiff's default. [citation omitted].
>
> *Id, at 827*

The behavior of the plaintiff in *Thoen* was a parallel to that of KI in this case. As of December 24, 2003, the duties that the Contract imposed on KI included providing service to the AMBs. KI did not believe it should have to perform those duties, so it did not, despite repeated directions from the C.O. that it must. Plaintiff's initial refusal to meet the Contract terms in one respect was soon expanded to its refusal to provide any

---

[14] For additional work he said he performed that the Court found had not been properly authorized.

[15] The reported opinion does not include the precise language of the contract at issue in *Thoen*, but defendant believes that the "duty to proceed" is stated in similar words in many or most contracts subject to the CDA over many years. In any event, the language in the Contract that KI executed is entirely consistent with the Court's statements in *Thoen*.

service at all. KI simply disregarded the Contract terms expressing its duty to proceed and the methods allowed for resolving disputes about the the obligations of the parties. The duties imposed on Mr. Thoen and on KI are in all materials respeects the same. The outcome of their claims must be as well.

More recently this Court decided *Becho, Inc. v.United States, 47 Fed. Cl. 595 (2000)* (also cited above for its discussion of summary judgment standards), and its opinion provides a thorough analysis of a supplier's obligations when presented with a contract modification. *Becho* presented a fact pattern essentially identical to that in this case. Plaintiff Becho, Inc. had a contract with the Army Corps of Engineers to perform work on a Corps project. Becho had completed work on the first phase of the contract, and its work had been accepted and paid for, when the C.O. instructed it to do additional work on that phase. Becho refused to perform the added duties without additional compensation, claiming that it had done all that was required of it. Becho then ceased its work on the next phase of the contract as well. The C.O. declared its refusal to perform on either phase to be an anticipatory breach, and terminated the contract.

Faced with these facts on cross-motions for summary judgment, the Court first considered whether the government could prove *prima facie* that the termination was justified:

> . . . [D]efendant argues that Becho's failure to complete the work required by the [contract amendment] . . . constituted a material breach and anticipatory repudiation of the contract, making the termination for default appropriate. Defendant correctly asserts that if the additional work requested [the Modification] was covered by the inspection and changes clauses of the contract, then the disputes clause of the contract required Becho to perform this work, whether or not it agreed with the modification, and later seek an equitable adjustment, if appropriate. *See Valley View Enterprises, Inc. v. United States, 35 Fed. Cl. 378, 383 (1996)*
>
> *Id., at 600*

Absent a supervening reason that warranted disregarding the language of the contract, termination was justified. It was then the burden of plaintiff to persuade the Court that requirements that contract imposed upon it regarding changes in the work demanded should be ignored. Becho did not claim that performance was impossible.[16] Rather, it argued that the ordered change was so significant as to excuse it from further performance. There was no dispute that termination for non-performance was appropriate if the contract modification was itself permissible. The central question presented to the Court, on cross-motions for summary judgment, was how to determine whether the additional work ordered by the C.O. amounted to a cardinal change of the contract.

**THE CARDINAL CHANGE DOCTRINE**

As with any other grant of power, there logically is a need to put some limit on the right of a contracting officer to add duties to an existing contract. There will always be some point at which addition of imposed duties would go “too far” and be unreasonable, so that a demand that they be performed will itself be a material breach of the underlying contract. If the added duties reach that point, the supplier has to be excused from performing them.[17] A determination that the limit has been exceeded means that

---

[16] Nothing in the Record here suggests that KI considered service for the AMBs to be impossible.
[17] The rationale for also excusing performance of the entire performance appears to be somewhat more complicated and theoretical. It may reflect recognition of a fatal divergence of the parties’ views as to what their contract is supposed to accomplish. If the underlying contract were to continue, without the supplier being required to perform added duties that the C.O. deems essential, then the government is not likely to obtain what it needs. Termination of the entire contract leaves the parties free to start over again tgether or enables to government to try again with a different supplier and a clean

the ordered changes so transform the nature of a contract that it is no longer what the supplier reasonably thought it was when the agreement was reached. This is called the "cardinal change" doctrine. It is considerably easier to describe this concept than to determine when it applies.

*Becho* identifies and notes judicial views about cardinal changes expressed in a line of decisions largely from this Court (or the Court of Claims) and the Federal Circuit, but rangely widely across relevant deciesion that apply (or try to explain application of) the doctrine. In *Becho,* this Court apparently felt that a satisfactory statement of the doctrine required some distillation from the somewhat imprecise formulations it found elsewhere. It relied most heavily on descriptions offered in *Allied Materials & Equip. Co., Inc. v. United States, 215 Ct. Cl. 406, 569 F.2d 562 (Ct. Cl.1978); Wunderlich Contracting Co. v. United States, 173 Ct. Cl. 180, 351 F.2d 956, 966 (Ct. Cl. 1965); Saddler v. United States, 152 Ct.Cl. 557, 287 F.2d 411, 413 (Ct. Cl. 1961),* and particularly *Alliant Techsystems, Inc. v. United States, 178 F.3d 1260 (Fed. Cir. 1999)*

The decisions reviewed in *Becho* do not offer anything approaching bright lines for determining how much change is too much" Those decisions refer instead to descriptions such as "*[imposition of] obligations on a contractor far exceeding any contemplated by [the] contract*"[18], or imposition of a change that "*fundamentally alters the contractual undertaking of the contractor*."[19] The Court chose to derive from other statements its own list of elements that are relevant to a determination of whether a given modification constitutes a "cardinal change":

> . . . while there is no precise calculus for determining whether a cardinal

---

slate. If a modification changes a contract so much as to be a cardinal change, then the contract presumably no longer reflects a "meeting of the minds" of the parties to it.

[18] *Becho, 47 Fed. Cl. at 600, quoting Alliant Techsystems, 178 F.3d at 1276.*

[19] *Id, citing Allied Materials 215 Ct. Cl. 406, 569 F.2d 562, 563-564 (Ct. Cl.1978)*

> change has occurred, the courts have considered, *inter alia*, the following factors: (i) whether there is a significant change in the magnitude of work to be performed; (ii) whether the change is designed to procure a totally different item or drastically alter the quality, character, nature or type of work contemplated by the original contract; and (iii) whether the cost of the work ordered greatly exceeds the original contract cost. [citations omitted]
>
> *Id, at 601*

The Court in *Becho* recognized that definitive rules governing the doctrine are not feasible, and that evaulation of a claim of cardinal change must be based on the specific facts presented. In *Becho,* given the evidence presented by both sides summary disposition was not appropriate. In that regard, the litigation posture of the parties in *Becho* was not the same as that of the parties here. Unlike in *Becho*, in this case the established facts are both undisputed and sufficient to support determination of whether a cardinal change was imposed. Unless plaintiff somehow can credibly controvert facts that it has already admitted, summary judgment is appropriate because the Record cannot support a finding that a cardinal change relieved KI it of its duty to perform.[20] Consideration of the *Becho* factors shows why this is so.

1. "*CHANGE IN THE MAGNITUDE OF THE WORK TO BE PERFORMED*"

The AMBs all lie along the existing route of the Contract. The additional time needed to service them every day is approximately 30 to 40 minutes. This is the figure stated by the AO, ***AP 142***, but it is also established by the formula set out in the Contract regarding added boxes. ***B.1.3, AP 28*** That formula determines the annual additional

[20] It is plaintiff's burden to invoke a cardinal change justification; if it does not then the Court need not consider defendant's arguments about it. Plaintiff has made statements prior to and during this litigation that hint at something like the cardinal change doctrine. Because that doctrine offers the only argument of any possible use to plaintiff, defendant is anticipating it here -- even though it is plaintiff's burden to justify application of the doctrine and not defendant's to disprove it.

hours of work required to service added boxes by calculations based both of the number of added boxes and the additional miles traveled to service them. No additional travel distance was required by the 52 AMBs, the added hours according the formula were 3.64 X 52, or 189.28 hours. The Contract requires service on 303 days per year, so the added time per working day is approximately .625 hours, or less than 40 minutes.

The hours of work required by the Contract when entered was 1,894: the AMBs added just slightly under 10% more work to plaintiff's duties, the 20% that plaintiff derives from adding 52 boxes to 250. According the formula as applied by plaintiff, this increment in work will yields an increase in compensation due of $2,708.60, and he protested when that amount was not offered. ***AP 117***.

The reason that an amount close to the one calculated by plaintff was not at first ordered along with the added service requirement is explained in the Record. Defendant found that when plaintiff's route was set up, it provided payment for more time than was actually needed to perform the required services, by perhaps an hour a day. The AO informed the DNO that the AMBs should require perhaps 35-40 more minutes per day to service, an estimate consistent with that yielded by the formual. ***AP 142***. The DNO accepted the AO's statements that the Contract included slack time, and concluded that appropriate additional compensation for the AMBs was $1,085.56. ***AP 89, 132***.

Plaintiff disagreed. He provided the DNO an explanation of why the added payment was insufficient and said it should be the $2,708.60 mentioned above. ***AP 117***. His protest resulted in the C.O. authorizing a further increase in compensation of $1,602.72, ***AP 92***, bringing the total increase to $2,690.28 – very close to the amount plaintiff has said is correct. This represents a 6.8% addition to annual compensation for

serving the added boxes.

Plaintiff has never indicated that it would be unduly burdened by the added work. Indeed, plaintiff never bothered to determine how much additional work the AMBs would impose on it. ***R 53*** The "magnitude" factor in *Becho* has not been quantified, but changes that by any measure amount to less than a 10% addition to the amount of work required or to the compensation the Contract warrants surely cannot achieve the status of being "too much."

Of course, that has never been the basis of plaintiff's refusal to serve the boxes. The only reason that consistently emerges from plaintiff's statements is that it did not feel it could be ordered to do something it did not agree to do. *See*, ***AP 116, 117-118*** Plaintiff's greivance is procedural, not substantive: it was not consulted about the change. Plaintiff (*i.e.,* Mr Keeter) evidently felt he had better things to do with its time than to service the AMBs, and all of plaintiff's subsequent actions were predicated on the right to grant or withhold consent that it found in one paragraph of the Contract.

2. "*A DIFFERENT ITEM OR DRASTIC ALTERATION OF WORK CONTEMPLATED*"

The discussions above of the purpose of the Contract, its context, and its provisions regarding box deliveries and changes, all relate directly to this suggested factor in a cardinal change analyses. The most important evidence of what the Contract was designed to procure is found in the Contract itself: it procures service for rural mail boxes. The modifications require more of the same, and nothing else. The Contract anticipates that "*en route*" additions may be ordered, and that is what happened. The Contract specifies that if the supplier is not pleased with a change of this sort, it must nonetheless provide the service that the C.O. orders, and seek relief as directed in the

Contract.

If plaintiff did not contemplate that boxes might be added to its route, that could only have been because it did not read the Contract or gave no thought to either the written terms in it, or to why the Postal Service needed the services that the Contract was procuring. A supplier cannot wear blinders when it accepts a contract, and then argue that the contract's performance demands were beyond its contemplation.[21]

The changes ordered by the C.O. that plaintiff refused to accept did not change the nature of the Contract in the slightest, and did not greatly alter the burden on plaintiff that the Contract imposed in any event. These changes cannot be deemed "too much" to expect plaintiff to perform.

3. "*COST OF ADDED WORK GREATLY EXCEEDING ORIGINAL COST*"

The cost factor associated with the AMBs is discussed above. An increment of less than 10% does not dwarf or greatly exceed the original cost. If it does, then C.O. will have scant flexibility at all to adapt to changes that the parties knew were likely to occur. That is not consistent with the needs of the Postal Service, nor the contract terms it has adopted to meet those needs.

## CONCLUSION AND RELIEF SOUGHT

The analysis required to decide this motion is not complicated. The Contract that

---

[21] *See, In re Boston Shipyard Corp., Debtor*, *886 F.2d 451, 456-57 ( 1st Cir. 1989)* The First Circuit declined to find that the changes at issue were "cardinal," noting that**: "**The contract between the parties contained a change clause, providing for an effective and efficient procedure for dealing with changes that would arise in the course of the contract's performance. Thus, the parties clearly anticipated that changes would need to be made." *Id*, at 457

was terminated imposed on plaintiff obligations that included the obligation to provide service to additional mail boxes located along the specified route, if ordered to do so by the Contracting Officer. The C.O. issued such an order but plantiff refused to accept it and stated that it would not provide the added services, despite repeated notice that the Contract said it must, and could be terminated if plaintiff refused to do the work. When the time came for performance of the added duties to begin, KI did not perform them. That refusal was an event of default sufficient to warrant termination.

When defendant deducted $341.60 from a payment to plaintiff, ***AP 116,*** KI escalated its refusals to encompass everything the Contract required it to do. Its default in performance not only of the added work but of the duties it had previously accepted, was as total and egregious a failing as can occur under a contract, and also warranted termination.

The only possible excuse for plaintiff's failures to perform would be a persuasive demonstration that the added services altered the fundamental nature of the agreement the parties had originally reached. The order to service the AMBs in this case simply cannot be elevated to the dignity of a cardinal change, so plaintiff's refusal to perform service for the AMBs, and then the entire Contract, cannot be excused.

The Court need not consider any of these arguments about contract rights and duties, because KI was not legally authorized to bring this suit in the first place.Should the Court not dismiss this action for want of jurisdiction, the Record before the Court dispositively establishes that termination of the Contract was warranted, and should be sustained.

For the reasons stated herein, defendant respectfully requests that summary judgment be granted, dismissing this action in its entirety.

March 19, 2007

/s/ *DOUGLAS J. COLTON*