# In the United States Court of Federal Claims

No. 05-243 C
(July 19, 2007)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * | * | |
| KEETER TRADING COMPANY, INC., | * | Capacity to Sue; Contract Disputes Act of 1978, 41 U.S.C. § 601 *et seq*.; Breach of Contract; Duty to Perform; Cardinal Change Doctrine; Repudiation; Conversion of Termination for Default to Termination for the Convenience of the Government. |
| *Plaintiff*, | * | |
| v. | * | |
| UNITED STATES, | * | |
| *Defendant*. | * | |
| * * * * * * * * * * * * * * * | * | |

*Christopher O. Carter*, Yellville, AR, for plaintiff.

*Douglas J. Colton*, United States Postal Service, Washington, DC, for defendant.

---

**OPINION**

---

**Bush**, *Judge*.

This matter is before the court following defendant's motion for summary judgment on plaintiff's claims under the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 601-613 (2000). The motion has been fully briefed. For the reasons that follow, defendant has not shown that default termination of the contract at issue in this case was proper. Defendant's motion for summary judgment is denied, plaintiff's claim against defendant for wrongful breach of contract is upheld, and the suit is stayed pending further action by the parties.

## BACKGROUND

This case centers on the United States Postal Service's (USPS) decision to terminate a mail delivery contract it held with a hired carrier in Yellville, Arkansas. The circumstances which led to that termination are established by the record and are not disputed by the parties. On May 31, 2002, USPS entered into Contract Number HCR 72665 (the contract) with Keeter, Inc.[1] (plaintiff, KI), an Arkansas corporation owned and operated by Edward L. Keeter (Mr. Keeter).[2] Under the contract, KI was obligated to receive, sort, and deliver mail to 250 residential mailboxes in and around Yellville, Arkansas, at an annual rate of $39,487.92. Contract performance was to commence on July 1, 2002, and to conclude on June 30, 2006. The contract included language which permitted USPS to change KI's duties without plaintiff's consent, so long as the change did not increase or decrease plaintiff's compensation by more than $2500. Def.'s App. at 66. In regard to changes in excess of that threshold, the document provided that

> [s]ervice changes other than minor service changes, including increases or decreases in compensation, may be made by mutual agreement of the contracting officer and the supplier. Such changes shall be memorialized by formal amendment to the contract.

*Id.* The contract also contained a standard clause which authorized USPS to terminate the agreement for default, in whole or in part, if KI failed to perform services in accordance with the terms of the contract:

> **H.5 EVENTS OF DEFAULT (Clause B-69) (January 1997)**

---

[1]/ Keeter Inc. later changed its name to Keeter Trading Company, Inc.

[2]/ As explained in defendant's motion, USPS is divided into eleven regional Distribution Network Offices (DNO). Contracting officers in each DNO award and administer highway contract route contracts for the region to which they are assigned, with assistance from a Contract Specialist who is "assigned to each contract and handles issues concerning it that do not require C.O. authority." Def.'s Mot. at 13 n.7. In addition, an Administrative Official (AO) conducts operational monitoring and supervision of contract performance. *Id.* The AO, who typically works from the origination facility on the contract route, may be a USPS employee with other responsibilities at the facility, for example, the Postmaster. *Id.*

> The supplier's right to perform this contract is subject to termination under the clause entitled *Termination for Default*. The following constitute events of default, and this contract may be terminated pursuant to that Clause.

*Id.* at 64. The contract listed a number of circumstances which would justify a default termination, including "[t]he supplier's failure to perform service according to the terms of the contract," "[f]ailure to follow the instructions of the contracting officer," and "[i]f the supplier materially breaches any other requirement or clause of this contract." *Id.* at 64-65. The contract provided further that, upon termination for default, USPS would be entitled to procure alternative services and charge KI for the costs of doing so. *Id.* at 64.

The parties agree that KI successfully performed the work required by the contract for more than a year. A dispute arose, however, on December 24, 2003, when USPS's Contracting Officer (CO) unilaterally issued a Route Service Order (RSO) which instructed KI to service fifty-two additional mailboxes located along a branch of KI's existing route. According to the RSO, KI was to begin delivering mail to the new boxes on January 24, 2004, and KI's compensation was to increase by $1087.56. Def.'s App. at 89. This change to plaintiff's duties was memorialized in an order titled "Insignificant Minor Service Change." *Id.*

After Mr. Keeter received the RSO, he informed USPS repeatedly that KI would not perform the additional work, primarily because Mr. Keeter believed it had been undervalued by the agency. Mr. Keeter was insistent that the proposed change should result in a large adjustment to KI's compensation, and therefore could only be effectuated by mutual agreement of the parties. The record shows that Mr. Keeter made verbal statements to that effect to several USPS employees, including Contract Specialist Jeanette Wofford (Ms. Wofford), an employee in the agency's Dallas, Texas DNO; to the contract's AO and Yellville Postmaster, Ms. Linda Orr (Postmaster Orr); and to the CO directly, several times in late December 2003 and in January 2004. Each time, the CO and his representatives informed Mr. Keeter that KI was contractually obligated to provide services to the additional boxes and that, if KI failed to do so, USPS would procure alternate services and deduct the costs of doing so from KI's contract payments. Mr. Keeter was advised that KI was entitled to submit a written grievance to the CO regarding the assignment of additional boxes, but that the company was required to provide the

disputed services while the complaint was under review. Mr. Keeter was warned that a failure to perform could result in termination of the contract.

On January 31, 2004, Mr. Keeter submitted a letter to the CO which expressed KI's complaints about the assignment of additional boxes to its route. At no time, however, did KI provide services to the new mailboxes. Eventually, the DNO considered KI's grievance letter, agreed with KI's reasoning regarding the compensation due as a result of the newly assigned duties, and added another $1602.72 per year to the value of the contract. This increase was accomplished through a second "Insignificant Minor Service Change" order signed by the CO. Def.'s App. at 92. KI continued to refuse to provide services to the additional boxes, however, on the ground that the unilateral change to its duties was impermissible under the terms of the contract's Changes clause. Eventually, USPS procured the delivery services from Postmaster Orr, and deducted the associated costs from payments otherwise due to KI. When Mr. Keeter learned of the deduction, he informed USPS that KI would no longer perform any work under the contract. On February 20, 2004, KI ceased all performance. Four days later, USPS issued a cure letter to KI which addressed the abandonment of KI's route and demanded prompt restoration of service. No further work was performed.

On March 10, 2004, KI's attorney submitted certified claims for breach of contract and other damages to the CO, as it was entitled to do under the CDA. Because those claims sought damages in excess of $100,000, KI certified them in accordance with the requirements of the statute. *See* Compl. Ex. 1; 41 U.S.C. § 605(c)(1). On April 28, 2004, the CO issued a decision terminating the contract for default, retroactive to February 20, 2004, based on KI's abandonment of its duties. The CO simultaneously issued a second decision which denied KI's certified claims. Def.'s App. at 98-102. Plaintiff filed this suit on February 22, 2005. Before this court, KI argues that each of the CO's decisions was improper. Plaintiff requests damages based on the government's purported breach of contract, including payments due for the remainder of the contract term and all litigation costs.

Following several procedural delays for which both KI and the government bear some responsibility, the United States filed a motion for summary judgment in this case on March 20, 2007. Plaintiff responded to that motion on April 20, 2007, and defendant filed a reply on May 5, 2007. Briefing is now completed and the matter is ripe for review. In the court's view, each of the parties has had a full

opportunity to brief all of the issues presented in this suit and has, in fact, done so. In addition, the briefs submitted by plaintiff and defendant, along with the parties' agreed upon findings of fact, establish that the facts relevant to liability in this case are undisputed. Moreover, the issue of liability in this suit centers on contract interpretation and thus presents a question of law to be decided by the court. For all of these reasons, the court concludes that it is able to render a determination on liability in this case.

## DISCUSSION

### I. Standard of Review

The parties have in effect filed cross-motions for summary judgment on the complaint under Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c). A genuine issue of material fact is one that would change the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In opposing a motion for summary judgment, the non-moving party must point to specific facts which show that a genuine issue of material fact indeed exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Any evidence presented by the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). Summary judgment pursuant to RCFC 56 can intercede and prevent trial if the movant can demonstrate that trial would be useless, in that more evidence than is already available in connection with its motion could not reasonably be expected to change the result. *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626 (Fed. Cir. 1984). When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. If the non-moving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied.

As is typical in cases filed under the CDA, this suit centers on questions of contract interpretation. The courts agree that contract interpretation presents a question of law which is "particularly well suited for summary judgment."

*Travelers Cas. & Surety Co. of Am. v. United States*, 75 Fed. Cl. 696, 703 (2007) (citing *Gov. Sys. Advisors, Inc. v. United States*, 847 F.2d 811, 812 n.1 (Fed. Cir. 1988)). It must be recognized, however, that "interpretation of language, conduct and parties' intent, *i.e.*, the question of what meaning should be given by a court to the words of the contract, may sometimes involve questions of material fact and not present a pure question of law." *Id.* (citing *Beta Systems, Inc. v. United States*, 838 F.2d 1179, 1183 (Fed. Cir. 1988)). In cases in which a genuine issue of material fact is presented, summary judgment is not appropriate. *Id.* Here, the court has determined that no material factual disputes exist regarding the proper interpretation of the contract. Therefore, the court is able to issue a ruling on the question of liability in this case. Significant fact questions remain, however, regarding KI's allegations of bad faith by the government, which will impact the type and amount of damages recoverable by KI. Accordingly, that matter will be stayed pending further factual development by the parties or settlement of plaintiff's damages claim.

## II. Analysis

### A. Threshold Matters

#### 1. Jurisdiction

The Contract Disputes Act (CDA), and the Tucker Act, 28 U.S.C. § 1491(a)(2) (2000), confer jurisdiction on this court in contract disputes in which the government is a party. *Travelers Casualty and Surety Company*, 75 Fed. Cl. at 702 (citing *Texas Health Choice, L.C. v. Office of Pers. Mgmt.*, 400 F.3d 895, 899 (Fed. Cir. 2005)). The CDA "provides that if a contractor has a dispute with the government regarding a contract, the contractor shall make a written claim to the contracting officer." *C.D. Hayes, Inc. v. United States*, 74 Fed. Cl. 699, 704-05 (2006) (citing 41 U.S.C. § 605(a)). The contracting officer is then required to issue a written decision on the contractor's claim. *Id.* at 705. Contracting officers are likewise required to issue final decisions on all claims asserted by the government against a contractor, including the decision to terminate a contract for default. *Id.*

A contracting officer's decisions are final, unless appealed by the contractor as permitted under the terms of the CDA. 41 U.S.C. § 605(b). That statute permits contractors to bring an action on a claim in the Court of Federal Claims or to file an appeal with the relevant board of contract appeals. 41 U.S.C. §§ 606, 609(a).

The action filed may not, however, "raise any new claims not presented and certified to the contracting officer." *Croman Corp. v. United States*, 44 Fed. Cl. 796, 800 (1999). In other words, "a final decision by the contracting officer on a claim, whether asserted by the contractor or the government, is a jurisdictional prerequisite to further legal action thereon." *Sharman Co. v. United States*, 2 F.3d 1564, 1568 (Fed. Cir. 1993) (internal quotations omitted), *overruled on other grounds by Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995); *see also England v. Swanson Group, Inc.*, 353 F.3d 1375, 1379 (Fed. Cir. 2004) ("We have held, based on the statutory provisions [of the CDA], that the jurisdiction over an appeal of a contracting officer's decision is lacking unless the contractor's claim is first presented to the contracting officer and that officer renders a final decision on the claim."). Thereafter, the court has the power to review certified claims submitted by a contractor or the government, including an agency's decision to terminate a contract for default. *C.D. Hayes*, 74 Fed. Cl. at 705 ("The Tucker Act confers jurisdiction on the court to render a declaratory judgment regarding the propriety of a default termination.") (citing 28 U.S.C. § 1491(a)(2); *Sharman*, 2 F.3d at 1572); *see K&S Constr. v. United States*, 35 Fed. Cl. 270, 277 (1996) (holding that the Court of Federal Claims had jurisdiction to review a default termination, which amounted to a government claim under the Contract Disputes Act, without the need for additional administrative review).

Here, KI asks the court to review its claim that USPS breached the contract and acted in bad faith in the administration thereof. The parties agree that, on March 10, 2004, KI submitted certified claims to the CO which alleged both a breach of contract and bad faith on the part of USPS, and that the CO denied those claims on April 28, 2004. The CO's denial of those claims provides the court with jurisdiction to entertain KI's request. *See* 41 U.S.C. § 609(a)(3). KI's complaint also requests review of the CO's decision to terminate the contract for default. Because this request is not accompanied by a request for monetary damages or a request to convert the cancellation of the contract to a termination for the convenience of the government, it is essentially a request for a declaratory judgment. *See Armor of Am. v. United States*, 69 Fed. Cl. 587, 592 (2006) (stating that a request for review of a default termination made without an accompanying request for money damages is, in effect, a request for declaratory relief) (citing *Scott Aviation v. United States*, 953 F.2d 1377, 1378 (Fed. Cir. 1992)). The court is likewise authorized to entertain that request. *C.D. Hayes*, 74 Fed. Cl. at 705; *K&S Construction*, 35 Fed. Cl. at 277. Finally, KI's instigation of this lawsuit on February 22, 2005 falls within the one-year limitation period during which a party

may commence a lawsuit after a CO has ruled on a certified claim. 41 U.S.C. § 609(a)(3). The jurisdictional prerequisites to suit in this court have therefore been satisfied.

### 2. Real Party In Interest

In its briefing, the government argues that because Mr. Keeter was not a party to the contract, he is not in privity with the government and is not a proper plaintiff in this action. The court agrees. RCFC 17(a) states explicitly that, in the Court of Federal Claims, "[e]very action shall be prosecuted in the name of the real party in interest." This court has held on numerous occasions that an owner or shareholder in a corporation is not a real party in interest with legal capacity to sue for breach of a contract between that corporation and the United States. *Algonac Mfg. Co. v. United States*, 428 F.2d 1241, 1249 (Ct. Cl. 1970) ("The contracts which serve as the basis for the claims in this case were between the government and Algonac Manufacturing Company. John A. Maxwell was not a party to the contracts . . . Maxwell is not a proper party to the suit, and we do not have jurisdiction of his petition."); *see Robo Wash, Inc. v. United States*, 223 Ct. Cl. 693 (1980) (stating that "the only damage which is alleged to have occurred to the stockholders . . . is the loss of value to their stock . . . these stockholders have no standing to sue individually, and must therefore be dismissed as parties"); *Pacetti v. United States*, 50 Fed. Cl. 239, 244-45 (2001) (citing *Algonac Manufacturing* for the rule that "[c]orporate officers do not have standing to sue on a corporation's behalf unless they themselves are personally a party to the contract"); *Computer Prods. Int'l, Inc. v. United States*, 26 Cl. Ct. 518, 529 (1992) (stating that "the United States entered into a contract with CPI, a California corporation, as opposed to a contract with Mr. Syed, the president of CPI . . . because the only parties to the contract at issue were the United States and CPI, Mr. Syed cannot be substituted as plaintiff in this case"). Here, only KI contracted with USPS, and KI alone may allege harm as a result of the government's conduct. While Mr. Keeter may have suffered some derivative harm as a result of his ownership of KI, that harm does not bestow him with standing to pursue this action. *Algonac Manufacturing*, 428 F.2d at 1249; *Computer Products*, 26 Cl. Ct. at 529. It follows that Mr. Keeter is not a real party in interest in this lawsuit, and all claims asserted by him must be dismissed. RCFC 17(a). Accordingly, the remainder of this opinion addresses claims by KI only.

**3. Capacity to Sue**

Defendant argues that the court lacks subject matter jurisdiction over this suit, under RCFC 12(b)(1), because KI's corporate charter was invalid on the day the action was filed. The United States contends that, for the Court of Federal Claims to have subject matter jurisdiction over a claim, the party asserting it must have the legal capacity to sue on the day of filing. Defendant points out, correctly, that a corporation's capacity to sue is governed by the law of the plaintiff's state of incorporation. Here, the parties agree that KI is incorporated in the State of Arkansas, that the Arkansas Secretary of State revoked KI's corporate charter on December 31, 2004, and that plaintiff filed this suit on February 22, 2005. Plaintiff's corporate charter was reinstated, however, on April 27, 2005. Defendant argues that, under Arkansas law, the fact that KI's corporate charter was invalid on the date of filing rendered it unable to file suit.

There is no question that in all federal courts, including this one, a corporation's capacity to sue or be sued is to be determined by the law of the state of its incorporation. *See* RCFC 17(b) ("The capacity of a corporation to sue or be sued shall be determined by the law under which it was organized."); Fed. R. Civ. P. 17(b); *Computer Products*, 26 Cl. Ct. at 524; *BLH, Inc. v. United States*, 2 Cl. Ct. 463, 466-67 (1983). It is beyond cavil, under Arkansas law, that a lapsed corporation does not have the legal capacity to file suit. *Terry v. Rice (In re Cheqnet Sys., Inc.)*, 246 B.R. 873, 878 (Bankr. E.D. Ark. 2000) ("It is well settled under Arkansas law that a corporation not in existence may not initiate a lawsuit."). However, the Arkansas Code also provides that "[a]ny corporation whose charter or permit authority to do business in the state has been declared forfeited by proclamation of the Governor or the Secretary of State may be reinstated to all its rights, powers, and property." Ark. Code. Ann. § 26-54-112(a)(1)(A)(i) (West 2006). In addition, "[r]einstatement shall be retroactive to the time that the corporation's authority to do business in the state was declared forfeited." *Id.* § 26-54-112(a)(1)(A)(ii).

In its motion, defendant correctly points out that this statutory language does not address whether retroactive reinstatement of a corporate charter cures standing defects in relation to suits filed during a period of lapse. Def.'s Reply at 2 (stating that "the meaning of 'retroactivity' in the statute is not explained, and cannot just be assumed to repair for all purposes a lack of capacity to sue that exists when suit is filed"). The United States argues that, to answer the question presented, the

court should examine a prior version of that section of the Arkansas Code and the judicial decisions which have interpreted it. Def.'s Mot. at 18 (citing *Terry v. Rice (In re Cheqnet Sys.)*, 246 B.R. 873 (Bankr. E.D. Ark. 2000); *Tribco Mfg. Co. v. People's Bank of Imboden*, 998 S.W.2d 756 (Ark. Ct. App. 1999)). In the cases cited by defendant, suits were filed by companies with lapsed corporate charters, and the courts held that reinstatement of those charters, post-filing, did not retroactively cure the companies' lack of standing. Defendant argues that the court should adhere to this "longstanding" position under Arkansas law, and hold that reinstatement of KI's corporate charter did not bestow plaintiff with standing to pursue this action.

Defendant is certainly correct that, under Arkansas law prior to 1999, reinstatement of a corporation's state sponsored charter served to revive its corporate status prospectively only, and did not retroactively cure standing defects in existence on the date of filing. *See Terry*, 246 B.R. at 879 (holding that, under Arkansas law, "[a] subsequent reinstatement of the corporate status does not retroactively restore or otherwise vest the corporation with a continuous existence"); *Tribco*, 998 S.W.2d at 758-59 (holding that a corporation lacked capacity to sue because "subsequent reinstatement of a corporate charter does not vest the corporation with continuous existence from its date of origin") (citing *Sulpher Springs Recreational Park, Inc. v. City of Camden*, 447 S.W.2d 844 (Ark. 1969)). However, as defendant concedes, the Arkansas Code was amended significantly in 1999, to add the specific provision that reinstatement of corporate charters "shall be retroactive to the time that the corporation's authority to do business in the state was declared forfeited." Ark. Code. Ann. § 26-54-112(a)(1)(A)(ii). That new language was in effect at all times relevant to this dispute, and it is that unequivocal language, alone, which applies to the case at bar. *See Omni Holding & Dev. Corp. v. C.A.G. Invs., Inc.*, - - S.W. 3d - -, 2007 WL 1630912 (Ark. June 7, 2007) (stating that precedents on this issue created prior to 1999 are no longer controlling because they are not based on the amended version of § 26-54-112). Accordingly, the case law cited by defendant, which is clearly based on a now-repealed version of the Arkansas Code, is not relevant or persuasive. *See, e.g.*, *Terry*, 246 B.R. at 878-79 (reiterating the language of the previous version of the statute, which provides that "once a charter is reinstated, the corporation shall *thereafter* be treated as if its name had not been declared forfeited" and concluding that "a subsequent reinstatement of the corporate charter does not serve to retroactively validate the initiation of the lawsuit") (emphasis in original).

There is no question that, in interpreting the Arkansas Code as it is written today, the court must begin its analysis by examining the plain language of the statute. *Shoshone Indian Tribe of the Wind River Reservation v. United States*, 364 F.3d 1339, 1345-46 (Fed. Cir. 2004) (holding that the plain language of a statute is controlling). In interpreting that language, the court must afford the words "their ordinary, contemporary, common meaning." *Williams v. Taylor*, 529 U.S. 420, 431 (2000) (internal quotations omitted) (quoting *Walters v. Metro. Ed. Enters., Inc.*, 519 U.S. 202, 207 (1997)); *Murakami v. United States*, 398 F.3d 1342, 1352 (Fed. Cir. 2005). The court must also interpret the statute in a manner which gives effect to all of its provisions. *Mudge v. United States*, 308 F.3d 1220, 1228 (Fed. Cir. 2002); *Perez v. Merit Sys. Prot. Bd.*, 85 F.3d 591, 594 (Fed. Cir. 1996).

Here, defendant is correct to point out that the plain language of Arkansas Code § 26-54-112 is silent on the issues of retroactive reinstatement and standing. *Shoshone Indian Tribe*, 364 F.3d at 1346. In the court's view, however, another subsection of the same statute, § 26-54-112(c)(2), answers the question presented here. That subsection, which follows provisions setting forth procedures for reinstatement, provides that "[t]hereafter, the corporation shall stand *in all respects* as though its name had never been declared forfeited." Ark. Code Ann. § 26-54-112(c)(2) (emphasis added). Thus, while the statute once stated that reinstatement was only prospective, it now explicitly provides that reinstatement is retroactive, Ark. Code. Ann. § 26-54-112(a)(1)(A)(ii), and further, that this retroactivity operates "in all respects." Ark. Code. Ann. § 26-54-112(c)(2). The court must give effect to these newly added words. *Mudge*, 308 F.3d at 1228.

When given its ordinary, contemporary and common meaning, the phrase "in all respects" indicates that the reinstatement provisions are broad in scope. *Williams*, 529 U.S. at 431. Indeed, no specific delineation or narrowing of the effects of reinstatement is accomplished through the statutory language. In the court's view, the absence of restricting language indicates that the curative impact of retroactive reinstatement is broad enough to include a lapsed corporation's incapacity to file suit. *See Omni Holding & Development*, - - S.W. 3d at - - (holding that, under § 26-54-112, restoration of the plaintiff's "corporate status vested it with continuous existence as though the revocation of its charter had never occurred," and finding no standing defect). Defendant has offered no plausible alternative interpretation of that language. Thus, the court concludes that the reinstatement of KI's corporate charter on April 27, 2005 cured any standing defect in existence on the date this suit was filed. Defendant's claim that the court

lacks subject matter jurisdiction over this action is rejected.

**B. KI's Requests for Review**

Plaintiff asks the court to review the CO's decision to terminate the contract for default. Under the CDA, this court must conduct a *de novo* review of that decision. *Moreland Corp. v. United States*, 76 Fed. Cl. 268, 284 (2007) (citing 41 U.S.C. § 609(a)(3); *Seaboard Lumber Co. v. United States*, 903 F.2d 1560, 1562 (Fed. Cir. 1990)). Plaintiff also asks the court to review the CO's decision to deny each of its certified claims, particularly those which alleged a breach of contract and bad faith by the government. The court must also review these claims *de novo*. 41 U.S.C. § 609(a)(3).

All of KI's requests for review hinge on plaintiff's allegation that USPS breached the contract by adding new mailboxes to KI's route without mutual agreement, and by taking deductions from KI's pay as a result of its refusal to service those boxes.[3] Plaintiff argues that those breaches entitled it to cease performance, and that USPS improperly terminated the contract for default based on KI's refusal to perform. The United States responds, however, that KI alone breached the contract when it refused to deliver mail to the new boxes, and when it stopped performing altogether. Based on those failures, defendant argues that the CO was entitled to terminate the contract for default.

It is well-settled that a contracting officer has broad discretion to terminate a contract for default. *Lanterman v. United States*, 75 Fed. Cl. 731, 733 (2007) (citing *Consol. Indus., Inc. v. United States*, 195 F.3d 1341, 1343 (Fed. Cir. 1999)). However, termination for default is "a drastic sanction which should be imposed (or sustained) only for good grounds and on solid evidence." *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987) (internal citation omitted). The default provision of a government contract does not require termination after a finding of default, but instead, provides the agency with discretion to do so, so long as that discretion is exercised reasonably. *Abcon Assocs., Inc. v. United States*, 49 Fed. Cl. 678, 686 (2001) (citing *Darwin Constr. Co. v. United States*, 811 F.2d

---

[3]/ Plaintiff also presented certified claims to the CO which alleged that KI had been harassed by USPS and Postmaster Orr, and that a hostile work environment existed at the Yellville Post Office. The CO declined to consider those claims. Because the claims fall outside of the jurisdiction granted to this court under the CDA, they likewise will not be considered here.

593, 596 (Fed. Cir. 1987)). Thus, the decision to terminate a government contract for default may be overturned if it is arbitrary, capricious, or an abuse of discretion. *Lanterman*, 75 Fed. Cl. at 733 (citing *Consolidated Industries*, 195 F.3d at 1343-44). Four factors serve as guideposts in determining whether a contracting officer's decision was reasonable:

> (1) evidence of subjective bad faith on the part of the government official, (2) whether there is a reasonable, contract-related basis for the official's decision, (3) the amount of discretion given to the official, and (4) whether the official violated an applicable statute or regulation.

*McDonnell Douglas Corp. v. United States*, 182 F.3d 1319, 1326 (Fed. Cir. 1999) (paraphrasing *U.S. Fid. & Guar. Co. v. United States*, 676 F.2d 622, 630 (1982)).

There is no question that, in cases in which a contracting officer exercises his or her discretion to terminate a contract for default, that decision must be "honestly rendered." *Moreland*, 76 Fed. Cl. at 284 (internal quotations omitted). Thus, even in cases in which a contractor has technically defaulted on its contractual obligations, the court will not uphold a default termination where the agency has acted in bad faith in administering the contract. *Id.* at 293; *Libertatia Assocs., Inc. v. United States*, 46 Fed. Cl. 702, 712 (2000) (stating that "[i]n view of the court's finding of bad faith on the part of the government, it is difficult–if not impossible–to assess whether the administration of the contract and the resulting termination for default was arbitrary and capricious because the evidence of default itself is tainted by bad faith"). Government agents are presumed, however, to discharge their duties in good faith. *Spezzaferro v. FAA*, 807 F.2d 169, 173 (Fed. Cir. 1986); *Kalvar Corp. v. United States*, 543 F.2d 1298, 1301 (Ct. Cl. 1976). To rebut that presumption and to establish that the government indeed terminated a contract in bad faith requires "irrefragable proof." *Abcon Associates*, 49 Fed. Cl. at 687-88 (citing *Kalvar Corporation*, 543 F.2d at 1301-02).

Initially, the government bears the burden to show that a default termination was justified because the contractor was in breach at the time of termination. *Lanterman*, 75 Fed. Cl. at 733 (citing *Lisbon*, 828 F.2d at 765). A nexus between the government's decision to terminate for default and the contractor's performance is required, and the government may not use default as a pretext for

terminating a contract for reasons unrelated to contract performance. *McDonnell Douglas*, 182 F.3d at 1329. One of the questions relevant to a contractor's alleged default is whether the contractor has met contract specifications. *Lanterman*, 75 Fed. Cl. at 734 (citing *McDonnell Douglas*, 182 F.3d at 1328) (stating in turn that "[f]ailure to meet contract specifications and inability to meet the contract delivery schedule are of course relevant considerations to whether a contractor is in default")). A clear violation of contract terms by the contractor supports a finding that a reasonable, contract-related basis for the termination exists. *See McDonnell Douglas*, 182 F.3d at 1328. If the government succeeds in proving default, the plaintiff then must demonstrate "that the default was excusable under the terms of the contract." *Airport Indus. Park, Inc. v. United States*, 59 Fed. Cl. 332, 338 (2004); *see Kennedy v. United States*, 164 Ct. Cl. 507, 512 (1974). This can be done, for example, by showing that improper government actions were the primary or controlling cause of the default and rendered the contractor financially unable to perform. *Abcon Associates*, 49 Fed. Cl. at 687 (citing *TGC Contracting Corp. v. United States*, 736 F.2d 1512 (Fed. Cir. 1984); *Nat'l Eastern Corp. v. United States*, 477 F.2d 1347, 1356 (1973)).

Here, the CO terminated the contract for default based on KI's abandonment of its duties, specifically, plaintiff's complete failure to perform after February 20, 2004. KI admits that it ceased performance on that date. Generally, a complete failure to perform is equivalent to a repudiation of contractual duties. *Dow Chem. Co. v. United States*, 226 F.3d 1334, 1344 (Fed. Cir. 2000) (explaining that "[r]epudiation occurs when one party refuses to perform and communicates that refusal distinctly and unqualifiedly to the other party") (citing *United States v. Dekonty Corp*., 922 F.2d 826, 827-28 (Fed. Cir. 1991)). Such a repudiation would, in fact, entitle the government to terminate a contract. *Id.* (stating that, when an injured party is faced with a repudiation, it can choose between terminating or continuing the contract) (citing *St. Paul Plow-Works v. Starling*, 140 U.S. 184 (1891); *McDonnell Douglas*, 182 F.3d at 1327; *Cities Serv. Helex, Inc. v. United States*, 543 F.2d 1306, 1313 (Ct. Cl. 1976)). Indeed, there is no question that a breach of contract by repudiation constitutes a reasonable and justifiable contract-based reason to terminate a contract for default. *See and compare Melville Energy Sys., Inc. v. United States*, 33 Fed. Cl. 616, 618 (1995) (stating that a contractor's decision not to work "constituted an apparent abandonment of the contract" and that "[a]bsent some defense, this abandonment gave the Corps ample grounds to terminate [the contract] for default").

It is equally well-settled, however, that a contractor's refusal to perform in the presence of a material breach of contract by the government does not constitute a repudiation. *Murdoch Mach. & Eng'g Co. of Utah v. United States*, 873 F.2d 1410, 1413 (Fed. Cir. 1989) (stating that the government's breach of contract "relieved [the contractor] of the default termination and its consequences") (citing *Malone v. United States*, 849 F.2d 1441, 1446 (Fed. Cir. 1988)). The law is clear that, when a party to a contract is faced with a breach by the opposing party, that party "can choose either to terminate the contract or to continue the contract, perhaps extracting other concessions or consideration from the breaching party in return for its willingness to modify the contract." *McDonnell Douglas*, 182 F.3d at 1327 (citing 3 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 7:36 (4th ed. 1992)). In other words, "[u]pon a material breach of a contract, the non-breaching party has the right to discontinue performance under the contract." *Farmers Grain Co. of Esmond v. United States*, 33 Fed. Cl. 298, 300 (1995) (citing *Stone Forest Indus., Inc. v. United States*, 973 F.2d 1548, 1550 (Fed. Cir. 1992)). Not every departure from the literal terms of a contract is sufficient, however, to be deemed a material breach. *Id.* (citing *Stone Forest Industries*, 973 F.2d at 1550). Thus, when determining whether a party caused a material breach, the court must consider the nature and effect of the violation, viewed in context. *See Stone Forest Industries*, 973 F.2d at 1551 (citing Restatement (Second) of Contracts § 241 cmts. a & b (1981)); *see also Farmers Grain Company*, 33 Fed. Cl. at 300.

Here, whether the United States has met its burden to establish a reasonable and justifiable contract-based reason for the default termination, and therefore shifted the burden to plaintiff to demonstrate that KI's default "was excusable under the terms of the contract," rests on the success or failure of KI's arguments regarding a governmental breach. *Airport Industrial Park*, 59 Fed. Cl. at 338. If plaintiff is correct in alleging that USPS materially breached the contract when it attempted to unilaterally add the new boxes to its route, KI will have established its right to cease performance under the contract, thereby undermining the basis for the CO's default termination. These same allegations, if proven true, likewise will provide the requisite support for KI's certified claims.

### C. Interpretation of the Contract

Here, to show that its alleged default was excusable, KI alleges that USPS improperly attempted to change its contractual duties. Plaintiff argues,

specifically, that USPS breached the contract when it ordered a major change to KI's contractual duties without mutual agreement. KI contends that these actions by defendant violated the terms of the Changes clause of the contract. Defendant disagrees, and contends that all of its actions in modifying the contract complied with the terms of the parties' agreement.

The parties' dispute is essentially a disagreement about how to properly interpret the contract. Most important to that dispute, of course, is the "Changes" clause of the agreement, which provides, in relevant part, as follows:

> **H.8 CHANGES (TRANSPORTATION) (Clause B-67) (January 1997)**
>
> **a. Service Changes**
>
> (1) Minor Service Changes. The contracting officer may, at any time, without consulting the supplier, issue orders directing an extension, curtailment, change in line of travel, revisions of route, or increase or decrease in frequency of service or number of trips and fixing an adjustment in the supplier's compensation which increases the supplier's rate of pay by no more than $2,500. If the supplier believes the increased cost of providing the service required by the order exceeds the increase made in compensation, it may request an adjustment of compensation for the service change.
>
> (2) Other Service Changes. Service changes other than minor service changes, including increases or decreases in compensation, may be made by mutual agreement of the contracting officer and the supplier. Such changes shall be memorialized by formal amendment to the contract.

**b. Extra Trips**

An extra trip is an additional trip of service operated on an infrequent time basis over the same route or part as normally provided under the terms of the contract. Extra trips shall be negotiated in advance of the performance when the contracting officer deems it appropriate. However, the contracting officer may order the supplier to perform such extra service at pro rata pay. If no rate of pay for extra trips has been negotiated in advance, the contractor shall nonetheless perform such extra trips as are ordered by the contracting officer and may, on an after-the-fact basis, obtain a lump sum reimbursement for the difference between costs incurred as a direct result of performing such extra trips and pro-rata payment for such trips, provided that such claims costs are adequately supported by documentary evidence furnished to the contracting officer. Claims for compensation above pro rata pay for extra trips must be filed in writing with the contracting officer, accompanied by full supporting documentation of costs, no later than 90 days after the performance of such extra trips. When the contracting officer has ordered several extra trips under a single order, the 90-day period begins on the date of performance of the last trip performed under such order. Failure to agree to such compensation above pro rata pay shall be resolved under the *Claims and Disputes* clause.

. . . .

**d.** The supplier shall proceed diligently in accordance with service changes and extra trips ordered unilaterally by the contracting officer. Disputes concerning such orders shall be resolved pursuant to the *Claims and Disputes* clause.

Def.'s App. at 66-67.

The parties disagree on whether this clause permitted USPS to make the disputed change to KI's workload. Plaintiff argues that, under the plain language of the Changes clause, the addition of fifty-two new mailboxes to KI's route fell within the scope of "Other Service Changes," and therefore could only be accomplished by mutual agreement. *See* Pl.'s Resp. at 7. KI contends further that because the parties never agreed on the addition of those boxes, KI was not contractually obligated to service them, and did not default on the contract when it refused to do so. In support of its interpretation, plaintiff argues that the additional work associated with the new boxes must be evaluated according to a formula provided in the contract for "Adjustments for Route Extensions or En Route Boxes." That portion of the contract states, in relevant part, that

> [a]djustments for extension and en route boxes will be processed using the following formula. Adjustments in the annual hours for casing and route operations will be computed using two constant factors. Multiply the number of additional boxes by 3.64 and the additional miles by 10.40. The sum of the two equals the new hours added to the contract.

Def.'s App. at 28. Plaintiff argues that, when analyzed in accordance with this formula, it is clear that the additional work at issue warranted more than $2500 in additional compensation. Moreover, KI contends that the course of events which unfolded after defendant attempted to make the disputed change demonstrates that the new work was worth more than $2500. KI points out that, after USPS initially valued the new work at $1087.56, the agency considered KI's grievance, agreed that Mr. Keeter's valuation of the addition was correct, and "processed a change order to add more money to the route as another insignificant change" worth an additional $1602.72. Pl.'s Resp. at 7. Plaintiff contends that by splitting the additional pay into two portions, the government purposefully made two minor changes to the contract, rather than one major change.

In response, the United States concedes that the "Other Service Changes" clause of the contract applies to the challenged work. Defendant argues, however, that the clause, interpreted in context, does not restrict the CO's ability to unilaterally order changes which increase compensation by more than $2500. The

government concedes that the clause affords contractors some negotiation rights regarding such large changes, which "justify the time needed for negotiation of the associated change in compensation," but insists that "these provisions do not make performance of 'other' changes contingent on the supplier's acceptance of them. Rather, they deal with the determination of appropriate changes in compensation when the C.O. orders changes in the work to be performed." Def.'s Mot. at 22-23. In fact, defendant asserts that, absent a cardinal change to the contract requirements, KI was required to perform at all times, and to present any complaints related to performance through the grievance procedures outlined in the contract. The United States claims that "[t]he 'minor/major change' distinction might have been a ground on which plaintiff could challenge assignment of [additional mailboxes]–but it is not a ground for ceasing to perform." Def.'s Reply at 8. Thus, the government contends that, even if USPS did order an "Other Service Change" without KI's consent, plaintiff was nevertheless required to continue performance, and that it breached the contract when it failed to do so.

In support of its position on this matter, defendant highlights several portions of the contract's language. The government points out first that, under the terms of the agreement, plaintiff was required to carry the mail "with certainty, celerity, and security." Def.'s Mot. at 19 (quoting Def.'s App. at 30). Similarly, § B.3.j of the contract provides that KI "*shall* deposit, receive, and deliver *all* mail directed to or coming from the assigned boxes" when directed to do so by the CO. *Id.* at 20 (citing Def.'s App. at 32). Defendant argues that

> [t]his language does not itself specify which boxes it refers to, but it emphasizes the inclusiveness of the service being provided. The boxes to be served do not need individual enumeration in the Contract: they are the boxes placed or found "*along the line of route*" that the Contract applies to.

*Id.* Defendant also points to § B.1.3 of the contract, which describes KI's delivery route. Emphasizing this section's directive that "route extensions or en route boxes" may be added when accompanied by an adjustment in compensation, the government argues that the addition of boxes "is an event contemplated when the contract is entered," and that § B.1.3 "does not in any way differentiate the duties associated with added boxes from any others. Boxes added . . . are simply more boxes to which all of the Contract's demands for certain and reliable service will

attach when the C.O. directs that they be served." *Id.* (quoting Def.'s App. at 28).

Next, the United States points to the "Extra Trips" section of the contract's Changes clause. Defendant argues that the work associated with the new mailboxes is governed by this clause, which states that "the supplier must proceed to perform any extra trips ordered by the contracting officer," and that extra trips shall be negotiated in advance "when the contracting officer deems it appropriate." *Id.* at 23-24 (quoting Def.'s App. at 30, 67). Defendant contends that performance by KI was mandatory in this instance because, under the terms of this clause,

> [i]f no rate of pay for extra trips has been negotiated in advance, the contractor shall nonetheless perform such extra trips as are ordered by the contracting officer and may, on an after-the-fact basis, obtain [compensation for the extra trip above the amount determined by the C.O., with appropriate documentation.]

*Id.* at 24 (quoting Def.'s App. at 67). Defendant argues further that this directive trumps the terms of the Other Service Changes clause which appear to allow contractors to refuse additional work valued at more than $2500. The United States also insists that, to the extent the Extra Trips and Other Service Changes clauses conflict, those terms must be interpreted consistently, because "[b]asic rules of interpretation applied by this [c]ourt require that contract terms be viewed within the contract *as a whole*, not as isolated language disconnected from its larger context." *Id.* at 25 (emphasis in original) (citing *North Star Alaska Housing Corp. v. United States*, 30 Fed. Cl. 259 (1993)).

Finally, the United States points to subsection (d) of the Changes clause, which states that "[t]he supplier shall proceed diligently in accordance with service changes and extra trips ordered unilaterally by the contracting officer. Disputes concerning such orders shall be resolved pursuant to the *Claims and Disputes* clause." *See id.* at 25 (quoting Def.'s App. at 67). Defendant argues that this part of the Changes clause creates a universal requirement to perform in accordance with unilateral changes which applies to both "Extra Trips" and to other service changes like the addition of mailboxes along an existing route.

There is no question that whether KI or USPS has violated the terms of the parties' agreement presents a question of contract interpretation. It is well-settled

that, when weighing arguments related to an alleged breach of contract, the court must begin by examining the contract's own language. *See Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991). All relevant terms of the parties' agreement must be accorded their plain and ordinary meaning. *Aleman Food Servs., Inc. v. United States*, 994 F.2d 819, 822 (Fed. Cir. 1993) (citing *Gould*, 935 F.2d at 1274); *Travelers Casualty & Surety Company*, 75 Fed. Cl. at 707. In other words, the language of the contract must be given the meaning that a "reasonably intelligent person acquainted with the contemporaneous circumstances" would afford it. *Allied Tech. Group, Inc. v. United States*, 39 Fed. Cl. 125, 138 (1997) (internal quotation marks omitted).

If the language of the contract is unambiguous, in that only one reasonable interpretation of it exists, then the plain language is controlling. *Triax Pacific, Inc. v. West*, 130 F.3d 1469, 1473 (Fed. Cir. 1997); *Bristol-Myers Squibb Co. v. United States*, 48 Fed. Cl. 350, 355 (2000). If, on the other hand, two different reasonable interpretations are consistent with the contractual language, the contract must be deemed ambiguous. *Cmty. Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1579 (Fed. Cir. 1993) (citations omitted). In cases in which an ambiguity arises among or between contractual provisions, the court must interpret them in a way which is reasonable and internally consistent. *See Brunswick Corp. v. United States*, 951 F.2d 334, 337 (Fed. Cir. 1991) (citation omitted) (rejecting contract interpretation that could "be harmonized only by ignoring important contract language"). In such cases, the joint intent of the parties, if ascertainable, is decisive. *See Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed. Cir. 1986). Indeed, "'[i]t is the general law of contracts that in construing ambiguous and indefinite contracts, the courts will look to the construction the parties have given to the instrument by their conduct before a controversy arises.'" *Id.* (quoting *United States v. Cross*, 477 F.2d 317, 318 (10th Cir. 1973)); *see also Highway Prods., Inc. v. United States*, 530 F.2d 911, 917 (Ct. Cl. 1976) ("Where there is an ambiguity in the contract instrument, it is appropriate to go outside the formal documents and ascertain the intent of the parties . . . ."). However, the mere fact that the parties may disagree with regard to the interpretation of a specific provision does not, standing alone, render that provision ambiguous. *See Community Heating & Plumbing*, 987 F.2d at 1579; *Brunswick Corporation*, 951 F.2d at 337.

When the meaning of contract terms is not immediately plain, this court relies on several rules to assist in its contract interpretation, and to reveal whether an ambiguity truly exists. "Before making a conclusive determination about an

agreement's ambiguity, or lack thereof, the court should consider the context in which the agreement was executed." *W&F Bldg. Maint. Co. v. United States*, 56 Fed. Cl. 62, 69 (2003). In addition, the court must attempt to read the contract's various provisions as a harmonious, integrated whole, interpreting these provisions in their larger contractual context, rather than in isolation. *Hol-Gar Mfg. Corp. v. United States*, 351 F.2d 972, 979 (Ct. Cl. 1965); *Gaston & Assocs., Inc. v. United States*, 27 Fed. Cl. 243, 249 n.7 (1992). The court will seek an interpretation that accommodates all of the document's terms and avoids a conflict between them. *Granite Constr. Co. v. United States*, 962 F.2d 998, 1003 (Fed. Cir. 1992); *Hol-Gar Manufacturing*, 351 F.2d at 979.

A corollary of the court's goal of harmonizing all contract provisions is that the court will not adopt an interpretation which renders a contract term nugatory. *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed. Cir. 1983); *see Arizona v. United States*, 575 F.2d 855, 863 (Ct. Cl. 1978) (adhering to the rule that the court will avoid an interpretation that renders a portion of the contract "useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result") (citations omitted). Finally, if an ambiguity exists and extrinsic evidence does not clearly establish the parties' intent, the ambiguity will be construed against the drafter of the language, under the doctrine of *contra proferentem*. *See Studiengesellschaft Kohle, M.B.H. v. Hercules, Inc.*, 105 F.3d 629, 634 (Fed. Cir. 1997) (citing *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 398 (Del. 1996)).

Here, the court must discern the meaning of the Changes clause and other relevant contract provisions in light of these settled principles of contract interpretation, and determine whether any ambiguity exists within or between them. This inquiry commences, of course, with the plain language of the "Changes" clause. *Gould*, 935 F.2d at 1274. The court agrees with the parties that the "Other Service Changes" provision is most relevant here. That clause, by its own plain text, applies to service changes which are not "minor" because they result in added compensation of more than $2500. Def.'s App. at 66. Here, KI alleges, and the record establishes, that the change to plaintiff's contract as a result of the addition of the new boxes increased KI's compensation by more than $2500. The initial change by USPS was accompanied by an increase of $1087.56, and that amount was later supplemented by another $1602.72. Def.'s App. at 89, 92. A total of $2690.28 was added to the value of KI's contract with USPS, and so, that addition constituted an "Other Service Change."

According to the plain language of the Other Service Changes clause, changes in excess of $2500 "may be made by mutual agreement of the contracting officer and the supplier." Def.'s App. at 66. In addition, they "shall be memorialized by formal amendment to the contract." *Id.* Interpreting these provisions as a "reasonably intelligent person acquainted with the contemporaneous circumstances" would, it is clear that Other Service Changes may be properly accomplished only when the CO and the contractor agree to do so. *Hol-Gar Manufacturing*, 351 F.2d at 975; *Allied Technology Group*, 39 Fed. Cl. at 138. In addition, a formal contract amendment is required to memorialize such a modification. No exceptions to these requirements are created by the plain language of this section. Further, and perhaps more importantly, no part of this language addresses, directly or indirectly, the question of whether a contractor is required to perform in response to Other Service Changes ordered in violation of these requirements. Because the contract must be interpreted in context and as an integrated whole, an examination of the agreement's other terms is necessary to determine whether they create such a duty. *Hol-Gar Manufacturing*, 351 F.2d at 979.

Defendant argues that a duty of absolute performance arises by virtue of the Extra Trips clause, which contains language requiring performance under all circumstances. The government is correct that under the Extra Trips clause, the contractor "must proceed to perform any extra trips ordered by the contracting officer." Def.'s Mot. at 23. However, as the government's own briefing recognizes, "extra trips" are defined in the contract as "an additional trip of service operated *on an infrequent time basis* . . . ." Def.'s App. at 67 (emphasis added). Extra Trips are described similarly in a letter written by USPS's Manager of Transportation Contracts, which states that the AO and his designated representative are permitted to "[d]ispatch extra trips *for an unanticipated volume of mail*." Def.'s App. at 41 (emphasis added). That letter also explains that the AO's powers do not "include long-term scheduled extras. Schedule extras should be negotiated in advance by [the contractor] and the Contracting Officer." *Id.* This description of the purpose of Extra Trips provides additional evidence that the Extra Trips clause applies to a narrow and unique type of temporary work, and that this work is distinct from changes known as "long term schedule extras," which may only be effectuated through negotiation. *See id.* Although the United States asserts that the Extra Trips clause applies to trips which are "both occasional and regular," defendant has provided no support for that position. *See* Def.'s Mot. at 23. The court finds, therefore, that the Extra Trips clause applies only to

temporary or infrequent changes in a contractor's workload.

Here, neither party has alleged that the disputed contract change directed KI to service the new boxes infrequently or temporarily. To the contrary, the "Insignificant Minor Service Change" forms used by USPS to order the change described KI's new duties in relation to plaintiff's annual workload and total annual compensation. Def.'s App. at 89. That fact indicates that USPS expected KI to perform the additional work on a permanent basis. It follows, then, that the work associated with the new mailboxes did not constitute an "Extra Trip." While defendant may be correct in asserting that the Extra Trips clause mandates performance under all circumstances, that directive is irrelevant here.

The United States has also argued that an interpretation of the Other Service Changes clause as requiring mutual agreement must be rejected because it would render the Other Service Changes and Extra Trips clauses contradictory. However, the court's conclusions about the scope of the Extra Trips clause undermines that contention. A careful reading of the contract demonstrates that no conflict between these two clauses exists, either explicitly or as applied. It is true that, under the contract interpretation favored by plaintiff, the CO has the absolute right to order "non-regular performance of the services that the supplier ordinarily provides under the Contract" pursuant to the Extra Trips clause, whereas Other Service Changes require mutual agreement. Def.'s Mot. at 24. That fact does not, however, indicate a contradiction in the contract's terms. Instead, this dichotomy results from the fact that the Extra Trips and Other Service Changes provisions address separate and distinct spheres of coverage and different types of additional work. Put simply, the Extra Trips clause governs irregularly scheduled work orders, which can be ordered outright, whereas the Other Service Changes clause governs permanent changes to a contractor's duties, which must be negotiated and agreed upon. These contractual terms are harmonious and in no way conflict.

Defendant also places great emphasis on § H.8.d of the Changes clause, which states that "[t]he supplier shall proceed diligently in accordance with service changes and extra trips ordered unilaterally by the contracting officer. Disputes concerning such orders shall be resolved pursuant to the *Claims and Disputes* clause." Def.'s App. at 67. The government contends that, based on this language, KI was required to perform in response to any and all service changes ordered by the CO. By its own language, however, this clause of the contract applies only to changes which are "*ordered unilaterally*" by the CO. *Id.* (emphasis added). In the

court's view, this phraseology applies an unequivocal duty to perform only those changes which are properly ordered unilaterally by the CO, under the terms of the parties' agreement. The clause refers, in other words, to minor changes amounting to less than $2500 worth of added work, which may be unilaterally ordered pursuant to § H.8.a(1), and to Extra Trips, which may be unilaterally ordered pursuant to § H.8.b. In those two areas, the CO is entitled to act unilaterally to order additional work from a contractor, and the contractor is likewise required to comply. Defendant's alternative reading of this clause as applying to all unilateral changes, proper or otherwise, is not reasonable. Moreover, even if it were, that fact would at best render the contract ambiguous, and such an ambiguity would be construed against the government, as drafter of the document, under the principle of *contra proferentem*. *See Studiengesellschaft Kohle*, 105 F.3d at 634.

Further, while there is no question that a government contractor's duty to proceed in accordance with clauses such as § H.8.d is broad, the requirement is not absolute. *See Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1276 (Fed. Cir.), *reh'g denied*, 186 F.3d 1379 (1999). In fact, an exception to the duty to proceed exists in situations in which the government has attempted to effect a change which fundamentally alters the parties' contractual undertaking. *See Becho, Inc. v. United States*, 47 Fed. Cl. 595, 600-01 (2000). Defendant admits that such an exception exists for so-called "cardinal changes," but insists that the additional boxes added to KI's route by the CO did not change the nature of the contract to an extent that it could be considered a cardinal change. Def.'s Mot. at 32. In support of this position, the United States relies on *Becho*, in which this court stated that

> while there is no precise calculus for determining whether a cardinal change has occurred, the courts have considered, *inter alia*, the following factors: (i) whether there is a significant change in the magnitude of work to be performed; (ii) whether the change is designed to procure a totally different item or drastically alter the quality, character, nature or type of work contemplated by the original contract; and (iii) whether the cost of the work ordered greatly exceeds the original contract cost.

*Id.* at 31-32 (quoting *Becho*, 47 Fed. Cl. at 601). Defendant argues that, when the facts of this case are weighed under this test, it is clear that the addition of

mailboxes to KI's route did not constitute a cardinal change. *Id.* Regarding the "change in the magnitude of the work to be performed," the government contends that the addition of those boxes did not require a significant increase in time or effort for performance. In fact, the United States claims that, according to the formula set forth in the contract, the additional time needed to service the new mailboxes was approximately thirty to forty minutes per day. Defendant points out that the contract initially required 1894 hours of work per year, and that the additional boxes increased this amount by only ten percent. The government argues that "changes that by any measure amount to less than a 10% addition to the amount of work required or to the compensation the [c]ontract warrants surely cannot achieve the status of being 'too much.'" *Id.* at 34. Regarding the second factor, whether "a different item or drastic alteration of work contemplated" occurred, defendant argues that, in this instance, the contract was designed to procure service to rural mailboxes and that "[t]he modifications require more of the same, and nothing else. The Contract anticipates that '*en route*' additions may be ordered, and that is what happened." *Id.* Finally, regarding whether the "cost of [the] added work greatly exceed[ed] original cost," defendant argues that the ten percent increase in cost which occurred here does not meet this standard, and that "[i]f it does, then [a] C.O. will have scant flexibility at all to adapt to changes that the parties knew were likely to occur." *Id.* at 35.

As explained in defendant's briefing, "[a] cardinal change is a substantial deviation from the original scope of work that changes the nature of the bargain between the parties." *ThermoCor, Inc. v. United States*, 35 Fed. Cl. 480, 490 (1996). A cardinal change

> occurs when the government effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for. By definition, then a cardinal change is so profound that it is not redressable under the contract, and thus renders the government in breach.

*Allied Materials & Equip. Co. v. United States*, 569 F.2d 562, 563-64 (Ct. Cl. 1978). In other words, the government is not permitted to obligate a contractor to perform in ways that far exceed those contemplated in the original contract. *Becho*, 47 Fed. Cl. at 600 (citing *Alliant Techsystems*, 178 F.3d at 1276). Accordingly, "[t]he cardinal change doctrine asks whether a modification exceeds

the scope of the contract's changes clause . . . ." *AT&T Commc'ns, Inc. v. Wiltel, Inc.*, 1 F.3d 1201, 1205 (Fed. Cir. 1993); *Gen'l Dynamics Corp. v. United States*, 585 F.2d 457, 462 (Ct. Cl. 1978) (stating that "[t]he changes clause vests in the contracting officer discretion to make changes within the general scope of the contract. Such changes may be by agreement or unilateral order. An order change determined to be outside the scope of the contract is an abuse of the contract right and is a cardinal change") (internal quotations and citations omitted). The chief purpose of the doctrine is "to provide a breach remedy for contractors who are directed by the government to perform work which is not within the general scope of the contract *and exceeds the scope of the contract's changes clause*." *PCL Constr. Servs., Inc. v. United States*, 47 Fed. Cl. 745, 804 (2000) (emphasis added) (internal quotation marks omitted) (quoting *General Dynamics Corporation*, 585 F.2d at 462).

Because every situation in which parties enter into a contractual relationship is unique, there is no definitive test for determining whether a change is beyond the scope of a particular contract. *See ThermoCor*, 35 Fed. Cl. at 490 (citing *Edward R. Marden Corp. v. United States*, 442 F.2d 364 (Ct. Cl. 1971)). Instead, "'[e]ach case must be analyzed on its own facts and in light of its own circumstances, giving just consideration to the magnitude and quality of the changes ordered and their cumulative effect upon the project as a whole.'" *Id.* (quoting *Wunderlich Contracting Co. v. United States*, 351 F.2d 956, 966 (Ct. Cl. 1965)). Indeed, a fact-intensive inquiry regarding both the events that led to the excess work and the effect of that work is required. *Id.* In addition, the contractor must prove specific facts in support of its allegation of a cardinal change. *PCL Construction Services*, 47 Fed. Cl. at 804. Factors such as changes in the nature, magnitude, and total costs of work to be performed under a contract are helpful guideposts for determining whether a contract modification rises to the level of a "cardinal change." *See Becho*, 47 Fed. Cl. at 601. Those factors are especially helpful in cases in which a challenged contract includes a standard changes clause which provides little specific guidance regarding changes, for example, in cases in which the clause states only that contract modifications are permissible so long as they fall within the scope of the parties' agreement. *See, e.g.*, *Becho*, 47 Fed. Cl. at 597, 601; *ThermoCor*, 35 Fed. Cl. at 490.

Here, the Changes clause of the contract is not worded broadly, but instead, sets forth specific parameters under which changes to the parties' agreement may be ordered. According to the plain language of § H.8.a, the $2500 threshold is key

to the determination of whether a particular change may be ordered unilaterally. Def.'s App. at 66. Because the Changes clause is so specifically crafted, the most appropriate way to determine the existence of a cardinal change in this particular case is to inquire whether the change at issue complied with the express terms of the Changes clause. The United States has focused on several aspects of the disputed change which are generally worthy of consideration. An examination of those factors cannot, however, override the specific contractual terms of the parties' narrowly drafted Changes clause, as those terms represent the essence of the agreement to contract. *See Becho*, 47 Fed. Cl. at 600-01. Defendant has analyzed the disputed change in terms of its percentage effect on compensation and workload, and the court agrees with the United States that a ten percent change in those factors does not necessarily appear to be substantial contract alteration. The fact remains, however, that USPS created the $2500 threshold for use in the contract's Changes clause, and the agency is therefore obligated to act in accordance with that standard. For the reasons previously discussed, the court concludes that the CO's attempt to make a change valued at more than $2500 without mutual agreement violated the terms of the Changes clause. *Id.* It follows that the modification was, in fact, a cardinal change which entitled KI to cease performance. *See PCL Construction Services*, 47 Fed. Cl. at 804.

Finally, defendant argues, as a matter of policy, that to interpret the Other Service Changes clause in the manner proposed by KI would render the contract unworkable. The government claims that, if the CO were without the unilateral power to order all types of work, effective management of the mails would be impossible. The United States fails to recognize, however, that the solution to the government's perceived dilemma exists under the terms of the contract as written. Under those terms, a CO is undoubtedly entitled to unilaterally order service to additional boxes on a temporary basis, pursuant to the Extra Trips clause, and then to negotiate the change on a permanent basis in accordance with the terms of the Other Service Changes clause. This course of action would permit the CO to comply with the terms of the contract and to successfully and efficiently manage the mails. Defendant has presented no reason, and the court can ascertain none, which would have prevented the CO from utilizing USPS's contractual rights in this manner in the case at bar. Nothing prevented the CO from ordering KI to deliver mail to the 52 boxes on a temporary basis, and then negotiating and agreeing upon a permanent change to the contract which would have secured that work for the future. What the CO was *not* entitled to do, however, was to order KI to perform more than $2500 in additional work on a permanent basis without first

securing plaintiff's assent. Contrary to the government's assertions, a unilateral and unfettered power to do so did not flow from the contract's provisions, and the CO's attempt to do so amounted to a breach of contract.

For all of these reasons, the court concludes that USPS breached the contract when it attempted to unilaterally add fifty-two new boxes to KI's route. That act represented a cardinal change to the contract which was serious enough to justify KI's refusal to perform the work in dispute and its discontinuance of contract performance altogether.[4] *Alliant Techsystems*, 178 F.3d at 1276; *Stone Forest Industries*, 973 F.2d at 1550. Defendant has not carried its burden to show, as a matter of law, that USPS's decision to terminate the contract for default was justified. The United States likewise has failed to prove that the CO's decision to deny KI's certified claims was proper. The government's motion for summary judgment is therefore denied.

### 3. Damages

In its complaint, KI requests the payments due for the remainder of the original contract term and litigation costs as damages to compensate it for the government's breach of contract. Typically, "[w]hen one party to a contract fails to perform and improperly repudiates its contractual obligations, the other party is . . . entitled to damages for breach." *Best Foam Fabricators, Inc. v. United States*, 38 Fed. Cl. 627, 637 (1997) (citations omitted). It is well-settled, however, that in government contract cases in which a termination for default is found to be improper, it will be converted to a termination for the convenience of the government, and damages calculated accordingly. *Id.* at 638 (stating that "the rule has been established that if the contract contains a termination for convenience clause and the contracting officer could have invoked the clause instead of terminating, rescinding or repudiating the contract on some other invalid basis, the court will constructively invoke the clause to retroactively justify the government's actions, avoid breach and limit liability"). Termination for convenience clauses allow the government to terminate a contract, in whole or in part, when to do so is in the government's interests. *Id.* at 637. "A termination for convenience

---

[4]/ It is unclear, from the briefing, whether plaintiff alleges bad faith as a separate justification for its cessation of contract performance. To the extent that KI does make such an allegation, however, the court finds it unnecessary to address that claim, inasmuch as a breach of contract has already been established based on the express terms of the contract.

essentially converts a fixed price contract into a cost reimbursement contract." *Id.* at 638 (citations omitted). Thus, convenience damages are limited to costs incurred prior to termination, a reasonable profit on work performed, and certain additional costs associated with termination. *Id.* at 637. Anticipatory profits and consequential damages are not recoverable. *Id.*

Here, the contract includes the following language regarding termination for default:

> **H.4 TERMINATION FOR DEFAULT (Clause B-13) (January 1997) (Modified)**
>
> **a.**
>
> (1) The Postal Service may, subject to paragraphs c and d below, by written notice of default to the supplier, terminate this contract in whole or in part if the supplier fails to:
>
> (a) Complete the requirements of this contract within the time specified in the contract or any extension;
>
> (b) Make progress, so as to endanger performance of this contract (but see paragraph d below; or
>
> (c) Perform any of the other provisions of this contract . . .
>
> . . . .
>
> g. If, after termination, it is determined that the supplier was not in default . . . the rights and obligations of the parties will be the same as if the termination had been issued for convenience.

Def.'s App. at 63-64. The Termination for Convenience clause, found at § H.3 of the agreement, provides that, upon a termination for convenience, the contractor will be entitled to liquidated damages in accordance with "the sum provided for in the *Changes (Transportation)* clause." *Id.* at 63. Further, "[t]he liquidated damages permitted by this contract, if any, constitute the supplier's full remedy for a whole or partial termination under this clause." *Id.* The relevant portion of the Changes clause states in turn that

> [i]n all cases, if this is a Highway Transportation Contract or a Domestic Water Transportation Contract and is terminated for convenience without fault on the part of the supplier, liquidated damages for the termination will be established as:
>
> (a) One third of the annual rate (if during the first two years) . . . .

*Id.* at 67. Thus, the contract dictates that, in situations in which the contract is wrongfully terminated for default, the termination will be converted to one for the convenience of the government, and damages will be calculated accordingly. *See and compare Dart Advantage Warehousing, Inc. v. United States*, 52 Fed. Cl. 694, 703 (2002) (reviewing similar language and concluding that "the improper default termination is converted to a termination for the convenience of the Postal Service by the explicit language in the Termination for Default clause"); *Murdock Machine & Engineering Company*, 873 F.2d at 1413; *SIPCO Servs. & Marine, Inc. v. United States*, 41 Fed. Cl. 196, 226 (1998).

The courts agree that a contracting officer's invocation of a termination for convenience clause "is conclusive in the absence of bad faith or a clear abuse of discretion." *Best Foam Fabricators*, 38 Fed. Cl. at 637 (citing *Krygoski Constr. Co. v. United States*, 94 F.3d 1537, 1541 (Fed. Cir. 1996), *cert. denied*, 520 U.S. 1210 (1997); *Kalvar Corp. v. United States*, 543 F.2d 1298, 1304 (Ct. Cl. 1976), *cert. denied*, 434 U.S. 830 (1977); *John Reiner & Co. v. United States*, 325 F.2d 438, 442 (Ct. Cl. 1963), *cert. denied*, 377 U.S. 931 (1964)). The same is true when a termination for convenience is deemed to have occurred under the terms of a contract:

> [i]n the absence of bad faith or clear abuse of discretion, the effect of the constructive termination for convenience is to moot all breach claims and to limit recovery to costs which would have been allowed had the contracting officer actually invoked the clause.

*Kalvar Corporation*, 543 F.2d at 1304; *see also SMS Data Prods. Group*, 19 Cl. Ct. 612, 619 (1990). However, if a contractor can successfully demonstrate that a CO's decision to terminate its contract for default was made in bad faith, the contractor will not be limited to damages in accordance with the termination for

convenience clause. *See Torncello v. United States*, 681 F.2d 756, 772 (Ct. Cl. 1982) (stating that "the government may not use the standard termination for convenience clause to dishonor, with impunity, its contractual obligations"). Instead, the contractor may recover traditional breach of contract damages. *See Best Foam Fabricators*, 38 Fed. Cl. at 637-38. Such damages are awarded with the goal of placing the injured party in as good as position as it would have been had the breaching party fully performed. *North Star Alaska Housing*, 76 Fed. Cl. at 212 (quoting *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1562-63 (Fed. Cir. 1997)). The non-breaching party is not, however, to be "'placed in a better position through the award of [expectancy] damages than if there had been no breach.'" *Id.* at 213 (quoting *Bluebonnet Sav. Bank, FSB v. United States*, 339 F.3d 1341, 1345 (Fed. Cir. 2003)). Accordingly, "[e]xpectation damages are recoverable provided they are actually foreseen or reasonable foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty." *Id.* (internal quotations omitted) (quoting *Nat'l Austl. Bank v. United States*, 63 Fed. Cl. 352, 355 (2004), *aff'd in part, rev'd in part on other grounds*, 452 F.3d 1321 (Fed. Cir. 2006)).

It cannot be disputed that, in attempting to make such a showing, a contractor "must meet a high burden because this court assumes that the Government acts in good faith." *Norwood Mfg., Inc. v. United States*, 21 Cl. Ct. 300, 309 (1990) (citing *Torncello*, 681 F.2d at 770; *Librach v. United States*, 147 Cl. Ct. 605 (1959); *Kalvar Corporation*, 543 F.2d at 1298). This requires "well-nigh irrefragable proof" that the government acted in bad faith. *Id*.; *Torncello*, 681 F.2d at 770. Stated more plainly, a plaintiff is required to raise "clear and convincing" evidence of improper motive on the part of the government. *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239 (Fed. Cir. 2002); *see also North Star Alaska Housing*, 76 Fed. Cl. at 187; *Libertatia Associates*, 46 Fed. Cl. at 706 (citations omitted) (describing the standard as "clear and strong evidence" of "specific acts of bad faith" by the government). This standard, while somewhat daunting, "is not intended to be impenetrable," and it "does not insulate government action from *any* review by courts." *North Star Alaska Housing*, 76 Fed. Cl. at 188 (internal quotation marks omitted) (emphasis in original) (quoting *Libertatia Associates*, 46 Fed. Cl. at 707). Instead, the relevant question is whether the plaintiff has presented evidence that the government had a specific intent to injure it, or was motivated by animus toward the plaintiff. *North Star Alaska Housing*, 76 Fed. Cl. at 187; *Libertatia Associates*, 46 Fed. Cl. at 707; *Norwood Manufacturing*, 21 Cl. Ct. at 309. Indeed, the concept of "bad faith" has

traditionally been equated with "actions motivated by malice or the specific intent to injure." *SMS Data Products*, 19 Cl. Ct. at 617 (citing *Kalvar Corporation*, 543 F.2d at 1302; *Knotts v. United States*, 121 F. Supp. 630, 630-31 (Ct. Cl. 1954)).

It is important to recognize, however, that a plaintiff need not show that each and every action alleged to be harmful "was independently animated by animus." *North Star Alaska Housing*, 76 Fed. Cl. at 189. To the contrary, "[c]ourts have found bad faith when confronted by a course of government conduct that was 'designedly oppressive,' or that 'initiated a conspiracy' to 'get rid' of a contractor." *Id.* at 187-88 (internal citations omitted) (quoting *Struck Constr. Co. v. United States*, 96 Ct. Cl. 186, 222 (1942); *Knotts*, 121 F. Supp. at 636). The covenant of good faith and fair dealing inherent in any contractual relationship may likewise be breached "if, in ways unenvisioned by the contract, a party proceeds in a fashion calculated to frustrate or hinder performance by its contracting partner." *Id.* at 188. This type of violation may occur even in the absence of a separate breach of express contractual terms. *Id.*

Here, KI has made a number of allegations in an attempt to show that USPS acted in bad faith when it terminated the contract for default. While plaintiff has made no specific claim regarding the CO's conduct, KI has presented a significant number of details regarding Postmaster Orr's role in rendering the decision to terminate the contract. The record provided by defendant includes documents which tend to support KI's allegation that Postmaster Orr, rather than the CO, made the decision to order the change to plaintiff's duties. KI also alleges, in great detail, facts which indicate that Postmaster Orr held a personal bias against Mr. Keeter. *See* Def.'s App. at 118. Plaintiff's allegations of an improper motive on the part of Postmaster Orr do not necessarily demonstrate that her personal bias influenced the CO's judgment as the ultimate decision maker. *See and compare Norwood Manufacturing*, 21 Cl. Ct. at 310 (explaining that allegations of bad faith by a contract's Planning Officer did not prove bad faith on the part of the contracting officer in making decision to terminate contract for default). However, "'[i]f the aggregate of the actions of all of the agents would, if all done by one individual, fall below the standard of good faith, [the government] for whom the various agents acted should be held to have violated that standard.'" *North Star Alaska Housing*, 76 Fed. Cl. at 189 (quoting *Struck Construction*, 96 Ct. Cl. at 221); *Libertatia Associates*, 46 Fed. Cl. at 706, 710 *et seq.* (relying on *Struck Construction* and examining conduct of contracting officer's representative in regard to evidence of bad faith by government). Thus, KI's assertions regarding

Postmaster Orr's motive and involvement in this dispute are relevant to the court's analysis.

In addition, the record also indicates, as plaintiff has suggested, that the addition of boxes to KI's route was not logical in light of its effect on KI and other USPS contractors' workloads. For example, a February 6, 2004 e-mail message from USPS's Contract Specialist, Ms. Wofford, to Postmaster Orr stated as follows:

> During our phone conversation last week, I had requested you send a narrative of the changes for these 2 routes for my file:
>
> I show Ed Keeter (72665) gained 52 boxes for a total increase of $1,087.56[.]
> Duane Hoover (726A3) lost 12 boxes but gained 11 miles per day for an increase of $2,230.85[.]
>
> There were some changes to these routes that was not written into the service change narrative. Please include all information in your narrative of how many boxes added, boxes deleted, miles added, miles deleted from each route. DID THESE TWO ROUTE CHANGES AFFECT ANY OTHER ROUTE?

Def.'s App. at 125-26. Apparently, the response sent by Postmaster Orr following this request was incomplete, and Ms. Wofford was forced to request specific information a third time. *Id.* at 126. Later, Ms. Wofford sent the following message to Postmaster Orr:

> The attachment is not legible (please mail).
>
> Please use the HCR# INSTEAD of HC62, etc. AND RESEND TO ME FOR MY FILES. I need to get all information so I can explain what happened to what route, etc.
>
> 1) The 52 boxes HCR 72665 GAINED: are they before

> Peel or after? (were the boxes out of Yellville or Peel?) Will this still put him in Peel 30 minutes early?
>
> 2) The route that lost 12 boxes and gained 11 miles: You state 52 boxes came from this route, but show he lost 12 boxes? He must have gained boxes from some route?
>
> 3) What territory did the one route lose that gave 52 boxes to HRC 72665? When in-line boxes come up what boundaries will be for 72665 and what boundaries for the other route since they both travel the same line of travel?
>
> 4) Please send me a marked up map for the 2 routes in question. The ones you sent were on 2 separate sheets and not too good for future use. I need to see the before and after for Hoover's route, AND the before and after for HCR 72665.

*Id.* at 128.

Plaintiff has also alleged, and another portion of the record indicates, that when USPS deducted money from KI's pay to compensate it for the expense of procuring alternative delivery services from Postmaster Orr, the amounts deducted were based on a much larger number of work hours than defendant had proposed to pay KI to complete the work. *Id.* at 117-18 (recounting plaintiff's allegation that while USPS offered to pay KI for ten additional minutes of work per day to service the new boxes, Postmaster Orr ultimately billed the agency for an average of one hour and twenty-one minutes per day to complete that work); 123 (note from Postmaster Orr stating that her rate for completing the services was $34.68 per hour plus the current mileage rate used by USPS); 134-48 (listing actual amounts deducted and reflecting one hour or more of work per day to service the new boxes); 142 (note from Postmaster Orr stating that "[i]t takes about 15-20 minutes to case the mail for the added boxes, pull the mail, [and] load it into the vehicle"). These documents support KI's contention that its compensation was calculated improperly by USPS, and call into question whether Postmaster Orr was acting in good faith. Finally, defendant's attempt to effectuate two "Insignificant Minor Service Change" orders amounting to less than $2500 in added compensation, rather than one which crossed that threshold, is established by the record as well,

and that fact also raises the question of whether the agency had a specific intent to deprive KI of its contractual rights. *See Libertatia Associates*, 46 Fed. Cl. at 707.

There can be no real dispute that plaintiff's allegations, even when coupled with the documentation contained in the record, do not meet the standard of "well-nigh irrefragable proof" required to establish bad faith on the part of the government. *Torncello*, 681 F.2d at 770 (internal quotations omitted). In the court's view, however, the allegations presented are serious, especially because several of them are borne out by the records presented by the government in support of its own motion. Summary judgment is not appropriate, of course, on the intensely factual question of whether USPS acted in bad faith. Additional information on this issue is needed in order to determine whether the contract's termination for convenience clause should be invoked to limit KI's right to damages. *See Best Foam Fabricators*, 38 Fed. Cl. at 637-38.

Accordingly, this matter shall be stayed pending further factual development of this case by the parties, including but not limited to the resolution of additional agreed upon findings of fact. The parties are encouraged to work toward a resolution of this matter which comports with the findings set forth in this opinion.[5] If no resolution of this matter can be reached, the court will conduct an evidentiary hearing, bifurcated from the present proceeding, on the issues of bad faith and damages. *See and compare North Star Alaska Housing*, 76 Fed. Cl. at 189 *et seq*. (extensively summarizing and analyzing testimony and evidence on the question of bad faith by a governmental agency); *Libertatia Associates*, 46 Fed. Cl. at 707 *et. seq*. (analyzing similar evidence following full trial on the merits). At that juncture, the court will also consider an application for attorneys' fees from plaintiff, pursuant to 28 U.S.C. § 2412 (2000), if KI believes it is eligible to apply for those fees. The parties are directed to file a joint status report regarding their progress on this matter on or before August 31, 2007.

---

[5]/ Plaintiff is reminded that this court's jurisdiction does not permit consideration of non-contract based claims, including claims of harassment or hostile work environment, although some of the underlying factual allegations might be utilized to demonstrate bad faith on the part of USPS. This court likewise is not entitled to award punitive damages. Accordingly, plaintiff's non contract-based theories of liability should not be the subject of negotiations conducted with the government in relation to this suit.

## CONCLUSION

Based on the foregoing, it is hereby **ORDERED** that

(1) Defendant's Motion for Summary Judgment, filed March 20, 2007, is **DENIED**. The United States materially breached the contract and wrongfully terminated the contract for default based on plaintiff's refusal to perform; therefore, plaintiff's liability claim against defendant is **UPHELD**. The issue of quantum for breach of contract damages is **STAYED** pending further order of the court. The parties are directed to confer and encouraged to resolve this issue through settlement; and

(2) The parties shall **CONFER** and **FILE** a **Joint Status Report** on or before **August 31, 2007**, reporting on their progress towards a final resolution of plaintiff's claims in the subject matter.

/s/Lynn J. Bush
Lynn J. Bush
Judge