# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**No. 05-243 C**

| | | |
|---|---|---|
| ****************************************** | ) | |
| EDWARD KEETER and | ) | |
| KEETER TRADING COMPANY, INC., | ) | |
| *Plaintiffs* | ) | **Case 1:05-cv-00243-LJB** |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| *Defendant* | ) | |
| ****************************************** | ) | |

## DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

## I. CONTENTIONS OF FACT

The evidence at trial will establish that Plaintiff Keeter, Inc. was not treated unfairly by Defendant, nor with any improper intent. The local Postal Service employee responsible for management of the mailbox delivery routes in her area (Linda Orr, the "AO") had originally recommended that a single large route that reported to two different post offices be split into routes that were more manageable and that would be responsible to only one facility, which is the usual practice. Plaintiff became the supplier for one of the ensuing routes, but

Ms. Orr later became aware that the configurations she had proposed for the "daughter routes" were not optimal, and themselves needed to be revised.

Ms. Orr documented her proposed revisions in 2003 and mentioned them to plaintiff, but she had no authority to implement them herself. If her proposals were implemented, she believed Plaintiff would be required to perform the contract as revised. Both Ms. Orr and Plaintiff were aware that any decisions regarding route revision, or contract enforcement, could be made only by the contracting officer.

The actions and decisions of Defendant that are relevant in determining whether the Postal Service acted in good faith in terminating Plaintiff's contract occurred at "SWDNO," that is the Southwest Area Distribution Networks Office from which the contracting officer and his staff award and administer over 2,200 active mail transportation routes, including contracts for box deliveries such as Plaintiff's, in a multi-state area that includes Arkansas. The evidence will show that even if Defendant's employees erred in their interpretation of the "changes" provision of the contract, they did so because of their understanding of that provision and because of the particular facts involved.

Defendant and its employees had no intention to harm Plaintiff. They sought to enforce what they believed were Plaintiff's obligations under its contract, to ensure that mail would be delivered to the customers along

Plaintiff's route rather than because of any personal attitudes or institutional arrogance.

These employees were attentive to Plaintiff's complaints, and in response to them they recommended and put into effect an increase in contract compensation that was almost exactly what Plaintiff had requested. Plaintiff abandoned all contract service before receiving notice of that increase.

Plaintiff was not terminated, nor punished, for its refusal to provide service to the additional 52 boxes. Defendant did deduct (some part of) its cost of providing that service by other means from pay otherwise due to Plaintiff. Given Defendant's belief that Plaintiff was obligated to service the added boxes, and that even if Plaintiff did provide the service it was still necessary, the deductions were both consistent with the contract and made for a proper reason.

The contract was not terminated by Defendant until April 28, 2004 -- even though Plaintiff ceased all performance of it on February 20, 2004. The letter it sent to Defendant on February 20 was the only unequivocal notice given to Defendant that Plaintiff repudiated the contract and was abandoning its performance. Defendant sent Plaintiff a cure notice requesting resumption of service, and only terminated the contract after Plaintiff had failed to respond to that notice. Defendant then did as it would do with any HCR supplier that failed

to perform at all, even after being sent a cure notice: from Defendant's perspective, the contract then ended when it was terminated for default on April 28, 2004.

The following numbered factual paragraphs summarize in finer detail the events leading to and surrounding the default termination of HCR 72665:

1. Plaintiff's contract box delivery route as of July 1, 2002 was derived from a prior route that had served two different post offices but was split and reconfigured based on recommendations made by Administrative Official Linda Orr.

2. In 2003, Ms. Orr concluded that the configuration that she had recommended for HCR 72665 and another route were unbalanced and should be revised. On or before December 5, 2003 she submitted her recommendations for those revisions, with supporting documentation, to the SWDNO.

3. Ms. Orr's recommendations for route revisions were made to further the interests of the Postal Service, not to favor or to harm any contract supplier or other person.

4. Ms. Orr believed, and told SWDNO, that the schedule for HCR 72665 as of July of 2002 provided more time for casing and route travel than was needed for performance of the route, or than was being used by the supplier. She indicated that the supplier was completing route tasks faster and earlier than the contract schedule contemplated.

5. Specialists Wofford and McCague at SWDNO believed that the extra time in the schedule for HCR 72665 could, and should, be taken into account in implementing the route revisions suggested by the AO.

6. Familiar Postal Service guidance concerning box delivery contracts indicated that the addition of en route boxes that did not increase route mileage and time was not automatically a "service change," and that the formula used to calculate incremental work associated with additional boxes was not mandatory if other route-specific information was available.

7. Wofford and McCague determined that, because of the extra service time built into HCR 72665, transfer to that route of the 52 boxes recommended by the AO would result in only 76 additional annual hours of supplier work, or 15 minutes on each working day. Based on this information and on their understanding of Postal Service policy, they applied the supplier's net hourly compensation rate of $14.31 to the additional hours of work, and determined that annual compensation should be increased by $1,087.56. The contracting

officer approved this recommendation on December 24, 2003. This determination was reached and implemented without an intention to cause harm to Plaintiff or to interfere with Plaintiff's performance of the contract.

8. The contract adjustment determined in this way was below the $2,500 threshold at which negotiation with the supplier was required prior to its implementation. The change was implemented as a unilateral "Minor Insignificant' adjustment, that would become effective on January 24, 2004.

9. Plaintiff opposed the contract adjustment, asserting amongst other things that its compensation increase was too small. The bases for defendant's calculations were provided to Plaintiff in January, 2004. Plaintiff responded that the contract schedule did not really include the extra time that the AO believed was available. Plaintiff was told by SWDNO to state his grievances and positions in writing and to submit them for consideration by the contracting officer. Plaintiff did so in late January of 2004.

10. Plaintiff did not comply with repeated instruction that performance of the added service was mandatory. In multiple communications with Defendant during January of 2004, Plaintiff stated that it did not accept the contract modification adding 52 delivery boxes to its route, and said that it would not perform the service. Although it repeatedly voiced protests about the route modification, Plaintiff performed its contract obligations other than servicing

the disputed boxes, until February 20, 2004. From January 24 to February 20, 2004, service to the 52 boxes was provided by the AO and another Postal Service employee.

11. Plaintiff's objections to the compensation adjustment ordered on December 24, 2003 were reviewed at SWDNO in January and February, 2004. The Specialists eventually accepted Plaintiff's explanation of why the schedule did not contain sufficient extra time for the added tasks to be performed with only 76 additional hours of work per year. The Specialists re-calculated the number of hours that should be added to the contract, to 188 per year or an increment of 122 hours over their initial calculation. At $14.31/hour, the additional 122 hours resulted in a further increase in the contract rate of $1,602.72 a year. A decision ordering that increase was issued on February 19, 2004.

12. On February 20, 2004, Plaintiff terminated all contract services and stated it would not thereafter perform the contract. This occurred before Plaintiff was aware of the February 19 adjustment. Plaintiff did not respond to a Cure Notice sent by Defendant on February 24, 2004.

13. The SWDNO believed in good faith that the 52 box adjustment ordered in December of 2003 had a value of less than $2,500 per year. Plaintiff continued to perform its route duties, apart from those added on December 24, 2003,

even as it complained that it was not required to perform the added services. Plaintiff did not declare an anticipatory breach of the entire contract until February 20, 2004. Defendant's conduct exhibited its belief that a contract dispute existed, but that it could and should be resolved through mechanisms specified in the *Contract Disputes Act.* Plaintiff's conduct appeared to ratify that belief.

14. Defendant's employees followed standard procedures authorized by the contract in ordering deduction from Plaintiff's compensation to offset the cost of providing service to the added boxes when Plaintiff would not. This was not a punitive or coercive gesture. It is a step regularly taken when service is omitted by an HCR supplier, and is subject to being challenged in the same manner as other disputed decisions by the contracting officer. Plaintiff's response was not a challenge of the decision, but was an abandonment of service occurring more than six weeks after the "material breach" on which it was based.

15. No actions of Defendant were undertaken with an intent to harm Plaintiff, or to interfere with Plaintiff's contract performance. The adjustments were made by Defendant out of its good-faith belief that they were consistent with the contract language, as explained by Postal Service policy statements with

which the personnel involved were familiar. The adjustments were based on Defendant's reasonable understanding of the contract terms.

16. None of Defendants actions were taken in conscious disregard of Plaintiff's legal rights.

17. Defendant's contracting employees did not exhibit any ill-will towards Plaintiff, and there is no clear and convincing evidence that any actions here at issue were undertaken with ill-will.

## II. <u>CONTENTIONS OF LAW</u>

1. Defendant enjoys a presumption that its employees have acted in good faith in performance of their duties. In order to overcome this presumption, Plaintiff must provide proof of bad faith that is "clear and convincing," another expression for what has also been referred to as "well-nigh irrefragable" proof of bad faith.

> *Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239-1240 (Fed Cir. 2002),* citing *inter alia* to *Schaefer v. United States, 224 Ct. Cl. 541, 633 F.2d 945, 948-49 (Ct.Cl. 1980); Knotts v. United States, 128 Ct.Cl. 489, 492, 121 F.Supp. 630 (Ct.Cl. 1954). See also*, *Krygoski Constr. Co. v. United States, 94 F.3d 1537, 1541 (Fed. Cir. 1996); L-3 Communications Integrated Systems v. United States, 79 Fed.Cl. 453, 462*

*(Fed.Cl. 2007);S system Fuels Inc. v. United States, 66 Fed.Cl. 722, 735 (Fed.Cl. 2005); Rice Systems, Inc. v. United States, 62 Fed.Cl. 608 (Fed.Cl. 2004).*

2. Important factors in determining whether government employees have acted in good faith include whether they acted with an intent to cause harm to the contractor or to interfere with its performance of contractual duties; whether their actions were based on reasonable beliefs as to the rights and obligations of the parties; and in general whether the governmental officials exhibited *animus* or ill-will towards the contractor.

*Am-Pro, supra, 281 F.3d 1234; see also, Caldwell & Santmyer, Inc. v. Glickman, 55 F.3d 1578, 1581 (Fed.Cir.1995); Fahey v. United States, 71 Fed.Cl. 522, 526 (Fed.Cl. 2006); Comprehensive Health Services, Inc. v. United States, 70 Fed.Cl. 700, 738-739 (Fed.Cl. 2006); System Fuels Inc. v. United States, 66 Fed.Cl. 722, 735 (Fed.Cl. 2005); Green Management Corporation v. United States, 42 Fed.Cl. 411, 439 (Fed.Cl. 1998); Keco Indus., Inc. v. United States, 203 Ct.Cl. 566 (Ct.Cl.1974).*

3. Defendant's employees reasonably believed that it was legally permissible to add the 52 en route boxes recommended by the Administrative Official to Plaintiff's contract without prior negotiation. It was their understanding that the formula for box additions was not mandatory in this instance and that the value of the additional work added to the contract was less than $2,500 per year.

4. Defendant nonetheless was attentive to Plaintiff's objections, and ultimately revised its position because of those objections when they determined that compensation for servicing the added boxes should be increased to almost exactly the amount that plaintiff had requested. Additionally, no action to terminate the contract was taken as a consequence of Plaintiff's refusal to service the added boxes beginning on January 24, 2004.

5. Defendant's employees followed standard Postal Service procedure by ordering deduction from Plaintiff's compensation to offset Defendant's cost of providing service to the 52 added boxes when Plaintiff refused to do so.

6. Plaintiff's continued performance of the contract, apart from the 52 added boxes, from December 24, 2003 to February 20, 2004, lead Defendant reasonably to assume that Plaintiff was pursuing its objections through the means provided in the contract. The actions of Defendant during that period were reasonable and appropriate for enforcement of disputed actions that the supplier may contest under the contractual *Disputes* provisions even while performance continues.

7. Plaintiff continued to perform its uncontested contract duties, instead of declaring a material breach and ceasing all performance on or soon after December 24, 2003. Plaintiff thereby waived, and is estopped from asserting,

that any actions by Defendant during January and February of 2004 constitute bad faith conduct that the Court should consider now.

8. Plaintiff has not established that Defendant acted in bad faith. The termination of Plaintiff's contract for HCR 72665 accordingly is converted to a termination for convenience, so that Plaintiff may recover the indemnity provided by the contract but no other damages or costs.

February 13, 2008

Respectfully submitted,

_/s/ Douglas J. Colton_
**Douglas J. Colton**
U.S. Postal Service
475 L'Enfant Plaza, SW
Room 6323
Washington, DC 20260-1127
Tel: (202) 268-6408
Fax: (202) 268-5287

**Counsel for Defendant**
**The United States Postal Service**