UNITED STATES
COURT OF FEDERAL CLAIMS

EDWARD KEETER and )
KEETER TRADING COMPANY, INC. )
)
Plaintiff, )
)
v. ) Docket No. 05-243C
)
THE UNITED STATES )
)
Defendant. )

Pages: 1 through 266

Place: Little Rock, Arkansas

Date: April 23, 2008

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

EDWARD KEETER and )
KEETER TRADING COMPANY, INC. )
)
Plaintiff, )
)
v. ) Docket No. 05-243C
)
THE UNITED STATES )
)
Defendant. )

Courtroom 8-D
U.S. Courthouse
500 W. Capitol Avenue
Little Rock, Arkansas

Wednesday,
April 23, 2008

The parties met, pursuant to the notice of the Court at 9:00 a.m.

BEFORE: HONORABLE LYNN J. BUSH
Judge

APPEARANCES:

For the Plaintiff:

CHRISTOPHER O'HARA CARTER, Attorney
P.O. Box 300
Yellville, Arkansas 72687
(870) 449-2100

For the Defendant:

DOUGLAS J. COLTON, Attorney
U. S. Postal Service
475 L'Enfant Plaza SW, Room 6323
Washington, D. C. 20260-1127
(202) 268-6408

C O N T E N T S


| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Plaintiff: | | | | |
| Duane Hoover | 9 | 25 | 30 | -- |
| Tommy Griffin | 34 | 44 | -- | -- |
| Edward Keeter | 51 | 81 | 118 | 124 |
| Linda Orr | 129 | 160 | 188 | 195 |
| Jeanette Wofford | 197 | 229 | 244 | 254 |

P R O C E E D I N G S

(9:00 a.m.)

THE COURT: Good morning. This hearing will come to order. This is the time and place set by the Court's Trial Notice in the case of Keeter Trading Company, Inc. v. The United States, Case Number 05-243C.

At this time, I will ask for appearances by counsel. First, Plaintiff's counsel.

MR. CARTER: Christopher Carter, Your Honor, for the Plaintiff.

THE COURT: Thank you, Mr. Carter.

And for the government.

MR. COLTON: Douglas Colton for the Postal Service of the United States.

THE COURT: Thank you, sir.

And with Mr. Carter at counsel's table is?

MR. CARTER: Your Honor, this is Ed Keeter, he is the President of Keeter Trading, Inc.

THE COURT: Fine, thank you.

Good morning, Mr. Keeter.

MR. KEETER: Good morning.

THE COURT: Okay. First, for preliminary matters, smoking and eating, of course, are not permitted in the courtroom. And I would ask at this point that you turn off any cellphones or beepers.

We will take periodic breaks during trial; however, if for any reason you feel you need a recess at a particular time during the proceedings, you may request it.

Only one person is to speak at a time and I do, of course, expect civility and professionalism between counsel at all times, which I really didn't need to say because I have most definitely gotten that. So I am assured of that.

The court reporter is instructed to interrupt the proceedings at any time if the transcript might be otherwise unclear.

I anticipate that we will hold trial from 9:00 a.m. to 5:30 p.m. daily and I also anticipate that we will probably have I guess about an hour for lunch.

As stated in the Court's February 24, 2008 Order, the parties have agreed and stipulated to Defendant's Proposed Stipulated Facts regarding background and function of witnesses. Also, as stated in the Order, the parties have stipulated to both termination for convenience damages as well as breach damages.

Therefore, the sole issue for trial here is whether the government acted in bad faith toward Plaintiff, such that the damages arising from its wrongful termination of Keeter -- and when I say Keeter, my reference -- I'm using it as a shorthand for saying Keeter Trading Company, it's not referring to Mr. Keeter -- such that it's wrongful

termination of Keeter should result in breach damages rather than P for C damages.

The Court's February 21 Order overruled the government's objections to Plaintiff's witnesses and evidence. Accordingly, both parties' proffered documents are accepted into evidence for this trial.

Counsel have provided copies to me and to my law clerk. Therefore, you may now provide a copy to the court reporter, if you have not done so.

MR. CARTER: Your Honor, on behalf of the Plaintiff, I'm providing the original that I prepared for the court reporter.

THE COURT: Thank you, Mr. Carter.

MR. COLTON: And Your Honor, I'm presenting Defendant's exhibits labeled "Witness Copy".

THE COURT: Thank you, Mr. Colton.

(Documents were proffered to the court reporter.)

(The documents referred to, heretofore marked for identification as Plaintiff's Exhibits and Defendant's Exhibits were received in evidence.)

THE COURT: And I would request that counsel have on hand a copy for use by the witnesses as they appear, as instructed in the Court's February 21 Order.

We will have Mr. Carter present the case for Keeter first, and he may make an opening statement if he so desires. Government counsel may defer his opening statement until Plaintiff has closed its case, or if he prefers, may make his opening statement immediately after Mr. Carter's.

Closing arguments -- which would you like to do, Mr. Colton?

MR. COLTON: I'll defer. It depends on what I hear.

THE COURT: Until after the case?

MR. COLTON: Until after the case, yes.

THE COURT: Fine, okay.

Closing arguments may be presented if counsel desire; however, I do wish to advise you that I will require post-hearing briefs along with a proposed statement of fact with record citations.

At this point I'd like to know if counsel have determined whether they wish to invoke the witness sequestration rule.

MR. CARTER: Your Honor, on behalf of the Plaintiff, because we have so thoroughly discussed this matter, I am not asking that the rule be invoked.

In addition, it's not my intention to make an opening statement. The Court is quite familiar with this case and all the documents and I'm not sure I could tell the

Court anything that would enlighten the Court at all at this point.

THE COURT: That's fine.

What about --

MR. COLTON: We concur, we do not invoke the rule, we do not request sequestration.

THE COURT: All righty, that's fine.

Well, are there any other preliminary matters before we proceed?

MR. CARTER: Your Honor, there is one.

The Court had asked me to contact the Bankruptcy Trustee when Mr. Keeter had filed bankruptcy. And last Thursday, I believe, she finally sent me a letter and indicated she was not going to make any claims on any settlement and/or judgment that may be obtained. And I intended to get here early enough and dig up that letter and it just occurred to me now that I have not done that. But I will give it to the Court sometime before we leave here today, and also Mr. Colton.

THE COURT: Okay, that's fine, Mr. Carter, because we don't need it for purposes of -- actually for the trial, but I appreciate that.

MR. CARTER: Well, the Court had instructed me to do that and, as I told the Trustee, I can't make you do anything, but I would appreciate it if you would put it in

writing. And she did.

THE COURT: Wonderful.

In that case, Mr. Carter, you may proceed with your witnesses.

MR. CARTER: Your Honor, we would call Duane Hoover to the stand.

THE COURT: The hot seat, Mr. Hoover.

Raise your right hand. Mr. Hoover, would you state your full name?

MR. HOOVER: Duane Allen Hoover.

Whereupon,

DUANE HOOVER

appeared as a witness herein and, having been first duly sworn, was examined and testified as follows:

THE COURT: Thank you, sir. You may be seated.

DIRECT EXAMINATION

BY MR. CARTER:

Q Mr. Hoover, very quickly, if you would, tell the Court where you live and how you're employed.

A I live in Yellville and I'm employed at the post office as a mail carrier.

Q And when did you first become a carrier for the post office?

A I believe it was 2002.

Q About July 1?

A July 1, 2002.
Q Prior to July 1 of 2002, had you ever done any work for the post office at all?
A Yeah, I subbed on a route which was HCR-63 at that time.
Q And whose route was that?
A That was my brother Steve.
Q Okay. In general purposes, would it be fair to say that that was a large route?
A Yes, it had over 150 miles.
Q Okay. In 2002, was something done to your brother's route?
THE COURT: Excuse me.
THE WITNESS: May I have some water?
THE COURT: Absolutely.
(Brief pause.)
BY MR. CARTER:
Q In 2002, was something done to that route?
A It was split.
Q Okay. And when you say a route is split, what happened?
A They divided the route into two parts.
Q Was it up for bid again?
A The two parts became up for bid at that time.
Q And did your brother bid on either part of that

route?

A No.

Q Did you bid on part of that route?

A I did.

Q Which part did you bid on?

A It's called the Pine Mountain Fire Department.

Q Okay, largely the eastern part of the route?

A Okay. I'm horrible with directions.

Q The area to the east of Peel anyway.

A Okay, yes.

Q And do you know who bid on the other half of the route?

A Ed Keeter.

Q And you had some familiarity with the post office and how the routes worked, did you not?

A Yes.

Q Because you had substituted for your brother.

A Correct.

Q And in preparing a bid for this route, did somebody help you?

A My brother Steve.

Q Okay. And in essence you looked at everything and submitted a bid to the Postal Service.

A Yes.

Q And your bid was accepted.

A Yes.
Q And apparently Keeter Trading's bid was also accepted.
A Yes.
Q And you started this route on July 1 of 2002?
A Yes.
Q If we go to July and August of 2002, did it become clear to you that some adjustment needed to be made to your contract?
A My route only allowed an hour for casing time and I needed more time than an hour. I was casing and it took more like an hour and a half to an hour and 45 minutes.
THE COURT: Excuse me, Mr. Hoover, would you state for the Court -- describe what casing means?
THE WITNESS: Casing is putting the mail in a sequential order to allow yourself to have the correct mail when you get on the route, the correct mail for your correct box.
THE COURT: Is it sorting into some large divided container or how does it work exactly?
THE WITNESS: Generally, there's three containers and each one of them has six rows on it. Within that six rows are slots and underneath the slot are labels and on the labels are the addresses. And you put them all in order and then you pull your last person on the route first and build

up bundles.

THE COURT: Thank you.

BY MR. CARTER:

Q With regard to the hour that you were given for casing, I guess it became apparent to you that wasn't a sufficient amount of time?

A Yes.

Q How many boxes did you have originally with the contract approximately?

A It was around 320, I'm not quite sure.

Q Okay. And when I say 320 boxes, would it be fair to say we're talking about mailboxes, active mailboxes, where you would have to stop and put something in a mailbox?

A Yes.

Q I guess to be fair to everyone, this is not a walking route, this is where you get in your vehicle and you drive and put mail in boxes; is that correct?

MR. COLTON: Objection, Your Honor, it's leading. I don't mind him helping the story along, but we're getting Mr. Carter's testimony. He described what it was and then he said yes.

THE COURT: This, Mr. Colton, is really preliminary because you can't assume that everyone, particularly this Court, knows the terms of art that are used for the Postal Service. And my understanding of what Mr. Carter was

establishing was how the system worked.

MR. COLTON: He's only leading, he's not asking questions, Mr. Carter is testifying.

THE COURT: But that is acceptable in preliminary matters where it's not anything that's controversial.

MR. COLTON: Okay.

THE COURT: So, you know, I'm going to allow that, because it actually -- if he hadn't asked it, I would have, because I need to get an understanding of how it works. I need to know, and in fact it has to be in the record, you know, the entire scenario. Does the deliverer of mail get out of the vehicle and walk up and put it on the front door where there is a mailbox or is this more of a situation where there is a -- I don't know the term for it -- an outside box that's by the highway. That's the thing that will -- those are preliminary matters and they're things that need to be in the record.

So for those purposes, I will allow it and I think it's necessary.

MR. CARTER: Thank you, Your Honor.

THE COURT: So if you would, repeat the question and let's -- and those sorts of things need to be explained and stated by whichever witnesses are best suited.

BY MR. CARTER:

Q You use a vehicle to deliver the mail.

A Yes.
Q And would it be fair to say that your route -- in fact virtually every route in Marion County -- is a rural route?
A Yes.
Q And sometimes you might even drive three-tenths or maybe even half a mile between boxes.
A Yes.
THE COURT: Excuse me, let me be certain that I understand. For the most part, on these rural routes, you drive up to the -- is the word box, is that what you used?
THE WITNESS: Box.
THE COURT: To the box, and you don't even have to exit your vehicle, you just put the mail into the box?
THE WITNESS: Correct. That's what I do.
THE COURT: And that's the situation generally across the board for the routes?
THE WITNESS: At Yellville?
THE COURT: In Yellville, yes.
THE WITNESS: Yes.
THE COURT: Okay, thank you, sir.
BY MR. CARTER:
Q Now you indicating your casing time was too short. What steps did you take or what occurred to change your casing time?

A I talked with Linda about getting more time for the casing.

Q Now, Your Honor, I know there's just a few people in the courtroom, and I know you, you know me and we know Linda, but the Court may not. Linda is who?

A Linda is the postmaster.

Q Linda Orr?

A Linda Orr.

Q Okay. And after you talked to her, were changes made?

A Yes.

Q What were those changes?

A I received an additional half hour for casing time.

Q Okay. In addition to receiving an additional half hour, you also received additional compensation?

A Yes.

Q Compensation in essence to cover that half hour.

A Yes.

Q Okay. If you would, describe for the Court a typical Duane Hoover day in 2002 when you had your route. What time would you arrive at the post office and what steps did you go through?

A I would arrive generally around 8:15 to 8:30, best of my recollection. And at that time, the mail was -- had been sorted and they had brought it back to my casing area

and I went in and started casing the mail to get ready to go on the route.

Q Now when you say they brought it in, who brought it in?

A The clerks, the mail clerks.

Q How is the mail divided so they know it goes to your route as opposed to Mr. Keeter's route or your brother -- your brother did get another route.

A Yes, he did.

Q So he still worked at the post office.

A Yes.

Q How do the clerks know which route something goes on?

A They use a scheme and they look at the addresses of the mail.

Q Okay.

A And determine which route to -- if it's a parcel, they throw it in a buggy. Each route has an individual buggy that the mail is put in by the mail clerk.

THE COURT: What is a buggy?

THE WITNESS: It's a holding container for parcels.

THE COURT: Okay.

BY MR. CARTER:

Q Basically a big canvas cart?

A On rollers so you can move it around.

Q And Mr. Hoover, to also be fair, your sister works at the post office, does she not?
A She's a clerk.
Q That would be -- who is your sister?
A Debbie.
Q Davenport?
A Davenport.
Q At some point in either -- in 2003, did there come up a discussion about changing your route around, between you and the postmaster Linda Orr?
A You mean by adding the HCR-63 route or 62?
Q Yes, making changes to where you were going to deliver.
A Yes.
Q If you would, tell the Judge about that, how did that come about and what was being proposed?
A Best I remember, Linda Orr came to me and asked me if I wanted to run route 62, which is an auxiliary route being used for Flippin. A carrier from Flippin would come to Yellville and case that mail and deliver that part from the Yellville post office. And she asked me if I wanted to take that over.
Q Okay.
THE COURT: Where is Flippin from Yellville?
THE WITNESS: It's seven miles east.

BY MR. CARTER:
Q And Flippin has its own post office.
A Yes, they do.
THE COURT: And this came about in 200-- what month and year?
THE WITNESS: 2003.
THE COURT: Early, February, January?
THE WITNESS: I don't remember.
THE COURT: Don't remember, okay.
THE WITNESS: I just don't remember dates.
THE COURT: Okay.
BY MR. CARTER:
Q Mr. Hoover, if I told you we discussed in our deposition the summer of 2003, would that sound about right?
A Yeah, that would be about right.
Q At that time, do you recall there was a discussion, when this was first brought to your attention, anything about your giving up part of your route?
A I don't recall it the first time I was asked about it.
Q Okay. At some point, did you and the postmaster have a discussion about you giving up part of your route?
A Yes.
Q Tell the Court about that.
A I came in from doing my job that day and I was

asked to divide Highway 14 north, which is about a 12-mile stretch of my route. There was approximately 100 boxes on that part of the route. She wanted me to divide that up.

Q And did you divide that up?

A Yes.

Q What point did you pick out to divide it?

A I went up six miles.

Q Was there any particular house?

A There was a house that I drove up in their driveway to deliver their mail.

Q What do you call that type of house?

A I'm trying to remember --

Q Hardship?

A Hardship.

Q And what exactly is a hardship box?

A It's a box where the occupants are disabled or ill, where they cannot easily get their mail out of their mailbox.

Q And so what does the Postal Service do?

A They provide it -- a route to get their mailbox as close as possible to the house.

Q And you decided that if it was 12 miles and that's roughly six, that would be a good spot to divide it?

A Correct.

Q So ultimately I think we can agree that that came to 52 boxes.

MR. COLTON: Objection, Your Honor. We don't know what the predicate that came to means.

THE COURT: Would you rephrase?

BY MR. CARTER:

Q Dividing this route, the first six miles of Highway 14 north, that is what you were -- that was what was proposed that you would give up, is that correct?

A Yes.

Q And ultimately that came to 52 boxes.

A Yes.

Q Okay. And it would be fair to say at Linda Orr's request, you were the one who determined these 52 boxes?

A Yes, because she also stated not to have any mileage added to Ed's route -- Ed Keeter's route.

Q Okay. And from where the Yellville post office is, it would be fair to say that both Mr. Keeter and you, your routes overlapped each other and you both had to go up 14 north.

A Yes.

Q So he would pass these 52 boxes and you would pass these 52 boxes.

A Yes.

Q And did you give this information to Linda Orr, the postmaster?

A Yes.

Q At any time -- well let me back up and ask, do you remember when the change went into effect?
A No.
Q It was some months later though?
A Yeah, it was sometime later.
Q Do you recall ever talking to Ed Keeter or anyone on behalf of Keeter Trading about this change or this proposal?
A I don't remember having conversations with Ed back then.
Q Okay. In addition to giving up these boxes and taking over this route from Sandy -- I think you said Sandy. Sandy is who?
A She was the carrier from Flippin.
Q In addition to --
THE COURT: I'm sorry, I didn't hear you. She was who?
THE WITNESS: The mail carrier from Flippin.
THE COURT: Thank you. Sorry, Mr. Carter.
BY MR. CARTER:
Q In addition to those two adjustments, were there any other adjustments to your route?
A Not that I recall.
Q So in essence, you gained 40 boxes, lost 52, for a loss of 12 boxes. But you gained mileage, is that correct?

A Correct.
Q And for Duane Hoover, was that a good thing, a bad thing?
A It was a good thing because I was paid compensation for the extra mileage.
Q And to be fair, the way the contract works, you get more money for mileage than you do for boxes.
MR. COLTON: Objection, Your Honor.
A I wouldn't know.
THE COURT: Just a second. What is the basis for your objection?
MR. COLTON: The statement is ambiguous. How many miles and how many boxes. The generalization doesn't hold true -- more for boxes than for miles. It doesn't make any sense, Your Honor.
THE COURT: Mr. Carter, would you --
MR. CARTER: Your Honor, we've already stipulated to the formula, so I'll just move on.
THE COURT: All right.
BY MR. CARTER:
Q The proposal with regard to the changes for you would increase your contract by about $2030.85, does that sound about right?
A Sounds about right.
Q Did you become aware at some point that Ed Keeter

and Keeter Trading, Inc. were opposed to these changes?

A Yes, I was aware of that.

Q Do you recall when you first became aware of it?

MR. COLTON: Objection, Your Honor. Lack of relevance. It has nothing to do -- nothing -- that he knows.

THE COURT: Overruled.

BY MR. CARTER:

Q Do you recall when?

A Shortly after it was proposed to him, I imagine.

Q Okay. But long before it was put into effect?

A Yes.

Q You knew that Ed Keeter did not favor this change at all.

A Yes.

Q Would it be fair to say that was common knowledge in the post office?

A Yes.

Q Did you yourself have an opportunity to talk to Ed Keeter or anybody on Ed Keeter's behalf or Keeter Trading's behalf about the proposed changes?

A I don't believe I've ever spoke to him about it.

Q With regard to Mr. Keeter's and Keeter Trading's opposition to these changes, did anyone from Little Rock or Dallas ever sit down and talk to you or give you a phone call to discuss this?

A Not that I recall.
Q If you had talked to anyone in Dallas, who would be your contact?
A At that time, I believe it was Jeanette Wofford.
MR. CARTER: Your Honor, I believe that's all the questions I have for Mr. Hoover.
THE COURT: Thank you. Mr. Colton, you may cross.
MR. COLTON: Thank you.

CROSS EXAMINATION

BY MR. COLTON:
Q Mr. Hoover, to be clear, you were not an employee of the Postal Service during any of these events, were you?
A No.
Q You said that you worked at the Yellville post office, that's where you got the mail that you were going to distribute, right?
A Correct.
Q You were a contractor.
A I was a contractor.
Q And as far as you know, Mr. Keeter was a contractor.
A Yes.
Q And when Ms. Orr came to you -- well, let's go back to the first incident. You needed more time than your contract provided for the casing, is that correct?

A Correct.
Q And you went to Ms. Orr and explained it to her?
A Yes.
Q And eventually time was added to your daily schedule?
A Yes.
Q Do you think you were treated fairly?
A Yes.
Q Did you have any special relationship with Ms. Orr that entitled you to get better treatment than other people got from her, as far as you knew?
A Not that I'm aware of.
Q And in fact, do you think that she helped you with that problem as a personal favor as opposed to --
A No.
Q Later, when Ms. Orr spoke with you about changing routes, is it correct that she asked you where was a logical point to make a route division? Is that what you said?
A I don't believe -- I did it and then went to her.
Q Well, why did you do it?
A Because it was a logical place to do it.
Q I'm sorry, I must not have asked the question very well. Did Ms. Orr come to you and say that she wanted to make some kind of adjustment between two or more routes?
A Yes.

Q Did she say why?
A I don't remember.
Q Let me remind you. Did she say something about equalizing workloads or balancing out, something like that?
A I just don't remember.
Q Okay, fair enough. Well, in any event, did she request some information from you?
A Information regarding --
Q Did she ask your opinion or information about something to do with changing the routes?
A I'm not sure.
Q I'm sorry --
THE COURT: Mr. Colton, I need for you to slow down enough to let him answer. You may proceed, but don't go quite so quickly.
BY MR. COLTON:
Q Mr. Hoover, counsel asked you some questions about where the break point was going to be between routes, do you recall that, a few minutes ago?
A Yes.
Q And what was it that you were asked to do that led to you making whatever determination you told to Ms. Orr?
A To divide the boxes.
Q So she asked you to divide the boxes?
A Yes.

Q And by that, she meant divide up the route?
A Yes.
Q Did she say why?
A Well, she wanted to give some of the boxes to Ed.
Q Did she say why?
A Because he had the time -- he had extra time at the post office where he wasn't working while everyone else was casing.
Q Did she say why she was asking you to suggest a place instead of going out and figuring it out all by herself?
A All I remember is she said not to add any more mileage to Ed's route.
Q Well, is it fair to say, Mr. Hoover, that you were familiar with that route?
A Yes.
Q And you knew what the effect on operating time would be of drawing the line at any particular place when you broke up the routes -- you knew that.
A Yes.
Q Would she have known that, based on her job?
A Probably not.
Q Did you have more than one conversation with her about where the logical point to break the routes would be, or was it only one time?

A It was only one time, best I recall.
Q At any time, did you go to Ms. Orr and say I want to stick some of my boxes on Mr. Keeter?
A Not at all.
Q So this came from her?
A Yes.
Q Did Ms. Orr say to you that she wanted to do this in order to harm Mr. Keeter or Keeter, Inc.?
A No.
Q Did she ever indicate that her purpose for doing this was personal rather than professional?
A No.
Q By the way, did you find that the place that you suggested the route be broken was the most logical place in your mind to do so?
A Yes.
Q Without going into great detail, can you explain what was it that made that choice the most logical?
A I had to exit off the main highway and go up into the driveway to service that mailbox, it was like a circle.
Q If I understand that, anybody who was servicing that mailbox was going to have to go a bunch more, so if you went as far as that item, that meant going a good bit farther, so you may as break right before that mailbox; is that right?

A No, because you didn't have to run the whole route, the whole 14 north. It's just that this box was not on the highway, it was off, I drove up a driveway to get to that box.

Q Do you recall explaining to Ms. Orr why it was the most logical place?

A I don't recall.

MR. COLTON: Okay, nothing further.

THE COURT: Excuse me. After the change took place, who ended up going up the highway -- you said it was a disabled --

THE WITNESS: The hardship box?

THE COURT: The hardship.

THE WITNESS: Hardship box.

THE COURT: Okay, who ended up servicing the hardship box, you or Keeter?

THE WITNESS: I did.

THE COURT: You did, okay.

MR. COLTON: Nothing further.

THE COURT: Thank you, Mr. Colton. Mr. Carter, redirect.

REDIRECT EXAMINATION

BY MR. CARTER:

Q Mr. Hoover, would it be fair to say that most of the time that you arrived at the post office Mr. Keeter had

already done his casing and had left?

A Yes.

Q It'd be also fair to say you did not actually have much contact with Keeter.

A That's correct.

Q At the Yellville post office, would it be fair to say that most of the employees smoked and took smoking breaks?

A Yes.

Q Did Mr. Keeter smoke?

A No.

Q So he didn't take smoking breaks.

A No.

Q Did he socialize much with people at the post office?

A Not that I'm aware.

Q Pretty much, he showed up and did his casing and left.

A He did his job, yes.

Q In the fall of 2003 -- I'm going to run through a bunch of names and tell me if these are all people who worked at the post office in the fall of 2003. On carrier routes, there would be Keeter Trading, Steve Hoover, Duane Hoover and Jay Raley.

A Yes.

Q Anybody else on carrier routes specifically out of Yellville?

A No.

Q And in terms of clerks, there's Debra Davenport, Cleo Wilkerson, Barbara -- is that right?

A Yeah, there was a Barbara there at some point.

Q Okay. There was an older gentleman who did the cleaning, do you remember who that was?

A Can't remember his name.

Q And Linda Orr, the postmaster.

A Yes.

Q Were you aware of anyone else who worked either through a contract or an employee of the Postal Service who was there at the Yellville post office in the fall of 2003?

A I'm not aware of anyone.

Q And if I count those -- Keeter, Orr, Hoover, Hoover, Davenport, Wilkerson, the cleaning fellow, Barbara and Mr. Raley, I count nine people.

A Okay.

THE COURT: Mr. Carter, would you -- I was jotting down the names again, would you mind repeating that?

MR. CARTER: Ed Keeter, Linda Orr, Steve Hoover, Duane Hoover, Debra Davenport, Cleo Wilkerson, Jay Raley, Barbara -- last name unknown and the cleaning person.

THE COURT: Thank you.

BY MR. CARTER:

Q Mr. Hoover, and of these nine, three were from your family -- you, your brother Steve and Debra.

A Yes.

Q To your knowledge, were any of the other employees there related to anyone else?

A No.

MR. CARTER: Those are all the questions I have.

THE COURT: Any recross?

MR. COLTON: No, Your Honor.

THE COURT: Mr. Hoover, you may be excused. Thank you.

MR. CARTER: Your Honor, I talked to Mr. Colton about this earlier. As with all witnesses, when they're done testifying, I'm going to ask that they be excused. We have inconvenienced a large number of people. If Mr. Hoover wants to stay, I have no objection, but I promised him I would get him done by noon and back on his way.

THE COURT: And you're agreeable to that, Mr. Colton?

MR. COLTON: Yes.

THE COURT: Mr. Hoover, you are free.

THE WITNESS: Thank you.

(Witness excused.)

MR. CARTER: Your Honor, Plaintiffs would next call

Mr. Tommy Griffin.

THE COURT: Good morning, Mr. Griffin.

MR. GRIFFIN: Good morning.

THE COURT: Don't sit yet. Stand and raise your right hand. Would you state your name for the record?

MR. GRIFFIN: Tommy Carl Griffin.

Whereupon,

TOMMY CARL GRIFFIN

appeared as a witness herein and, having been first duly sworn, was examined and testified as follows:

THE COURT: Thank you, you may be seated.

DIRECT EXAMINATION

BY MR. CARTER:

Q Mr. Griffin, if you would, tell the Court where you live and how you're employed.

A I live in Pyatt, Arkansas and I'm employed with the United States Postal Service.

Q And Mr. Griffin, how long have you been employed with the United States Postal Service?

A Since February of 1984.

Q If you would, briefly run down all the positions that you've had with the Postal Service, and where these positions were.

A I started out as a city carrier, letter carrier, in Lawrence, Kansas. In 1987, my wife got -- accepted at a job

offer in Illinois, where I transferred as a letter carrier to Illinois. Later transferred from the carrier craft to the clerk craft and worked in Illinois until 2001 when I relocated to Arkansas. For a short time, I worked as a rural carrier in the Yellville, Arkansas post office while I was waiting for a clerk position to open up in the Harrison post office where I'm at currently.

Q Okay. Earlier in talking to Mr. Hoover, I talked about an individual by the name of Jay Raley. Did you have any connections with Mr. Raley?

A Yeah, I worked as Jay Raley's sub for -- I'm not sure how long, I think it was less than a year maybe at the Yellville post office.

Q Okay. Now were you an employee of the post office at this time?

A Yes, I was considered a non-career employee but I was employed by the Postal Service.

Q Okay, could you explain that to the Court?

A I was called -- first I was a temporary rural carrier and then I was called rural carrier associate. They're positions that you're employed by the Postal Service but you're in a non-career status because you're not a full time employee, basically you just sub for the regular.

Q Okay. Have you been a full time employee in the past for the post office?

A Yes.
Q And since then have you been a full time --
A Yes.
Q Altogether, how many years have you worked for the United States Postal Service?
A Twenty four.
Q Okay. With regard to Mr. Raley and a sub, how often did someone need a sub?
A I carried the route every Saturday on Mr. Raley's day off and then I subbed for him whenever he was on vacation or took any other time off for personal reasons or whatever.
Q Did he take a lot of time off?
A He did shortly after he got me as a sub because I guess he hadn't had a sub for awhile, so he took advantage of having a substitute. And then at one point -- and I'm sorry, I don't remember the date -- he had some surgery and he was out for about six weeks and I carried while he was recuperating from his surgery.
Q During the time that you were at the Yellville post office, who was the postmaster?
A Linda Orr.
Q Did you meet and come to know Ed Keeter?
A Very briefly.
Q What about Duane Hoover?
A I knew Duane as far as a working relationship,

yes.

Q We've had some discussion about his brother Steve, did you know Steve?

A Yes, I knew Steve.

Q Okay. If you would, -- well, let me back up. We've had some testimony about casing.

A Uh-huh.

Q Talk to me about casing and efficiency of casing.

A Well, --

Q And I know you can brag on yourself.

A -- I'm not real sure I know what you mean by efficiency. Casing the mail, like Duane said, when you go in in the morning, the clerks have broken down your mail and basically separated it to the routes. You have to put it up in route order so when you pull it down, it's in delivery order. When you start carrying a route, you're not very efficient. After you carry the route -- the longer you carry the route, the more efficient you become. That's about my expertise on that.

THE COURT: Why?

THE WITNESS: Pardon me?

THE COURT: Why?

THE WITNESS: Why is that my expertise on that?

THE COURT: No. You made the statement that when you start you're not very efficient but after you carry, you

become more efficient. So would you tell me why?

THE WITNESS: Well, because like Duane described, most letter cases have three wings and the addresses, especially in a rural route, a rural situation, where we're at, there's a lot of county roads that swing around and they're not necessarily in any type of -- they're in an order but you pick up a piece of mail and you have to case it by address, so you may be putting one piece here, one piece here, one piece here. So when you first start, you have to learn where that piece of mail goes. After you've carried it time after time, you can -- it becomes second hand and you know where that piece goes as soon as you look at it, so casing time takes less time, breaking the mail down and preparing it for carrying it takes less time supposedly -- in most cases.

BY MR. CARTER:

Q When you were substituting for Mr. Raley, about how many boxes did that involve?

A I think -- I'm not real sure, but it was in the high 500s, right around 600 maybe.

Q And in terms of efficiency, once you got to know the route, how long typically would it take you to case the mail?

A Once I got to know it, I would go in at 6:00 and I could normally be out of the office by 7:30, 8:00. If there

was a lot of mail, depends on how I felt that day, maybe 8:30.

Q Okay. Prior to taking this job at Yellville, had you ever worked at a post office as small as Yellville?

A No.

Q It would be fair to say that largely you worked in much larger towns -- cities.

A Yes.

Q In the larger post offices that you worked in, would you have much contact with the postmaster?

A Normally myself, no. I worked 2 or 1 which is midnight to eight, so we're usually going home when they're all coming to work. So you would see them sometimes.

Q What about Yellville, did you have much contact with the postmaster there?

A Not really. I only worked usually Saturdays and that was usually her day off, but I did see her when I subbed during the week and stuff like that.

Q Let's talk about Mr. Keeter's situation. Are you familiar with it?

A Yes, I am.

Q Okay. Did he confide in you?

A Yes, he did.

Q Likewise, did you have an opportunity to talk to Linda Orr about the situation?

A No.

Q Did you have a chance to talk to Mr. Duane Hoover about the situation?

A Yes.

Q Tell me about that.

MR. COLTON: Objection, Your Honor. It's framed to be hearsay, if it's offered for anything of the contents, the truth of the contents.

THE COURT: Mr. Carter.

MR. CARTER: Your Honor, the objection is probably very well taken.

BY MR. CARTER:

Q Let me move on and ask you to describe the general atmosphere at the post office in the morning when you came in to do casing. And I'm talking about at the time when both Mr. Duane Hoover and Mr. Ed Keeter were employed doing home carrier routes.

MR. COLTON: Your Honor, I'm going to object on the grounds of relevance. This has nothing to do with what happened -- the general atmosphere, unless we know that the Postal Service did something to Mr. Keeter, it doesn't tie up which is why I objected to this witness in the first place.

THE COURT: You're objecting as to relevance?

MR. COLTON: Yes, Your Honor, it doesn't tie up at all.

THE COURT: Okay.

MR. CARTER: Your Honor, I believe that the atmosphere that is created in the post office, and he is certainly an observer of it, is highly relevant when the issue before this Court is bad faith. Because there's many elements of bad faith you have and it is all part of the broader picture.

THE COURT: I will overrule the objection.

Do you need that question repeated or do you remember it?

THE WITNESS: Well, yeah, I mean --

BY MR. CARTER:

Q What was the atmosphere in the mornings when things were being cased, the mail was being cased? What generally happened?

A Most of us talked, joked, discussed, you know, the weather, the latest sports, whatever was going on. Is that what you're talking about, that kind of --

Q What about Mr. Keeter?

A Ed's case was right next to mine -- when I worked, I should say, it wasn't my case, Jay Raley's case. I would say good morning, he would say good morning. There wasn't much else said between the two of us. I mean he just started, it was like, you know, the new guy starts and it's kind of hard to get him to open up at first when you're new

somewhere, I guess -- I don't know.

Q Did people take breaks during the casing?

A Yes.

Q Did Mr. Keeter take breaks?

A No.

Q Why not?

A I have no idea.

Q Okay. When people take breaks, what would they do, where would they go?

A We'd go out on the dock and smoke.

Q Would it be fair to say virtually everybody who was doing casing or working there smoked?

A All the rural carriers and contract carriers with the exception of Ed, I think all smoked. And we'd pretty much all go out at the same time.

Q And when y'all were out smoking, what was Mr. Keeter doing?

A I'm assuming he was in casing mail.

Q All right. With regard to talking about sport scores and things going on, did that occur on the loading dock or in the room where you're casing?

A Both.

Q Did Mr. Keeter participate in that?

A No.

Q I don't want to put words in your mouth, but would

he be like a loner?
A I couldn't label somebody like that. I just assumed that like when I have transferred to other offices, including when I started at Yellville, I was quiet and didn't say much until I got to know everybody after working there for awhile.
Q Okay. Did Mr. Keeter come to you and talk to you about his contract?
A Yes, he did.
Q Why you?
A We had talked before and he knew that I had a lot of years in the Postal Service and he knew that I had been a union representative for the American Postal Workers Union and he was asking me some advice as to what he should do.
Q Okay. And did you give him advice to the best of your ability?
A Yeah.
Q Do you recall a time when Mr. Keeter refused to deliver additional boxes that were given to him?
A I remember the time, yes. I believe I was only working one day when it actually occurred, but -- so I'm not aware of how long it had been going on or how long it continued after that.
Q Did you have any discussions with the postmaster Linda Orr about Mr. Keeter's refusal to accept changes?

A No.

Q Do you recall having small talk with Linda Orr about it?

A Not really small talk. I remember a couple of times in passing comments were made by a lot of people about the situation.

Q Okay. Well, specifically Linda Orr, the postmaster, do you remember any comments she made?

A It seems like one day I remember I was there and she was not happy about something and it turned out, later I found out it was about Ed not carrying the boxes. I can't remember word for word, but she made some comment of he's going to carry those boxes or I'll fire him or he's going to get fired or something similar to that.

Q Would it be fair to say the postmaster was upset?

A Yes. As I understand, she was having to deliver them, deliver those boxes.

MR. CARTER: Judge, those are all the questions that I have.

THE COURT: Mr. Colton.

CROSS EXAMINATION

BY MR. COLTON:

Q Mr. Griffin, in your years as an employee of the Postal Service, have you ever been responsible for contracting with HCR carriers?

A No, sir.
Q Have you had any responsibilities of speaking on behalf of the Postal Service with regard to contractual matters?
A Yes, sir.
Q Well, contractual matters involving contracts with outside carriers; that is, people like Mr. Keeter?
A No, sir, only dealing with the contract with the American Postal Workers Union.
Q The labor contract with the employees.
A Yes, sir.
Q Now did you have any of that kind of responsibility when you were working out of the Yellville post office?
A No, sir.
Q In any of the conversations that you had with anybody concerning Mr. Keeter, whether it was with Mr. Keeter or Ms. Orr, were you, in your own mind, speaking on behalf of the Postal Service?
A No, sir.
Q Did Ms. Orr ever tell you that she had a personal animosity toward Mr. Keeter and wanted to do him harm?
A No, sir.
Q By the way, Mr. Keeter came to you because you said he thought you were familiar with postal matters?
A Yes, I guess that's why.

Q What did he ask you?
A He just -- basically he brought me a copy of his contract and he asked me to read it and if he (sic) thought he had any recourse for having these boxes added to him. And basically by reading his contract, my -- I don't have any legal background, but as a union representative for six or seven years in the Postal Service, I get to read and learn to interpret the contract. By looking at his contract, I made some suggestions that I thought things were done wrong according to his contract, as far as the way things were calculated and the way they approached it. And I basically told him that was my opinion, I have never dealt with highway contract issues before, that he might seek some help somewhere else.
Q And after you had told him what you thought of those various provisions, did you have any more conversation about that? Did he ask you for further explanation or a more detailed discussion?
A I think he called me once on the phone and I basically -- I talked to him about it, but I had no knowledge of that contract and if there was any interpretations that have been agreed upon between the Postal Service and the contractors. So, you know, I just basically said in general knowledge, this is my opinion.
Q Had you ever seen that contract before Mr. Keeter

showed you a copy?

A No, I had not.

Q Finally, with regard to that atmosphere that you were asked about, isn't it correct that Mr. Keeter was viewed as unfriendly by the people who worked there?

A I -- no, I wouldn't say unfriendly, no.

Q He didn't come out and seek to mix in with the other folks, did he?

A I think once or twice when we were out on break and he was going out to go to Peel or something, he would stop and say something to us, you know, and then go back in. But I don't think so on the other answer -- on the other question.

MR. COLTON: Okay, just a moment, please.

(Brief pause.)

BY MR. COLTON:

Q Did Ms. Orr ever say anything derogatory about Mr. Keeter?

A Well, the only thing, like I answered earlier, about in passing one day, that she was mad and I heard her say something about if he wasn't going to carry those boxes, if he wasn't going to deliver those boxes, I'll fire him or he'll get fired. And I don't recall the exact wording, but it was something to that effect.

MR. COLTON: Nothing further.

THE COURT: Mr. Carter, do you have any redirect?

MR. CARTER: No, Your Honor.

And likewise, I would ask that Mr. Griffin be allowed to be excused. If he wants to stay here, that's fine or if he wants to get back to Pyatt or Harrison, that's also fine.

THE COURT: Can you spell Payette?

THE WITNESS: Pyatt.

THE COURT: Pyatt.

THE WITNESS: P-y-a-t-t.

THE COURT: Okay, thank you. You're excused, Mr. Griffin.

THE WITNESS: Thank you.

(Witness excused.)

MR. CARTER: Your Honor, if the Court wants to take a break, the next witness will be fairly long.

THE COURT: Okay, we can take a break because I want to get some water for the witness stand.

Ten minutes?

MR. CARTER: That's fine. I have nowhere to go. And they took my cellphone or wouldn't let me bring it in, so I have no one to call.

(A short recess was taken.)

THE COURT: We're back on the record.

Mr. Colton.

MR. COLTON: Your Honor, in light of Your Honor's Order about the sponsorship of all exhibits, I realized that there's one exhibit that counsel and I agreed could be in that affects the stipulation and that is Defendant's Exhibit Number 25 which is a discovery document with a set of requests for admissions that counsel has agreed should be deemed admitted. It's a lot of background facts. As you'll see, it's contract numbers and dates and correspondence and conversations. It wasn't directed to this issue, it's background on the whole matter. There wouldn't be a sponsor because it's not a document that was created at the time of the events.

THE COURT: Wait a second. Let me -- okay, we're talking Defendant Exhibit Number 25 which is Defendant's Request for Admissions and these were requests, and I don't see -- what was Plaintiff's response?

MR. COLTON: They were deemed admitted.

MR. CARTER: Your Honor, we filed a response saying we admit everything.

THE COURT: Okay.

MR. COLTON: I think it just provides background for how we get to today.

THE COURT: Okay. That's fine. I don't have a problem with that, but there still may be instances -- and I recognize you want to streamline the hearing as much as

possible, but there still may be instances where I may need some background information as we go along to better place the context of the testimony.

MR. COLTON: Sure, it's for the dates and times, things that witnesses tend to forget. It doesn't resolve the questions of the case, but it fills in the background.

THE COURT: That is helpful and counsel may wish to refer to this if it's necessary to refresh the witnesses' recollections and then that could be done without any objection between either counsel. So I think it's an excellent suggestion and I thank you both for bringing it up at this point.

MR. COLTON: Thank you.

THE COURT: Thank you, sir.

Mr. Carter, you may call your next witness.

MR. CARTER: Your Honor, we would call Edward Keeter, President of Keeter Trading Company, Inc.

THE COURT: Good morning, Mr. Keeter.

MR. KEETER: Good morning.

THE COURT: Would you state your full name for the record?

MR. KEETER: Edward Lee Keeter.

Whereupon,

EDWARD LEE KEETER

appeared as a witness herein and, having been first duly

sworn, was examined and testified as follows:

THE COURT: Thank you, you may be seated, sir.

DIRECT EXAMINATION

BY MR. CARTER:

Q Mr. Keeter, if you would, tell the Court where you live?

A Yellville, Arkansas.

Q And what county is that in?

A Marion.

Q How long have you lived in Marion County?

A All my life except for a year and a half.

Q And where were you during that year and a half?

A I was in the first grade and lived in Catoosa, Oklahoma.

MR. COLTON: Your Honor, I'm having a difficult time hearing the witness.

THE COURT: Can you adjust the microphone?

Mr. Keeter, how far is Yellville -- just to place this -- from Little Rock?

THE WITNESS: About 120 miles straight north.

THE COURT: Thank you.

MR. CARTER: 132.8 according to the Trip Tik.

THE COURT: Okay.

BY MR. CARTER:

Q Mr. Keeter, if you would, tell the Court a little

bit of background about yourself. First of all, how old are you?

A I'm 45.

Q And what have you done, business-wise, throughout your life?

A Real estate investments and I was in sales for awhile, selling automobile detailing supplies. And I had this mail route for awhile.

Q Talk to me about Keeter Trading Company, what is that?

A Well, it had property in that name, I had some rental property and I also was involved in building a website to sell Tibetan rugs and I also had the mail route under Keeter Trading.

Q Talk to me about the mail route. Prior to July 1 of 2002, had you ever had a mail route for the Postal Service?

A No.

Q Had you or Keeter Trading ever worked for the Postal Service?

A No.

Q Tell me about finding out -- how does one get to be -- get a route to carry the mail as a contract carrier?

A It was posted in the post office lobby and I asked Linda about it.

Q Okay, now when you say Linda, are you talking about Linda Orr, the postmaster?

A Linda Orr, the postmaster.

Q When you say it was posted in the lobby, there's some sort of notice you saw?

A Right.

Q What did you do?

A I asked her about it and I think they sent a packet from Dallas.

Q Okay, when you say they, you mean Dallas?

A Dallas, yes.

Q Okay. And what did you do?

A Well, I consulted Steve Hoover, because he had a contract route already, about making the bid, how to fill it all out. I sent in the packet and I was awarded the contract.

Q Now Steve Hoover, that would be Duane Hoover's brother?

A Brother, yes.

Q So if Duane Hoover testified that Steve helped him, I guess Steve helped both of you?

A Evidently.

Q Okay. And you sent a proposal off to the United States Postal Service?

A Correct.

Q Did you -- obviously you were awarded a contract.
A Right.
Q If you would, describe to the Court the route that you were given.
A I had to sort the mail at Yellville and then I had to load all of Peel's mail and packages and all of Summit's mail and packages.
Q Now you're telling the Judge things that she's not going to be familiar with.
A Okay. Summit is a town that adjoins Yellville to the north, just up the road from Yellville.
Q And what did you have to do for Summit?
A I had to drop off all of their mail and all their packages of a morning.
Q Okay, but you didn't deliver Summit's mail?
A No.
Q Okay.
A And then Peel's -- I don't know how far Peel is from Yellville, but up by the lake in the northern part of the county. I had to sort mail up there too and take them their mail and packages.
THE COURT: When you said the first one, Summit?
THE WITNESS: Summit.
THE COURT: Okay. You took up -- you took the mail up but you didn't drop it at individual boxes?

THE WITNESS: No. I just went in the back door and the mail was in boxes and the packages, of course, were separate, and I would just unlock -- I had a key to the back door, unlock the door and set it inside so the Summit postmaster could sort it out to the boxes.

THE COURT: Thank you.

BY MR. CARTER:

Q Did Summit only have P.O. boxes?

A As far as I know, yes.

Q Okay. And to be fair, the Yellville post office and Summit post office are two and a half, three miles apart.

A Yes.

Q And Summit is a small -- you've lived in Marion County almost all your life, do you know the original name of the City of Summit?

A North Yellville.

Q Okay. And with regard to the community of Peel, talk to me about that. What did you do for Peel?

A I took the mail up to Peel, all the mail, and set it in the back there. And part of that mail went out to the boxes in the post office, and the rest of it was the route. So I had to run -- part of my route was Yellville and part of my route was Peel.

Q Okay.

A So I had to come back to Peel and sort there too.

Q So Summit had no delivery but Peel had delivery and you did the Peel delivery.
A Correct.
Q In addition to -- did you do Yellville delivery also?
A Yes.
Q Typically when Ed Keeter arrived at the post office, what did you do? Run through a typical day.
A I would start casing the mail, sorting and casing the mail.
Q What time did you arrive at the post office?
A Seven o'clock. And I would do that and then at some point, they would get all of Peel's and Summit's mail into the bins or the buggies and I'd take them out and load them up in the truck and keep them separated. Then I would come back in and finish sorting and then I would -- it be time to leave then.
THE COURT: Were you casing and sorting mail for both Peel and Yellville?
THE WITNESS: Yes, I had 116 boxes at Yellville and I had 133 boxes at Peel.
THE COURT: But was this done at the same location or in two separate locations?
THE WITNESS: No, two separate locations.
THE COURT: Okay.

BY MR. CARTER:

Q After you have put the Peel mail and the Summit mail in your vehicle and cased your 116 Yellville boxes, what did you do?

A Well, it'd be about 8:00 by that time and Linda had said that if the Baxter Bulletin paper wasn't there by 8:00, that I was free to go at 8:00. Sometimes I wasn't ready, a lot of times I was. And I would go to Summit, drop off their mail and then drive on to -- start toward Peel and deliver part of Yellville's route, just a few boxes, on the way.

Q Now the Baxter Bulletin, what is that?

A It's a newspaper, a daily newspaper from Baxter County. I had one customer that had a Baxter Bulletin, I had to wait until 8:00 until that came in. If it wasn't there, I could leave.

Q Okay. And would you deliver any mail prior to getting to Summit?

A No.

Q So Summit was your first stop?

A Correct.

Q After dropping the mail off at the Summit post office, what was your next stop?

A I would go past the Welcome Ridge turnoff and I had just a few boxes there and then I would drive on to Peel and drop the mail off there.

Q So you didn't deliver 116 boxes first?
A Not before I got to Peel, no.
Q Okay. What would you do when you arrived at Peel then?
A I would unload all of Peel's mail and then I would immediately leave and run the rest of the 116 -- well, part of the rest of the 116 boxes. It was a complicated route, it had all these divisions. Run Yellville, and then I'd drive back to the Peel post office.
Q Okay. And what would you do when you came back to the Peel post office?
A I would start to sort and case --
Q Okay.
A -- Peel's route.
Q And how long did it take -- you said 133 boxes? How long did it take you to sort and case that?
A About an hour.
Q And where would you go from there?
A Then I would run the first part of Peel, toward the lake. I would do that and then I would come back to Peel again and --
Q This is already the third time you've dropped by the Peel post office?
A Right. I would come back to Peel and then load up the outgoing mail. I couldn't leave until 12:00, so if I was

through before 12:00, I couldn't leave until 12:00 because people were bringing mail in to go out. Then I would run the rest of the Peel route, second part of Peel, and then start home and pick up a few more boxes I had left over from Yellville.

Q Now when you say start home, what do you mean?

A Start toward Yellville.

Q The Yellville post office?

A Yellville post office, yes.

Q And did you always end up at the Yellville post office?

A Correct.

Q Why would you end up at the Yellville post office if you've delivered everything?

A Well, I had to get the mail that was outgoing from Peel and also mail that I'd pick up along the route at the boxes had to go back to the Yellville post office to go out.

Q Now for the Court's information, could you describe the community of Peel. There's obviously a post office there.

A There's a post office there, sort of a salvage yard and a store, the store's closed now, and a couple of churches. That's about it.

Q Cafe? Cafe?

A Yeah. Well, that's been closed too.

Q Okay. That's pretty much the entire community of Peel then?

A Yes.

Q Very, very rural.

A Uh-huh -- yes.

Q Okay.

THE COURT: But there are farmhouses or houses somewhere?

THE WITNESS: Some farm, but most of it's retirees up by the lake.

BY MR. CARTER:

Q Within a half mile of the Peel post office either way, there isn't more than 10 or 12 houses, would that be a fair statement?

A That'd be close, yes.

Q It'd be a wide spot in the road.

A (The witness nods.)

Q Is that a yes?

A Yes -- yes. This is my first time in Court.

THE COURT: The one thing you have to remember is you have to speak your answers, because if you shake your head or say uh-huh or huh-uh, it doesn't show up.

THE WITNESS: I'll try.

THE COURT: Thank you.

BY MR. CARTER:

Q Now Mr. Keeter, at some point, did the postmaster approach you and discuss possible changes to the route?

A Yes, in the summer of 2003, she asked me about taking some boxes off of Duane's route on north 14.

Q Okay. Did she indicate to you how many?

A Not at that time, no.

Q And what did you indicate?

A I told her I'd think about it, and the next day I told her I wasn't interested.

Q Why aren't you interested? That'd be potentially more money for Keeter Trading.

A When I initially talked to her about taking the route, I told her I would like to have that one because of the number of boxes and I could also get done early in the day and I had a real estate license, I could do something else in the afternoon.

THE COURT: Are you referring to your original route or to the proposed changed one?

THE WITNESS: The original route.

THE COURT: Thank you.

BY MR. CARTER:

Q So when you bid on the original contract, it fit Ed Keeter's lifestyle?

A Correct.

Q And where did you sell real estate?

A Marion County.
Q I don't know of a Marion County Land Company.
A Well, okay, in Marion County with BBD Realty, United Country Real Estate.
Q Okay, and where is that located?
A In Yellville.
Q So in essence, you were employed by your company and you also sold real estate.
A Yes.
Q Are you married?
A No.
Q Okay. With regard to any proposed changes, when did you and Ms. Orr talk about it next? Or who talked to you about it next?
A Duane Hoover did out in the parking lot. He stopped me in the parking lot and told me that I could either take those extra boxes or take a pay cut.
Q Did you respond in any way, shape or form?
A I told him that he wasn't in charge of my contract.
Q Okay.
A That was all that was said.
Q When did this -- the next time you had any discussion with anyone about adding boxes to your route?
A December 1, 2003, Linda --
Q How can you be so sure of that date?

A Because I wrote it down.
Q Okay.
A December 1, 2003, she told me that I would be taking those boxes.
Q And what did you tell her?
A I told her I didn't think it was right and she said that -- I said this is to appease Duane Hoover not being happy with our contract.
MR. COLTON: I cannot hear. I lost everything I'm sorry.
THE COURT: Okay, would you speak up a little bit and not speak quite so fast?
THE WITNESS: Is that better?
MR. COLTON: Yes, thank you.
THE WITNESS: I lost my train of thought where we were at.
THE COURT: Would you repeat your question?
BY MR. CARTER:
Q We were talking about December 1, 2003 and you were explaining what you were telling the postmaster.
A I told her I didn't think it was right and this was just to appease Duane Hoover because he wasn't happy because my contract was so much more than his. And she told me that it didn't matter what I thought.
Q How many boxes were on your route?

A Two hundred fifty -- 249.
Q And Mr. Hoover, I think, indicated that he started with 320, 323, somewhere in that area?
A It was somewhere in there, yes.
Q So he had more boxes than you. Was his contract lower than yours?
A Yes.
Q Okay. Did Ms. Orr say anything to you when you pointed that out to her?
A She said I would be taking the boxes. I did ask her how many boxes it was and she had to check with Duane to find out how many boxes it was.
Q Okay. Did all this occur on December 1 of 2003?
A Yes.
Q When was the next time there was any discussion or information relayed to you about this proposed change?
A I immediately called Jeanette and told --
Q Now when you say Jeanette?
A Jeanette Wofford in Dallas.
Q Okay. You've probably never met her --
A No, I have not.
Q Today's the first day -- you have talked to Jeanette Wofford --
A Numerous times.
Q Okay.

A I immediately called Jeanette and she said I needed to read the changes clause in the -- at first, I said -- she asked me why didn't I object to this earlier and I told her I didn't know anything about it. She said it was a done deal.
Q Okay. Ultimately, did a change order come through?
A Yes, later that month, in December, a change order came through.
Q Okay. Did you have a follow up discussion with Jeanette Wofford?
A Yes. I called her and was asking about the amount of the award, it was a little over $1000, which was a 20 percent increase in boxes for $3.59 a day. I didn't think that could be right.
Q Okay. Did you indicate to her whether you were going to accept these changes?
A Well, not at that point, because I hadn't figured out yet what the contract said. I hadn't studied the contract.
Q Okay.
A At some point, I figured out what the contract -- she said to look at the major and minor change section of the contract, and I did. And I found the formula and put the extra number of boxes to the formula and it came out to $2700 and the contract said any change over $2500 required a mutual agreement.

Q Okay. Did you talk to Jeanette about that?
A Yes, repeatedly.
Q Do you recall what day these changes were to take place?
A January 22nd or 23rd I think, somewhere in there.
Q Of 2004?
A 2004, yes.
Q Did Keeter Trading deliver those boxes?
A Yes, they did, for four weeks. Yes, Keeter Trading did deliver those boxes.
Q You delivered those 52 boxes?
A No, no, no. I continued running my route. Linda delivered the 52 boxes.
Q Why didn't Keeter Trading deliver those 52 boxes?
A No, Linda delivered the 52 boxes.
Q Why didn't Keeter Trading deliver those 52 boxes?
A Oh. Because it wasn't according to the terms of my contract.
Q Did you make that clear to Linda?
A Yes.
Q I'll show you what we have marked as Plaintiff's Exhibits 4-A through 4-Y. These are known I guess as Form 550s. Could you describe those to the Court?
A Yes, I got these every day.
Q No, no, could you describe what that form is for

the Court?

A Well, if you've done something wrong, it's called writing you up, and they describe what your offense is. And you're supposed to respond and there's a space at the bottom for them to respond back.

Q Okay. And Exhibit 4-A, what's the date on that?

A 1/24/04.

Q Would that be the day that the change was to go into effect?

A It must have been, yes.

Q And was Keeter Trading written up?

A Yes.

Q For what?

A For not delivering the 52 boxes.

Q Did you respond to it?

A Yes, I did.

Q And what did you put?

A "I never agreed to this change to my contract which adds over 20 percent to my box count. This change is not according to terms of my contract. I delivered all the mail I'm responsible for."

Q Okay. And did the postmaster put a response to that?

A She did not.

Q If we look at Exhibit -- well, let me speed up --

the remainder of Exhibit 4 are these forms for every day that you were -- between January 24 and February 20 of 2004, is that correct?

A Yes.

Q And were you written up for the same thing every day?

A Every day. She added some things occasionally, mostly the same thing.

Q And what was your response?

A It was something similar every time.

Q That it wasn't pursuant to your contract?

A Wasn't according to my contract.

Q At any time prior to February 9 of 2004, was the area for responding ever filled in by the postmaster?

A No, it was not.

Q Now in the way the system works, the postmaster is also your administrative official, is that correct?

A Yes.

Q Did Linda Orr ever sit down with you and ask you "Mr. Keeter, why is Keeter Trading not delivering these 52 boxes?

A We had a conference with the Bull Shoals postmaster, but other than that, I don't recall anything else.

Q And do you recall what you discussed with Ms. Orr

and the Bull Shoals postmaster?
A That this wasn't according to terms of my contract.
Q Okay. Did Ms. Orr or the Bull Shoals postmaster pull out the contract and look at it to see what you were talking about?
A They did not.
Q Did you have a copy of your contract?
A Not with me, no.
Q Mr. Keeter, if you look at Exhibit 4-H, 4-I, 4-J, 4-K 4-L, 4-M, 4-N, 4-O -- if we look at all those running from January 31, 2004 to February 9 of 2004, in Section 3, Postal Service comments, was a comment made by the postmaster?
A Yes, it says "chargeable".
Q Were you ever provided a copy of that prior to your leaving -- prior to February 20 of 2004?
A A copy that said chargeable?
Q Yes.
A No.
Q Okay. And what are the -- if we look at the first one, when is it dated, the part that reads chargeable?
A January 31, '04.
Q What is it dated where it says chargeable?
A 2/9/04.
Q And the next one?

A 2/9/04.
Q The next one?
A 2/9/04.
Q The next one?
A 2/9/04.
Q Which is 4-K. 4-L?
A 2/9/04.
Q 4-M?
A Not sure I can read that.
Q Okay. 2/18/04 maybe?
A 2/18/04, yes. 2/18/04.
Q For 4-N?
A 2/18/04.
Q For 4-O, I believe -- yeah, it must be.
Did you ever receive a copy of any of those that say chargeable?
A No.
THE COURT: What does chargeable refer to? I don't want to jump ahead, so if you were going to get there, fine.
MR. CARTER: I will get there. It will be with another witness, Your Honor.
THE COURT: That's fine.
BY MR. CARTER:
Q Mr. Keeter, did you have a further discussion with Jeanette Wofford concerning this situation after January 24,

2004?

A Yes, numerous times.

Q Would it be close to a daily basis or every other day?

A Not daily, but it'd be quite often, yes.

Q And Jeanette Wofford is who?

A She was my contact in the Dallas office, that I was supposed to call with problems.

Q Okay. And did you call her and talk to her?

A Yes.

Q Ultimately, did you have a conversation with her and Mr. McCague?

A Yes, I did.

Q Who is Mr. McCague?

A Her superior.

Q Okay. Do you recall what day that conversation took place?

A After the change went into effect, about a week or so. I'm not sure exactly. It's in the notes that she provided.

Q You've seen various notes that Jeanette Wofford has written?

A Yes.

Q To your knowledge, are they all accurate and true or do you disagree with any of them?

A Not what she's got written down, I don't think so.

MR. COLTON: Your Honor, sorry, but I object, I can't tell what the answer meant.

THE COURT: Mr. Carter, could you narrow your question down so that his response can be a bit more focused?

BY MR. CARTER:

Q Mr. Keeter you have had an opportunity to review Jeanette Wofford's notes from your file, have you not?

A Yes.

Q To your knowledge, is everything that Jeanette Wofford wrote accurate?

A As far as I can recall, yes.

Q Okay. I'll show you what we've marked as Plaintiff's Exhibit Number 7. Would you have any reason to disagree that on January 28, 2004, you had a conversation with Mr. McCague and Jeanette Wofford?

A I did have a conversation, yes.

Q Okay. Tell the Court about that conversation.

A I was trying to explain my position and I said that Linda had told me that what I thought didn't matter and Mr. McCague informed me that Linda was right, that what I thought didn't matter.

Q They told you what you thought didn't matter?

A Correct.

Q And that was Mark McCague of the United States

Postal Service.

A Yes, it was.

Q Did they ask you to put things in writing?

A Yes, they did.

Q And did you do that?

A Yes, I did.

Q I'll show you what we've marked as Defendant's Exhibit Number 7. Is this the letter that you wrote in response to what Mr. McCague requested?

A Yes, it is.

Q And when did you write that letter?

A It's dated January 31, '04.

Q And did you explain to the United States Postal Service what the position of Keeter Trading was?

A Yes, I did.

Q And did you tell them that they misapplied the formula?

A Yes, I did.

MR. COLTON: Your Honor, the document speaks for itself.

THE COURT: I will grant some leeway in this, but Mr. Carter, I would request that you limit how much into depth you go with this since Mr. Colton is correct that we do have the document.

But I will allow you to point out certain sections

of it through your witness.

BY MR. CARTER:

Q Specifically the third paragraph, you set out the formula pursuant to your contract.

A Yes, I did.

Q From the date of that letter, January 31, 2004, through February 20, 2004, did you ever hear from Mr. Mark McCague again?

A I did not.

Q Did you hear from Ms. Wofford again?

A Yes, I talked to her several times.

Q Okay. And did -- at any time, did she tell you, "Mr. Keeter, you're correct."

A She did not.

Q At no time -- prior to February 20, 2004, at any time did any member of the United States Postal Service, whether in Yellville or in Dallas or Little Rock, tell you that we made a mistake and miscalculated things?

A They did not. They would not even discuss the change clause at all.

Q What do you mean they wouldn't discuss the changes clause?

A Well, I kept pointing out what the formula said and anything over $2500 required --

THE COURT: Mr. Keeter, you're talking too fast.

THE WITNESS: Okay. I pointed out that if you applied the formula, it's over $2500, it's $2700. And any change over $2500 required mutual agreement, and they would not discuss it.

BY MR. CARTER:

Q At any time did the United States Postal Service attempt to negotiate with you?

A They did not.

Q What did the United States Postal Service do?

A Well, in February, they sent me a letter saying that if I didn't comply with their wishes, that they were going to dock my pay on February 20.

Q Okay. Did the Postal Service dock your pay?

A Yes, they did.

Q What happened at that point? Well, let me ask you, did you negotiate with the Postal Service about docking your pay?

A No, I didn't.

Q This was something they did unilaterally.

A Yes. They told me it was going to happen but they didn't discuss it whatsoever.

Q Between January 28 when you had this conversation with Ms. Wofford and Mr. McCague and February 20 of 2004, did you have any other conversations with postmaster Linda Orr?

A She did tell me that every day she was writing down

how much it was going to cost me for -- that she would get for delivering those 52 boxes. And I asked her, you mean you're going to get your salary plus get part of my check too. And she said she'd get every penny of it, everything she wrote down. It added up to $1093.

Q Okay, and she did all this prior to February 20?

A Yes.

Q And we had earlier talked about Exhibits 4-A through 4-Y, that Form 550s. Is that where you're getting those figures?

A Yes.

Q So she had -- it added up to you say over $1000?

A $1093.

Q And the Postal Service was proposing to pay you $3.00 a day or so?

A Yes, $3.59 a day. She was charging me as much as $95.00 a day to deliver the 52 boxes.

Q Why turn in the keys?

A Well, I knew with them taking $1093, that's a third of my gross pay, $3069 for a four-week period, there's no way I could continue running that route.

Q Now when you say gross pay, that's the gross income that Keeter Trading --

A Yes.

Q Could Keeter Trading operate with that type of

loss?
A No, it could not.
Q I'll show you what we've marked as Exhibit 17.
THE COURT: Plaintiff's Exhibit?
MR. CARTER: Plaintiff's Exhibit 17.
BY MR. CARTER:
Q Is that a letter that you wrote to the Postal Service on February 20 of 2004?
A Yes, it is.
Q And what's the thrust of that letter?
A When they didn't pay me the contracted amount for that four week period, they had breached the contract.
Q Okay. And what is Plaintiff's Exhibit 18?
A It's a note about termination for default.
Q Okay, and did you receive a copy of that?
A No, I didn't receive that.
Q Plaintiff's Exhibit 19-A. You received a copy of that?
A Yes.
Q And that was signed by Mr. Rodriguez, terminating the contract, is that correct?
A That's correct.
Q At any time prior to today, has any official of the United States Postal Service told you, "Ed Keeter, we miscalculated your contract."

A In the deposition, Jeanette said she would make a change. That was the first time.
Q Okay. You're talking about September of 2007.
A Yes.
THE COURT: Is that referring to -- that's before the Court's decision came out. So your question was whether or not -- I didn't quite get that, so would you repeat that, Mr. Carter?
MR. CARTER: Your Honor, the Court's decision I believe was July 17 and this would have been in September of '07. I think it was after the Court's decision.
THE COURT: The depositions were after the Court's decision?
MR. CARTER: Yes.
THE COURT: Okay.
BY MR. CARTER:
Q The Form 550 that you received, at any time, has the United States Postal Service said "We're wrong, we're going to take those out of your file."?
A No, they have not.
Q Did the United States Postal Service give Keeter Trading oral reprimands?
A Yes.
Q Have any of those been retracted?
A No.

Q After February 20 of 2004, did you receive a certified letter from the Postal Service that effected another change to your contract?

A Yes, just a couple of days later, I got a second change, it was for $1700 additional.

Q Okay. If you take the first figure and the second figure, was it close to what you felt it should have been?

A Yes.

Q Well, now you've got the money. What's the problem?

A It was never about the money, it was the principle of the thing. I was telling them this was not according to the terms of the contract and they were trying to force me to do it anyway.

Q What do you mean, they were trying to force you?

A Financially. I was given a choice, either you accept this change or we'll force you off that route, we'll get rid of you. They didn't say that, but that's what was going on.

Q Okay. And so you stood for your principle and said I have this contract and we're going to follow this contract.

A Correct.

Q Did you tell the Postal Service that?

A Yes.

Q And did anyone at the Postal Service say let's sit

down and go over this formula?
A They did not.
Q How many formulas are in your contract?
A Pertaining to changes, just that one. It addresses the mileage and number of boxes.
Q I'll show you Defendant's Exhibit 3-A. Is this your contract, HCR-72665?
A Yes, it would be.
Q Effective 1 July of 2002?
A Uh-huh.
Q And adjustment for route extension or en route boxes.
A Correct.
Q Now these 52 boxes were en route boxes?
A They were.
Q Literally, you take 52 times 3.64 times the contract price?
A That's your hourly rate, yes.
Q Something that should be done in a minute or two.
A Yes.
Q Your contract says that all times are approximate, is that correct?
A It is.
MR. CARTER: Judge, I have no further questions.
THE COURT: This formula for added boxes that you

referred to in 3-A, was that a part of your contract?

THE WITNESS: Yes, it is.

THE COURT: Thank you.

MR. COLTON: Your Honor, could I have about two minutes to get myself organized before we start?

THE COURT: Certainly.

MR. COLTON: Thank you.

(A short recess was taken.)

THE COURT: You may proceed. We're on the record.

CROSS EXAMINATION

BY MR. COLTON:

Q Mr. Keeter, why was your contract with the Postal Service -- at least the contract of Keeter, Inc. -- terminated, in your understanding?

A Because I refused to deliver those 52 boxes.

Q I'm sorry, I can't hear you.

A Because I refused to deliver those 52 boxes.

Q Can you point to any document that says that that's why you were terminated?

A Any document?

Q Yes. Have you seen any document --

A It's the letter for termination for default.

Q And what does that document say was the reason, as you recall, for you being terminated?

A For not performing the job, what they thought

should be --

Q You weren't delivering any mailboxes at the time you were terminated, were you?

A They had forced me off the route by that time.

Q No. You weren't delivering any mailboxes, were you?

A That's correct.

Q On January -- excuse me -- February 20, 2004, you stopped performing any part of your route, correct?

A That's correct.

Q And thereafter, you got a letter from the Postal Service saying please come back and perform your route, correct?

A Yes, I had three days.

Q They didn't terminate you, right?

A Not at that time.

Q Right. And they told you you were getting more money, correct?

A They told me that before February 20.

Q And -- but you received it after February 20.

A Correct.

Q So you knew you were going to be receiving more money, the amount you had originally requested, correct?

MR. CARTER: Your Honor, I'm going to object. That's a mischaracterization of all the evidence. As

testified and the documents support, he never requested additional money.

THE COURT: Mr. Colton, the Court has already ruled that -- let me finish. The Court has already ruled that the Postal Service breached the contract, it has already established that Keeter was default terminated and that it was wrongful. So what is the relevance and purpose of where you're going with this?

MR. COLTON: Your Honor, if there's bad faith, it has to be in something we did. I'm asking the witness, if he doesn't accept why the termination occurred -- really, Your Honor, the point is we have a breach of contract, I'm trying to come down to if there was anything besides the breach of contract. I want to know what constituted the bad faith on top of the breach -- unless every disagreement that results in a breach is automatically bad faith. There's got to be something more. I'm trying to find out what he claims it is.

THE COURT: That is the purpose of this entire hearing, so I don't understand your line of questioning with regard to the witness as to his legal opinion of what bad faith is?

MR. COLTON: No.

THE COURT: Where are you going?

MR. COLTON: Your Honor, I would like to show that rather than being harsh and cruel and unforgiving, that the

Postal Service was trying -- this is before there was a lawsuit -- was trying to accommodate him, that we tried to be reasonable and I'm going to show why we did, because that's important. Unless there is bad faith simply because there was a firm disagreement. Your Honor has ruled on that, but the question is, is that all that it takes, that we have a disagreement? And there will be evidence to show why it happened. So I want to know is there something more.

He claims that he was terminated because of the boxes and that isn't true and I'm going to prove it.

THE COURT: I think your characterization of his testimony that he was terminated because of the boxes, I mean he went beyond that. So I would urge you and caution you to be careful in terms of how you phrase this and what you're saying. Let's go ahead and rephrase your question and let's go from there.

MR. COLTON: Your Honor, I specifically asked him why and he said it was because I didn't service the 52 boxes. That's why I followed up.

THE COURT: But counsel, he's also given a sequence of events that happened after he refused to service the 52 boxes. So I want you to be very cautious and straight-forward here, you know, because once the witness testified that he -- he's already stated what happened after he didn't service the 52 boxes, and then stated that, you know, he

continued to service his other boxes for awhile, and then there was testimony about the deduction from his pay and so forth.

So I want you to be careful and accurate with your characterization.

MR. COLTON: Thank you, Your Honor. I have a clear understanding of that distinction and was not attempting to go after the underlying ruling.

BY MR. COLTON:

Q Mr. Keeter, what, in your view, constituted bad faith by the Postal Service?

A Well, forcing me off the route was the big part. It wasn't just the $1093, it was -- there's a document 459, 460 and 461 where they added another $250 to Linda's 1093, they show 1343, they show the 424 deduction and showed that I owed a balance of 917. I couldn't continue running the route.

Q I'm sorry, you just referred to a bunch of figures and I'm going to have to back you up to find out, so we break it out into pieces.

Okay, you were forced off the route, is the first part of the answer; is that right?

A Yes.

Q And that was bad faith. And the way in which you were forced off the route was what?

A Not paying me the contracted amount.

Q Okay. Money was withheld, is the way you were forced off the route?

A Yes.

Q Now I'm going to ask you a question, it's a hypothetical question, but it's an important one. If the Postal Service believed sincerely and honestly that you were obligated to service those 52 boxes, did it have a right to deduct -- as you understand it -- to withhold money when you didn't service them?

A Not according to the terms of the contract. We've established what the terms of the contract were.

Q Now is it impossible in your mind that the Postal Service could have sincerely and honestly believed that what it was doing was correct?

A No, it wasn't impossible --

Q I'm sorry, I didn't hear you.

A -- I went over time and time again what the contract said and they would not address it.

Q Now you kept saying the same thing to the Postal Service, correct?

A Yeah, what the contract said.

Q And I'm not sure I heard your answer, do you think it is not possible that the Postal Service really believed in its position?

A They were trying to force me to do it regardless of what the contract said.

Q That wasn't the question.

THE COURT: Mr. Colton, when you say the Postal Service, it becomes a bit confusing. If you would be more specific.

MR. COLTON: Sure, all right.

BY MR. COLTON:

Q When you were dealing with Ms. Wofford and Mr. McCague, did you understand that they were operating under the authority of the contracting officer?

A They had superiors; yes, I knew that.

Q Do you have any basis for asserting that they did not honestly and sincerely believe that what they were doing was a correct reading of the contract?

A I don't know how they could have after I pointed out very plain exactly what the contract said. And they knew, they knew I had an attorney, and they still tried to force me to do it.

Q In other words, they stuck by their guns, right?

A Yes. So did I.

Q Going back to that very beginning point when you signed up for the contract. You said that this appealed to you because of the timing and the number of boxes, is that right?

A Correct.

Q Okay. Now you knew when you accepted the contract, didn't you, that you could be required to work more boxes than the number that was in the contract, correct?

A Yes, I did.

Q In fact, as long as the number of boxes didn't have a value above $2500, did you have any right to object to it, as you understood the contract?

A None at all.

Q So, if 60 boxes had been added in three distinct chunks of 20 each, you would have had to do them; correct?

A I think so, yes.

Q Okay. So when you contacted Ms. Wofford, I think your testimony was you said this isn't right. That was December 1, 2003.

A Uh-huh.

Q What was it that wasn't right?

A The fact that Duane and Linda could do this, put this all together and force me to do this when I objected to it.

Q Okay. What's the evidence that Duane and Linda put all this together, on which you base that statement?

A Well, nothing written, just what I -- I talked with them, I knew he was disappointed because our contracts were different. I was told there was $6000 difference and he had

more boxes, so he was mad.

Q I'm sorry, you went so fast, I didn't hear that.

A He was unhappy because -- I was told that his contract was $6000 less than my contract.

Q Were you told that by the Postal Service?

A No, I was told that by people there at the post office.

Q And did you ever see the documents yourself?

A No, I did not.

Q And was this somehow a bad act on the part of the Postal Service, if it were true?

A Not the difference in the contracts. You make your bid and they accept the lowest.

Q Well, I'm trying to make the connection to Duane and Linda, you think was wrong. What are you saying happened?

A Because he went to Linda -- what you hear out there on the dock when you're talking to people, that he was mad. He wanted to get our contracts closer together. So when they figured it up, according to the formula, he was supposed to have got $1100, I found out later, and they gave him $2200. Mine was supposed to have been $2700 and they gave me $1000. So they made our contracts closer together and kept my change below the $2500 threshold, so we wouldn't have to address the major change issue.

Q As of December 1 of 2003, when you called Jeanette and said this isn't right, did you know how many boxes you were going to be working, added boxes?

A No, because Linda had to get with Duane to figure out exactly how many boxes it was.

Q All right. And you didn't know what the increase in pay was going to be, did you?

A No, not until I got the deal later that month.

Q So on what basis did you say this is wrong?

A The fact that Duane could use his -- having so much family there, they had a lot of power to get a change implemented.

Q Other than your belief that that's what happened, do you know of any facts that show that there was some sort of agreement between Linda Orr and Duane or his family to do something to your disadvantage?

A Rephrase that.

Q Do you know of any facts that support the notion that Linda --

A They didn't write it down, no.

Q Okay. Well, can you point to any facts now that show that Linda Orr did something at the bidding of Duane Hoover or members of his family?

A Nothing written, no.

Q Okay. And have you provided all that you know in

terms of oral testimony about that?

A All that I know, yes.

Q Now you heard Mr. Hoover say that he did not talk to Ms. Orr about this. Do you have anything that can disprove that, what he testified to?

A Look at the e-mail of July 31, 2002. Linda is -- there's a discussion about the difference in our contracts and that Duane didn't have enough time. Linda refers to Duane's big complaint about needing more money. That's just a month after I started.

THE COURT: Excuse me. I would ask counsel to tell me where in the exhibits --

MR. COLTON: It actually is Defendant's 1, it's in both sets, but that e-mail would be Defendant's 1. I wasn't going to bring it up, but Defendant's 1.

THE COURT: Okay, here's --

MR. COLTON: It's part of -- there's several e-mails and I believe it's --

THE COURT: Give the witness a copy of the government's exhibit and let him point to me --

MR. COLTON: I'm sorry, I've got it -- just a minute, it's not 1, it must be 24 then.

(Brief pause.)

MR. CARTER: Judge, it's Plaintiff's 1.

MR. COLTON: Well, you've got Plaintiff's 1 there

in front of you already.

BY MR. COLTON:

Q Mr. Keeter, do you have in front of you the document you were just referring to?

A Uh-huh.

Q Verbalize your answer, please.

A Yes.

Q Okay. And this is e-mail that you say shows that there was some communication about money between Mr. Hoover and Ms. Orr?

A Yes.

Q And this is an e-mail from July 2002, right?

A Yes. I hadn't worked up there a month yet.

Q Now what is your understanding of what this says, what it means? I'm trying to figure out what you think it means.

A Well, look at the casing times -- Jeanette says look at the casing times between our two routes. I did not catch this -- I'm reading -- but it can be corrected. It appears I had less boxes and more time, 116 boxes, one hour and 15 minutes and Duane has 300 boxes and one hour. These can be corrected, but it is up to you.

Her reply is "No problem, but does it mean more money to the contractor? I think that is his big complaint. Otherwise, I just change the schedule by adding more time for

casing, not changing the run time, and submit to you?"
Q Do you recall hearing Mr. Hoover testify that he had too little casing time? Do you remember hearing that this morning?
A Uh-huh.
Q You want to verbalize, please?
A Yes.
Q And he testified that he went to the administrative official and it got corrected and he got paid for the additional half hour that was put into his schedule.
A Uh-huh.
Q Yes?
A Yes.
Q Is there anything that you believe is inappropriate in that?
A No, but that shows that he's complaining about the difference in pay.
Q Well, the question that got us onto this was what can you point to something that shows that there was some kind of agreement between Ms. Orr to help out Mr. Hoover, and that's why those boxes were added to you?
A There's nothing in writing.
Q It's not this document? Anything else you can think of?
A No, I can't.

Q Okay. Is there any other conduct that you considered to have been done in bad faith by the Postal Service?

A Writing me up for some things that was manufactured in those four weeks. She wrote me up for not -- I didn't know -- I wasn't familiar with Duane's customers so I put mail in the throwback where it didn't belong. She kept giving it back to me and then she wrote me up for it, for delaying mail. I didn't delay the mail, she was the one, she kept giving it back to me.

Q Mr. Keeter, as far as you know, did those Form 5500s, any of them, have anything to do with the termination or your contract or the 52 boxes?

A It had everything to do with the 52 boxes.

Q All right. Do you know if those Forms 5500 were given any attention whatsoever in the termination of your contract?

A I don't know what they did with those.

Q Do you know what a Form 5500 is?

A Yes, I do. I got them every day for four weeks.

Q Each one of those said you didn't deliver the 52 boxes, correct?

A Correct.

Q And that's accurate, isn't it?

A That's accurate.

Q Now do you know why the Postal Service requires 5500s to be written, under what circumstance?

A When they consider that you've done something wrong.

Q At the top of the 5500 it says it's a contract irregularity report, correct?

A Correct.

Q Well, wasn't your failure to do something that you were being ordered to do, at least in the view of the Postal Service, an irregularity?

A Maybe their view, but it wasn't according to the terms of the contract.

Q Was there any consequence of those 5500s to you, the ones that said you didn't deliver the mail to the 52 boxes?

A I didn't hear that.

Q Was there any consequence of those writeups to you?

A Yes, she was putting down every day how much it was going to cost me.

Q Okay. How much it was going to cost you. Do you have any knowledge of Postal Service policies with regard to providing service when the contractor doesn't provide it?

A No, I do not.

Q In your deposition, I asked you if the Postal Service would be entitled to deduct from your pay the cost of

paying someone else to deliver the mail if a contractor did not. Do you remember that?

A No, not really.

Q Okay, do you have any believe as to whether it's appropriate for the Postal Service to deduct from pay to one of its contractors, its cost of replacement service if the contractor doesn't provide service?

A It would be if the contractor wasn't abiding by the terms of the contract. But that wasn't the situation here.

Q Right. Now at the time, if the Postal Service thought you were supposed to be delivering those boxes, would you agree that writing down those expenses was the appropriate thing to do?

A Not after I went over time and time again what the contract said. This wasn't according to the terms, they wasn't justified in it at all.

Q So if they didn't agree with you -- excuse me -- you had told them the right thing and they continued to do the wrong thing and they just should have not done it.

A Once it was pointed out that I knew exactly what the contract said, they should have reversed it. They did not.

Q Okay. You testified that it offended you -- in your deposition -- greatly that Linda Orr was going to get this money.

A Yes.
Q How do you know that Linda Orr was going to get that money?
A She told me.
Q Okay, she told you. Now she has denied that, you're aware, aren't you?
A Yes, I'm aware of that.
Q Okay. Is there anything in any of those documents that says that Linda Orr is asking to be paid?
A She puts down in her e-mail or a memo or something, she wrote down what her hourly rate was that she would get paid, she put that down on the Form 5500 or 550, whatever it is, every day, how many hours it would be. She's also asking about being paid for her vehicle mileage.
MR. COLTON: Your Honor, I've got to get my copy of the exhibits.
BY MR. COLTON:
Q Do you have Plaintiff's exhibits in front of you, sir?
A Yes.
Q Would you please turn to Exhibit -- well, it's in the 3 series, starts with 3-A. Do you have those in front of you, Mr. Keeter?
A Yes, I do.
Q Are these documents that are labeled as Plaintiff's

3-A, B, C, et cetera, are these the documents you were just referring to in which the amounts were written up?

A I believe there's an e-mail too that she states the mileage.

Q Do any of these documents say that the money is being requested by Linda Orr for Linda Orr?

A That's her hourly rate, it doesn't say for Linda Orr.

Q All right. So in your mind, the reason it's got her rate is because she wants to be paid?

A That's what she told me.

Q That's what she told you. You've testified that you knew Linda Orr was on salary, correct?

A Yes.

Q Would you agree that when she was out delivering mail, she wasn't at the post office?

A Correct.

Q And if she was on salary, then the post office would be paying her her salary to do the work that a supplier is supposed to do.

A Yes, her salary.

Q That's right. And therefore, the post office is out her services while she's off doing that other job, right?

A I guess so. They're breaking the contract, I don't know where you're going with this.

Q Okay. Can you think of any other actions that constituted bad faith by the Postal Service besides the ones you've already identified?

A Forcing me off the route by not paying me and figuring it wrong to begin with. Their failure to respond in any way. They wrote me up and I wrote that it was against the terms of the contract and they never would respond. I wrote them a long certified letter, I never got a response to it. They just refused to talk about the contract after I made clear I knew what it said.

Q With regard to those Forms 5500 that you didn't get a response to, do you know of any contractual or regulatory or any other provision that says that the Postal Service will respond to the contractor after it receives the contractor's explanation for the event?

A No. They write you up and you respond, you'd think they would write something down to refute it if they had something legitimate to refute with and they did not.

Q You knew they disagreed with you, didn't you?

A Disagreed? They knew what the contract said as well as I did.

Q Mr. Keeter, you understood going all the way back to January that the Postal Service disagreed with you about the contract. You knew that.

A I knew there was a dispute, yes.

Q So were you expecting them to say for the reasons we've given you before, we disagree?
A They never did give me any reasons.
Q Well, excuse me, Mr. Keeter, didn't they tell you that the reason that they had done what they had done had to do with the time that was available in your contract?
A Well, time was not a factor in the change clause, it's number of boxes and mileage. And as I explained in my letter, they gave me an hour and 15 minutes to sort 116 boxes at Yellville. They only gave me 25 minutes in Peel to sort 133 boxes. And I pointed out that that wasn't right. So they're saying it took -- they wrote down I had an hour to get to Peel and it really took a little over half an hour. But if you take into consideration the time they didn't give me in Peel to sort the mail, it worked out, because it took about an hour to sort the mail at Peel and they gave me 25.
When I wrote the letter, I submitted several weeks of time sheets and suggested that they show me where all this extra time was and they never responded to the letter.
Q Okay. Mr. Keeter, the question was you were told that the reason that the Postal Service had acted as it did the first time was because there was excess time in your schedule already. You were told that, weren't you?
A I was told that.
Q Right, and you were told that from the beginning,

from January.

A After I got the -- well, when I called Jeanette, when I figured out what the contract said, she said well, I need to call Linda, when I told her it was over $2500 --

Q Mr. Keeter, can you please answer the question?

A I'm trying to.

Q It's a yes or no question. You were told that by Jeanette in January of 2004.

A Ask the question again.

Q You were told by Jeanette Wofford as of early January of 2004 that the reason that the value of the additional boxes had been calculated the way it was was that there was extra time in your contract, so they didn't need to add the 189 hours.

A Yes, she told me after she called Linda and Linda told her.

Q Well, however she got to that, you weren't there when Jeanette Wofford had any dealings with anyone else in the Postal Service to come up with the figures -- you weren't there, were you?

A No, I was not.

Q So you're surmising how it happened.

A Well, I got the phone call, I know what happened.

Q Do you have any reason to assert that the Postal Service concocted this extra time in your contract in order

not to have to negotiate with you?

A I have never heard anything at all about the time being a problem until I pointed out what the contract said and it was --

Q No, Mr. Keeter, the question was --

THE COURT: Mr. --

MR. COLTON: I'm sorry, I thought he was done.

THE COURT: -- I would like for you to let him finish --

MR. COLTON: I'm sorry.

THE COURT: -- his answer --

MR. COLTON: I realize I did it, you're right.

THE COURT: Would you finish your answer, Mr. Keeter?

THE WITNESS: He throws me off.

THE COURT: I know. So don't do that, Mr. Colton.

MR. COLTON: I'm on cross examination.

THE COURT: Well, I mean if what he's answering is objectionable, then interrupt. Otherwise, let him finish his answer.

MR. COLTON: Are you finished now?

THE WITNESS: Would you ask that again?

BY MR. COLTON:

Q The question I was asking was do you have any basis for asserting that the Postal Service invented this idea that

there was extra time in your contract, so as to avoid having to negotiate with you by artificially holding the value of the service under $2500?

A I had worked that route for a year and a half and time was never brought up once, until I pointed out what the contract said. And then they brought up this time thing. Before that -- it'd been fine for a year and a half and all of a sudden it was an issue because they needed it.

Q Mr. Keeter, do you assert here in court that the Postal Service invented that reason in order to avoid going over the $2500 limit? Is that your contention?

A Yes, because it wasn't an issue. As I pointed out to them that the time was not right because they didn't give me enough time in Peel to sort the mail.

Q I'm trying to find out, sir, whether you think they acted in bad faith in raising time.

A Yes.

Q Okay. And you don't think that there's any basis on which time could be a legitimate consideration?

A According to the changes clause, it's number of boxes and number of miles. Time is not a factor in the changes clause.

Q Is it, therefore, your belief that the Postal Service could not have had a good faith belief that was different than yours -- different than yours -- concerning

the application of those clauses?

A The language of that changes clause is very plain. And I pointed out time and time again what it said.

Q Is that the equivalent of saying they could not have a good faith belief?

A They could not have a good faith belief, they knew what the contract said.

Q Okay. How much money was withheld from your check?

A $424 and some cents, I don't know the exact number.

Q Did you use a different figure in your deposition, three hundred and some odd dollars?

A Yes, the 424 they took, they had added money to my $3069 figure when they gave me the $1000, which I never did the work for. So actually the deduction from the check that I should have got was three hundred and something dollars, but they took 424, to account for the extra money they had given me.

Q They paid you for the boxes you weren't delivering and then subtracted it out?

A Well, I never delivered them. They added -- it would have meant $1000 divided by 13, whatever that would have been, each check. So the figures didn't come out right because it's $3069 -- what I should have been getting, they took $361 or whatever it was, away from that.

Q Are you done?

A Yes.

Q In your direct testimony, you talked about they're going to subtract a thousand some odd dollars and given your gross pay check, that you couldn't afford to operate. Well, did they ever subtract a thousand something dollars from a pay check?

A The 1093 was what Linda wrote down every day. The total of all those write-ups was 1093. If you look at documents 459, 460, 461, the post office, they added $250 or so to it for a total of 1343. They show where they took 424 and I owed them a balance of $917. They didn't tell me when they was going to get it, but Linda told me she'd get every penny of it.

THE COURT: Wait. We're going to have to go over that again, because you said it very quickly and I didn't really understand it.

I think that Mr. Colton's question was that there was testimony about there being a sum of $1039 that was going to be taken and then we've got that versus you're saying it was actually either three hundred and something or four hundred and something dollars. I would like for you to more slowly explain all those figures that have been thrown about.

THE WITNESS: Okay. They deducted $424 from my check. The amount for the month should have been $3069. Well, they had added -- that first change, they give me $1000

for the 52 boxes, when it should have been 17, but they give me 1000 first. So they had added that to --

THE COURT: Wait you said for 52 boxes when it should have been 17? What do you mean, should have been 17?

THE WITNESS: 1700, the whole change should have been 27, they first gave me the $1000.

THE COURT: Yes.

THE WITNESS: Okay, so you divide that by 13 and you add that to my --

THE COURT: You're dividing --

THE WITNESS: You get paid every four weeks.

THE COURT: Okay.

THE WITNESS: I got $3069. So they added --

THE COURT: You got $3069 per month.

THE WITNESS: Yeah, a four week period.

THE COURT: Okay.

THE WITNESS: So, they said they took 424 but they had added that $1000 to my contract amount for those 52 boxes, which I never did. So in reality, they didn't take 424, they took 361 because you take the figure from the 3069. This is complicated. The 3069, my check was shorted by $361.

THE COURT: Uh-huh.

THE WITNESS: And what was the other part of your question?

BY MR. COLTON:

Q The question was did they ever take the $1000?

A The 1093, every day that she wrote me up, she wrote down how much that I owed her. Well, it adds up to 1093 for all the four weeks that she delivered those 52 boxes.

Well, we got a document, when we got the disk from the post office, 459, 460 and 461 on the disk in your packet there.

MR. COLTON: It's Exhibit 20, Your Honor.

THE COURT: Okay.

THE WITNESS: They added $250 to Linda's 1093 for a total of $1343. And it shows where they took the 424, and left me owing a balance to them of $917.

THE COURT: Okay, you said that this is reflected in --

MR. COLTON: In Plaintiff's 20.

THE COURT: Plaintiff's 20.

MR. COLTON: What he's talking about, Your Honor.

THE COURT: Okay. Mr. Carter, can you let Mr. Keeter take a look at the Plaintiff's exhibits?

MR. CARTER: He has them in front of him.

THE COURT: Okay, turn to Plaintiff's Exhibit 20, please.

THE WITNESS: Okay.

THE COURT: I don't know whether -- I wanted to walk through these figures on here so I'm sure that I

understand this. Are you comfortable doing this, Mr. Colton, or do you want to wait for redirect for Mr. Carter to do it?

MR. COLTON: I'm not comfortable because I don't consider them in play. I mean we've got stipulated numbers, so I have not been prepared to say -- I know in general, and the witness who prepared them is here, if Your Honor wishes to hear that. But I'm just trying to figure out what Mr. Keeter thinks was bad faith. Not to go to the truth of it, but just his impression of it.

THE COURT: Well, I'm trying to see how Plaintiff's Exhibit 20 ties in with the figures -- you've pointed it out as being Plaintiff's Exhibit 20, but I don't see Plaintiff's Exhibit 20 as reflective of the dollars that Mr. Keeter was just citing to, so --

MR. COLTON: Something that he said when he said that he had received a document, I know what documents he was sent and this is the only one that has numbers, so I knew what it had to be. I would then ask him, are these the documents you were referring to.

THE WITNESS: Yes, it says cost for postmaster and clerk to deliver 52 boxes for 26 days equals $1342.59 minus $424.80 deduction, leaves $917.89.

BY MR. COLTON:

Q Do you know when you got this document?

A It was on that disk that we got from the post

office.

Q You mean you had not seen any of -- you hadn't seen this document before?

A No.

Q You agree that it -- I'm sorry, I interrupted again.

A But I knew about the 1093 because she wrote that down every day.

Q Now has the Postal Service, to your knowledge, ever come after you for that money?

A No, they have not.

Q And am I correct that the document is dated, as you understand it, June 10, 2005?

THE COURT: Which document are you referring to, Mr. --

MR. COLTON: The first page, Your Honor.

THE WITNESS: June 10, '05. It just confirmed what Linda wrote down and what she told me, and they added more money to it.

BY MR. COLTON:

Q Am I correct, June 10, 2005 is after this litigation had been started?

A Yes.

Q And that was when you first saw this.

A Yes.

Q So it wasn't something that was going on when you were fussing with the Postal Service.

A No, just the 1093.

Q Okay, and you understand that the Postal Service had rights under its contract to seek damages to replace your service -- you understood that when you entered the contract.

A Yes. This shows how much it was going to take too.

Q Okay. By the way, back up to document 19-B. Would you characterize what you believe this document to be, if you know?

A It's an answer to the case that we had filed against the post office and it goes down the points that Chris made in his case and denies everything.

Q I'll use the term, final decision. I was unclear about some of your earlier testimony. If you look at 19-A, do you know what 19-A is?

A About seeking damages?

Q Just do you know -- do you have a characterization of what this document 19-A is? Maybe I should ask a foundation question. Have you ever seen this document before?

A Yes, I would have got this.

Q Did you receive it at or about the time it's dated?

A Well, I don't remember, it's been four years. I assume that I did.

Q So what did you consider it to be?
A It's a termination.
Q It notifies you of termination and says why you were terminated, right?
A Yes.
Q And it has everything to do with the events of February 20, right?
A Yes, when they breached by not paying me the contract amount, yes.
Q Okay. Have we exhausted the acts of bad faith? Have you described everything that you believe the Postal Service did that constituted bad faith in its dealings with you?
A They were wrong to begin with and not responding and then forced me off by not paying me the contract amount. I think that's -- telling me I didn't matter, what I thought didn't matter.
Q Okay. Not responding was -- you described the not getting back to you after you wrote explanations on those 5500s. Was there anything else they didn't respond to?
A They didn't respond to my letter that I sent on the 31st.
Q They didn't?
A They did not.
Q Well, if we turn to that letter, and you've got

Plaintiff Exhibit -- let me see what that is --

MR. CARTER: I think it's Defendant's Exhibit Number 7.

MR. COLTON: It is, we'll look at that. Do you have a copy up there? If not, I'll have to bring mine.

BY MR. COLTON:

Q Take a look at Defendant's Exhibit 7 for a moment and, if you can, identify it.

(The witness reviews a document.)

A Okay.

Q Can you identify Defendant Exhibit 7?

A That's the letter I wrote to the post office.

Q This is the one that you just mentioned that they didn't respond to?

A Right.

Q Okay. Now without having to go through that letter, would you agree that it talks about how the amount of money should be calculated for those 52 boxes?

A Yes.

Q All right. Didn't the Postal Service respond by in fact increasing the amount of money?

A Yes, and Jeanette called me and told me they were going to do that, and I told her that this puts it over the $2500 threshold, it's a major change and I said are you still going to dock my pay and she said that they would.

Q With regard to this letter in which you talk about money and you're entitled to more, would you agree the Postal Service responded by doing what you had asked them to do with regard to the amount of money?

A Not at all because I wasn't obligated to do it at all, by the terms of the contract.

Q Well, if you weren't obligated to do it at all, why did you talk about the money at all?

A Because that's how it's determined whether it's a minor or major change. If it's a minor change, they could have forced me to do it; but it wasn't, it was a major change.

Q But if you go forward in this letter, you talk about things -- this is a case of pure jealousy. That's on the second page of the letter. And then you talk about when you bid on the route and Duane and so on. Are these things -- this pure jealousy -- that you're holding against the Postal Service as acts of bad faith?

A The fact that they went along with it, his wishes, is.

Q How do you know they did anything according to Duane's wishes?

A Linda didn't even know how many boxes it was until she consulted with Duane.

Q Duane was the one who was operating the route,

correct?

A Yes.

Q And if Ms. Orr needed to know what a sensible place to divide the route was, was there anyone more logical to turn to than Duane?

A No, he'd been complaining about the route, so he'd be the logical one to turn to.

Q I'm sorry, I did not hear you, sir.

A He had been complaining about the route, so he would have been the logical one to consult.

Q How do you know he had been complaining about the route?

A The e-mail I referred to awhile ago and all the talk on the dock too, about it.

Q The talk on the dock and a 2002 e-mail, and that's how you knew he'd been complaining?

A Yes. I didn't know about the e-mail, but the talk on the dock, I knew about all that.

Q Did Linda Orr tell you that he'd been complaining about his route?

A No.

Q Did anybody at the Postal Service, speaking with what you thought was authority, tell you that?

A No, of course they wouldn't tell me that.

MR. COLTON: Just a minute, I may be about done,

Your Honor.

(Brief pause.)

BY MR. COLTON:

Q Did the conduct of the Postal Service cause adverse consequences to Keeter -- how to phrase this -- to exclude the part that we already agreed about, one thing led to another and you abandoned the contract?

A I didn't abandon the contract, I was forced off the contract.

Q Okay. Did you know on the 20th of February that -- did you have to stop providing service on February 20?

A I couldn't afford to run another day with them taking that kind of money off my route, I'd be working for free.

Q You weren't going to get any money once you stopped working, were you?

A Well, no, but --

Q Therefore, I want to know how the economics were such that you were compelled to walk off.

A Because I couldn't afford to run my vehicle and work for free.

Q Why did you think you were going to have to work for free?

A Well, if your gross pay is 3069 and they're taking 1093, that's a third of your gross. So you'd be working half

the time or more for nothing. And nobody can afford to do that.

Q And at that point, they had taken three hundred and some odd dollars out of your check.

A Yes, with the assurance they would get more.

Q Okay. And after you received notification that your amount of pay was going to increase and you received a notice saying please go back to work, did you contact the Postal Service to say well, let's try and work this out, you give me more money and maybe we can do something?

A I had been trying to work it out for weeks and they would not talk about it. They just refused to talk about it.

Q Didn't you testify that out of those three thousand dollars, whatever it was, that you got monthly that most of the money went to you and your operating expenses were quite low as a proportion of that money?

A Well, I had 100 miles a day vehicle expense.

Q If you had continued to run the route, you would have had more money than if you didn't run the route, right?

A Yeah, if I'd accepted their terms, I would have, but I wasn't going to do that because there was a breach of the contract.

Q Since you weren't terminated while you were not servicing those boxes and no one in any of these documents said we're going to terminate you if you don't service those

boxes, why couldn't you pocket the money for your other boxes and appeal with regard to the others? I'm not saying you had to, but why couldn't you?

A Because I'd been talking to them for weeks about this and they wouldn't discuss the contract now. If I'd tried to appeal that, they sure wouldn't have then.

Q Did you understand that you had legal recourse?

A Eventually I did, yes.

Q Had you read the contract as of the time you signed it?

A Excuse me?

Q As of the time you started servicing the contract, had you looked at it, the contract itself?

A I looked over it when I started, yes.

Q And I don't want to ask you to be a lawyer, I just want to know if you were aware that the contract provides a mechanism for dispute resolution while the contract is being performed.

A Yes, but I didn't have that opportunity, they forced me off the route by not paying me.

MR. COLTON: If I might have a moment, Your Honor, I think I'm done.

(Brief pause.)

BY MR. COLTON:

Q I think you also said that there's bad faith

because someone told you that your opinion didn't matter, is that right?

A I don't know the legal opinion of bad faith, but in my opinion it is, yes.

Q In other words, you told them, my opinion of the contract is X and someone responded it doesn't matter what you think about it, here's what you have to do?

A That's what they said, yes.

Q In any other way, did the Postal Service treat you discourteously, rudely or unfairly?

A Well for four weeks, it was tough going in there because there was a lot of tension and she would give me the silent treatment. Communication was just what it took to get the job done.

Q And you lost your temper a couple of times, didn't you?

A No, I did not.

MR. COLTON: Nothing further, Your Honor.

MR. CARTER: Your Honor, I only have two follow up questions.

THE COURT: All right.

REDIRECT EXAMINATION

BY MR. CARTER:

Q Mr. Keeter, the grievance letter is Defendant's Exhibit Number 7. In your grievance letter, you pointed out

to the Postal Service that there's a problem that everything is being done to benefit Duane Hoover, is that correct?
A Are you in the blue book?
Q The Defendant's exhibits, yes. There's a tab for 7.
A Okay. What was the question again?
Q You told the Postal Service, based on what you'd heard on the dock and everything else, that you believed that this was being done to benefit Duane Hoover and to disadvantage Keeter Trading.
A Correct.
Q Now at that time, you had never seen Plaintiff's Exhibit Number 1, had you? That's the 2002 e-mail.
A Oh, no, I had not.
Q If we look at that e-mail, the comparative is between Duane Hoover and Ed Keeter's routes, or Keeter Trading's routes.
A Yes.
Q Immediately there's a comparison between the two, but you didn't know that, but you surmised that.
A Yes, I did.
MR. COLTON: Your Honor, I'm going to have to object. This is a bit of argument here, it's not just questions.
THE COURT: I will sustain the leading. So if you

would ask him questions where it's not just a yes or no.
BY MR. CARTER:
Q If you would look at Plaintiff's Exhibit Number 11.
A Yes, I've got it.
Q Which one is that?
A Is that the e-mail?
Q Yes. Those are the figures between your route and Mr. Hoover's route, is that correct?
A That's correct, yes.
Q Where they grossly underpaid you.
A Yes.
Q And grossly --
MR. COLTON: Objection. Where we grossly underpaid him?
THE COURT: Mr. Carter, the characterization --
MR. CARTER: I'll drop the word grossly.
BY MR. CARTER:
Q Where Keeter Trading was underpaid.
A Yes.
Q Pursuant to the formula.
A Uh-huh. Yes.
Q And Duane Hoover was overpaid pursuant to the formula.
A Yes, he was.
Q So these things that you surmised, the contracts

are being brought closer and closer together.

A Yes, they are.

MR. COLTON: Objection, Your Honor. Again, it's leading.

MR. CARTER: Your Honor, he's already testified to it and it's just a summary of his testimony.

MR. COLTON: I'll withdraw it.

THE COURT: Okay.

BY MR. CARTER:

Q One of the write-ups that you received in Plaintiff's Exhibit 4 was actually by Debra Davenport, was it not?

A Yes, I did get written up by Debra.

Q And Debra Davenport is who with regard to Duane Hoover?

A It's his sister.

THE COURT: Which exhibit are you referring to, Mr. Carter, just now, the write-up?

MR. COLTON: Your Honor, it's Defendant's 14.

THE COURT: Defendant's 14. Okay, it Defendant's 14.

THE WITNESS: I've got it.

BY MR. CARTER:

Q Mr. Keeter, if you would look at Exhibit 19-B.

THE COURT: Plaintiff's or Defendant's?

MR. CARTER: Plaintiff's 19-B.

BY MR. CARTER:

Q And if we look at the second page of it where it says Claim (1) - UPS (sic) breach. That was written by Mr. Rodriguez?

A Yes.

Q He chooses not to address any issues with regard to breach by the Postal Service.

A Correct.

Q He indicated that 52 boxes were added to your route, you disputed it and, therefore, you were terminated. So any discussions about anything other than these 52 boxes, that was the cause of termination.

MR. COLTON: Objection. That's an opinion, but calling for a legal conclusion with regard to what this says.

THE COURT: Where are you looking, Mr. Carter, in this exhibit?

MR. CARTER: It is the second page, it is the heading Claim (1) - USPS Breach.

THE COURT: Okay.

MR. CARTER: Specifically I'm talking about the first two sentences.

THE COURT: Okay. Mr. Keeter, why don't you just read those since you need to read it anyway. Read those sentences into the record.

THE WITNESS: "I need not decide the issue whether the United States Postal Service breached the contract. On December 24, 2003, 52 additional boxes were added to your contract."

MR. CARTER: Is that a period?

THE WITNESS: Yes.

THE COURT: Yes. You want to go ahead with the rest of it?

THE WITNESS: Okay. "You invoked the provisions of H.8.a. of the contract to decline the offer. At the same time, you refused to comply with your contractual obligations found later in that same provision - H.8.d. - to comply with all service changes pending dispute resolution under H.2. You then compounded your breach by" --

MR. CARTER: Uh --

MR. COLTON: Can he read the paragraph?

THE COURT: Let him finish reading the paragraph. Go ahead.

THE WITNESS: "You then compounded your breach by abandoning the contract on February 20. Your abandonment of the contract rendered moot any purported breach by the United States Postal Service."

THE COURT: Okay.

BY MR. CARTER:

Q So again, the Postal Service wouldn't even address

the points you had brought out.

A They never would, never would address it.

Q So by the time Exhibit 19-B was written, you had dealt with the administrative official, Linda Orr, the postmaster; your contracting specialist, Jeanette Wofford; her superior, Mark McCague; and then Mr. Rodriguez.

A Yes, that's correct.

Q And none of them would discuss this with you.

A They would not.

MR. CARTER: Those are all the questions I have, Your Honor.

THE COURT: Mr. Colton.

RECROSS EXAMINATION

BY MR. COLTON:

Q Mr. Keeter, if you would turn again to Defendant's Exhibit 14.

A Oral Communication Record?

Q Yes. Have you read that?

A Yes.

Q Is there anything inaccurate in it?

A No, there's nothing inaccurate, she told me to put the boxes in a certain place. They had told me before where to put the mail.

Q These were instructions on if you're not going to carry those 52 boxes, would you please do this and that and

the other so somebody else can service them?
A That's correct.
Q Okay. Is there anything wrong with that?
A No, I said okay.
Q To you, is this any sign of bad faith?
A Not this particular document, no.
Q While you were in your disagreement with the Postal Service but before February 20 of 2004, weren't you encouraged to write up your grievance for consideration?
A I did, on the 31st, yes.
Q You were told that's what you should do.
A Yes.
Q So that it could be considered, correct?
A Right.
Q And would you agree that that's what led to the additional seventeen hundred some odd dollars?
A Well, it may have, but that was in breach of the contract.
Q Okay. Did anyone at the Postal Service ever say "and that's all we can do, you have no further recourse, you can't go" -- did anyone ever tell you that if you didn't like it, tough, you had no recourse?
A They were giving me a take it or leave it proposition. I could either take those 52 boxes or they would force me off the route.

Q Was it your understanding that you had nothing to do while -- strike that. Did you understand that you could pursue a remedy -- if you carried the boxes, you could appeal whether or not you were required to do that?

A It would be a waste of time. If they wouldn't talk about it then, they wouldn't talk about it at an appeal.

Q Why would it be a waste of time?

A Because they wouldn't talk about it now and it's right in front of them.

Q Well, did you understand that the appeal was to a separate tribunal?

A I don't know how the appeal worked.

Q But you decided that the Postal Service wasn't going to change its mind, right?

A No, they didn't.

Q Didn't you testify in your deposition that the reason that the Postal Service wasn't going to change its mind was because then it would have to go and undo several other routes?

A That was in a note that I think Jeanette wrote, that they wouldn't undo four routes.

Q How do you know they wouldn't?

A I just saw what was in her note.

Q Did you understand at the time that the Postal Service had authority in the contract to terminate your

contract for convenience, that it could have done so?

A They could have, yes.

Q Okay. And if that were the only way to get those mailboxes delivered, that would not have been a breach of contract, as you understand it, would it?

A Well, it didn't happen.

Q I understand it didn't happen, but if you had insisted on saying I will not deliver those boxes, I will not, I will not, period. The Postal Service could have said okay, you're going to be terminated.

A No, that would have been a violation of the contract, because they couldn't add 52 boxes and expect me to do it without mutual agreement.

Q Well, and if you didn't agree, they had the right to terminate for convenience, you understand that?

A I suppose. I'm no lawyer, I don't understand all that.

MR. COLTON: Nothing further.

MR. CARTER: No further questions, Your Honor.

THE COURT: Okay, Mr. Keeter, you are excused.

(Witness excused.)

THE COURT: I suppose this would be a good break for lunch, or do you wish to continue on? It's up to counsel.

MR. CARTER: Well, Your Honor, since it's 12:12, I

would say it'd probably be a good time to break for lunch because I think the next witness will also be fairly long.

THE COURT: Okay, that's fine. So we're off the record now.

(Whereupon, a luncheon recess was taken at 12:12 p.m., the hearing to resume at 1:15 p.m., the same day.)

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

AFTERNOON SESSION

THE COURT: We are back in session.

Mr. Carter, do you wish to call your next witness?

MR. CARTER: I do, Your Honor. We call Linda Orr.

THE COURT: Good afternoon, Ms. Orr. Would you state your name -- full name, for the record, please?

MS. ORR: Linda K. Orr, O-r-r.

THE COURT: Raise your right hand.

Whereupon,

LINDA K. ORR

appeared as a witness herein and, having been first duly sworn, was examined and testified as follows:

THE COURT: Thank you. Be seated, please.

DIRECT EXAMINATION

BY MR. CARTER:

Q Ms. Orr, for the court reporter, the K is K period, not K-a-y?

A Either one. I use the initial most of the time.

Q Ms. Orr, if you would, tell the Court where you live and how you're currently employed.

A Yellville, Arkansas and I'm retired.

Q And you're retired from what?

A Postmaster of Yellville, Arkansas.

Q Well, the Postal Service.

A Yes.

Q And the last part of your career in the Postal Service, you were postmaster at Yellville.
A Yes.
Q From when to when were you postmaster in Yellville?
A October of '93 through January of '05.
Q Okay. The situation involved in this case basically I guess is July of 2002 through April of 2004. You were the postmaster at Yellville, Arkansas post office that entire time, were you not?
A Yes.
Q If you would, very briefly tell the Court your history with the United States Postal Service, what jobs you've had and at what stations.
A I was a postal inspector for nine and a half years and then I went to the Southern Regional Office in the Transportation office, I can't remember the title. Then I became manager of budget for the Memphis Division and then I went to Yellville as postmaster.
Q It'd be fair to say that throughout most of your career with the Postal Service, you've been in a supervisory position?
A Yes.
Q And how many total years did you work for the United States Postal Service?
A Thirty.

Q With regard to the Yellville post office, we've had -- you've been in the courtroom, so you've been able to hear all the testimony. With regard to Mr. Steve Hoover, he apparently had a route out of Yellville that was cut in half.

A Steve Hoover? No.

Q No? Which Hoover?

MR. COLTON: I would object that he's assuming facts not in evidence.

THE COURT: Well, let --

BY MR. CARTER:

Q Duane's brother is who?

A Steve.

Q Okay. Did Steve have a route in the north part of the county that was divided in two?

A I don't believe so.

Q In 2002?

A I don't believe so.

Q Okay, let me ask this question. In 2002, Duane Hoover bid on a route?

A Right.

Q Ed Keeter bid on a route.

A Right.

Q Prior to those routes being let out in 2002, were they all one route?

A Now you're asking me something, I swear -- let me

think. (Pause.) Okay, yeah, I think so. That hadn't entered into it, I forgot about that.

Q So Steve Hoover did have a big route that was split in two.

A Right.

Q Okay. And Ed Keeter bid on part of it and Duane Hoover bid on part of it.

A Right.

Q And ultimately through the Postal Service process, they were awarded contracts.

A Right.

Q Okay.

A It wasn't split in two and that's why it was kind of confusing.

Q It was divided into -- probably that's not the best words, split in two -- it was divided.

A Right.

Q Okay. Now we have talked about Plaintiff's Exhibit Number 1, which is a series of e-mails between yourself and Jeanette Wofford. And I'll show that to you to refresh your memory. Do you recall in July of 2002, Mr. Hoover coming to you indicating that he just wasn't -- didn't have enough time to case everything on his route?

A Right, uh-huh.

Q And you e-mailed Jeanette and discussed it with

her, is that correct?
A Correct.
Q And ultimately Mr. Hoover received more money.
A I never dealt with money, I don't know.
Q Okay. Was Mr. Hoover happier?
A He didn't say he was unhappy.
Q Better question, did he bring the topic up again?
A I don't remember him doing it.
Q Now the postmaster -- well, let me back up and ask you some basic questions about Marion County, Arkansas. That's where Yellville is located?
A Yes.
Q How many post offices are in Yellville -- excuse me, in Marion County? And let's be more specific. In 2003, how many post offices were in Marion County?
A I'll have to count. Five -- six.
Q That being Peel, Bull Shoals, Pyatt, Summit, Flippin and Yellville?
A Right.
Q Okay. In terms of coverage area of the county, which post office was responsible for the biggest area?
A I believe Yellville.
Q And it'd be fair to say that almost half the people that live in Marion County probably have a Yellville address.
A I wouldn't go so far as to say half, but a good

third.

Q Okay. And even the Summit mail and the Peel mail is distributed from Yellville.

A Distributed how? We don't work all their mail, no.

Q Okay. What do you mean by that?

A Well, what do you mean by distribute from Yellville?

Q The mail that arrives at the Yellville post office, where does it come from?

A Harrison.

Q Okay. A better answer would be all over the world, but --

A Oh, okay.

Q -- it comes from the Harrison distribution office?

A Yes.

Q And the Harrison distribution office drops off at Yellville the Yellville mail, the Summit mail and the Peel mail.

A That's correct.

Q Any others?

A No.

Q And then through the Yellville post office, the Summit mail is then dropped off at Summit and the Peel mail is dropped off at Peel.

A That's correct.

Q And Summit and Peel are much smaller post offices.
A Yes.
Q With regard to the former route of Steve Hoover, the route now run, in 2003, by Keeter Trading and by Duane Hoover, did you see changes that you wished made to that route?
MR. COLTON: Objection, Your Honor, that fact is not in evidence. There's no foundation. I'm not disputing it, it's just the fact that counsel is testifying as to matters when we need somebody to give testimony.
MR. CARTER: Your Honor, she's testified to it and I believe every witness has testified to it.
THE COURT: My recollection -- and I would ask Ms. Orr to correct me if I'm wrong -- my recollection was that Ms. Orr did ultimately testify that the route that Steve Hoover had was divided -- I think there was an objection to Mr. Carter's characterization of it as being split.
MR. COLTON: My objection is to something about Mr. Fraley (ph) was running the route, that he included in his question. That's an assumption.
THE COURT: Would you --
MR. CARTER: I don't recall mentioning a Mr. Fraley.
THE COURT: I didn't hear that.
MR. COLTON: Maybe I didn't hear it right.

THE COURT: Would you repeat your question, Mr. Carter?

BY MR. CARTER:

Q Ms. Orr, some time in 2003, the original route that was run by Steve Hoover and now run in 2003 by Duane Hoover and Keeter Trading, did you reach a conclusion that certain changes or adjustments needed to be made to those routes?

A Yes.

Q Okay. If you would, describe to the Court what changes you felt were needed and why those changes were needed.

A Are you talking about when I first established them or later?

Q Later. The summer of 2003.

A Okay. Duane's route covered Welcome Ridge, Pine Mountain and Webb's Landing, high growth areas, and he was getting overburdened on his route. Overburdened meaning too much mail, too many miles. And they were going to make me split it at some point, which is very costly.

THE COURT: They who?

THE WITNESS: They, Dallas and Little Rock -- Little Rock, my bosses. So I needed to get some --

BY MR. CARTER:

Q I hate to interrupt you right here, but maybe to clarify a point, your direct bosses are in Little Rock --

A Little Rock.

Q -- and Mr. Hoover's or Mr. Keeter's direct bosses were in Dallas.

A Yes.

Q Okay.

A So I needed to lighten the load of the route, Duane's that went to these high growth areas, at least as an interim solution.

Q Okay. And how did you propose doing that? What was your game plan or your thought process on it.

A Doing it the cheapest way I could.

Q Okay. And ultimately how did you determine that it should be done? More specifically, what changes did you recommend to I guess both Little Rock and Dallas?

A By changing some boxes that were on both carriers' line of travel. It would not change a line of travel, it would just change a number of boxes one route was serving as opposed to the other.

Q Okay. Mr. Hoover had talked earlier about a lady from Flippin.

A I couldn't remember when that was done, that's why I was trying to get if it was before or after all this. We had an auxiliary route in the Yellville post office. That means a carrier was at Flippin, she was a Flippin carrier, who cased mail and delivered mail from Flippin to the

Yellville post office. She got to the Yellville post office, cased around 100 boxes of Yellville mail that she then delivered on her way back to the Flippin office with the remainder of the Flippin mail.

And that is one route I wanted to get rid of because when you have two bosses, it's hard to be over one carrier.

Q Let me show you what we marked as Plaintiff's Exhibit 6 and I think it's probably already been discussed and described. And I would merely ask you to read through these e-mails and that may spark some of the changes that you had suggested. And to be specific, this is an e-mail that you sent to Ms. Wofford, or at least the bottom part is.

(The witness reviews a document.)

A Uh-huh. Yes, I remember this.

Q Okay. Now could you explain to the Court all the changes then that you wanted to institute?

A All of the Yellville mail that HC-62, the one from Flippin, delivered.

THE COURT: Is this the lady from Flippin?

THE WITNESS: The lady from Flippin.

THE COURT: She's HC-62.

THE WITNESS: Whatever.

THE COURT: Yes?

THE WITNESS: Yes. I wanted that Yellville mail to

be delivered by a Yellville carrier, I would have more control over the route, for complaints or anything else, extensions, any kind of changes.

BY MR. CARTER:

Q To be fair, of all the carriers that went through the Yellville post office, which one did you have the most complaints about?

A At that time, that -- the lady from Flippin.

Q The one doing just 40 boxes.

A Right, whatever. I thought it was 100, but 40, okay.

Q Okay, that was one change. And then you talked about the line of travel. Were there any other changes that you were thinking of or wanted to make part of this situation?

A At that time -- this is when I was really starting on this -- I really wanted to change what ended up being Duane's route and have him run it backwards. That's not in here anywhere, but that would have caused over 200 people to have to move their boxes and I didn't want to go through that headache. So I was able to add these 40 onto Duane's route without changing his whole line of travel.

Q Okay.

THE COURT: Ms. Orr, excuse me. Is HC-61 (726A3), is that Mr. Duane Hoover?

THE WITNESS: Yes, I believe so. I can't remember if it was 63 or -- they gave it another one, 65.

THE COURT: Does either counsel know who this is, this HC-61? You don't, Mr. Colton?

MR. COLTON: No, Your Honor. I could dig it out, but at the moment, I simply don't recall.

THE COURT: And --

THE WITNESS: Well, from number three at the top, it looks like 65 would be Ed Keeter's route.

MR. COLTON: Your Honor.

THE COURT: Yes?

MR. COLTON: I have an objection with regard to relevance. I understand that background is important, but I don't think we're getting into the question about did we make the right decision. We are organizing routes, unless there's some indication that it was in bad faith. The details are --

THE COURT: Mr. Colton, I sat through while you went through the process of how the default termination came about. This is the sort of detail and background that I believe would assist the Court in understanding the entire scenario. So on that ground, I will overrule your objection.

And this is my question right now in fact, that is on the floor, which is does anyone know, can anyone tell me who HC-61 (726A3) is?

THE WITNESS: It's been so many years ago --

THE COURT: I understand.

THE WITNESS: I've tried to forget.

THE COURT: That's not a problem, Ms. Orr, you may not be able to tell me.

THE WITNESS: Let me see if I can just read here and figure it out.

BY MR. CARTER:

Q That's Hoover, I know.

A Okay. 61, the 6A3, looks like Duane Hoover.

THE COURT: Do you remember who the lady from Flippin's boxes were given to? Were they given to Duane Hoover?

THE WITNESS: Duane Hoover.

THE COURT: Okay.

BY MR. CARTER:

Q Earlier you had used a term that I wanted you to explain. You talked about Mr. Hoover might have to do his route in reverse. Could you explain that to the Court? You wanted to avoid him having to do his route in reverse.

A Right. In order not to have all these carriers going up highway 14 at the same time every day and delivering different parts of the route, a good way to have done it would be change Duane Hoover's route to where what he would normally be delivering last in the afternoon would be first in the morning, and he would be going backwards from the

current line of travel. But if I did that, everybody on that route would have to move their boxes from one side of the road to the other. People do not like to do that and I didn't want to get involved in it.

THE COURT: Was that going to come about as a result of the additional boxes from the lady from Flippin?

THE WITNESS: Uh-huh -- correct, correct.

BY MR. CARTER:

Q Now in suggesting these changes, did you talk to Ed Keeter about these potential changes?

A About the 52 boxes, yes.

Q And what did Mr. Keeter tell you?

A That he didn't want the change.

Q Okay. And he was pretty consistent with that position.

A Yes.

Q We've already introduced into evidence what everyone's positions and responsibilities are. You were Ed Keeter's administrative official.

A Yes.

Q And in a small area, typically the postmaster is the administrative official for carrier individuals.

A Correct.

Q Did Mr. Keeter explain to you why he didn't want the changes?

A I don't remember a real explanation. All I remember is that he just didn't want them.

Q I'll show you what is marked as Defendant's Exhibit 1 and it's pages 4 and 5 and it's something called Box Delivery Contract Route Survey. Did you complete pages -- and I don't want to confuse you, but this page --

A One to four.

Q No, this is defense document 1, page 4 and defense document 1, page 5.

Did you prepare those two pages?

A Yes, I did.

Q And is that -- with regard to Ed Keeter, is that what you submitted to Dallas recommending changes to his route, or to the route of Keeter Trading, Inc.?

A Yes.

Q Now I notice that you wrote down here "supplier does not use the hour 15" -- I'm looking at it upside down, I'm sorry.

A "morning casing time."

Q Okay. "Presently 45 minutes used, driver is currently allowed" -- if you would, just read that to the Court. That is your handwriting?

A Yes, uh-huh.

Q "Supplier does not use 1 hour and 15 minutes morning casing time. Presently, 45 minutes is used. Driver

is currently allowed 1 hour to drive from Summit to Peel. He leaves Yellville early and arrives at Peel between 8:30 and 9:00. Extra time allowance is not necessary for him to meet the Peel dispatch time."

Q Okay. Ms. Orr, were you telling Dallas that Mr. Keeter didn't need any time added to his contract?

A Yes.

Q But by your figures, 52 boxes were being added.

A Correct.

Q And with regard to the other routes, you submitted similar documents saying we want to add this much mileage and either reduce or increase these boxes, is that correct?

A Correct.

Q At any time, did you indicate to Dallas that there's a certain figure that Ed Keeter should be paid or have taken away from his contract?

A No.

Q It would be fair to say that Linda Orr as postmaster looked at the situation, suggested these changes and submitted them to Dallas.

A Right.

Q And it'd be -- you yourself do not institute changes.

A I request changes.

Q And in fact that is in accordance with the

regulations that you're required to follow.

A Right. If I institute, I have to pay.

Q Mr. Colton has been nice enough to provide us with what is Defendant's Exhibit 5, the Administrative Official's Manual for Highway Contract Routes.

A Okay.

Q Are you familiar with this document?

A I'm not sure I've ever seen the whole book. I know that came from the book.

Q Okay.

A But it's not all of the book.

Q To be fair, looking at the table of contents, the book itself is about 171 pages.

A No, this is all from a training session and it comes from different places, different handbooks. You can tell by some of the printing that it's not all the same. It's a few pages from this manual and another few pages from another one and forms that apply to whatever the page is.

Q Okay.

A But that is not the manual.

Q Despite its title?

A It was in a training -- the whole manual is not there.

Q Okay.

A I was not given the whole manual.

Q This document has page 32 in it. It's Policy on Additional Enroute Boxes. Are you familiar with that document? It apparently was executed at sometime, we don't know when, by the Transportation Contracting Officer, Southwest Area.

A Yes.

Q Are you specifically familiar with that document?

A Yes.

Q If we look down to the fifth paragraph down, it discusses a formula. Were you familiar with that formula?

A No.

Q Okay. I guess I'm at a loss and maybe you can help me out. You were familiar with this document, but not familiar with the formula contained inside the document.

A Well, we had instructions that came after this. It also mentions seven boxes -- I'm going to get into something else here, but it changed from seven boxes to fourteen before additional pay is given and we don't use a formula. So I didn't need to know this formula.

Q Now when you say we --

A We AOs don't use --

Q Administrative officials.

A No.

Q You do not use the formula.

A Do not.

Q You just merely submit the information to Dallas.
A Exactly.
Q Okay. With regard to Mr. Keeter, I know that when I took your deposition in September, you really weren't sure what the heck he was talking about in terms of his disagreement with his contract. Would that be a fair statement?
A That's a very fair statement.
Q Now you've been here in the courtroom most of today. Do you sort of grasp now what Mr. Keeter's been saying all along?
A I understand, but not agree.
Q Okay. On the same document, this is page 44, there's two paragraphs -- or two sections here -- well, let me -- General Information on HCR Contracts. Are you familiar with that document?
A I'm not going to say this document. I can pretty much tell what it is, but I don't remember reading it.
Q Okay. I guess my more basic question is are you familiar with that document?
A Do you want me to read it?
Q No, no. I mean prior to today, had you ever seen that document or had it in your possession?
A I don't know, I'd have to read it in order to tell you.

Q Okay, that's fair.
(The witness reviews a document.)
A I've read this or something similar, I can't swear it's the same.
Q You understand that as the administrative official, you do not enter into negotiations with contractors and if you turn the page, on page 45, there's a bunch of do's and don't's or I guess in this case, those are mostly don't's, things that you are not supposed to do.
A Right.
Q And that would be changing routes, unless it is ordered by the contract carrier person.
A Right.
Q Because, to be fair, Mr. Keeter, Mr. Hoover, Mr. Raley, all those people have contracts with Dallas and it's your job just to see that stuff gets done.
A Right, except Jim Raley does not have -- I mean Jay Raley does not have a contract, he's a rural carrier.
Q Okay, he works for the post office.
A He works for the Postal Service.
Q I guess also on page 45, you, as the administrative official, are specifically barred from attempting to influence any negotiations with regard to contracts with HCRs.
A I'm reading. Well, I don't see influencing

anything, but no, we're not allowed to do that either.
Q (Indicating.)
A Oh, I didn't make it down that far.
Q Oh, I'm sorry, number 4 where it specifically says not influence the contractors regarding the contractors' application.
A You're correct -- you're correct.
Q Now as I understand it, you wanted to lessen the number of boxes on Duane Hoover's route, get rid of the lady from Summit --
A Flippin.
Q -- Flippin, and do it the cheapest way possible.
A Exactly.
Q Now Linda Orr as postmaster doesn't deal with the figures, so how are you going to do it the cheapest way possible?
A The most logical way and the way that would cause less change to what I already have.
Q Would be ultimately the cheapest way.
A Right, uh-huh.
Q Did you and Jeanette -- Jeanette is the person you send these changes to, is that correct?
A Correct.
Q Did you and Jeanette go over any figures, financial figures, to determine how we can do this the cheapest way?

A I don't really remember.
Q Ultimately, Dallas approved your changes.
A Yes.
Q And do you recall having a discussion with Mr. Keeter in early December of 2003 about the changes going into effect the following month?
A Yes.
Q And what did Mr. Keeter tell you?
A That he did not want the boxes.
Q Do you recall what you told him?
A I think I told him it had already been submitted and approved.
Q Okay. Between that conversation and January 24 of 2004 when these changes went into effect, did you have any more conversations that you recall with Ed Keeter about these changes?
A Not that I recall.
Q January 24, 2004 rolls around and apparently Mr. Keeter doesn't deliver 52 -- those 52 boxes. Tell me about that, what discussions did you have or how did you discover those 52 boxes were not delivered?
A Well, the first day, I believe was a Saturday and I got a phone call from the post office saying he didn't take the mail.
Q Okay. And that was the message you got, "the

mail".
A For those boxes.
Q Okay. So you understood initially, from the first day, that he wasn't going to deliver those 52, but he delivered all his other mail.
A Correct.
Q And during that entire time period, with regard to all the other boxes, you never received a complaint from anyone.
A I'm not going to say never, but I don't remember any.
Q Okay. And it would be fair to say that Keeter Trading was very consistent, we will do what we were contracted to do in December -- early December of 2003, but these 52 boxes, we are just flat out not going to deliver.
A That's right.
Q And based upon that, you as postmaster completed a 5500.
A Correct.
Q And a 5500 is what basically?
A A contract irregularity report.
Q Okay. And I'll show you -- we have between 4-A and 4-Y, we have all of them between January 24, 2004, February 20 of 2004. Would it be fair to say from here down to section 2 on all these documents you completed.

A Yes, uh-huh.
Q Are you familiar with all of these?
A Not each individual one, but they're all mine.
Q Okay. It would be safe to say that, to speed things up, the route number is always 72665, Yellville-Peel Boat Dock, the date would change, but it'd be safe to say there was one for every day.
A Correct, six days a week.
Q And driver's name, Ed Keeter, point -- what is that one?
A Point of irregularity.
Q Point of irregularity, p.o. and route. Now what does that mean?
A Post office and route.
Q Okay. The office is Yellville; title is postmaster; Keeter, Inc. at their address; and on the first one, "114 letters, 27 flats and 6 parcels not cased or delivered. All mail was intentionally delayed."
A "All this mail was intentionally delayed."
Q The word "this" -- oh, okay, I see it. And that was for those 52 boxes.
A Right.
Q He, being Mr. Keeter, clearly set those aside.
A Correct.
Q And then Mr. Keeter responded and indicated this

wasn't pursuant to my contract.

A Correct.

Q Now I notice you didn't respond to any of these until February 9. At the very bottom in section 3, Postal Service comments.

A That is true.

Q And the reason you responded or started responding on February 9 is that you received an e-mail from Ms. Wofford indicating that you really needed to respond to these.

A I don't respond on these until they're sent to Dallas.

Q Okay. Do you recall getting --

A They're for Postal Service use, the way I understood it.

Q With regard to Ms. Wofford, do you recall getting an e-mail from her indicating you needed to respond?

A Not specifically, no.

Q Okay. Now if we jump ahead to some of the ones that we have in here that you responded, the response was the word "chargeable". This is 4-H, 4-I, 4-J, 4-K, 4-L. What does chargeable mean?

A I've always taken it to mean that it is not just a minor irregularity on the route, that there is something wrong that we need to get changed.

Q Okay. Chargeable means like --

A It's like between a misdemeanor and a felony.

Q Okay, when you say chargeable, you're not talking about money, you're talking about, you know, if this were a criminal context, criminal charges should be filed.

A Right, exactly.

Q Okay. And I notice it's not on the first couple, but then starting on January 27, an additional "Failure to observe contract schedule." And all the remaining complaints talk about not following the contract schedule. Can you explain that to the Court?

A Not following a contract schedule. If that's all it was, I would not even consider it chargeable unless it was consistently late. I was pointing out that he was consistently early and had time to deliver these boxes.

Q Okay. So actually, in and of itself, with regard to his contract -- the contract that was in place say on December 1, 2003, those times were still -- that you now marked as an irregularity -- he was still running under those times.

A Uh-huh.

Q And --

THE COURT: You need to --

THE WITNESS: I'm sorry. Yes.

THE COURT: Thank you.

BY MR. CARTER:

Q And once, after two or three months, Mr. Keeter got the hang of casing, he was pretty consistent with regard to those times.

A Very consistent, yes.

Q Now we have a series of notes in here that I have labeled Plaintiff's Exhibits 3-A through 3-N. And Ms. Orr, I would ask that you look through these notes and tell me if you wrote all of them.

(The witness reviews a document.)

A I did.

Q To be fair, these are contemporaneous notes. If something happened say on January 27, either on the 27th or 28th, you would write a note on it.

A Yes, uh-huh.

Q These are not things that you've reconstructed weeks later.

A No.

Q And like the first one here on January 27 of '04, "Please deduct the following from the pay of 72665. You have 1-26-04 2.5 hours times 34.38. That's your rate of pay.

A That's what I figured it would be, yeah.

Q And 25 miles at 37.5 a mile for 9.38. So you wanted 95.33 deducted from his pay.

A Yes.

Q All the documents, 3-A through 3-N, that you've

identified in your handwriting, all of them discuss deducting pay for work that either you or somebody else did to deliver those 52 boxes.

A That is correct.

Q And did you remind Mr. Keeter that you were deducting -- requesting deduction of funds?

A Yes.

Q And did you tell Mr. Keeter that you would be -- or that money would be deducted from his contract?

A I probably did. I don't remember if I told him it would be, but that I was sending in asking that it be.

Q Okay. And that would, in essence, be consistent with the 550, because a lot of -- 5500, because a lot of those also discuss figures.

A I suppose, yeah.

Q If we look at Plaintiff's Exhibits 9, 10 and 13, I would ask if you were the author of those exhibits.

A Well, on 9, I initiated it and part of it is a response from Jeanette Wofford.

Q Okay. And on 9, you were inquiring about potential termination of the contract with Keeter.

A Yes.

Q On Plaintiff's Exhibit 10, that is a note that you wrote to Jeanette, is that correct?

A That's correct.

Q On February 6 of 2004, again talking about termination of route 72665. That would be Keeter.
A Yes, correct.
Q And then Exhibit 13, that is an e-mail from you to Jeanette, is that correct?
A And a response from Jeanette.
Q And in which you also again talked about potential termination proceeding.
A Correct.
Q What is the date on that?
A 2/9.
Q Okay. And Exhibit 9, the date on this is 2/2?
A 2/2, uh-huh.
Q So 2/2, 2/6, 2/9, three times you inquired of Jeanette Wofford about terminating Keeter, Inc.'s contract.
A Correct.
THE COURT: You said the date on Plaintiff's Exhibit 9 is 2/2/03 --
MR. CARTER: I hope it's '04.
THE COURT: '04 -- I'm sorry, my misstatement. Exhibit 10 is 2/4?
MR. CARTER: 2/6/04.
THE COURT: 2/6/04. And Exhibit 13?
MR. CARTER: Is 2/9/04.
THE COURT: Thank you.

BY MR. CARTER:

Q During the period of January 24 through February 20, when Keeter, Inc. did not deliver these 52 boxes, did you deliver those boxes each and every day?

A I might have missed one day and one of the clerks did, but pretty much every day.

Q And throughout your career with the Postal Service, you had not done casing and delivery.

A No.

Q So this was a new event for you.

A Right.

Q And it took a lot of time.

A Not a lot, there weren't that many boxes.

Q Okay. Well, in looking at the times, it's a bit over an hour anyway.

A To case?

Q No, to case and deliver.

A Oh, well, yes.

Q Okay. You indicated to one of my earlier questions that you now sort of understand what Mr. Keeter's talking about, but you disagree with it. Tell me why -- tell the Court why.

A Why I disagree?

Q Yes.

MR. COLTON: Your Honor, I'm going to object. Is

her opinion even relevant to the determination of bad faith? I don't see where it helps Your Honor decide whether we behaved at the time.

THE COURT: I overrule the objection. I would like to hear her response.

THE WITNESS: If what he says is the way it should be, that he only abides by the contract that he signed in 2002, we could never add a box to his route, we could never extend route to a new customer. It would be strictly what he started with no matter how much growth was in his area, on his route or beyond his route but that his route should cover. That's why I disagree.

BY MR. CARTER:

Q You heard Mr. Keeter indicate that if 10 boxes or so were added to his route, he'd have to accept it.

A Yes.

Q You understand that 52 boxes were added to his route and his position has always been that because of the increase in the contract, my contract says that you have to negotiate with me to handle this.

A I don't know anything about the negotiation part. I'm just talking about increased boxes, especially en route boxes.

Q Well, the contract itself says nothing about en route boxes, does it?

A I'm not that familiar with the contract.

MR. CARTER: Judge, I have no further questions.

CROSS EXAMINATION

BY MR. COLTON:

Q Ms. Orr, what is your responsibility for interpreting carrier contracts?

A I don't really think I have a responsibility for interpreting contracts.

Q Whose responsibility is that, from your standpoint?

A Dallas, the Transportation office.

Q If the Dallas Transportation office says here is something that a contractor is required to do, do you have the authority to say, no the contractor isn't required to do that?

A No, I do not.

Q There was a reference in your testimony to schedule, to you having filled out Forms 5500 -- not 550, but 5500 -- to say that Mr. Keeter was not adhering to the schedule. Do you recall that?

A I do.

Q Now to you, what does the word schedule mean, for a contractor?

A It's the reporting time listed on his contract or schedule of duty, schedule of performance of work is what it is.

Q Have you ever heard the term statement of work?

A Yes.

Q How do you know what the schedule is for a supplier, a contractor who works out of Yellville? How would you know?

A I don't know how to answer that. It's on the form.

Q Do you have in front of you the Defendant Exhibit book, the one with the blue cover?

A No, I don't have anything.

MR. COLTON: I left one up there when we first came in this morning, which was the witness copy. I put it up there. Oh, I'm sorry, that was the witness copy, I'm sorry. And I thought that the second copy I provided the Court was the reporter's copy. I don't have a third copy.

THE COURT: What I asked counsel to do was to provide one copy to me, one copy to my law clerk, have one copy for the court reporter and have one witness copy. Is that what you provided?

MR. COLTON: I have -- no, I think I forgot to pick the third copy up. I think I've got another one here. I brought the witness copy and not the reporter copy, although I've got that copy, it's not over there. I don't want to inconvenience anyone, it'll just take me a moment.

THE COURT: Okay.

(Brief pause.)

MR. COLTON: Actually, this morning I decided no, it's extra and I don't need it. I'm going to, if I might, Your Honor, I can provide the witness with my copy. I'll let Mr. Keeter look at it, it's got tabs but no hints to the witnesses.

THE COURT: That's fine. Or actually we could use the court reporter's copy until such time as we're done.

MR. COLTON: Thank you.

THE COURT: So in fact, could we let the witnesses use both of your copies and that way -- we'll do that and just be certain that at the end of proceedings you return this to the court reporter and that no marks are made on those copies.

MR. COLTON: Thank you, Your Honor. It is unmarked.

(The court reporter provided exhibits books to the witness.)

BY MR. COLTON:

Q Ms. Orr, would you turn to the first tab in the Defendant Exhibit book and just so you glance at them, the documents all have the labels DXH-1. You were asked some questions about these before and you identified several pages as having been material that you submitted to Dallas to effect the route change, do you remember that?

A Yes.

Q Can you just tell me, are the rest of the pages here parts of the same package of materials that you sent to Dallas, or associated with it, that you know of?

A They're associated with it.

Q Okay. Now with regard to the parts that are forms that are handwritten, were they all prepared by you?

A Yes.

Q Would you please turn to the last -- let's see, well there's a page number here, DXH-1 and in the middle of the bottom, there's actually a page number and I'd like you if you would to turn to page 15, if you can find it.

A Okay.

Q Now actually look at page 15, 16 and 17. Do you know what those documents are, taken together?

A This is the route description that Dallas sends back once a change has been approved.

Q Is that what you meant by a schedule?

A Yes.

Q This is how you know what the contractor is supposed to do?

A Exactly.

Q Now can you tell as of what date this schedule was in effect?

A January 24, 2004.

Q That was the date that the 52 boxes were to be

added, correct?
A Correct.
Q Now I think we've heard testimony that Keeter, Inc. was not delivering those boxes.
A Right.
Q So when you filled out a 5500 that said he was not abiding by his schedule, were you referring to this entire group of documents or times, minutes and hours?
A Times.
Q Okay, do you note anything in here that says how many boxes he's delivering -- I should say was supposed to deliver?
A 302.
Q Was he delivering 302 boxes?
A No.
Q By the way, do you know what effect those Forms 5500 had on Mr. Keeter, the ones you filled out? Do you know?
A No.
Q Okay. Do you know whether you had any responsibility to share those forms with Mr. Keeter after he returned them with his statement?
A Well, like I said earlier, I did not think that that was the purpose of that portion of it. It was for me to make comments to Dallas, if necessary.

Q Have you ever been instructed orally or in writing that after writing a 5500 and giving it to the contractor and getting it back, that you're then supposed to go and respond to what the contractor said, with the contractor?

A No.

Q Did in fact -- what did you do with the forms when you got them back?

A I just kept them.

Q You didn't submit them anywhere?

A I'm not sure that I did right away. It was -- I wasn't going to send them in unless I had to.

Q At the time that these events were occurring, were you familiar with Forms 5500?

A Yes.

Q Have you ever had a contractor who you requested be terminated before up until Mr. Keeter?

A I'm not sure.

Q Okay. Is there any instruction or direction that you're aware of that says it's inappropriate for an AO to request that a contractor be terminated?

A That it's improper? No.

Q In fact, did you view it as appropriate?

A Yes.

Q Why did you want Keeter, Inc. to be terminated as of the time you started writing those in February of 2004?

A Because he wasn't doing what the contract told him to do.
Q And who was doing it instead?
A I was.
Q Was that what you viewed the job as postmaster to be?
A Yes.
Q I mean --
A Not what it's supposed to be but somebody had to deliver the mail and I was the only other person there to deliver the mail.
Q When you got the job as postmaster, were you told that you were going to be delivering mail?
A No.
Q Did doing so take you away from any other duties or responsibilities that you felt you should be performing?
A Oh, sure.
Q Well, why did you need to have Mr. Keeter's contract terminated? What would that have to do basically with you delivering the mail instead of him?
A I couldn't keep up delivering the mail and doing everything else.
Q How would having him terminated fix that?
A I could get another contract.
Q You could get another -- you mean another contract

could be let?

A Uh-huh.

Q Yes?

A Yes.

Q Could you get another contract? Could you go out and hire someone?

A Oh, no, no.

Q Well, until the contract was terminated, was there any inhibition on going out and getting another contract?

A I couldn't. Two people can't deliver the same route.

Q So you mean you can't have two active contractors?

A Right.

Q So having him terminated was a prerequisite to getting a permanent replacement for him?

A Correct.

Q Is that why you wanted his contract terminated?

A Yes.

Q Did you have any personal animosity that motivated you to request the termination?

A No.

Q Did you have any desire to harm Mr. Keeter?

A No.

Q You sent these memoranda or e-mails in February of 2004, did the DNO promptly terminate the contract, as far as

you know?
A No. As far as I know, they did not.
Q Were you ever told one way or the other whether they were going to in response to your request?
A No.
Q Were you ever criticized for having made those requests?
A No.
Q Would you take a look in the Defendant Exhibit book at the document at tab 4. Now there are two documents there, they're labeled 4-A and 4-B. 4-A is about 15 pages.
A 4-A is a partial handbook, Highway Contract Routes Box Delivery Service.
Q That's 4-A. And then 4-B is dark, I can't tell but it's the Highway Contract Routes - Box Delivery Service.
Q Are you familiar with these two documents?
A More so with 4-B than with 4-A.
Q What is your understand of what 4-B, as in boy, is?
A This is the carriers' responsibility.
Q Well, when you say this, what are you referring to?
A The handbook, Exhibit 4-B.
Q Was this something that was provided to you in the course of your duties as a postmaster and AO?
A Yes.
Q Did you ever resort to this for information?

A Yes.
Q Did you view this as some sort of guide to how to handle situations?
A Yes, I did.
Q Now if you look at 4-A, I notice that it has a date at the bottom of it. Does that refresh your recollection as to what it might be?
A I know what it is. I just wasn't as familiar with 4-A, I was 4-B.
Q An earlier version of the same thing, isn't it?
A Yes.
Q As far as you know, is 4-B the version that was in effect in 2003 and 2004?
A As far as I know, yes.
MR. CARTER: I'll make it easier, we will stipulate that 4-B is in fact the one that was in effect during 2003 and 2004.
THE COURT: Since 4-B was in effect, are the provisions that are included in 4-A the same or have they been changed?
MR. COLTON: They're materially the same.
THE COURT: Thank you.
BY MR. COLTON:
Q I'd like to turn now to tab 5, there's a stack of materials. Have you seen in aggregate this stack of

materials before?

A Yes.

Q How would you characterize or describe these documents?

A These documents are pages taken from various manuals, handbooks and other documents relating to HCRs.

Q Have you ever had these in your possession while you were postmaster at Yellville?

A Yes.

Q Do you recall how you got them?

A It was from a training session I believe held at Fayetteville a few years ago.

Q Do you recall --

THE COURT: Excuse me, when you said ACRs --

THE WITNESS: HCR, Highway --

THE COURT: HCR.

MR. COLTON: Highway Contract Route.

THE COURT: I thought she said A, but it's H.

MR. COLTON: That's a mistake very frequently made, the way it sounds.

BY MR. COLTON:

Q You said you received these in a training program?

A Yes.

Q Who conducted the training program?

A The Transportation office in Dallas.

Q Is that the office that awards the contracts, including the one that Keeter had?
A Yes.
Q Now as far as you know, did you receive these documents before or subsequent to the summer of 2003?
A Before.
Q All right. And what did you understand these documents basically to be for? What was the purpose of you having them?
A It was for our job in relation to highway contract routes.
Q Did you at one time read them?
A Oh, yes, I'm sure.
Q I'm not going to ask you questions about them, but as of 2003, 2004, did you have any reason to dispute that these were the policies that the Postal Service wanted you to apply?
A No.
Q And turning particularly now to Exhibit 6 in the Defendant book, do you have it in front of you?
A Yes.
Q This is the same document that counsel asked that you look at before and he found a version of it that was in Exhibit 5. This one is just separated out for convenience and because it has a fax header at the top of it. Have you

seen this document before?

A Yes.

Q Looking at the top of the page, do you see the fax telephone number?

A Yes.

Q Do you know whose fax number that is?

A No, I assume it's the Transportation office.

Q Well, if you don't know, you don't know.

A I don't know.

Q How about to the left, can you read the date there?

A 2/12/99.

Q That's what it appears to be, okay. If you would turn to -- let's see -- in the Plaintiff book, there are a number of these 5500s and counsel asked you about the group of them. As far as you know, are each of them accurate in stating that Keeter did not operate the 52 boxes or deliver to them on the days when we said Keeter did not?

A Yes.

Q And you have no reason to change your mind about that?

A None at all.

Q What were you told was the occasion for filling out a 5500, when were you supposed to do it?

A When it happened, when whatever event happened, happened.

Q Well, if an event happened on more than one day, did that mean you didn't need to do it after the first time?
A No, every day.
Q So was there any animus on your part, that is dislike of Keeter, that motivated you to fill out a 5500?
A No.
Q Did you understand it to be your duty to do so?
A Yes.
Q Now you were asked what the term chargeable means. What is the basis of your saying what it means? You said, you know -- I'm not sure what you said it means.
A And I can't remember what I was told it really meant, but I always took it as anything other than a very minor infraction.
Q When you wrote chargeable, did it mean to you that yes, it happened and there's no excuse that I know of for it?
A Yes.
Q All right. I want to ask hypothetically if a carrier fails to deliver on some day, but it turns out that a bolt of lightning hit the truck and stopped it dead. Now it is true, under our hypothetical, that the mail didn't get delivered. Normally, you'd write up a 5500 for that.
A Yes, I would.
Q However, would you then, in deciding whether or not to say it's chargeable, take into account that a bolt of

lightning came down?

A Not necessarily because they're supposed to have a backup carrier in case a bolt of lightning hits them so the mail will get delivered.

Q And if you write chargeable, as you might, what is the consequence to the contractor?

A None normally, if it's a one time occurrence.

Q Regardless of how many times it happens, are you the one who decides what the consequence is?

A No, no.

Q Who decides?

A The contracting officer in Dallas.

Q Is the contracting officer bound in that lightning strike incident to say sorry, it's your fault, to the contractor, we're going to charge -- is the DNO in Dallas bound by your decision to do something then?

A No.

Q When did you send in the 5500s regarding Keeter, Inc.?

A You know, I really don't remember. I don't think it was on a daily basis.

Q And with regard to writing that information about money, first of all, did you ever get any money for carrying the mail?

A No.

Q The hourly rate, any kind of payment for services when you delivered mail instead of Keeter?

A No, I did not.

Q Do you know if anybody got paid for those services?

A No, they didn't.

Q Well, when you said charge Keeter, why were you saying that?

A Did I say charge or deduct?

Q Deduct or charge, either one?

A He was getting paid for delivering those boxes. I was getting paid by the Postal Service for delivering those boxes. And you can't pay two people to deliver the same boxes.

Q Well, when you were delivering the mail, you say you were getting paid, were you getting paid anything more than you usual salary?

A Oh, no, no.

Q And during that time, were you available to do your regular postmaster duties?

A No, I was out delivering mail.

Q Have there been occasions when you've been an AO in which a contractor has been unable, for whatever reason, to operate a route, other than Keeter and you have told the DNO we had to pay somebody to do it -- have you ever hired somebody?

A I don't believe so.

Q By the way, how many routes of this sort had you dealt with as of 2003 -- how many were there -- withdraw that. How many active routes were there as of the summer of 2002, July 2, 2002?

A In Yellville?

Q In Yellville.

A Highway contract routes?

Q Yes.

A Two and a half.

Q A half? What's a half a route?

A The auxiliary.

Q Well, didn't you testify that you wanted to get the auxiliary not to be at Yellville?

A Correct.

Q And you said that's because of the two bosses thing?

A Right.

Q Was it to punish anybody?

A No.

Q When you were asked about recommending changes, you referred to two incidents and counsel asked you about one. He asked you about events in 2003 that led to the addition of those 52 boxes. Was there another time in which you recommended adjustment to the routes prior to that?

A I'm not sure -- well, before 2003, it was 2002 when I got rid of or asked that we no longer have the auxiliary route out of Flippin and adjust the other two.

Q I think -- let me see if I can clarify this. When did you recommend that that auxiliary route be changed so that it would not come to Yellville any more?

A 2002.

Q Before Mr. Keeter's service started?

A Oh, yes.

Q Okay. In general, how many routes did you shift around as of 2002?

A In Yellville, two; in Flippin, it was more like three.

Q And did you do so to benefit any individuals?

A No.

Q Did you do so to help Duane Hoover?

A No.

Q At the time that Mr. Keeter started, Keeter, Inc. started in the summer of 2002, had the changes just been put into effect?

A Yes, they had.

Q Now did you come to believe you had made a mistake?

A Yes.

Q What mistake had you made?

A I did not give Duane's route enough time and I gave

Ed's route too much time.

Q When you say you gave Duane's route insufficient time, how did you come to that conclusion?

A He was really having to hustle to get his route done, and I mean really hustle.

Q Did he tell you that?

A I think eventually he did.

Q Did you observe anything besides him telling you that?

A Oh, yes.

Q How did you go about verifying or observing that he needed more time?

A Well, his casing time, he could not make it in the time that was given. And he wasn't joking around, playing around, he was working.

Q Did you personally observe that?

A Yes.

Q Did you go out to wherever this happens and see what was going on?

A Well, it was right in the office.

Q So you could see it.

A I could see it.

Q With regard to the amount of time provided for Mr. Keeter's route, did you have observations as to how much time he needed or did not need?

A Yes, I did.
Q What observations did you make?
A That he did not need all his time casing in the morning.
Q How could you tell?
A Because he would be over at his case just waiting for us to get some more mail worked. Instead of him coming in at 7:00, he should have been coming in at quarter to eight, no earlier than 7:30.
Q Did he occasionally leave before his designated leaving time?
A Only if the newspapers y'all talked about earlier were there.
Q Did he ever leave the newspapers behind?
A If they came in after 8:00, he was told it was all right.
Q Other than your own observations, did you have any other information that there was more time built into Mr. Keeter's route than was needed to operate it easily?
A He was arriving at Peel early.
Q And how did you know that?
A The postmaster told me.
Q So you communicated with another postmaster?
A Right.
Q When you in 2003 recommended changes and wrote the

note that counsel asked you about saying there's extra time, did you have the information that you just related about your observations and what you'd heard from someone else?

A Yes.

Q And why did you send that to Dallas?

A Why didn't I send --

Q Why did you provide that information to Dallas?

A I thought I did.

Q No, why did you?

A Oh, why did I?

Q Yes.

A Because I was changing the route but I wasn't asking for any more time.

Q Were you --

A There was time already there.

Q Did you consider this to be appropriate in your duties as AO, to let them know how much time the route took?

A Yes.

Q Now later, after the 52 boxes had come up and were not being delivered, were you asked at that point to explain how you'd come up with the figures?

A Yes.

Q And you went over some e-mails, is that the genesis of those e-mails, that you were asked to explain?

A That is correct, yes.

Q Do you have any reason to think that -- strike that. Did Dallas ever tell you no, don't send us that information?

A No.

Q And did you invent any information or fabricate it so you could cause Mr. Keeter to make less money?

A No.

Q Did you do anything to provide an excuse for not paying him?

A No.

Q Did you have anything to do with the decision of whether or not to negotiate with him?

A No.

Q You were aware that Mr. Keeter did not want the responsibility of those other 52 boxes, correct?

A Correct.

Q However, did Dallas ever tell you that he didn't have to deliver them?

A No.

Q As far as you understood, did you even have the authority to agree with Mr. Keeter and disagree with Dallas? Could you have said, you're right, Ed, you don't have to do it?

A No.

Q In your direct testimony, counsel asked about Ms.

Wofford directing you to respond. Did you understand Ms. Wofford ever to tell you that you had an obligation to go back and talk to Mr. Keeter about the 5500s that you had written? Did she tell you that?

A Not specifically.

Q Well, what did she tell you?

A The best I can remember, it was toward the middle of February, maybe the first, that I had to have an official conference with him and discuss.

Q Do you recall asking at some time how one went about having a contractor terminated?

A Yes.

Q Did Ms. Wofford -- did you ask that to Ms. Wofford?

A Probably, yes.

Q Do you recall if she said you have to do certain things?

A Yes.

Q Do you recall what those things were?

A Not all of them. One was the official conference, is what I'm going to call it.

Q Okay.

A Official discussion.

Q Let me make sure we've got all the documents. Looking at page -- excuse me, Exhibit 22 in Defendant's book. Do you have that in front of you?

A Uh-huh.
Q This is a document you wrote?
A Right.
Q And it was on February 12.
A Yes.
Q Now as of February 12, Mr. Keeter wasn't delivering the 52 boxes, correct?
A Correct.
Q And do you recall whether you were asked to provide this information down here about how long it would actually take Mr. Keeter to perform those services?
A Not that I remember, but obviously I was.
Q Was there any difference in the amount of time that it took you to service those 52 boxes and the amount of time it would have taken Mr. Keeter?
A Yes, I had to get to the boxes and get back to the post office.
Q You had to leave the post office, drive out and drive back?
A Right.
Q And he was already there?
A He was already there.
Q And theoretically would you assume that he was a little quicker at casing?
A A little bit.

Q Would you please look at Exhibit 20 in the Defendant book?

A Okay.

Q Do you recognize the three pages -- is it two or three pages -- the two pages that are there in Exhibit 20?

A Yes, uh-huh.

Q Just state what they are, please.

A The first one is a note that the postmaster at Bull Shoals wrote about the formal conference, stating who was there. And the second page is a letter or a typed notation of the conference.

Q And the date of that conference was?

A January 30.

Q Is having that conference something that you were told you have to go through to have something changed about the situation?

A Yes.

Q Were you present?

A Yes, I was.

Q If you look at this note, does it accurately reflect what occurred at the time?

A Yes.

Q Now at that meeting, did Mr. Keeter have anything different to say than he had been saying to you for the last month?

A No.

Q Was there any further information that you could provide him at that time?

A No.

Q Didn't change his mind?

A No.

Q And if you would turn to document 16 in Defendant's book. Is this a document that you prepared?

A Yes.

Q I notice this appears to be a form. Did you make up the form?

A No, it's a form.

Q And the purpose of this was what?

A To let the contractor know that a formal conference had been set up.

Q And that's the conference for which the minutes are documented, is that correct?

A Right.

Q Did you have any conversations with any person who was either a carrier -- a contractor -- excuse me -- a contractor at the Yellville post office or a relative of a contractor about taking steps to benefit Duane Hoover or a member of his family and to do bad, to harm, Mr. Keeter?

A No.

Q In fact, I think I asked you before, did you take

any steps for the purpose of helping either Mr. Hoover or a member of his family?

A No.

Q And did you do anything for the purpose of harming Mr. Keeter?

A No.

MR. COLTON: Nothing further.

THE COURT: I have a question. Ms. Orr, you mentioned that Mr. Keeter had permission to leave for his route if the -- I don't remember the name of the newspaper.

THE WITNESS: Baxter Bulletin.

THE COURT: The Baxter Bulletin -- if the Baxter Bulletin had not arrived by I think it was 8:00 a.m.?

THE WITNESS: Yes, uh-huh.

THE COURT: Okay. Other than the Baxter Bulletin issue, of which he had permission for, was there a problem with Mr. Keeter beginning early and finishing early?

THE WITNESS: Yes, if there's a schedule, you're supposed to follow it. People like to get their mail at the same time every day and that's kind of a Postal Service policy -- it really is, I am not kidding you -- that within reason the mail should be at your house around a certain time every day.

THE COURT: So that would have been the only reason that there would have been a concern?

THE WITNESS: Well, and obviously we were paying him more because it took less time than what I thought it was going to take.

MR. COLTON: I'd like to just follow up, Your Honor, to that question you just asked.

BY MR. COLTON:

Q Ms. Orr, do you know of any reasons other than that people like to get their mail at the same time, why the Postal Service finds it unacceptable, undesirable at least, for a supplier to operate early, to be ahead of schedule?

A Well, mail can't be picked up, I mean they can't be sure that any mail they put out is going to get picked up that day if the carrier has already been there.

Q Do you know from your experience whether that's a national policy?

A Yes.

Q And do you know whether in other circumstances than Yellville, it has very real and tangible consequences for somebody if a contractor operates early?

A Yes.

Q Does it have something to do with the scheduling and processing?

THE COURT: Mr. Colton, oh, no. I asked the question. Now it'd be one thing if you are leading with regard to Mr. Carter's question and he doesn't object. But

I'm going to object based on the question that I asked.

MR. COLTON: Okay.

THE COURT: Now you will not lead, you know, and put words into her mouth because that is what you're doing.

MR. COLTON: I'm sorry, Your Honor, that's fine.

REDIRECT EXAMINATION

BY MR. CARTER:

Q Ms. Orr, if you look at Defendant's Exhibit 16, which you have identified as a two page letter with regard to a request for a formal conference.

A Yes.

Q If we look at the second page, and these are consistent with some of the write-ups. January 27 and January 28. "Schedule specifies arriving at Peel at 9:30, carrier arrived at 8:30."

A Yes.

Q Isn't that great for Peel?

A Sure, the Peel post office.

Q Because the mail is going to be put up even quicker.

A In the boxes, but the route itself, it would affect the route.

Q If you would look at Defendant's Exhibit 1, pages 16 and 17.

A Okay.

Q You would agree with me -- and this is down where there's the one star and two stars -- the distance and the time in these contracts are estimated times, are they not?

A Yes, they are.

Q And estimated distance. And everybody knows that up front.

A Yes.

Q And if we turn the page and look at page 17, about the sixth line down, it talks about supplier casing (mark-up) Peel and this is Mr. Keeter's contract, is it not?

A Yes.

Q Start at 10:55 and end at 11:20.

A Yes.

Q Mr. Keeter testified that there's 133 boxes, 25 minutes to case. Based on all the times that everyone else has testified to, that's not even reasonable, is it?

A I don't remember. I don't remember the circumstances.

Q The point is these times are all approximate.

A All approximate, yes.

Q If you would turn to Defendant's Exhibit 4-B, specifically page 13 of that document, which is page 21 of the overall exhibit. And I know I probably confused you, but it's Section 212 Compensation Adjustment.

A Compensation Adjustment, okay.

THE COURT: Well, you confused me with regard to the pages. So what --

MR. CARTER: We're on 4-B.

THE COURT: B.

MR. CARTER: Page 13 as the book goes, Handbook P-5, but it's page 21 of this particular document.

THE COURT: There's a 13 down here.

MR. CARTER: It's that number is the big number and then that p. is the document number.

MR. COLTON: The page number is at the bottom of the page.

THE COURT: Yeah, it's better to go with the bottom of the page, it says p. 21 is on the bottom of the page for Exhibit 4-B as in boy, and on to the right it would say 13 on the right hand side of the page.

BY MR. CARTER:

Q Now Ms. Orr, you indicated that you were familiar with Handbook P-5, the Highway Contract Routes - Box Delivery Service.

A Yes.

Q You were given a copy of this book. In fact, this actually comes in a booklet.

A Yes.

Q And Mr. Keeter, to your knowledge, was given a copy, all the route carriers were.

A To my knowledge.

Q And if we look at Section 212.1, whether you were familiar with what was in or not in Mr. Keeter's contract, that section makes it very clear what the manager can do with regard to service changes; does it not?

A Yes.

Q Likewise, two sections down in 212.31, formula to be used.

A By the manager of transportation contracts.

Q So whether you were familiar with all the terms of Mr. Keeter's specific contract, nothing could be clearer than what is contained in P-5.

MR. COLTON: I'm going to object, Your Honor, that's argument.

THE COURT: Rephrase your question, please, Mr. Carter.

BY MR. CARTER:

Q Ms. Orr, in reading 212.1 and 212.31, is there any ambiguity that you read in those?

A I'm not sure I understand 212.31 at all. It's more than ambiguous.

Q Okay.

A To me.

Q It sets out a formula that is to be used.

A Right.

Q Okay. And if you go all the way to page 2 of this document and you look down at Section C --
A Page 2 of --
Q The very front that's signed by Keith Strange, Highway Contract Routes - Box Delivery -- the transmittal letter.
THE COURT: Mr. Carter, please cite to the bottom center for your page number.
MR. CARTER: Page 2.
THE COURT: The bottom center?
MR. CARTER: Yes.
THE COURT: We were on the bottom center page 21, so now where are we?
MR. CARTER: We're going to move back to page 2.
THE COURT: Going to go back to page 2. Thank you.
THE WITNESS: And you want me to?
BY MR. CARTER:
Q Look at Section C there. A person can actually go on line and read Handbook P-5, can they not?
A Yes, as indicated here.
Q And in fact, today, if I knew how to hook it all up, I could go on line right now and have this document right in front of me.
A That's what it says.
Q With regard to the changes on Mr. Keeter's contract

for December 24, 2003, that was to take effect on January 24, 2004, the contract calls for an additional 76 hours. Do you have any idea where that 76 hours came from?

A I have an idea but I'm not positive.

Q Okay. Did it come from you?

A No.

Q Okay, did you make any suggestion on any number of hours to put in the contract?

A No. To my knowledge, I don't remember.

Q Do you recall having any discussions with anyone as to how many hours should be added to Mr. Keeter's contract?

A The only thing I remember is saying that no time needed to be allowed for that.

Q Okay. And you realize -- at least today, you realize that time has no relevance to these contracts.

A I really don't realize that.

Q Okay. Now you indicated, to a question that Mr. Colton asked, that no, you didn't do any of these changes for the benefit of Duane Hoover.

A Correct.

Q But when I was asking you questions, you specifically indicated that because of the huge increase in the Pine Mountain and Webb's Landing area, that you knew this route was going to need to be split. So in essence, the changes were for the benefit of Duane Hoover.

A If we can differentiate between Duane Hoover's route and Duane Hoover personally, it was for Duane Hoover's route.

Q Okay. But ultimately he received more money and had less boxes.

A That I really don't remember.

Q Okay. And you indicated to Mr. Colton in a comment that we were paying him, meaning Mr. Keeter, more than you should have been.

A It appeared that way since he had so much extra time.

Q Okay, but this --

A We could have cut the time down.

Q -- this was a bid contract and it was all fair, it was published or I guess announced on the post office wall and he submitted a bid and he was awarded the contract.

A Correct.

THE COURT: Was this a sealed bid contract, do you know?

MR. CARTER: I don't know, Your Honor.

THE COURT: Which of your witnesses would know that?

MR. CARTER: The next witness.

THE COURT: Okay, fine.

MR. CARTER: I've got no further questions.

RECROSS EXAMINATION

BY MR. COLTON:

Q Ms. Orr, do you know what, in terms of what the contracting officer the term service change means? As interpreted by the contracting officer?

A No.

Q With regard to that policy manual, the handbook that you just looked at page 2 of, the one that's got Mr. Strange's signature on it. Was this part of the contract, as far as you know?

A The booklet?

Q Yes.

A To my knowledge, no, but --

Q Did you view it as part of the contract?

A Yes.

Q You did view it as part of the contract? I've got inconsistent answers.

A Well, I'm not sure now what you're asking.

Q Was it a part of, as you understood, Mr. Keeter's contract?

MR. CARTER: Your Honor, it's been asked and answered.

MR. COLTON: But she said no the first time. I'm sorry.

THE COURT: Mr. Colton, because she gave an answer

you do not like, that does not mean that you get to do over like that. She's answered the question and so, you know, you've done this before. I'll sustain the objection, move on.

MR. COLTON: Did -- not, that's not -- nothing further.

THE COURT: You may be excused, Ms. Orr.

(Witness excused.)

MR. CARTER: Your Honor, again, as with all my witnesses except Mr. Keeter, Ms. Orr can be excused as far as the Plaintiff is concerned and get back to Yellville.

MR. COLTON: No objection.

THE COURT: Thank you very much.

MR. CARTER: She's certainly free to stay if she wants to stay. I'm not trying to kick people out.

THE COURT: That's fine, whatever she desires is fine. Mr. Colton has agreed, so that's fine. Thank you.

MR. CARTER: Your Honor, for the next witness, Plaintiff would call Jeanette Wofford. And again, I apologize if I've mispronounced the last name, as I've done before.

THE COURT: Good afternoon, Ms. Wofford.

MS. WOFFORD: Good afternoon.

THE COURT: Would you please state your full name for the record.

MS. WOFFORD: Jeanette Wofford.

THE COURT: Pronounce that again.

MS. WOFFORD: Jeanette Wofford, W-o-f-f-o-r-d.

THE COURT: Wofford, I'm busily mispronouncing it -- Wofford, all right.

Whereupon,

JEANETTE WOFFORD

appeared as a witness herein and, having been first duly sworn, was examined and testified as follows:

THE COURT: Thank you, you may be seated.

DIRECT EXAMINATION

BY MR. CARTER:

Q Ms. Wofford, we have agreed as to the various duties that you have, we've already stipulated to that and there's a couple of pages on that. But if you would, tell us where you live and what your current employment is.

A I live in Dallas, Texas and I'm currently employed at Southwest Area of the United States Postal Service.

Q That's sort of the regional office.

A Yes.

Q Of which Arkansas is part.

A Yes.

Q And how long have you worked for the United States Postal Service?

A Twenty eight years almost.

Q If you would, give us a brief rundown of what you've done for the Postal Service over the almost 28 years?
A I started out as a letter sorter on the LSM -- well, it's a letter sorting machine. I was an LSM operator. I worked there for about -- I had several details, I worked in that capacity for two years with about a year detail in labor relations.
And from there, I went into statistical programs for approximately from eight to ten years.
And then into transportation.
Q Okay. And so are you currently working in transportation?
A Yes.
Q How long all together have you worked in transportation, all the way up to today, the 23rd of April of 2008?
A I've been in the Southwest Area since '98, but in transportation as a network specialist since '92.
Q Okay, so for the past 16 years.
A Yes.
Q Starting in '98 when you were at the Southwest region, what was your duty or what area were you in charge of?
A Arkansas.
Q Okay. And obviously based upon the testimony, in

2003 and 2004, you were also in charge of Arkansas.

A Yes.

Q Was Arkansas the only state that you had to deal with?

A No.

Q What other state did you have?

A I have, over the term of being in the Area office, I've had some area of Texas.

Q Okay. Do you still have Arkansas?

A Yes.

Q So it'd be fair to say from 1998 through today, you've always had Arkansas.

A Some portion.

Q Some -- okay, Arkansas I take it then is divided into pieces.

A Yes.

Q With regard to Yellville, I guess you have somewhat of an advantage over possibly even me in that you have a good idea of where all the various post offices are throughout Arkansas.

A If I have a map, yes.

Q How long has Yellville been part of what you deal with?

A Well, I no longer deal with Yellville, but during 2002, I did.

Q Okay, 2002, 2003, 2004?
A Yes.
Q Do you remember when you lost -- lost is probably not the right word -- when they rearranged everything?
A No, not offhand, I don't.
Q Okay. From the time Keeter Trading had a contract with the post office all the way through February 20 of 2004, you were the contracting officer?
A I was the contract specialist.
Q Contract specialist.
A Yes.
Q And the Judge had asked a question earlier and I guess it's appropriate. In terms of contracts being let out, or more specifically with regard to Mr. Keeter's contract, how -- what is the process, how is it done?
A I don't understand what you're saying, let out.
Q Okay. we had some testimony earlier that two new routes were created from one bigger route. How did the public or individuals or companies know that there are some route available that people I guess can bid on?
A We put out a solicitation indicating the area and information that's pertinent to that route.
Q Okay. And then do people contact the postmaster or do they contact your office? How would I get additional information on this route if I wanted to bid on it?

A Call our office.
Q Okay. And do you send out a packet?
A Yes.
Q Okay. And if I submit a bid to you, is it a public bid, a sealed bid? How does that work?
A If it's a regular route, it's a sealed bid.
Q Okay. And they're all opened I guess at the same time.
A Yes.
Q In terms of -- let's suppose I bid $31,000, somebody else bid $33,000, but I'm a convicted felon. Does that have an impact on it?
A It depends on if we knew that at the time.
Q Okay, if you find out before it's awarded, you can potentially cancel it even if I am the low bidder.
A Yes.
Q I mean you do background checks.
A If you're not qualified for that, yes.
Q That's what I'm getting at, is that there are background checks that are done.
A Yes, once the person gets the route, there are.
Q Okay. So potentially the low bidder is awarded the contract -- excuse me -- is approved and a background check is done.
MR. COLTON: Objection, assumes a fact not in

evidence.

MR. CARTER: Well, that's why we're asking the question, to get it into evidence.

MR. COLTON: The question assumes the contract goes to the low bidder.

THE COURT: Speak up, Mr. Colton.

MR. COLTON: The questions assumes that the contract goes to the low bidder. It changed over time, we're not in every respect like a federal agency. I don't want to say more because --

THE COURT: Okay. I had a question earlier and was told that some one of the subsequent witnesses is going to address what kind of contract this is. Do you have a problem with this particular witness answering that question?

MR. COLTON: No, I don't. It's just the assumption that the low bidder automatically wins.

THE COURT: Okay. Ms. Wofford, do you know what type of contract is in issue in this case? What kind of contract Mr. Keeter had with the Postal Service?

THE WITNESS: I believe he had a regular four-year term route.

THE COURT: Do you know if that was a sealed bid or not?

THE WITNESS: If it was a regular four-year term, yes.

THE COURT: It would be a sealed bid.

THE WITNESS: Yes.

THE COURT: With the lowest responsive responsible offeror winning?

THE WITNESS: Or the best value because during that time he was under probably an RFP also.

THE COURT: Well, now if it's an RFP, that's different from a sealed bid. So I'm asking you do you know which one it was or does the Postal Service have some sort of a hybrid?

MR. COLTON: Your Honor, sidebar off the record.

The answer is it's a hybrid because we are not subject to federal procurement regulations. The best value is given consideration in those respects unlike the procurement you have with other federal agencies. Separate rules and now no rules at all. That's why best value comes under discussion.

THE COURT: Best value what?

MR. COLTON: Best value provided the contracting officer discretion as to who they would choose. I'm a little hesitant but --

THE COURT: Well, I'm asking this for my general information for background. Obviously, you know, it doesn't necessarily impact on -- I mean we're talking the question of bad faith here, but I would like an overall understanding of

the background of this to get a --

MR. COLTON: I was only concerned about the assumption built in about low bidder. The purchasing manual at that time was about a foot thick and it changed a lot, but other than that, I have no objection to the general line of questioning as long as it isn't assumed that we're starting from the usual federal acquisition regulations.

THE COURT: Okay, and who -- just so that I can get my question answered, who among the witnesses that we have is best suited, because actually what's happening is that you're testifying, which isn't going to help me. So who of the witnesses can answer that?

MR. COLTON: The contracting officer, who is here, is the most knowledgeable.

THE COURT: Great.

BY MR. CARTER:

Q Ms. Wofford, if we can move ahead. Keeter Trading was awarded a contract for a portion out of Yellville, Arkansas, is that correct?

A Yes.

Q Now prior to December of 2003, did you have any complaints about Keeter Trading's performance of that contract?

A I don't recall any.

Q And Ed Keeter, on behalf of Keeter Trading, he

would call you occasionally if he had questions.

A If I recall correctly, the only time we really got into conversation was when this particular change request came into being.

Q Okay. If you would, tell the Court what you recall about this change request.

A I recall there were several routes involved, that's one reason for so many of the e-mails. I was trying to do my analysis to see exactly what was happening.

Q Okay. In December of 2003, I guess the proposed changes by Ms. Orr were approved; does that sound right?

A I don't know about the date unless I see a document.

Q Okay. This is Defendant's Exhibit 2, the first page.

A Okay.

Q It looks like December 24, 2003 down there in the bottom left hand corner.

A This is the results of that change.

Q Let's see -- you know these forms better than I do. I must be missing something -- oh, the effective date being 1/24/2004.

A Yes.

Q And it's described "Insignificant Minor Service Change", new boxes - 52, make total boxes 302.

A Uh-huh -- yes.
Q Somebody came up with 76 hours added to the contract. Do you know how that 76 hours came about?
A If I could see the document, I could probably figure it out.
THE COURT: Mr. Carter, there should be Defendant's exhibits at the witness desk so that you don't have to continue to use yours.
BY MR. CARTER:
Q Ms. Wofford, I apologize. If you would look at Defendant's Exhibit 2. It is tabbed.
A Tab 2, yes.
Q This is a contract service order. If I look at this form, how do I determine how many hours have been added to the contract?
A On this 7440, you can't.
Q Okay. What form does a person look at then to determine the number of hours added to a contract?
A It would be in the schedule, the new hours.
Q Okay. We have -- let me back up. With regard to Mr. Keeter's contract and any other contract say with in the state of Arkansas, other than the times and the mileage, do all the contracts read the same?
A I don't understand what you're saying, all of the contracts. Do you mean the actual statement of works?

Q Yes -- no, not the individual deliver here, pick up here and case times, but the language of all the contracts, do they all read the same with regard to the supplier's responsibility and the Postal Service's responsibilities?

A It would depend what type contract.

Q Okay. The type of contract that Keeter, Inc. would sign for an HCR.

A The statement of works for a box delivery at that time --

Q Yes.

A -- would have basically the same language.

Q And all those contracts say that the times are approximate, the mileage is approximate; would that be fair?

A Yes.

Q And they all have incorporated the formula that is to be used to add additional boxes or mileage to the route, is that correct?

A Not necessarily a formula to add it.

Q Are you telling this Court then that the formula contained in Mr. Keeter's contract, it would be different than formulas contained in other persons who have the same type of contract?

A No, that's not what I'm saying. What I'm saying is -- perhaps I should ask you, are you asking me if there is a formula that is used to determine how many boxes or whatever

is in the contract?

Q No, I'm not asking that. Specifically if you look at Defendant's Exhibit 4-B, page 21.

A Okay.

Q And if we look at Section 212.31, is that formula contained in all HCR contracts that are let out by the Southwest Region to people in Arkansas?

A Now are you asking if this language or is this formula used to make up the contract?

Q No, I'm not asking you -- is that formula contained in the contract?

A This formula is a part of the statement of works.

Q You've lost me when you say statement of works.

A That's a part of the contract.

Q Okay. And that is in every single contract?

A Yes, on the statement of works.

Q Okay. Likewise, if we go up to Section 212.1, is that language contained in every contract?

A I would have to see a contract. This is from some type of handout.

Q Okay.

A This is from the P-5. I would have to look in the statement of works.

Q With regard to the P-5, that is given to every contract carrier, is it not?

A No, not necessarily.
Q Why would it not be given to a contract carrier?
A Because really this -- I don't even know -- well, this was put out in 2001, but when Mr. Keeter got his contract, I don't know if we had those to send out.
Q Okay. If you look at Defendant's Exhibit 1, page 17, there is the paragraph that begins "Adjustment for route extensions of en route boxes". Does that paragraph appear in every HCR contract in Arkansas?
A It appears in the statement of works for the box delivery routes.
Q Okay. So the answer is yes?
A Yes, for box delivery.
Q Ms. Wofford, if you could, tell me how did the Postal Service go so wrong and apply the wrong formula on Keeter Trading?
MR. COLTON: Your Honor, that's argumentative as to ask her why.
THE COURT: I will sustain. You can rephrase your question.
BY MR. CARTER:
Q Ms. Wofford, why -- or was this formula applied to Mr. Keeter in December of 2003?
A It was not applied because I was told that he already had the additional time and no additional time was

needed, because in his route there was too much time in the route for his travel between Summit and Peel. It only took him 30 minutes and he had over an hour in there, which he had been paid for.

Q And who told you that?

A When I talked to the postmaster.

Q Okay, Mr. Keeter did not tell you that?

A No, he did not.

Q You've been in the courtroom and -- well, let me back up. You acknowledge that the times in these contracts are estimates.

A Yes.

Q And you've heard that the casing time for Keeter, Inc. at Peel was just 25 minutes for 133 boxes.

A Yes, I heard that today.

Q Can you point to anywhere in Mr. Keeter's contract or in the P-5, anything that says that if he has too much time in his contract, you don't have to follow this formula?

A No, I cannot.

Q Do you recall having a discussion with Mr. Keeter on January 2 of 2004?

A I'm not sure what date, but I've had many discussions with him.

Q More specifically, and to your credit, when you have conversations with people that affect a carrier route,

you write notes on it and put it in files.

A Yes, usually I do.

Q Okay. And if you look at Plaintiff's Exhibit Number 2, that's in the one with the plastic binding, this document is dated 1/2/04 at 8:58. Is this a document that you created?

A Yes.

Q And this document is based upon conversations that you had with Mr. Keeter?

A Yes.

Q And Mr. Keeter told you that he did not agree with the changes and he felt the postmaster was favoring the Hoovers.

A I'm reading to see if that's in here.

Q Fourth paragraph.

A Yes, I see that.

Q Okay. And you indicated to him that he would be in jeopardy of losing his route if he did not do as instructed.

A Yes.

Q Okay. And on January 2, 2004, he made it clear to you he was not going to carry the new boxes and if she gave it to him, he was going to put them on the ledge.

A Yes.

Q So I guess it'd be fair to say as of January 2, 2004, the battle lines were drawn.

A I was aware of his feelings.
Q Okay. On Plaintiff's Exhibit 6, you sent an e-mail to the postmaster asking her to give you a better explanation as to these changes, did you not?
A Yes, it appears that I did.
Q And if you turn the page and look at Plaintiff's Exhibit Number 7, I think these are all notes in your handwriting, are they not?
A Yes.
Q And let's see, on the 27th, you had contacted Ms. Orr asking her position and then you sent a note to Mark indicating "we need your expertise".
A Yes.
Q Mark would be who?
A Mark McCague would be my team leader at the time.
Q Okay. That's the fellow here in the courtroom.
A Yes.
Q Did you arrange a telephone call or was a telephone call had between Mark, yourself and Mr. Keeter?
A Yes.
Q Do you recall what day that was?
A I'm assuming by this note -- I don't know if it was this day or not, but I did arrange one.
Q Okay. If we look at --
A It appears to be 1/28.

Q Okay. And you wrote various notes -- to be fair, what Plaintiff's Exhibit 7 is, is two notes that you wrote, one on the 27th and one on the 28th.

A Yes.

Q And the 27th being sort of a little sticky thing in the upper left and the note from the 28th being a large page, full sheet.

A Yes.

Q Okay. And with regard to that conversation, other than looking at Plaintiff's Exhibit Number 7, what do you recall about that conversation?

A Mainly it was a conversation to try and reason with Mr. Keeter and try and resolve the issue of the 52 boxes not being carried.

Q Okay. Now when you say try to reason with Mr. Keeter, what do you mean?

A Try to get him to see where that could be a part of his contract, because his contract can be altered, depending on the growth in the area.

Q Okay. And did Mr. Keeter indicate that the Postal Service was not correct?

A Yes.

Q And did Mr. McCague ask him to put what he wanted in writing?

A Yes, we did tell him to put it in writing.

Q Okay. And did you receive what I believe is Defendant's Exhibit 7 from Mr. Keeter?

A Yes.

Q And if you read through Defendant's Exhibit 7, is there anything in there that Mr. Keeter had not previously talked to you about over the preceding four or five weeks?

(The witness reviews a document.)

A Just glancing through this, we had talked about these things.

Q Okay. Now with regard to this letter, do you recall that Mr. McCague indicated that it had to come from Mr. Keeter and not from his lawyer?

A I don't recall that.

Q Okay. If you have a note to that effect, would that note be accurate?

A Yes, if I have a note.

THE COURT: Was Defendant's Exhibit 7 sent to you, Ms. Wofford or who, do you know who it was sent to?

THE WITNESS: No, it was probably sent to me.

THE COURT: To you?

THE WITNESS: Yes.

BY MR. CARTER:

Q Now based upon the letter that Mr. Keeter sent, you had a number of e-mails going back and forth still with postmaster Linda Orr, did you not? And specifically I'm

referring to Plaintiff's 11 and 12 and 13.
A Eleven is trying to get more clarity on what I'm doing with the change.
Q And that was on February 6, which was after Mr. Keeter's letter.
THE COURT: Which exhibit are you in right now, Mr. Carter?
MR. CARTER: Plaintiff's Exhibit 11.
THE COURT: Thank you.
THE WITNESS: Yes, that was on the 6th.
BY MR. CARTER:
Q And that was after Mr. Keeter's letter.
A The date is, yes.
Q To be fair, you took Mr. Keeter's letter seriously.
A Yes.
Q And you worked the formula that he outlined in his letter.
A I don't know if I worked the formula or not.
Q Okay. Plaintiff's Exhibit 12, this is also in your handwriting, is that correct?
A Yes.
Q And that's February 9.
A Yes.
Q Do you recall telling postmaster Orr that she needed to fill in responses to the 5500 forms?

A I don't recall it, but it would be normal for me to say that.

Q Okay. Then also there's Plaintiff's Exhibit 13, where postmaster Orr talks about a termination and you explain the various steps that they had to go through.

A Yes.

Q If you turn the page, there's Plaintiff's Exhibit 14, it appears to be a note dated 2/10/04. Did you generate this document?

A Yes.

Q And you placed it in Mr. Keeter's file.

A Yes.

Q And at this point, in reading through this note, it would be fair to say that based upon Mr. Keeter's letter, you reworked the formula and discovered it should add 189 annual hours to the contract.

A It appears, yes.

Q And that would be more than $2500.

A I don't know, I'd have to work it to see.

Q Okay. Do you recall giving a deposition to me back in September?

A Yes, uh-huh.

Q And do you recall us working through that?

A I know we discussed this, but it's been a long time, I don't know exactly what it would have been. If I see

the documents, I could.

Q I don't want to put words in your mouth, but if you look at your deposition on pages -- the bottom of page 20 and the top of 21, and quickly read through those and refresh yourself -- or refresh your memory.

A Okay, after I read the second paragraph, I figure this is for the second 7440.

Q Okay.

A Yes, where we tried to resolve it and we added the additional hours.

Q And if we take the 189 hours, it does increase the contract more than $2500.

A Yes, it probably does, yes.

Q And you would agree with me that in September when I took your deposition, you told me there was no negotiation with Mr. Keeter at any time.

A No, because during the time of the second 7440, I was just trying to resolve it and the negotiations didn't really come into my mind.

Q And you referred to the second 7440 as an insignificant minor service change.

A Yes.

Q Even though it encompassed the same thing from the December 24, 2003 change.

A But it was separate and it still fell under

insignificant.

Q Is there a part of the contract that you can cut it into two pieces to make them both insignificant?

A No, the second was trying to resolve the issue.

Q Ms. Wofford, as you understand it, what was the issue?

A The issue was that Mr. Keeter did not want to deliver the boxes because he said that he was not given the time. So after Mark and I talked with him, after that conversation, I explained to Mark that I would like to go ahead and give him the extra time because Mr. Keeter was adamant that he was not going to carry the boxes.

Q Okay. If you go back and look at Defendant's Exhibit 7, the very last paragraph, did not Mr. Keeter talk about "I wonder what I've done wrong in this situation. I bid a contract and got it."

A Yes, he does have that in the paragraph.

Q And if you look at the top of that page, the fourth line from the bottom of the first partial paragraph, "Her math does not work. In light of these facts, it is clear this is a major service change. The proper dollar increase is above $2500, which needs to have mutual agreement. She does not have that agreement. She has no right to charge me for delivering that mail, since that service is not in accordance with the terms of our contract."

MR. COLTON: Your Honor, I want to object because counsel has, for some time, been arguing the merits of the breach of contract, not why it happened, but trying to say you breached the contract, you breached the contract, as Your Honor has ruled. I thought this was about why did we do it, did we know we were doing wrong, did we intend to harm him, whatever the standards are. And that's not what counsel is talking about, he's trying simply to hammer home the fact that you were wrong. So I object.

MR. CARTER: Your Honor, I disagree completely with Mr. Colton's characterization. The point that I'm trying to stress here is that the Postal Service believes that this is about money, and the case is not about money, the case is about principle. He said here's what my contract says, I don't agree to it. Giving him money did not solve the problem, that's not what he was asking. He says this is my contract, you have to negotiate and you don't have my agreement.

THE COURT: But what's on trial today is the issue of bad faith, so whatever Mr. Keeter's feelings about whether it hinged on money or whether it hinged on a matter of principle or whether it was both, what both counsel have to focus upon is the question of bad faith or, you know, good faith and fair dealings. So that is where I would direct the line of questioning.

And while you're reorganizing with that, I have a question that I would direct to Ms. Wofford.

Since we've been talking about the two Exhibit 7s, both the Plaintiff's and the Defendant's Exhibit 7s, perhaps you can enlighten me and shine a light so that I can understand this better. Mr. Keeter had a given contract amount, I think it was like $3069, is my recollection of his original contract amount. Is that correct, do you recall that?

THE WITNESS: I heard him say that was what he got each month.

MR. CARTER: That's correct, Your Honor. The contract amount was about 39,000 and change.

THE COURT: Okay, I'm sorry, I meant to say per month, right, $3069 per four weeks was I think specifically what he had said.

And the original amount proposed to be deducted for the 52 boxes was -- was that $1093 -- how much was it?

MR. COLTON: The records actually only show four hundred some odd dollars. The only order that we have is four hundred dollars and Mr. Keeter testified it was three hundred some dollars. And that's the only evidence.

THE COURT: That was proposed to be deducted for the 52 boxes. How did that work?

MR. CARTER: Actually deducted. The proposed

amount I think was the 1093.

THE COURT: And that was for four weeks, correct?

MR. CARTER: I would say that that's probably correct. I'm not sure how much of a delay there actually is in actually making payments.

MR. COLTON: The proposal -- Mr. Keeter counted something up, Ms. Orr turned these in day by day and she didn't total them. So Mr. Keeter took a cross section of it and said it amounts to X dollars. That was how he came up with the number.

THE COURT: With the 1093.

MR. COLTON: That was his number.

THE COURT: Okay. Well, have the parties worked it out, you know, where we have something definitive as to what amount was proposed by Ms. Orr for the deductions?

MR. COLTON: On a day-by-day basis, each day has an amount. We have not otherwise discussed it.

THE COURT: Okay. Have the parties worked it out where you can line up to see what the difference, if any, was between what the proposed deductions were to be, as opposed to what the proposed payment was supposed to have been up front?

MR. COLTON: I have not.

MR. CARTER: Nor have I, Your Honor.

THE COURT: Because that seems to me to be a part

of this Exhibit 7 that was submitted to Ms. Wofford, it seemed to be a part of the argument that Mr. Keeter was making and actually a part of the argument that Mr. Keeter was making in terms of how can I make any money, you know.

And I want to be sure that I get the two parties to address these issues. You know, they've just been sort of brought up but not completely fleshed out because, you know, that's what I need to really thoroughly understand this case. Mr. Keeter has made the argument that, his gross, I think he said, was for four weeks was $3069, it was proposed by Ms. Orr to deduct approximately a third, $1000 per four weeks, for the 52 boxes, but yet and still, you know, what I had been offered by Ms. Orr was a substantially smaller amount. So I'm asking -- I don't know what-- we're getting low in terms of witnesses and that particular issue has been brought up on numerous occasions, but counsel have not --

MR. COLTON: Your Honor, without testifying myself, the alternative will be addressed, that is what was done, why that calculation to us never would have been made. We'll explain it.

THE COURT: I don't want legal argument about it, what I'm asking for and what I have yet to get from either side is a thorough explanation through your witnesses.

MR. COLTON: Yes, Your Honor, and I think it will become apparent. That's all I can say.

THE COURT: Promises, promises.

MR. COLTON: Well, Your Honor, I'm not sure that it will be the way you want. I have something in mind that I think is responsive and I shouldn't say any more than that.

BY MR. CARTER:

Q Ms. Wofford, if you would turn to Plaintiff's Exhibit 20, hopefully I can answer some of -- or hopefully you can answer some of these questions for the Court.

Plaintiff's Exhibit 20, the first page there that has this, the sticker that says Plaintiff's Exhibit 20 on it. What exactly is that?

A I show this to be the 7440 for the termination for default, release of funds.

Q Okay, now the Postal Service wasn't going to release any funds to Mr. Keeter, were they, or Keeter, Inc.?

A Well, it's based on the damages.

Q Okay. And this says reviewed by JW 6/10/5. That would be you?

A Yes.

Q Okay. And if we turn the page, the Postal Service was seeking $1342.69 from Mr. Keeter for 26 days, is that correct?

A It's shown here those were the damages after the termination of the contract.

Q Now that's not 26 days after February 20, 2004,

those are including the January 24 through February 20 days, is it not?

A This is a result of how much it cost to procure new service, all of that is taken into consideration, the administrative costs and that's the difference.

Q Okay, now from I guess the February 20, 2004 check paid to Keeter, Inc., there was a $424.80 deduction, was there not?

A Yes.

Q And so that left $917.89 that the Postal Service, in addition, wanted from Keeter, Inc.

A That's not connected with this document. The -- if I recall correctly, 424 was the deduction for Mr. Keeter not delivering the mail. That was based on the postmaster having to deliver.

Q Okay.

THE COURT: Is that what the post office considered as the reprocurement?

THE WITNESS: No, at that time, that was because the postmaster had to use her vehicle, use another clerk, her time to do what we had paid Mr. Keeter for. That was the deduction for however many days it was. And that was prior to this.

THE COURT: And Mr. Keeter had been paid additional sums for the 52 boxes?

THE WITNESS: Yes, and this was prior to the termination. The $424 was the deduction for Mr. Keeter not delivering the 52 boxes.

THE COURT: Now if Mr. Keeter, from the outset, has said I'm not going to deliver the 52 boxes, then how -- and never did -- how has the Postal Service paid him for that?

THE WITNESS: Because the first 7440 that was cut added the 52 boxes to his route, his contract, and money was added for it.

THE COURT: Which exhibit is that?

MR. CARTER: Plaintiff's Exhibit 20.

MR. COLTON: Your Honor, that's December 24, 2003 route service order.

THE COURT: Plaintiff's Exhibit 20.

MR. CARTER: To clarify, what I'm talking about with Ms. Wofford is Plaintiff's Exhibit 20. The service route is --

MR. COLTON: That may not be the route service order, I'm sorry.

Your Honor, I'm getting very tired, could we take a break? I need to go and splash my face with some water.

THE COURT: That's fine if you want to take a break. We can take -- we'll come back at 4:15.

MR. COLTON: Thank you, Your Honor.

(A short recess was taken.)

THE COURT: Let's go back on the record.

BY MR. CARTER:

Q Ms. Wofford, when we broke we were talking about Plaintiff's Exhibit Number 20 and I was on the second page. And if I go down to Part 3, total damages and reprocurement costs, $1298.69, that is in essence money that the Postal Service believed that Mr. Keeter -- or that Keeter Trading owed the Postal Service for the additional stuff that the Postal Service had to do.

A Yes.

Q And in part, if we go up to the area that's not boxed, it's "caused the postmaster/clerk to deliver 52 boxes for 26 days, $1342.69", to a large extent those would be the figures that Ms. Orr put together that we've talked about.

A Yes, I see that now.

Q Okay. Then there's -- the next box is various administrative costs.

A Yes.

Q And then if I look at the next page, it appears Part 3, total damages and reprocurement costs minus $43.85.

A Yes.

Q So if I take these two pages, would the correct figure be the $1298.69 minus $43.85?

A I would say so.

THE COURT: Where were you looking for the $1298.00

figure, Mr. Carter?

MR. CARTER: Part 3 on the second page of the three page document, right below the second box.

THE COURT: That says minus $43.85?

MR. CARTER: That's the third page that I have.

THE COURT: Oh, okay. Thank you.

BY MR. CARTER:

Q Ms. Wofford, very quickly, if you --

THE COURT: Let me, before you move on from that, let me ask, did the Postal Service do a formal reprocurement?

THE WITNESS: I don't understand what you're asking.

THE COURT: Was anything done by the post office in terms of getting the 52 boxes delivered other than having Ms. Orr do it?

THE WITNESS: No, at the time that Mr. Keeter had the contract, no. But after Mr. Keeter abandoned the route, then we did get replacement service.

THE COURT: For his entire route.

THE WITNESS: Yes. That included the 52 boxes.

BY MR. CARTER;

Q That would be Roger Barrett?

A I don't recall who it was.

Q Okay. Ms. Wofford, if you would look at Defendant's Exhibit 18, which is another one of your notes.

It's also dated apparently 1/28/04. Did you write this note?

A Yes.

Q Now I had talked to you earlier -- and since we had a break, I've had a chance to find it -- in reading the first paragraph, does this refresh your memory about what I had said about lawyers?

A Yes, it does.

Q Okay. Mr. McCague -- it'd be fair to say that Mr. McCague indicated to Mr. Keeter that the letter was to come from him and not from his lawyer.

A Yes.

Q Do you know -- was there any discussion as to why that stipulation was in there?

A No, because I didn't even recall it being there until I read it.

Q Okay. And if you would look finally at Plaintiff's Exhibit 18, you made a note -- well, let me back up. This document, Plaintiff's Exhibit 18, is a note prepared by you to put in Keeter Trading, Inc.'s file, is that correct?

A Yes.

Q And I think you noted in there -- and I'm starting at the end of the third line -- "Contractor Ed Keeter on HRC 72665 was not in agreement with the change. He submitted a complaint that he was given no extra time for the additional 52 boxes on his route and refused to deliver them."

A Yes.
Q And then you put that in his file.
A Yes.
MR. CARTER: Judge, I believe that's all the questions I have for Ms. Wofford.
THE COURT: Mr. Colton.

CROSS EXAMINATION

BY MR. COLTON:
Q Ms. Wofford, at any time in your dealings with Mr. Keeter or Keeter, Inc., did you believe that you were breaching the contract between him and the Postal Service?
A No.
Q Did you ever believe that you were acting outside of your authority?
A No.
Q You testified -- would you take a look at Defendant Exhibit Number 6? Is that in front of you?
A I beg your pardon?
Q Do you have that?
A Yes.
Q Before today and before this legal proceeding, have you seen this document?
A Yes.
Q Have you seen it before these events involving Keeter, Inc.?

A Yes.
Q Did this document have any impact on your understanding of obligations concerning that formula in the contract?
A I knew that I didn't have to go by the formula exactly.
Q Do you recall having any belief at the time as to where this document came from, where you saw it, where it originated?
A I believe it's headquarters issued.
Q Now did you consult this document in the course of your dealings with Keeter?
A No.
Q But did you have ideas in mind associated with this document?
A Yes, I knew -- yes.
Q Okay. Does the term service change have a meaning to you?
A Yes.
Q What is a service change?
A That there will be a change to the existing contract, something will be altered on the existing contract.
Q Did it make any difference in any of the events that have been described whether or not the additional 52 boxes constituted a service change -- would it make any

difference in how you treated it?
A I would have to look at all of the facts.
Q Could it make a difference -- strike that. Was the addition of those 52 boxes, in your view, a service change?
A Yes.
Q Okay, and did you consult with anyone about that?
A No.
Q In the years in which you have been acting as a contracting specialist, have you ever dealt before with a contractor who refused to take additional work?
A I'm sure I have.
Q Do you have a specific recollection?
A No, no one stands out.
Q Would it have been possible to continue Mr. Keeter on the contract without him having to perform the boxes -- to perform those 52 boxes?
A Yes, if we had to, we could have put them back on the other route.
Q Do you know -- you could have done that -- do you know if that is what would have been done?
A No, I don't know what would have been done.
Q Who would have made that decision?
A It would have been the contracting officer.
Q Have you ever -- strike that. When you received the letter from Mr. Keeter, I believe it's the one dated

January 31, Defendant Exhibit 7. Take a look at that please. You read it through?

A Not entirely today, but --

Q At the time it was received.

A Yes, yes.

Q Now did this tell you exactly, in your mind, what it was that Mr. Keeter wanted?

A Not reading it now.

Q Do you remember if you were quite certain what he wanted?

A Yes.

Q Looking at the last paragraph on the second page, where it says "I would like to continue on my route if I can keep it for the remainder of the contract." Was that one of the options that you were trying to effectuate as of the time you got this letter?

A Well, we really didn't want to default his route.

Q There's a note that was referred to also in which you asked Mr. McCague for help, to please come talk to the contractor. Do you recall that?

A Yes.

Q Why did you want Mr. McCague to become involved?

A Because I wanted him to try to help me explain to Mr. Keeter concerning the 52 boxes and to see if Mr. McCague had anything that he could say that would help Mr. Keeter to

understand.

Q Understand what?

A The addition of the 52 boxes, and that it would be a part of his contract.

Q Let's take a look at Exhibit 17, Defendant's. Looking in the upper left hand corner, where the small note is, it says "I would like for you to talk to this contractor before we get to the point of terminating him."

A Yes.

Q Did you have any desire, intention, to terminate Mr. Keeter, was that a goal?

A No.

Q Throughout this whole sequence of events, did you want to get rid of Mr. Keeter?

A No.

Q Did you threaten him?

A No.

Q Did you intimidate him?

A No.

Q Did you harass him?

A No.

Q If you would look again at his letter, number 7, it says, "A job with an atmosphere of harassment and intimidation and threats is difficult to take." Do you have any idea what -- did you have an idea at that time what he

was talking about?

A No.

Q Ms. Wofford, you were asked some questions about the documents that are -- let me see -- Plaintiff's -- the last exhibit, the ones that have those calculation sheets, that's number 20 and the attachment, Plaintiff 20. Looking at pages 2 and 3 of that exhibit, can you tell by looking at them when these documents were created?

A Just looking at the second one?

Q Pages 2 and 3 of Exhibit 20, Plaintiff Exhibit 20.

A I see an effective date but that doesn't necessarily mean it was created on that date.

Q Does that tell you a no earlier than or no later than time for either of these documents?

A That tells me that effective that date, these documents will be valid.

Q Does the fact that it says that indicate whether or not the contract has already been terminated?

A Termination effective -- I would say that it means that it was at that point.

Q If you look at the first page of Exhibit 20, could you identify what that document is?

A This is the termination for default, the release of funds.

Q Is this something that happens before or after a

contract is terminated?

A It happens after.

Q At the bottom of the middle block there, it says "Replaced by regular HCR 72665 effective 7/24/04." Does that indicate to you the earliest time that this document could have been created? Strike that. Could this document have been created before July 24, 2004?

A Yes, it could have.

Q Could it have been created before the contract was awarded that is referred to there, replaced by regular HCR?

A Well, just looking at this, I see where I reviewed it, that 6/10 date.

Q Yes.

A That would tell me that it happened around that time.

Q Were any of these materials sent to Mr. Keeter before his contract was terminated -- or Keeter, Inc.'s contract was terminated?

A Not that I know of, not before.

Q Were they sent to coerce or intimidate him in any way?

A No.

Q Does this refresh your recollection about the reprocurement in any way as to when and to whom it was granted?

A As to who replaced the service?
Q Or anything else about it, I just want to know --
A Yes, looking at these documents, I can tell on the third one that we had an emergency in place.
Q Can you explain the difference between the second and third pages?
A Well, the third page indicates that 726DU was secured to replace service and that's an emergency route. And the second page is for the regular route that replaced -- and when I say regular, I mean a four-year term, a route that was solicited to replace the service.
Q Could you explain to the Court the sequence of events in terms of who provided service from the first time that Keeter, Inc. did not serve the entire route, which I think we would agree is February 20, up until the replacement of that contract -- who provided service and is it reflected on these documents?
A I would say that an emergency route more than likely took up the service after Mr. Keeter abandoned the route.
Q Explain what an emergency route is as compared to something else.
A An emergency is a route that we can call and try to get bids on for service when an unusual event happens -- occurred that causes the route not to be able -- the regular

contract not to be able to provide the service. In this case, the abandonment. So we had to procure service in order to replace Mr. Keeter's route.

Q Is that a reference to services provided by Ms. Orr or someone else?

A It could have been someone else and I'm not -- Ms. Orr could have provided it a day or two until we get the emergency, I don't recall.

Q Is this document that is the second page of this exhibit and the third page, is that a form or is this something you prepared particularly for this occasion?

A No, this is the standard form that prints out with the termination order.

Q And up here where it says number of days left in pay cycle, et cetera, do you see that? Number of days left in pay cycle, default --

A Oh, yes.

Q Did you make that up for the occasion or was this standard?

A That's standard.

Q Did you do anything with regard to preparing these documents after February 20, 2004 that was not the way you would have treated the default of any other contractor?

A No.

Q And by the way, do you know when these documents

were provided to Mr. Keeter?
A I should have had -- more then likely they were certified.
Q Well, perhaps, but do you know?
A No, I don't.
Q In your dealings with Ms. Orr, did she express a desire to do anything to hurt Mr. Keeter, on a personal level?
A No.
Q When she told you that she believed there was extra time in his contract, did you consider that relevant to your work?
A Yes.
Q Did she suggest that it was an excuse or a pretext on which you could avoid negotiating with him?
A No. I could see it on the schedule.
Q Did you ever believe that you had a duty to negotiate with Mr. Keeter, but you just didn't want to do it?
A No.
Q Did anybody ever instruct you that steps should be taken to avoid negotiating with Mr. Keeter?
A No.
Q When Mr. Keeter's letter of January 31 came in, you said you read it. Did you share it with anyone else?
A I don't recall if I did or not. More than likely,

I probably talked to my group leader and/or the contracting officer.

Q Do you recall how it came about that more money was to be paid to Mr. Keeter, that a decision was made to pay him more money?

A That decision had to go through my group leader.

Q Do you remember what first started -- that is, how did the very idea of considering it come about, when it did come about?

A After Mark McCague and myself had talked to him, to Mr. Keeter, then we decided we would try to resolve it and I suggested we pay him the difference.

Q Was it because you thought you were wrong?

A No, it was because we wanted to see if Mr. Keeter would go ahead and deliver the boxes. Because at that time he kept saying that he wasn't given the time.

Q Mr. Keeter testified that it wasn't about the money. Did you believe it was about the money, that that's what his objection was?

A I don't know if I believed it was about money, I know he mentioned time and that equates to money.

Q Going back to the original determination of the amount of money you were going to pay him, do you recall specifically how you calculated it?

A No.

Q Is it your belief that you did or did not take into account the information that had been provided by Ms. Orr?

A I did take into account the information.

Q Now at a later time when Mr. Keeter provided information, did he convince you that in fact, there wasn't extra time in his contract?

A No, he didn't.

Q Did you go back and read the contract to decide exactly what you needed to do as we went along and to see do I have to apply the formula or not?

A No.

Q Was that because you didn't care?

A No, it was because based on the facts that I had, it appeared that what I did was correct in that case. The time was there and I could see it on the schedule.

Q Did you attempt to compare casing time for X number of boxes versus casing time for Y number of boxes? Did you do calculations down to that level?

A No, but what I do whenever I do a change, and in this case there were four or five routes, I try to look at each one to see if basically what was taken out was being put on another route, and if the time, looking at how much time was allowed for route A was the same amount of time allowed for route B. Those are the things that I was looking at.

Q And when you did the work, time was important, is

that what you're saying?

A Yes.

Q Time.

A Uh-huh.

Q Did Mr. Keeter tell you that time didn't matter?

A I don't recall.

Q If you would look at Defendant's Exhibits 4-A and 4-B. Do you have those before you? Defendant's Exhibits 4-A and 4-B. I believe you were asked whether these were provided to Mr. Keeter. Do you remember being asked that?

A Yes.

Q Do you have any belief as to whether these are documents that are routinely given to HCR box deliver contractors?

A Well, it depends on if we have these. These were sent to us by headquarters and I don't recall if we had them in the office when Mr. Keeter was awarded his route.

Q Did you have an opinion as of 2003 or 2004 as to what the purpose of documents 4-A and 4-B was?

A I don't understand what you're saying.

Q Did you consider it to be a part of the contract?

A P-5? No, it was just --

Q I don't want to lead you, so use your words.

A Okay.

Q If you would look at the beginning of document 4-B,

at page 2, where it says B-1 and I want you to say whether you can explain what is meant -- if you understand -- by areas, districts, processing and distribution centers/facilities and administrative officials. Are those Postal Service terms?

THE COURT: Excuse me, what -- I'm not sure I'm on the same page with you.

MR. COLTON: It's Exhibit 4-B, the second page at the bottom where it says Distribution. It's part of B-1 on that page.

THE WITNESS: Oh, I see, yes.

THE COURT: Wait a minute, we're at 4-B.

MR. COLTON: Correct, it's page 2, using the little p. 2 at the bottom, first real page.

THE COURT: Thank you.

BY MR. COLTON:

Q Would you repeat your answer as to whether those are Postal Service terms?

A Yes.

Q Does each of them, to you, have a meaning?

A Yes.

Q Okay. Do you know the origin of that 76 hours?

A Not at this point.

THE COURT: Excuse me. What 76 hours are you referring to?

MR. COLTON: The 76 hours that were credited the first time in December of 2003 and then 112 hours were added in February which got up to the 188 hours, which is what the formula gave. And so the origin of the 76.

BY MR. COLTON:

Q So you don't remember?

A No, not offhand.

Q Was it a consequence of a -- do you know whether it was random or the consequence of a mathematical decision?

A It was math.

Q And do you believe that it was based on any particular information?

A Whatever was contained in the service change.

Q When you say the service change, what are you referring to?

A The document that was submitted by the postmaster Linda Orr.

Q You mean the package of material that justified her request?

A Yes, and gave all the particulars about each route.

MR. COLTON: I may be done, Your Honor.

(Brief pause.)

MR. COLTON: Nothing further.

THE COURT: Thank you.

REDIRECT EXAMINATION

BY MR. CARTER:

Q Ms. Wofford, do you know how many days in a year the Postal Service delivers mail?

A I believe it's 303.07 for box delivery routes.

Q Okay, that's even a better answer than I thought I was going to get. If --

THE COURT: I just have to ask about the .07.

THE WITNESS: It's just for figuring.

THE COURT: Okay.

MR. CARTER: Well, I'm sure February 29 figures into that every few years.

MR. COLTON: Do we refer to it as K-7?

THE WITNESS: Yes.

MR. CARTER: I think I have the answer.

THE WITNESS: Okay.

BY MR. CARTER:

Q If we took 15 minutes, which I think is reflected in Ms. Orr's submission to you, 15 minutes would be one quarter of an hour. So if we took 76 hours times four, I come up with 304 and you said the figure was 303.07 days a year.

A Yes.

Q So more than likely, what we were doing is adding 15 minutes to Mr. Keeter's contract, multiplied by the number

of days and then just rounding it off.

A I would have to see my figures to know exactly what I did.

Q Okay. But this is certainly pretty darn close to that.

A It looks like it, but I'm not going to say that I did that.

Q And if we look at page 5 of Defendant's Exhibit 1, Ms. Orr has 249 boxes -- oh, I'm sorry, I'm so used to just having one exhibit -- if you look at Defendant's Exhibit, page 5 and I'll try to stay back.

A Exhibit 1?

Q Exhibit 1, page 5.

A Okay.

Q This is the page that says G. outbound trip Yellville Post Office.

A Yes.

Q And it's the one that has language at the bottom "supplier does not use the 1:15". Are we on the same page?

A Yes.

Q Okay. If we go up to L. summary, boxes, 249 and B. actual 301, and then we skip down, there's office time, 1:30, 1:30. And then route time 4:45 and then it's changed to 5:00. So that would be a difference of 15 minutes.

A Yes.

Q And in terms of time involved on this proposed change, 15 minutes is it.

A Actually it's more like 30 minutes, if you read what she says.

Q Okay. When -- you're talking about statement of proposed service?

A Yes.

Q But I'm just talking about Section L., the summary.

A Yes, but I'm not sure if I even used that as my basis for what I got on the first service change.

Q Okay. You indicated to Mr. Colton I believe that you did not believe that you had to use the formula contained in Mr. Keeter's contract and in Handbook P-5. Explain to me why you believed you did not have to use the formula.

A Because there are times when we don't. And in this case, with the extra time in the route and the postmaster saying that the supplier did not need more time because he already had that extra 30 minutes, then I would not need to add that much time to the route.

Q Where in Mr. Keeter's contract or Handbook P-5 does it give you or Mr. McCague or any Postal Service employee the authority to make that decision?

MR. COLTON: Calls for a legal conclusion, Your Honor.

THE COURT: That does not call for a legal

conclusion. The question was whether or not you can point to any particular provision that states what she says that she had the authority to do. So that's not a legal conclusion, you are overruled.

THE WITNESS: In this case, there's really no place in there that says what to do when you have additional time in the contract.

BY MR. CARTER:

Q And in fact, the contract says specifically for changes this is the formula to use.

A It gives that formula as a basis but we just don't -- "you must use it" is not there.

Q Okay. Mr. Keeter signed a contract with the Postal Service. How is he going to know that you have this secret thing out there that you can do.

A It's not a secret. In Mr. Keeter's case, there was additional time built in when he was awarded the route. I'm not sure if he was aware of it, but he agreed himself, upon my conversation with him, that there was an hour or more time from Summit to Peel, but it actually only took 30 minutes, because I discussed this with him.

Q Okay. But did you discuss with him the casing at Peel?

A That didn't come up, he did not bring that up.

Q Okay. Did you discuss with him that the time

estimates in these contracts are in fact estimates?

A Yes, he knows that.

Q And did you hear the testimony of Mr. Griffin who indicated that, you know, over time you start to do things a lot quicker?

A Yes, as you become more efficient.

Q So is it the position of the United States Postal Service the if Mr. Keeter becomes efficient, then more work should be given to him with no conversation, you can just dump it on him?

A No, this was travel time, there was more travel time in the contract.

Q And there's nothing -- you would agree with me, there's nothing in Mr. Keeter's contract that talks about adjusting the travel time if there's too much or too little in the contract?

A Those are things that the postmaster knows to do based on surveys.

Q But the postmaster doesn't have any authority to change it.

A She has to come through our office for all changes.

Q And so you're telling -- if I understand it, you're telling this Court that it would be possible that based on the amount of time put in the contract that Keeter, Inc. bid for, that the Postal Service could come back and say oh, we

put too much time in there, we're just going to decrease the contract.

A No, that's not the way we would do it.

Q Mr. Colton asked you a question about other people turning things down and you said that they must have, but nobody stands out.

A Yes.

Q Mr. Keeter stands out though.

A Because I'm here, yes.

Q If you would look at Defendant's Exhibit 6, I think you indicated to Mr. Colton you were familiar with it, but this policy on additional en route boxes, you didn't use this as part of your discussions or negotiation -- excuse me -- discussions or conversations or evaluation of Keeter, Inc.

A No, not to my knowledge, I didn't.

Q And it would be fair to say that Defendant's Exhibit 6 is a fairly old document, is it not? And the reason I ask you that question is if you look in the third paragraph, it talks about merely $1000 with regard to changes, which could be unilaterally put into effect.

A Yes, I see that.

Q So you would -- would it be fair to say that this is a fairly old document?

A It's been around, yes.

Q This is not a document you use today, is it?

A Well, I have not been told that we do not use it.
Q Okay. Then if you would look at Defendant's Exhibit 17, the small note in the upper left hand corner where it talks about "need your expertise", Mr. Colton read everything except the last sentence and you wrote on -- it'd be fair to say that on the 27th day of January 2004, you wrote in your little note to Mr. McCague, "He does not want the change."
A Yes.
Q In terms of the letter of January 31, 2007 (sic), which is Defendant's Exhibit 7, the long letter that Mr. Keeter wrote and he talked about intimidation, did he ever say that Jeanette Wofford intimidated him?
A He never told me that.
Q Okay. But he was upset with the postmaster.
A Yes.
Q She wrote 5500s on him.
A Yes, she did.
Q She said I'm going to take money from you.
A I don't know if she said that or not.
Q Well, she kept sending you notes on a regular basis saying here's how much we need to get from him.
A That's normal procedure for omitted service.
Q Three times she talked to you about termination after Mr. Keeter sent this letter, on February 2, February 6

and February 9.

A Okay.

Q In 2003, 2004, that time period, do you have any idea how many contracts in Arkansas were let out that were similar to Mr. Keeter's?

A No.

Q Did you cover the entire state?

A No.

Q How much of the state did you cover?

A Arkansas is from 716 to 729 areas, I covered from 724 to 729.

Q Okay, do you know how many post offices that covered?

A No, not offhand.

Q How many contracts did you cover in Arkansas?

A I would say around 130 box routes and that's not all that I had because I also had supplier routes.

Q Now box routes would be what Mr. Keeter dealt with.

A Yes.

Q So you had at least 130 contracts that you dealt with.

A Yes.

Q And I think you told Mr. Colton you didn't review Mr. Keeter's contract at any time after January 31, 2004 when he wrote you this two page letter that is Defendant's Exhibit

7.

A That I didn't review it?

Q Review his contract and go over the language in his contract.

A I don't understand what you're asking me.

Q Okay. Did you ever pull out Mr. Keeter's contract that was in effect and read through it to understand what Mr. Keeter was saying, or just refresh your memory as to what the contract said?

A I don't recall if I did or not.

Q Okay. If you look at Defendant's Exhibit 4-B on page 2 which is the transmittal letter, Mr. Colton talked to you about Part B. distribution and I want to talk to you about Part A. explanation. The Postal Service indicated "This handbook establishes the national policy and procedures for the operation and administration of highway contract routes box delivery service and has been revised to clarify areas of responsibility reflecting all changes in organizational structure and positional titles." I mean P-5, Handbook P-5, this is an important document, is it not?

A Yes, it is.

Q And with regard to this document, the changes that you instituted with regard to Mr. Keeter's contract, is there anything in Handbook P-5 that indicates you had the authority or the contractual authority to do what you did with regard

to the time on Mr. Keeter -- or on Keeter Trading's contract?

A Anything that addresses the time?

Q Yes.

A I don't believe there is because that's a unique situation.

Q When you indicate it's a unique situation, was it unique because the proposed changes were affecting four or five routes?

A Not necessarily but the fact that the time came in. I don't believe there's anywhere in there that would address when the contract had more than enough time.

Q And the sole reason for your belief that there was more than enough time is because the postmaster told you that.

A And I can look at the statement of works.

Q Okay.

A The time allowed, the travel time allowed between Summit and Peel.

Q How could you look at it and determine that was too much or too little?

A Is it where I can reference it?

Q It is. If you look at Defendant's Exhibit 1, page 15, 16, 17, 18, 19, 20, you'll know these a lot better than me but if you look at that, how can you look at that and tell me there's too much time?

A Looking on page 15?

Q Yes.

A Trip one in the statement of works, it shows from Summit, the third line, it shows that the carrier leaves Summit at 0830 and arrives in Peel at 0930. And the postmaster had said that it did not take that long, and if you do a map search on it, the travel time. It's showing travel time of one hour right here.

MR. COLTON: Your Honor.

THE COURT: Yes.

MR. COLTON: At this point, I would object. Counsel is arguing about a conclusion that the witness drew apparently trying to get her to say she couldn't draw it. I don't believe that enters into a bad faith conclusion. In light of all the other evidence, does it matter whether she was right or wrong? Are we here trying to adjudicate the conclusion she should have drawn from the documents? I don't think that's what this case is supposed to be about. That's the basis of the objection.

MR. CARTER: That's fine. I have no further questions.

RECROSS EXAMINATION

BY MR. COLTON:

Q Ms. Wofford, did you make a recommendation -- strike that. Did you prepare a draft document that would

effectively terminate this contract at some time on or after February 20, 2004?

A February 20, is that --

Q After the date on which he ceased.

A The only time I did -- started termination was after I received a letter from Mr. Keeter that he had turned in his keys.

Q And do you recall the date of that?

A No.

Q The record shows that, we don't need to go into it.

Do you recall whether Mr. Keeter was sent a cure letter?

A Yes, he was.

Q What is a cure letter, if you know?

A It allows the carrier X amount of days to get on the route and continue the service.

Q And was this before or after the date on which he turned in his keys?

A More than likely it was after.

Q Do you recall whether he responded to it?

A I don't recall.

Q Did, at some point after the cure letter went out, did you draft effectively a termination letter to be signed by the contracting officer?

A Yes.

Q When you did so, did someone request that you do it or was it on your own initiative?

A It was procedure, my own initiative.

Q And in preparing that letter for someone else to sign, did you take into account any of those Forms 5500?

A No, at that point, no.

Q Did they have any relevance at all, those 5500s, to any decision that you made with regard to Mr. Keeter? I don't mean the stuff about Ms. Orr driving the route, I mean whether he was late, the things he was written up for, did that have any impact on any decision that you've discussed in your testimony?

A No.

Q Does the Postal Service have a policy as to whether it will remove a 5500 from a file because a contractor disagrees with it?

A No.

Q That is we don't have a policy or we won't do it?

A Well, it's based on the comments from the supplier and whether or not the administrative official determines that they are chargeable or non-chargeable.

Q What does chargeable mean?

A Means they are valid, it's something the supplier could have prevented.

Q In this instance, did the fact that those 5500s

were or were not chargeable make any difference?
A To me at that point, no.
Q Well, do you know if it made a difference to anybody else who was involved in these events?
A No.
Q You don't know?
A No, I'm saying they did not.
Q Did anybody to whom you submitted the proposal to terminate ask you about 5500s?
A No.
Q Do you know why the contracting officer terminated the contract?
A He did not terminate, the supplier abandoned the route.
Q Well, that's sort of a conclusion. I want to know do you know why an order was signed saying terminated for default -- do you know the basis on which the contracting officer did that? Not a legal conclusion but just what was the reason.
A Because I submitted the paperwork to him, and based on the facts, there was no service being provided, so we had to terminate this route in order to get another route.
Q Is it the custom of the Postal Service to terminate contractors who don't perform, who don't provide service?
A Well, we go through a disciplinary procedure but

it's not just because he doesn't -- he stops service, we allow time for him to correct that. That's the cure letter.

Q With regard to a contractor that turns in keys and submits a letter and says I'm never going to perform this again -- now I'm not asking -- it's not a legal conclusion, from your standpoint, did the Postal Service do anything different with regard to Mr. Keeter than it would have done for any other contract?

A No.

Q If you'd look at Defendant's Exhibit 3. Do you have that?

A Yes.

Q Is this the entire contract in Defendant's Exhibit 3, between the Postal Service and Mr. Keeter, as far as you know?

A No, it's just one page.

Q You were asked if you could point to other provisions. Can you describe how thick the rest of -- Your Honor --

THE COURT: When you say other -- that's much too vague, I don't know what you're talking about. Put it in context please.

BY MR. COLTON:

Q Do you recall if counsel asked if you could find any provision that dealt with subtracting money or assigning

boxes -- he asked several questions about it, I don't have the precise wording. Do you remember him asking if you could point to provisions? We'll just start with that.

A About performance?

Q It's a general question.

A Yes.

Q I'm going to withdraw it and try again. There has been testimony about adding individual boxes. Is it required that the formula be used, as you understand it, if the postmaster realizes somebody new has moved into the neighborhood and a new box is put there because there's a new customer. Under those circumstances, as you understand the contract, does the formula have to be imposed or used?

A We would use the formula for one box?

Q Well, is it necessary that that be reported to you immediately?

A Well, yes.

Q Does it say that in the contract, do you know?

A That the postmaster should report it?

Q Should report it, yes.

A That's part of the P-5.

Q Well, is there some numerical point at which the postmaster is supposed to report, as far as you understand, additions to the service?

A Yes.

Q What is that numerical point, either a number or --
A One box per mile.
Q Okay, one box per mile. Do you know whether the postmaster is expected to report every in line box that is added or only after a certain number has been reached
A After a certain number.
Q Now whether the number is two or 20, what happens prior to the time that number is reached? What is the postmaster supposed to do?
A I would say the postmaster keeps track until it gets to the number that is to be submitted.
Q Do you know whether what you just described is contained in the contract?
A New boxes, yeah, I see it here.
Q Where, tell me, do you see it?
A Adjustments for route extensions, the first paragraph, Exhibit 3.
Q Yes. Well -- okay, I'm trying to find out where, if anywhere, in the contract it says that the postmaster reports when a certain numbers is reached. Is there somewhere supposedly where it says that?
A No.
Q Nonetheless, is that what the Postal Service does?
A Yes, we have a form that the postmaster submits with that information on it.

Q You were asked about the P-5. In addition to whatever the P-5 says, are there other guidelines, policies or procedures with regard to administration of box delivery contracts?

A Yes.

Q Sorry?

A Yes.

Q If you look at Defendant Exhibit 6.

A Okay.

Q Do you have any reason to believe that this was withdrawn or taken out of circulation as of 2003?

A No.

Q So when administering contracts -- by the way, I asked you previously if you considered P-5 to be part of the contract. Do you have an opinion as to whether the P-5 is a binding document that must always be followed to the letter -- do you have an opinion as to that?

MR. CARTER: Your Honor, again I'm going to object, it's the same question that the Court sustained my objection when Mr. Colton was talking to her earlier.

MR. COLTON: Since then, we've had some cross examination, Your Honor, attempting to say that something is a serious --

THE COURT: Wait. Mr. Carter, would you restate your objection?

MR. CARTER: Your Honor, the question that Mr. Colton has asked of Ms. Wofford is the same question that he asked her earlier, she gave an answer and he asked the question again and that's when I stood up and objected that it was asked and answered and the Court sustained my objection. And so again, I guess my objection basically is it's been asked and answered.

MR. COLTON: May I respond, Your Honor?

THE COURT: You may.

MR. COLTON: First, it actually was a slightly different question because -- it was. Second, counsel went into that point and attempted to talk about this document in his cross examination, so he reopened it and what I just asked about her attitude about it is not what I asked before. I did not ask her the words is this binding -- I know I didn't do that.

THE COURT: You didn't ask her -- if he went back into the area again doesn't reopen the door for you to ask the same question again. So are you saying this is a different question?

MR. COLTON: Yes, I am saying that it's a different question. I asked something about other understanding, but I'm asking now whether she considered this particular document binding. That's my recollection, Your Honor, and I'm getting so tired, I can't do better.

THE COURT: Your question was whether or not she --

MR. COLTON: Considers it to be binding.

THE COURT: -- considers this to be binding.

MR. COLTON: P-5, uh-huh.

THE COURT: I'll allow it. Answer the question, please.

BY MR. COLTON:

Q Do you consider, Ms. Wofford, the P-5 that's been identified to be binding as instruction of what you must do?

A No.

THE COURT: Mr. Colton, do you have much more?

MR. COLTON: No.

THE COURT: Because we're going to --

MR. COLTON: I think I may be done.

(Brief pause.)

MR. COLTON: Nothing further.

THE COURT: Thank you.

MR. CARTER: Ms. Wofford, very quickly with regard to that last question. If you would turn to Defendant's Exhibit 4-B page 2, this is the front page of the Highway Contract Routes Box Delivery Service. And as I understand it, you believe that despite the language in paragraphs A and B and that it's on the internet, that this is not binding upon you.

THE WITNESS: When you say binding, are you meaning

as part of the contract?

MR. CARTER: As part of the contract.

THE WITNESS: As far as I know, this is not part of the contract.

MR. CARTER: But is it binding upon you as a contracting official to follow these rules and regulations?

THE WITNESS: I can refer to it.

MR. CARTER: Okay. Is the contract entered between the Postal Service and Mr. Keeter binding?

MR. COLTON: Your Honor, first I object and second, there's a line of cases on this point about the effect of documents like this. The witness has stated her view. Anything beyond that is argument.

THE COURT: Mr. Colton, you opened this door. Let me finish, please, sir. You opened this door again, and so I'm going to allow Mr. Carter the leeway to ask his question as to whether or not the witness felt that P-5 -- that the document was binding upon her or not.

MR. COLTON: That was not the question he asked.

THE COURT: Right, and what was your second --

MR. CARTER: My follow up question was does she believe that the contract entered between the Postal Service and Keeter, Inc. is binding.

THE WITNESS: Yes.

MR. CARTER: Judge, I have no further questions.

MR. COLTON: No further questions.

THE COURT: Just under the wire, okay, because we have to let the court reporter out before 5:30, so we will reconvene tomorrow morning at -- counsel, input. Do you want 9:00, 9:30, what's your preference?

MR. COLTON: I vote 9:30 and sleep in a little bit.

THE COURT: Mr. Carter.

MR. CARTER: My preference would actually be 9:00, the earlier the better, but I will defer to Mr. Colton's 9:30 if that's agreeable with the Court.

MR. COLTON: Your Honor, if you prefer earlier, I'll do it.

THE COURT: We will reconvene tomorrow at 9:15.

(Laughter.)

THE COURT: Court is adjourned.

(Whereupon, the proceeding was adjourned at 5:25 p.m., to reconvene at 9:15 a.m., on April 24, 2008.)

//

//

//

//

//

//

//

UNITED STATES COURT OF FEDERAL CLAIMS

REPORTER'S CERTIFICATE

I, Peggy J. Warren, reporter, hereby certify that the foregoing transcript consisting of 264 pages is a complete, true, and accurate transcript of the testimony indicated, held on April 23, 2008 at Little Rock, Arkansas

In the Matter of: EDWARD KEETER & KEETER TRADING CO., INC. v. UNITED STATES

I further certify that this proceeding was recorded by me, and that the foregoing transcript has been prepared under my direction.

Date: May 17, 2008

________________________________
Peggy J. Warren
Official Reporter
Heritage Reporting Corporation
1220 L Street, N.E.
Washington, D.C. 20002