# UNITED STATES
# COURT OF FEDERAL CLAIMS

EDWARD KEETER and )
KEETER TRADING COMPANY, INC. )
)
Plaintiff, )
)
v. ) Docket No. 05-243C
)
THE UNITED STATES )
)
Defendant. )

Pages: 267 through 397

Place: Little Rock, Arkansas

Date: April 24, 2008

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| EDWARD KEETER and | ) | |
| KEETER TRADING COMPANY, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 05-243C |
| | ) | |
| THE UNITED STATES | ) | |
| | ) | |
| Defendant. | ) | |

Courtroom 8-D
U.S. Courthouse
500 W. Capitol Avenue
Little Rock, Arkansas

Thursday,
April 24, 2008

The parties met, pursuant to the notice of the Court at 9:20 a.m.

BEFORE: HON. LYNN J. BUSH
Judge

APPEARANCES:

For the Plaintiff:

CHRISTOPHER O'HARA CARTER, Attorney
P.O. Box 300
Yellville, Arkansas 72687
(870) 449-2100

For the Defendant:

DOUGLAS J. COLTON, Attorney
U. S. Postal Service
475 L'Enfant Plaza SW, Room 6323
Washington, D. C. 20260-1127
(202) 268-6408

C O N T E N T S


| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Plaintiff: | | | | |
| Mark C. McCague | 278 | 290 | 311 | 327 |
| Eracio Nunez Rodriguez | 336 | 341 | 370<br>383 | 375<br>385 |
| Edward Keeter (recalled) | -- | 391 | -- | -- |

| EXHIBITS: | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| Joint: | | |
| 1 - Handbook P-5 | 396 | 396 |
| 2 - Contract (to be later provided) | 396 | 396 |

P R O C E E D I N G S

(9:20 a.m.)

THE COURT: Back on the record.

Mr. Carter, are you ready to present your next witness?

MR. CARTER: I am, Your Honor.

Mr. Colton and I were talking earlier. Doug, do you want that?

MR. COLTON: Your Honor, both Mr. Carter and I came to conclusion in preparing the exhibits that we didn't need to include contract. Whether or not it was a good judgment or a bad judgment, out to have been an inconvenient judgment, because Your Honor has be about matters that are in the contract and the witnesses have been t

Would Your Honor like a complete -- I will submit one.

THE COURT: The two of you actually read my mind because was one thing I was going to request, was a complete set -- a compl And I think it would also be helpful to have the complete handbook effect at the time of the contract for Mr. Keeter.

MR. COLTON: I believe the one that is there may be comple it isn't, I'll make sure you have one.

THE COURT: Okay.

MR. COLTON: I believe I put the whole one in in the appe motion for summary judgment, but if not, absolutely. As to the com what we think of as the complete contract printed out is more than

These contracts incorporate, for example, wage and hour laws, anoth pages. There is boilerplate and things that are attached by refer printed them all out, hundreds of pages, all the terms and conditio clauses that in this case are about 100 pages total, and I would pro that.

THE COURT: Now the items, the provisions that are incorpo reference, because the Postal Service is so unique -- if it was a r would assume that I'd be able to find it in the FAR, but I take it here.

MR. COLTON: Not in the FAR.

THE COURT: Correct. Okay, so what I would request then counsel be sure that there are no really relevant provisions that a by reference but that are not included. If they are incorporated b attach those.

MR. COLTON: I will consult with Mr. Carter and we will ag know, you do not need the Walsh-Healey Act.

THE COURT: I agree, that's fine. And I'm very glad that you mentioned that because, again, it saved me the trouble because going to be something before we ended trial that I would have reques

MR. COLTON: We were talking about it as if it was there wasn't there. We'll take care of it, Your Honor.

THE COURT: Thank you.

MR. CARTER: Your Honor, in my defense, the Court recalls

a conference call in February and I indicated oh, there'd probably hundred pages, in part because the contract was amended a couple of was just wanting to include all three of them to make it complete. made it quite clear that that was way, way too much and so obviousl pare down and the Court had indicated a lot of this stuff was alrea anyway. And actually, I had assumed the full contract was in the looking through that, I'm not sure that we attached at any time the

MR. COLTON: In the appendix to the motion for summary juc I do not know whether that is considered in evidentiary terms, it's times in Your Honor's opinion from last summer, but it's a different So I think it would be easier just to provide it again.

MR. CARTER: Your Honor, I think it would probably just b then if we just incorporated into this hearing all the attachments the motion for summary judgment.

THE COURT: Now I want to be sure, because I didn't recal contract itself, you know, the major part of the contract itself Defendant's appendix. Is it?

MR. COLTON: Well, Your Honor, I was looking at the opini it's cited to frequently. I couldn't imagine a summary judgment without including the contract.

THE COURT: Well, no, but not all of it. You may have i pertinent provisions, but not necessarily all of it.

MR. COLTON: I believe, because this is how I traditional

include about 100 pages and I leave the Walsh-Healey, the Service C
that thing, out. However, I intended last night to look but I didn
computer.

THE COURT: Does either counsel have that document here?

MR. COLTON: Mr. Carter has it with him.

THE COURT: That's fine.

MR. CARTER: Let's see.

MR. COLTON: The terms and conditions that are referred to
least on pages 55 to page 83 --

THE COURT: You really don't need to go through that now.
would like to do if it is agreeable to counsel is to leave it that
about in terms of the "contract" is indeed in the government's app
motion for summary judgment, then fine, you will agree that we wil
that as another -- for purposes -- as a trial exhibit here, that you
trial exhibit.

If not, then you will submit it.

MR. COLTON: Absolutely, Your Honor.

THE COURT: Is that agreed?

MR. COLTON: We'll get a letter to you next week.

MR. CARTER: That is agreeable, Your Honor.

THE COURT: Okay, that's wonderful.

MR. CARTER: Just in case anyone has a question on it, I c
book.

(Mr. Carter and Mr. Colton confer.)

MR. COLTON: I'm sorry about the sidebar, but it seems efficient.

THE COURT: That's fine.

MR. CARTER: Your Honor, I have the actual booklet.

THE COURT: What is this?

MR. CARTER: The P-5, the Highway Contract Routes Box Del Service from July of 2001, that we were discussing as part of Plaint -- excuse me -- Defendant's Exhibit 4-B. And the Court was a litt whether we have the whole thing. And this is the whole thing inclu intentionally left blank provisions.

MR. COLTON: Your Honor, I personally copied that and I le this page is intentionally left blank, but they are otherwise ident objection to this being received.

THE COURT: I would like to have it if that's a copy that be willing to give up.

MR. CARTER: Since I discovered I can get it on the inter willing to give it up.

THE COURT: You have it marked as Plaintiff's Exhibit --

MR. COLTON: Your Honor can cross that out, I don't care doesn't worry me, however you wish to deal with it.

THE COURT: Well, let's admit this into evidence as -- le will we mark this?

MR. COLTON: Joint 1?

THE COURT: You're brilliant.

MR. CARTER: I would never do that unless the court repor sticker that said Joint.

THE COURT: Joint Exhibit 1. Well, the only problem is th have a copy for the court reporter, but --

MR. CARTER: Judge, I can solve that problem.

THE COURT: Oh, okay.

THE REPORTER: I have some stickers that don't say anythi can write on it what you want to call it.

THE COURT: Then let's admit this as Joint Exhibit 1 so we it confused with the portions of it that are already included. Now to both counsel, that that is what we will do, is to mark this as that it isn't confused with the portions that are included in -- wh

MR. COLTON: It is Defendant's 4-B in the current book of

THE COURT: Now is 4-B the entirety of this?

MR. COLTON: Except for the pages that say this page intentionally left blank, it is supposed to be. But I think havin makes it --

THE COURT: Easier by reference. Well, if the entirety c 4-B, then we could leave it as such and I would just take this for e if that is acceptable.

MR. COLTON: If we could just check at the break, it'll ta

30 seconds just to flip through. I am 98 percent sure it is compete

THE COURT: All right, well, let's hold off and during

address this issue and when we come back, we will make a final dec

how to deal with this. So we'll leave it unresolved for the moment.

MR. COLTON: With regard to the contract, I would propose

be Joint 2 as opposed to just relying upon and pointing to the summ

papers; if Mr. Carter and I agree to one for your purposes, could we

Joint Exhibit and then pick a number?

THE COURT: We'll know better by the end of trial and wh

submit it, then you two agree upon what you want to call it and subm
it doesn't matter to me, just as long as I get it. Okay, thank you.
MR. CARTER: Your Honor, all that is fine with the Plaint

our next witness, we would call Mark C. McCague.

THE COURT: Good morning. Will you state for the record

name?

MR. MCCAGUE: Mark Charles McCague.

THE COURT: McCague.

MR. MCCAGUE: Yes, ma'am.

THE COURT: Raise your right hand.

Whereupon,

MARK CHARLES MCCAGUE

appeared as a witness herein and, having been first duly sw
examined and testified as follows:

THE COURT: Thank you, Mr. McCague. Please be seatec

DIRECT EXAMINATION

BY MR. CARTER:

Q Mr. McCague, if you would, tell the Court where you

how you're employed.

A I live in Rockwall, Texas, I'm employed by the Unite

Postal Service.

Q And how long have you been employed by the United St
Postal Service?

A In June, it'll be 31 years.

Q And what is your -- if you would, just give us a bri
what you've done for the United States Postal Service in thos
A Oh, I started as a clerk in Binghampton, New York, w

received my four year degree from the State University of Ne Binghampton. I started my employment after college. I was craft for five and a half years before I received my first o

promotions to supervisor of mails. That's m-a-i- l-s, not m-

Q I was going to ask that.

A I became a manager of what was called a hasp (ph.), w

for all intents and purposes a truck terminal. In 1995, I

opportunity to work in Dallas on detail in the Southwest Are

Network Office where I was promoted in 1996 to contract tran

specialist.

In January of 2003, I was promoted to senior contr

transportation specialist, which is in effect the contract

representative and in August of last year, 2007, I received a

level promotion to senior contract transportation specialist

Q So in 2003, 2004, you were a senior contract speciali

A Yes.

Q And Jeanette Wofford, she would have worked under yo
that correct?

A She was part of the team, yes.

Q Okay. We've heard some discussion of the team. Cou
describe what the Postal Service means when they refer to the

A Certainly. There were three people on the team --
Price, Jeanette and myself as the team leader -- handling th
Oklahoma and Arkansas. It was geographically divided up.

person had approximately 175 highway contract routes. A c

proportion of that was box delivery routes and the remainin

would be transportation routes. And I provided technical gu

assistance, along with doing my current responsibilities whi

solicit highway contracts, recommend to the contracting offi

highway contracts, economic adjustments, service change adju

renewals and anything else that was required to contractuall

a highway contract.

Q Okay. With regard to the team concept, if a bid p

came in on a contract, did all three of you review it or did

review it? How did that work?

A Generally, the specialist who handled the area open

sealed bids, ranked them according to bids and recommended a
the lowest responsible responsive offeror. If I concurred
decision, it was presented to the contracting officer for ex

would recommend to the contracting officer.

Q Okay. And in terms of the team concept, if a bid ca

it was in Jeanette Wofford's area, she would put them togethe

recommendation to you. Russell is not really involved in tha

A No, he wouldn't have been I believe, no.

Q Okay.

A I mentioned him because he's part of the team.

Q And I'm still confused. He's part of the team, but more like a hierarchy to me than a team concept.

A As I said, the state of Oklahoma and Arkansas was bro

geographically where each specialist would have approximate

routes in a particular geographical area of either Oklahoma o

Q With regard to then Jeanette and Russell, what woul
confer on or deal with together?

A I'm not sure I understand the question. They're equa

Q I understand that, but it seems to me that if a situ
or something needed to be approved, Jeanette would go to y
Russell would go to you, but they don't confer together or co

with you.

A They may -- you know, they may talk amongst each othe

Q Okay. Between July 1 of 2002 and December 31 of 20

with regard to Jeanette Wofford and anything she would have, have any connection with it at that time, did you?

A I believe I did.

Q I understood you to say that in January of '03, you b
senior contract specialist. Did you deal with Jeanette prio
the senior contract specialist?

A As a contract transportation specialist, yes.

Q Okay. What is the difference between --

A Unless I'm mistaken about my promotion. I mean ther

been many and it may have been 2002. Unfortunately for the didn't bring my resume with me.

Q Let's go to 2003, during the year of 2003, were you

any problems involving contractor Keeter, Inc. in the state c

A It was brought to my attention, yes, by Jeanette.

Q In 2003?

A It was brought to my attention.

Q In 2003.

A It was brought to my attention. This contract was a

2002?

Q Yes.

A Okay.

Q And when it was first brought to your attention, do
the discussion that you had with Jeanette?

A I believe it was over the 52 boxes. Of course, bei

courtroom for seven and a half hours yesterday refreshed qui
my memory.

Q That's the purpose of my not asking for the rule,

people can get the whole picture.

Do you recall -- it was over the 52 boxes, do you re

was discussed between you and Jeanette?

A Summarizing -- yes, that the postmaster, acting as administrative official, wanted to make changes and one of t involved Mr. Keeter's route with the en route box increase of

Q And did Jeanette explain to you how she arrived at th
changes that she put in Mr. Keeter's contract?

A I believe she did.

Q And as a senior contract specialist, you were aware

not in accordance with the contract, were you not?

A That is not correct.

Q How was it in accordance with the contract?

A It was an en route box increase, it was in accordanc
contract.

Q Okay, can you explain to me how it was?

MR. COLTON: Your Honor, I object that this require witness to argue on the contract. What the witness believed

but the question calls for him to argue from the contract.

THE COURT: Sustained to the extent that, counsel, should ask him what he believed.

BY MR. CARTER:

Q You believed that it was in accordance with the contr

A I do.

Q Okay. Can you tell the Court why the en route for
contained in the contract and in the P-5 Highway Contract R
Delivery Service did not apply?

A It was not recommended by the administrative official

Q Okay. And ultimately did you have a telephone conve
with Ed Keeter?

A Yes.

Q Is that the only time that you talked to Ed Keeter?

A I really don't recall speaking to him any other time

may have.

Q And do you recall ever writing a letter to Ed Keeter?

A I do not recall.

Q If you had written a letter to Ed Keeter, it would
Keeter's file at Dallas, would it not?

A If I had written a letter.

Q It would be in the file.

A It may be, yes.

Q Okay. Well typically it should be.

A Is that a question?

Q Yes.

A Typically it should be.

Q In your conversation with Mr. Keeter, you indicated
recall what you told Mr. Keeter?
A I -- verbatim, I do not.

Q Okay. Do you recall telling him that he could put hi
in writing?

A I may have said that.

Q And do you recall telling him it should come from yo
from a lawyer?
A I may have said that.

Q Why would you have said that to him?

A Because we wanted it in his writing.

Q Why?

A It was my requirement for him to paint it, to have hi
on it, to know that it was his wishes and not an attorney's w

Q If -- did you ever see the letter -- prior to Februa

did you see the letter that Mr. Keeter wrote, which is Defen
Number 7?

MR. COLTON: I object. He's asking him whether he s

before it was written, prior to December 20, 2004? Isn't th
letter bears?

THE COURT: Mr. --

MR. CARTER: I said February 20, 2004.

THE COURT: If the dates are incorrect, then the wit

answer whether or not he's seen it --

THE WITNESS: I'm not sure I can find the letter.
reviewed thousands of letters, just so you understand why --

THE COURT: What exhibit are you referring to, Mr. Ca

MR. CARTER: Defendant's Exhibit 7.

THE WITNESS: I may have seen this.

BY MR. CARTER:

Q Okay. Do you recall my taking your deposition in Oc
2007?
A Yes.

Q And I believe we took that deposition on October 16 o

A Sounds about right.

Q And do you recall my asking you -- page 12 -- that "

here today on October 16, 2007, do you understand what Kee
Trading, Inc.'s position is with regard to why they refused
52 boxes." Do you recall what you told us?

A I do not.

Q You indicated no, you didn't understand what Keeter's was.

MR. COLTON: There is an objection at that point. I
on the record -- should I state my objection now?

THE COURT: Repeat what the question was, Mr. Carter.

MR. CARTER: The question was "As we sit here on Oct

16, 2007, today, do you understand why Keeter, Inc. refused

those 52 boxes?"

MR. COLTON: I request that the question be read exa
it was asked, because that's why I objected.

THE COURT: Well, what is your --

MR. CARTER: Okay, "As we sit here today on October 2007, do you understand what Keeter Trading, Inc.'s positio regard to why they refused to deliver the boxes."

MR. COLTON: My objection was ambiguity at the time
the term position. I don't want him to be impeached by som
that's my stated objection.

THE COURT: Are you currently stating your objection?

MR. COLTON: No, Your Honor, I wanted to make sure

well, I do believe that the statement position, he asked di

what the position was. I want to be sure that the witness u
the term position. The reason, justification, what he was
that's what it regarded. Again, with that stated, --

THE COURT: Okay, I understand the background now.

Mr. Carter, would you simply put your question to th

and we'll go forward.

BY MR. CARTER:

Q I asked you that -- well, as of October 16, 2007, tl

had been three plus years, did you understand on that day wha

position was, why Keeter, Inc. did not deliver those 52 boxes

A Did I understand why he didn't want to deliver them?

Q Yes.

A I did not understand why.

Q Okay. In this particular case, if 52 boxes were go
added to the route, how was the increase in compensation calc

A Mr. Keeter was given the formula ultimately.

Q Okay. Again, in your deposition, did you not state

particular case, we took the document that the postmaster su

valid requirements and implemented them."

A Is that a question?

Q That is a question. The question is did you say tha

October 16, 2007?

THE COURT: Why don't you read into the record, Mr
McCague, the question and your response. Show him where it

let's go from there.

THE WITNESS: Would you like me to read it, Your Hono

THE COURT: Into the record.

MR. CARTER: Lines 2 through 8.

THE WITNESS: Question by Mr. Carter: "Okay, let me go back and ask a question. If 52 boxes are going to be ad

route, how is the increase in compensation calculated?"

"In this particular case, we took the documents th

postmaster submitted as valid requirements and implemented th

BY MR. CARTER:

Q "In this particular case", that was your response, beginning with "In this particular case".

THE COURT: You didn't differentiate between where question ended and where your response began, I think is wh saying.

MR. CARTER: That's what I'm asking.

THE COURT: When you read it into the record.

THE WITNESS: My answer: "In this particular case, the documents that the postmaster submitted as valid require implemented them."

BY MR. CARTER:

Q During the time between May of '96 through the end o you dealt with contracts, did you not?

A Yes.

Q Did you ever become involved in a contract carrier argued with you and told you I am not accepting this change major change pursuant to my contract?

A Mr. Keeter.

Q Mr. Keeter is it?

A That's all I recall.

Q And --

A There may have been others.

Q Typically at any one time, you yourself were control contracts and then between, I guess starting in January of 2 were approximately 510 or so that you would be in charge o administering yourself.

A More than that, yes.

Q Well, I'm taking the 175 times three and I think if 525, approximately.

A (The witness nods.)

THE COURT: You have to -- when you give your respon you've got to state it.

THE WITNESS: Yes.

BY MR. CARTER:

Q Do you ever recall telling Mr. Keeter that he was g deliver the boxes and it didn't matter what he thought?

A I may have said that.

MR. CARTER: I believe those are all the questions I Your Honor.

THE COURT: Mr. Colton.

MR. COLTON: I found, Your Honor, last night the set should have had, the exhibits, Defendant's exhibits, the one not remember to bring. I knew they were there someplace.

CROSS EXAMINATION

BY MR. COLTON:

Q Mr. McCague, as of the time of the events we've be discussing regarding Keeter, Inc., you were supervising, in Wofford?

A Yes.

Q Would you take a look at Defendant's Exhibit Number you have that before you?

A Yes.

Q Does that bear your signature?

A That is mine.

Q What is this document called?

A This is a 7440, it's a contract route service order.

Q What is the function of a route service order?

A To make changes to a contract, to make economic adjustments to a contract, to make one time payments to a co do any of the administrative changes to a contract, the supp address, telephone number. Anything that changes the contra original award or makes economic adjustments from the contrac

Q I was just trying to get the general function, you'v that.

A I'm sorry.

Q Was this document prepared for your execution by M Wofford?

A It was.

Q Do you remember if, at the time she presented it to
had any specific conversations as to how the result on that
had been determined or derived? Just do you remember if yo
conversations.

A Yes.

Q Do you remember the conversations themselves?

A Not specifically. I could summarize.

Q Okay. Is it your belief that you discussed with h
document before you signed it?

A Absolutely.

Q Do you remember whether or not you were aware at the
you signed it that the amount of money that it ordered be p
contractor was not calculated using the formula for in line
that we've been discussing?

A I was aware.

Q You were aware. Being aware that that was the case,
tell Ms. Wofford that there was anything wrong with what she

A There was nothing wrong with --

Q No, did you tell her? Did you say to her, can't do t

A No.

Q Did you think there was anything wrong with the way
done it?

A No.

Q Would you take a look at Defendant Exhibit Number 6. I know you've seen this document because obviously I've talked about it. Do you know whether you had seen this document as of the time you signed that route service order on December 24, 2003?

A I don't recall specifically.

Q Well, do you have a belief as to whether or not you had then?

A I may not have seen it.

Q Okay. As of December 24, 2003, did you have a belief as to whether or not the formula was mandatory in a situation such as you were dealing with, the application of that formula was mandatory? Did you have a belief as to that?

A The application of the formula was not mandatory.

Q Well, the answer is you had a belief and the belief was --

THE COURT: You can't -- don't -- wait. I want you to be careful in your repeating back because you seem to be adding to it.

THE WITNESS: I'm trying very hard not to --

MR. COLTON: It's because he answered two questions at once and I wanted to be sure.

THE COURT: Okay, then go back and divide the question back up.

THE WITNESS: I'm a little confused, so --

BY MR. COLTON:

Q Did you have a belief about whether or not it was ma to use the formula. Just did you have a belief.

A I did have a belief.

Q What was that belief?

A That the formula was not mandatory, it was merely guideline.

Q Can you tell the Court if you had not seen Defendant 6, which you said you may not have by that date, how you wou known or come to the conclusion that application of the form mandatory?

A Through the years of training and talking to people office, the formula was not mandatory. That's my belief anc training, the way I learned through the years. Hopefully I question.

Q Was that based on your own determination of what pc was? That is, did you decide that or did you understand it other source?

A I understood it to have some other source.

Q Did you know where that came from originally?

A Just past practice.

Q Do you recall if at some point in late 2003 or early Wofford asked you to speak with Mr. Keeter concerning the 52

boxes on that route?

A Yes.

Q Do you remember specifically why she wanted you to s
with Mr. Keeter?

A Yes.

Q Why did she ask you to? That is, not what was in he
but what she said to you as to why she wanted you to speak wi

A To summarize, it was to kind of break the impasse be
Mr. Keeter not delivering the boxes and for me to assist in
that he was responsible for delivering those boxes.

Q What was your understanding of what the impasse was?

A My understanding was money.

Q And do you recall why you thought it was about money?

A Because the formula was not applied.

Q Well, did Ms. Wofford give you any information about
Keeter's position was? If you remember now.

A I can't recall specifically.

Q If you don't recall. Did you speak with Mr. Keeter?

A I believe once.

Q Do you recall what was said by either of you in
conversation?

A Not specifically, although -- not specifically.

Q What -- do you have sort of general recollections of

what? Do you recall what Mr. Keeter said to you about servi
boxes and why he was unhappy?

A I believe he was adamant that he was not going to
delivering those boxes.

Q Did he say it was because of the money?

A He may have.

Q Do you remember?

A I don't remember.

Q Do you remember what you said to him?

A Not verbatim but I advised him to deliver those boxes

Q Okay.

A It was required.

Q Do you remember if there was any conversation abou
application of the formula?

A I don't recall.

Q I think you've testified -- did you recommend that M
submit something in writing?

A Yes.

Q Why did you tell him to submit something in writing?

A So we could have a written document as to what his
was, as to what the Postal Service allegedly had done wrong.
know that the Postal Service did nothing wrong, but --

Q Just respond to the question, please.

A Okay.

Q In your dealings with other contractors, have any contractors raised complaints -- not this same complaint, si complaints or grievances with you?

A Oh, yes.

Q Have you ever instructed them to submit their griev writing?

A Oh, yes.

Q Is it standard policy to request that it be stated grievance?

A Yes.

Q Was Mr. Keeter in this regard, that is requesting h complaint in writing, treated any differently than any othe would be?

A No.

Q You testified that you may have said you do it and p a lawyer. You think you may have done that, is that correct

A Yes.

Q If you did that, would you have done it for the pur keeping him --

THE COURT: Mr. Colton, now you've asked the questi before and you're not letting him testify. You know, if yo your purpose have been blah, blah, blah. I would apprecia

would be a bit more careful about how you're phrasing your (
because I don't want so much your testimony and him affirmi
opposed to ask the question and let him answer it.

MR. COLTON: If I might, Your Honor, I've got these
out word for word precisely to keep them as narrow and make
no. But in this instance, I can provide--

THE COURT: It's a bit unusual because although Mr.
has called this witness, he's more of a government witness t
reality --

MR. COLTON: I understand that.

THE COURT: So I just simply ask you to be a bit m
mindful of the phrasing of your questions and not have it s
your testimony.

MR. COLTON: It hasn't been objected to. I am aware
and I'm trying not to lead, but rather I'm trying to get th
respond to something and not to tilt him one way or the other

THE COURT: Proceed.

BY MR. COLTON:

Q Have you ever, in dealing with any other contract
requested or instructed that the contractor not use a lawyer
grievance?

A No.

Q Do you know why you decided to do it in this instance

A I just wanted it in his handwriting to see what his
were.

Q Okay. Do you know whether he subsequently submitte
response to your request that he put it in writing?

A Yes, he did.

Q We've had some conversation about that. Did you tak
letter seriously?

A Yes.

Q Do you recall if anything was done by the Postal Ser
consequence of or in response to that letter that Mr. Keeter

A Yes.

Q Did you play a role in whatever was done?

A Yes.

Q Do you know if after that letter was received, the a
compensation to be paid for those 52 boxes was increased?

A Yes.

Q Did you approve the increase?

A Yes.

Q Did the suggestion for the increase -- was it presen
by Ms. Wofford?

A Yes.

Q Do you remember if she provided an explanation of wh
was suggesting that increase?

A In the interest of fairness --
Q It's a yes, no question. Did she give you an explana
A Yes.
Q All right. Do you recall what her explanation was?
A It was to -- after reviewing the letter -- to give Mr
he was requesting for, to make him whole.
Q Now did you understand that what he was requesting --
your belief at the time -- this was it, that what was given
wanted?
A Yes.
Q Did you believe that if that was provided, he would
to service those boxes?
A I thought so.
Q Had he said anything to the contrary that you can rem
A Not that I can remember.
Q As of January of 2004, were you authorized to order
deductions be made from a contractor's or supplier's pay fo
under any circumstances?
A Yes.
Q Under what circumstances were you authorized to orde
there be a deduction?
A Omitted service, which, Your Honor, means a supplier
all or part of a day. That would be one example.

Q Okay. As of January of 2004, had you in fact author
a deduction be made for omitted service from a contractor o
Keeter, Inc.?

A Absolutely.

Q Was this an event that was -- at one end of the spe
would be really rare and at the other end of the spectrum wo
common? I'd like to know how often this sort of thing comes

A More often than it should.

Q Either in terms of percentages or frequency, some id
routine it is.

A It was somewhat common.

Q When you would order a deduction for omitted service
would the amount of the deduction be calculated or determined

A Well, it could be done in a couple of different ways
would be to take the miles times the rate per mile and make
deduction, or if there were damages to the Postal Service,
amount of those damages could be deducted from the supplier.

Q When you used the term damages to the Postal Service
did you mean by that?

A Not getting the services that we contracted for.

Q Well, if there has been a failure to operate, does t
you're not getting the services?

A Not from the supplier.

Q If you don't get the services, why aren't all failur
in the category you just described of damages?

A Some are chargeable, some are not chargeable.

Q What's the difference?

A Non-chargeable would be where, although the supplier
operate, there may be an act of God or some extenuating circ
that prevented the supplier from carrying out his contractual

Q In those instances where damages to the Postal Ser
occurred, how would you determine the amount of damages, w
information was you rely on?

A Most likely it would be from the administrative offic

Q What nature of information, not the source but what w
be trying to find out?

A Why the service was omitted and what the cost was.

Q How would you know -- not from whom, but what inform
would provide you the cost?

A It could be a letter from the administrative officia
PS Form 5500.

Q I'm trying to find out the information, not the tech
takes. What information is, in your view, cost?

A The cost of overlaying service when the original ser
provided.

Q Overlaying service means what?

A Another contractor or perhaps a Postal employee has t
transport mail or deliver mail.

Q In the case of --

A Or sort mail.

Q I see. In the case of another contractor, you mean
who doesn't work for the Postal Service as an employee. Is
you meant? You said another contractor.

A Correct.

Q And you also said if it's a Postal Service employee
mean someone who worked at the Postal Service who performed
duty?

A An employee of the Postal Service, yes.

Q In that instance, what is the cost to the Postal Ser
incurred that you would charge?

A Generally, it would be their hourly rate because th
taken away from their duties as a Postal employee to perform
that really falls outside of what they're supposed to be d
day-to-day basis.

Q Would the money that was deducted from the supplie
contractor's pay in that instance, because a Postal Service
had to provide the service, would that money then be paid o
Postal Service employee who actually delivered that mail?

A Oh, no. It would not be paid to the supplier.

Q Do you recall authorizing deductions from the pay to
Inc. at any time?
A Yes.
Q Do you recall when?
A It was sometime after he stopped delivering the boxes
Q Was that the -- was the failure by Keeter, Inc. to d
boxes the reason that you made the deduction?
A Yes.
Q And we've all heard it, who was providing the service
A As far as I know, the postmaster Linda Orr went out
delivered the boxes.
Q Are you familiar with the records that she submitted
costs that were incurred to provide that service? Have you s
A Yes.
Q Was there anything out of the -- not out of the ordi
there anything inappropriate from your standpoint in the way
documented what she did?
A No.
Q Do you believe it was her duty to submit that informa
A Yes.
Q Was it her duty to submit that information every day?
A Not every day.
Q Was it her duty to submit it for each day that was mi

A Yes.
Q And within what time frame?
A A reasonable time frame.
Q Weeks, months, years?
A A week.
Q Relatively close to the time of the event?
A Yes.
Q Has anything up to today caused you to believe that those charge documents that she submitted, whatever we call inaccurate?
A No.
Q Was the purpose of deducting money from any supplier didn't operate to coerce a supplier into performing?
A No.
Q What was the purpose for deducting the money?
A To make sure that the Postal Service remained whole damages that it suffered.
Q Specifically with regard to Keeter, Inc., when you a those deductions, was it your intention to coerce Keeter i something it didn't want to do?
A No.
Q Have you ever done anything in your professional ca with the Postal Service that was intended to harm Keeter, Inc

A No.

Q Have you ever taken any action with regard to Keete
based on a personal dislike of Keeter, Inc. or Mr. Keeter pe

A No.

Q Did Jeanette Wofford ever do or say anything that ca
to believe that she wanted to harm Keeter, Inc.?

A No.

Q Did Mr. Wofford ever say or do anything that caused
believe that Linda Orr wanted to harm Keeter, Inc.?

A No.

Q Did you ever speak with Linda Orr yourself regardin
events, the 52 boxes?

A I may have with Jeanette, I don't specifically recal

Q Okay. Did Linda Orr do anything or say anything th
heard or read that caused you to believe that she wished to
Inc.?

A No.

Q In general in your duties, when you issue any order
authorized to issue, do you take into account in deciding wh
to do so, recommendations provided to you by any other perso

A Yes.

Q Particularly do you rely upon recommendations made
Postal Service personnel?

A Yes.

Q And most particularly do you rely upon recommendati made by the contract specialists who are members of the sam that you're a member of?

A Yes.

Q Over the years, have you relied upon Jeanette Wofforc

A Yes.

Q Have you formed an opinion as to whether she does th that what she says is reliable?

A Yes.

Q And what is that opinion?

A What she says is reliable and trustworthy.

Q Do you have an opinion as to whether or not Ms. Wof makes recommendations based on what she believes is in the interest of the Postal Service?

A Yes.

Q And what is your opinion?

A That she makes recommendations that are in the best of the Postal Service.

Q When you signed the route service order on December 2003, did you consider that route service order to be in the of the Postal Service?

A Yes.

Q Do you have any knowledge as to whether or not as December of 2003, Linda Orr had made her recommendations on basis other than what she thought was the best interest of Service? It was a convoluted question. I'm asking for info you have any information that caused you to believe that recommendations were based on anything other than the best i the Postal Service?

A No.

Q Were you involved in the decision to terminate Keete default?

A I was involved in the recommendation to the contra officer, yes.

Q Did you have any conversations with the contracting before the termination was signed?

A I believe I did.

Q Do you recall that?

A I don't recall them specifically.

Q Has Mr. Rodriguez -- Mr. Rodriguez is the contractin is that correct?

A He is.

Q By the way, who is Johnny Lott?

A Johnny Lott is another senior contract transporta specialist.

Q Was he authorized to issue orders or documents that affect Mr. Keeter under some circumstances?

A He may have been if I was out of the office or Mr. R was out of the office.

Q Okay. Has Mr. Rodriguez ever said or done anything t know -- obviously only if you know if it -- that has caused that he wanted to hurt Keeter, Inc.?

A Oh, no.

Q I'm sorry?

A Oh, no.

Q With regard to the manual that we referred to, it's if you would take a look at it, the one that we talked about which is a manual called P-5.

A Uh-huh.

Q If you'll look at 4-B, we'll talk about that.

A Okay.

Q It's 4-B in the Defendant's book. No, that's the Pla It's the big book, Tab B and it's the second part of Tab B excuse me, 4-B.

A It goes from 4 to 5, I don't find --

Q It's part of 4, it's after 4-A, but it's not separate

A I have it.

Q Okay, are you familiar with this document?

A Yes, I am.

Q What is your understanding of the purpose for which document exists?

A It provide a guideline for administering highway con delivery routes.

Q As you understand it, is this document supposed to distributed to contractors?

A No, it is not.

Q Not saying whether or not they can get it. Did it e your attention that anybody in your office in Dallas was providing this document to contractors?

A Yes.

Q Who was that person?

A I believe it was Johnny Lott.

Q And --

A And Jeanette Wofford may have been.

Q Do you recall when you found that out if you took any

A Yes.

Q What action did you take?

A To cease making normal distribution of the P-5 to su contractors.

Q Were you trying to make sure that suppliers did not about what this said?

A No, I was trying to adhere to the distribution that Strange had signed off on.

Q Did anyone instruct you to do that?

A No.

Q Did you consider the P-5 to be a part of the contract

A No.

MR. COLTON: Nothing further.

REDIRECT EXAMINATION

BY MR. CARTER:

Q If you look at P-5 there, page 2, it's the introduc

Who is Keith Strange? I know it says Vice President Purcha

Materials, but do you know who he is, what position he has i

Service?

A He's the Vice President of Purchasing and Materials.

Q And what does purchasing and materials cover?

A It would cover the purchase of goods and services c
United States Postal Service.

Q Okay. And I notice in section D. Questions and comme

to be sent to 475 L'Enfant Plaza in Washington.

A Uh-huh.

Q That's the USPS headquarters?

A Yes.

Q This came from headquarters.

A Yes.

Q And this distribution it to be to all areas, distric
and distribution centers/facilities and administrative offic
pretty much the entire gamut, would it not?

MR. COLTON: Objection, entire gamut of what?

THE COURT: Could you be more specific, please?

BY MR. CARTER;

Q Everyone who would deal with the highway contract rou
delivery service was to receive one of these. Is there anyb
that list?

MR. COLTON: Objection, Your Honor.

THE COURT: I don't see -- I don't think that the

answered the first question that you asked or did you shake

I didn't hear an answer.

THE WITNESS: I didn't think it was a question. I t

was a statement. To me, it didn't sound like a question.

THE COURT: I thought it was a question.

THE WITNESS: Oh.

THE COURT: Okay, go back. Mr. Carter, would you ask

question to the witness, please?

MR. CARTER: The first question used the word gamut, was trying to redefine it.

THE COURT: No, the one after gamut was what I didn'

the response to.

BY MR. CARTER:

Q Mr. McCague, Section B-1 states "This handbook is b
distributed directly to all areas, districts, processing ar
centers/facilities and administrative officials." Wouldn't t

people employed by the United States Postal Service connect

highway contract routes box delivery service?

A Seems reasonable.

Q And Section F. effective date. "This revision is ef
receipt." You agree that that's what the Vice President of
and Materials from headquarters in D.C. sent out and said

effective now.

A Yes.

Q What is your understanding then of the purpose of P-5

A It's a guideline for the administering of highway co
delivery routes.

Q Okay. Would it be fair to say that if there was som

contract that you were unsure of, you should refer to P-5 t
answers that question?

A Yes.

Q Now you indicated in a question that Mr. Colton ask
you did not have any reason to believe that Linda Orr was no
the best interest of the post office.

A Is that a question?

Q Is that correct?

A Is that a question? To me, it sounds like a statemen

MR. COLTON: I object, it was a mischaracterization
question. I know exactly what I asked him.

MR. CARTER: I didn't ask Mr. Colton's question, I a

the response.

MR. COLTON: My question --

THE COURT: Repeat your question, Mr. Carter.

BY MR. CARTER:

Q In response to a question Mr. Colton asked you indica

you did not believe -- you did not have any evidence that Li

not acting in the best interest of the post office, is that c

A Yes.

Q And that she had no animosity toward Keeter Trading

Keeter.

A Yes.

Q But you've seen Defendant's Exhibit 7 where Mr. Ke

specifically accused Linda Orr of doing things to favor Dua because Duane Hoover underbid his contract. You were aware Keeter made that allegation.

A Allegation doesn't mean it's true.

Q But it's at least some indication that maybe she's r

things on the up and up.

A I don't agree.

Q So everything Ed Keeter says is completely and totall
and that's your position.

MR. COLTON: Your Honor, he's arguing with the witnes

A I haven't said that.

MR. COLTON: This is argument, not questions.

THE COURT: Okay, well, Mr. Carter, phrase your ques
more as questions as opposed to argument.

BY MR. CARTER:

Q True or false, you sat in here yesterday and you hea
Mr. Hoover was upset that he didn't have enough time and so
increase.

A I heard it.

Q And he compared his contract and Linda Orr compared contract to Mr. Keeter's contract.

A Bad comparison.

Q But it was done.

A Yes.

Q So that would support what Mr. Keeter was saying.

A Oh, I don't agree.

Q Then when these changes are put in place, you would

with me the formula was not used on Keeter's contract, the c
December 24, 2003 approved by you -- the formula was not use
Keeter's changes.

A The formula was used ultimately. The formula was use

Q On December 24, 2003, the formula was not used on M
Keeter's changes.

A Correct.

Q Nor was the formula used on Mr. Hoover's changes.

A Is that a question?

Q Yes.

A Doesn't sound like a question. Nor was -- it sound statement.

Q Do you agree with that statement then?

A I'd have to see the documents in front of me. I'd h

Mr. Hoover's contract.

Q Okay. You sat in the courtroom and you heard, did y
that he received a $2000 increase by losing 12 boxes and ga
miles.

A There's more to it than that.

MR. COLTON: Your Honor.

MR. CARTER: I understand that.

THE COURT: Wait, wait, wait. What is your objectio

MR. COLTON: My objection is that unless the questio
what he did believe, this is argument about what counsel be

should have believed.

THE COURT: Both counsel have referred and didn't in

the rule of sequestration and have said you heard a prior w

blah, and then ask a question. You've done it, Mr. Carter's objection, Mr. Colton, is overruled. I'm going to allow hi question.

MR. COLTON: May I ask a question?

THE COURT: Yes.

MR. COLTON: Is it permissible in what we're doing i

proceedings to say I know you tell me what you did believe, you have believed something else -- is that -- I'm trying to the relevance is.

THE COURT: The question here is bad faith. You kn
don't see that his question is improper. I've made my ruling
Proceed.

BY MR. CARTER:

Q With regard to the changes for Duane Hoover, the fo

likewise was not applied to his changes.

A I'd have to see the service order in front of me.

Q Mr. McCague, you heard the testimony that he lost 12
and gained 11 miles and had a $2000 increase. You've dealt

contracts enough to know that the formula clearly was not app

A I do not know that.

Q If we add 11 miles times 10.4, that's the formula.

A Uh-huh.

Q One times four is four, one times four is four. That

zero. Add two zeroes, you have 11. I come up with 1144 that

added to the contract.

A I disagree, I would have to see the supplier's cost s

know what his line by line breakdown was before I am able to

question.

Q But this is a simple --

THE COURT: Mr. Carter, he's answered the question

that is going into argument with him. That is his response.

MR. CARTER: Okay.

BY MR. CARTER:

Q You also heard Ms. Orr indicate that she wanted to e
burden on Mr. Hoover, and that was one of her considerations
changes because she felt his route was growing.

A I thought it was to ease the burden on the route a
specifically to Mr. Hoover.
Q Well, Mr. Hoover was the one who delivered the route.

A He was the supplier.

Q If you would turn to Defendant's Exhibit 17, there's

from Ms. Wofford in the upper left hand corner dated 1/27/04

A Uh-huh.

Q That would be prior to your phone conversation wit

Keeter, is that correct?

A I believe so.

Q And the last phrase in there states, does it not, "H
want the change."

A That's what it says.

Q And then if you look at Defendant's Exhibit 7, that

Keeter's letter. On the second page of it, if we look at the

-- not the first full paragraph, but the one that starts on

page, and we go up four lines, did not Mr. Keeter tell the P

--

A Well, I'm lost yet. Which paragraph?

Q That one, the parts that I have underlined.

A I see.

Q Could you just read "In light of"?

A Start from here, "I didn't know Linda was trying to again. Jeanette told me to read my contract."

Q Are you on the first page? "In light of"?

A Oh, okay. "The math just does not work. In light facts, it is clear that this is a major service change." Oh

that. "The proper dollar increase is above $2500, which nee
mutual agreement. She does not have that agreement. She has
to charge me for delivering that mail since her service cha

according to the terms of our contract." I do not agree with

Q But you indicated to Mr. Colton, did you not, that

unaware and you thought it was about money. And Mr. Keeter

writing, not by his lawyer, that he did not want that chang

major change and he didn't agree with it.

A It's about money and it's not a major change. It's

box increase.

Q Okay. And in the last paragraph of this letter, did

out that if Duane Hoover wants money, then he can keep tho

boxes, it's not part of my contract.

MR. COLTON: Your Honor, the document states what i

states.

MR. CARTER: Yes, Your Honor, but Mr. McCague testi
that he thought it was about money and didn't have any indic
Mr. Keeter was not going to deliver the boxes and that mone

solve the problem.

MR. COLTON: I'll withdraw the objection.

THE COURT: Okay. So respond, Mr. McCague.

THE WITNESS: Could you repeat that, Mr. Carter?

BY MR. CARTER:

Q My question is in the last paragraph, he indicates th

Hoover wants more money, Duane Hoover can have those, but th
not part of my contract and I don't agree with it.

THE COURT: That's not a question.

A That's what he says in this letter. Doesn't mean I it.

BY MR. CARTER:

Q But at the very least, the Postal Service was inform
position.

A Yes.

Q And in a response to a question Mr. Colton asked, dic
tell him that in no manner did you believe that you did an
purpose to coerce Mr. Keeter or Keeter Trading to do somethir

not want to do.

A Yes.

Q Yet, Mr. Keeter has indicated I do not want to delive

boxes and are you telling this Court that you believe that t
terminate the contract was not coercion?

A It was not coercion.

Q Threatening to charge him money was not coercion?

A I don't believe it was a threat.

Q Deducting money was not coercion?

A It was in the best interest of the Postal Service.

Q Did you see prior to January 28 or for that matter F

of 2004, any of the PS Form 5500s that Ms. Orr and Mr. Ke

completed?

A I've seen them.

Q Did you see them prior to February 20, do you remembe

A I remember seeing them, I don't recall specifically w

Q And you do not consider those forms coercion?

A I do not. I consider them contract route irregular

are true in nature.

Q And the $95 a day roughly that Ms. Orr believed she

entitled to versus a contract of $3.59 increase per day, you

that was coercion?

A I do not.

MR. COLTON: Objection to the mischaracterization, "I

believed she was entitled to".

MR. CARTER: Your Honor, that's an issue for the Cou

decide because Mr. Keeter testified that's exactly what she s

THE COURT: Okay. Given that is a question of fact
purposes of asking your question to the witness here, you ma
rephrase.

BY MR. CARTER:

Q It was the intent of the Postal Service, especially

Plaintiff's Exhibit Number 20, was it not, to seek reimburse

cost that the Postal Service incurred by having Linda Orr del

boxes?

A Well, there's some words in there I don't agree wit

you repeat the question?

Q Plaintiff -- do you have Plaintiff's Exhibit 20 in fr

A Yes, I do.

Q And it was the intent of the Postal Service to s
reimbursement from Mr. Keeter based upon the cost of having I
postmaster of Yellville, deliver those 52 boxes.

A Right, there was a deduction for damages to the Pc

Service, yes.

Q And that amount is over 25 times more than what the

Service was proposing to pay Mr. Keeter.

A I'm not sure that that math is correct.

Q Well, let's do it simply. On December 24, 2003, th

Service proposed a contract increase for these 52 boxes of $

heard Ms. Wofford indicate that there's roughly --

THE COURT: Is that --

Q That's correct you heard that?

A Yes.

Q And you heard Ms. Wofford testify yesterday that the

303.0 --

A 303.07.

Q -- days in a year.

A If it's a K-7 frequency, yes.

Q Now I said $3.59 a day based upon what Mr. Keeter put

letter. But that would be fairly accurate if we took 1087

303.07, we'd come with a figure of three dollars and some cha

THE COURT: Is that correct?

Q That's correct?

A If you say so.

THE COURT: I would like an understanding of these f

as well, so I want your input and response to this, Mr. McC

you say so is not going to be adequate --

THE WITNESS: Sorry, Your Honor, yes.

MR. COLTON: We'll stipulate to the math.

THE COURT: Okay, thank you.

MR. COLTON: Since we don't have a calculator, I'll with Mr. Carter on that.

MR. CARTER: Well, Your Honor, I've asked the questi

I believe it has been appropriately answered.

THE COURT: I want to hear the rest of the answer.

MR. CARTER: Okay.

BY MR. CARTER:

Q Now the Postal Service roughly was requesting $95 a

Linda Orr's costs.

A That was her request.

Q And those were the figures that were compiled and p

Plaintiff's Exhibit 20.

A Yes.

Q And so that three dollars and some cents versus $9

roughly 25 times and you do not consider that coercion either

A No.

MR. CARTER: No further questions, Your Honor.

THE COURT: Before you go, was the figure of $95 approved?

THE WITNESS: It was submitted by Linda Orr, but it

never actually -- I do not believe we actually made that fu

That was her request.

THE COURT: But there was an amount of four hundred

something dollars I think that was deducted?

THE WITNESS: I believe it was $424.80.

THE COURT: And was that -- how was that divided up

day?

THE WITNESS: I'd have to see the documents in front

but we -- my recollection is we did not make the full deduct

Orr had requested. That's my recollection.

THE COURT: Okay, and you don't remember what the deduction was?

THE WITNESS: I don't. Some numbers have been throw
around. If I could see the 7440, I would know.
MR. COLTON: The amount is in the record, I was act

going to cover this.

THE COURT: Okay, all right, were you finished, Mr. C

MR. CARTER: If Mr. Colton is going to cover it, the

let me ask one additional question.

BY MR. CARTER:

Q The Court asked whether or not you were recovering t

amount, but in 2005, you signed an order which is -- or app

order which is Plaintiff's Exhibit 20 in which the Postal Se

and decided here is the full amount.

THE COURT: Which document is this?

MR. CARTER: Plaintiff's 20.

A Okay. No, I did not sign this.

Q I know Jeanette Wofford identified her signature on i

A If this is what you're referring to, Mr. Rodriguez si

Q Okay. And Mr. Rodriguez in relation to your position

A He's my boss, he's the contracting officer.

MR. CARTER: Okay. Judge, I have no further question

THE COURT: So is Mr. Rodriguez the more appropriat person to cover this?

MR. COLTON: In some respects, no, because of delega of authority. In principle.

THE COURT: All right.

RECROSS EXAMINATION

BY MR. COLTON:

Q Mr. McCague, let's be clear and provide the Court in about what these documents precisely are. If you would look the first page in Plaintiff's Exhibit 20.

A Contract route service order releasing the funds due termination by default of Mr. Keeter's route. It's a calcul damages were to the Postal Service in terms of reprocurement get another contract. Nothing related to omitted service.

Q If you'd turn over to the following two pages. Now recall whether you saw these documents at the time they were

A I probably did.

Q But do you recall now?

A Yes.

Q Okay. Are these standard form documents?

A Yes.

Q What is the circumstance under which a default dama worksheet is prepared?

A It was prepared --

Q No, this is a general question. What are the circu under which they're prepared as a general matter?

A When reprocurement costs exceed the cost of the rep contract.

Q Okay. Were the deductions that Ms. Orr was requesti way of her notes that were sent to the DNO, were those repro as meant by this sheet?

A No, no, different animal.

Q Okay. Well, what's the difference?

A Well, damages, you would generally have an existing where there was some irregularities that cost the Postal Se money and you would make those deductions on an active cont Reprocurement costs after the fact when the defaulted cont replaced at a higher rate, those reprocurement costs are cha supplier who defaulted.

Q When a reprocurement is done, is a competitive bid s

A We're always required to have at least adequate comp

Q Okay. Now when a contractor fails to provide servi

course of an existing contract, are competitive bids sought service immediately? Let me strike that. What is done if s contractor doesn't show up, what is supposed to happen that terms of delivering that contractor's mail?

A Two things can happen. Either the Postal Service ca the mail or the administrative official can attempt to contr -- attempt to contact a minimum of three suppliers to take t overlay the service.

Q What is the instruction to the AO, if there is an in what is the most important thing to have happen, to get the service or something else?

A We tell them the cheapest service.

Q Okay.

A They're not knowledgeable in lowest responsible resp offer.

Q Is the AO authorized to permit service to be skipped to wait until somebody cheaper can be found?

A Oh, no.

Q Is the AO required to try to preserve service?

A Absolutely.

Q Well, in your experience, when it is necessary to service on short notice to be done perhaps even the same da usually more expensive or less expensive than when service i

by competitive bid?

A My experience shows that it's generally more expensiv

Q Substantially?

A In some cases.

Q Under what circumstances is a Postal Service employee to provide that service as opposed to an outside supplier?

A The Postal Service may not have a pool of readily av suppliers to go to and take bids or it may be the urgency of of the mail is such that they want to boom, get it right out

Q Under the circumstances involving Keeter, Inc. was inappropriate for the postmaster Ms. Orr to undertake to pr service herself for the period we're talking about of several

A No.

Q When such service is provided and it is expensive, d Postal Service do anything to mitigate that cost; that is, t over time?

A Yes.

Q What does the Postal Service do?

A We solicit and award contracts.

Q Was that done in this instance?

A When -- it would not have been feasible to get and contract to deliver 52 boxes in the instances where Linda delivering them.

Q You mean to get someone just to contract for that.

A Correct.

Q Now was the Postal Service willing to contract to Mr or someone else, do you know?

A I don't know.

Q Okay. Do you know what happened then? Just do you k

A No.

Q Okay. Do you know if Mr. Hoover was available to do

A I don't know.

Q When the costs incurred for -- I'm going to call i replacement -- what do we call it when right now today we've someone to replace a carrier -- excuse me, a supplier, who operating? Does that have a term?

A We solicit an emergency contract.

Q Is there also something else that's an emergency cont has a term?

A Emergency ratification.

Q I'm referring to the immediate thing, whatever else is we have to cure this right now and I'm going to call that contract. When you receive the information from the AO as how much it cost, are you in your position obligated to char instance the full amount to the contractor?

A Not obligated. It's up to the contracting officer.

Q You make recommendations on such matters?

A Yes.

Q Do you always request the full amount?

A No.

Q In the instance of Mr. Keeter, do you know whether amount that he was charged was every cent that could have charged?

A It was not.

Q Do you recall what -- were you involved in the decis whether or not it should be this amount versus that amount?

A I believe I was.

Q Do you remember why you picked the amount you picked?

A I think -- and I'm not 100 percent certain, I'm sorry the charge was made only for Ms. Orr's use of the vehicle.

Q Okay.

A That would account for the substantially lesser amour

Q Okay.

A And not necessarily her time.

Q Well, I'm going to take your word for it, but do you that or is this just speculation on your part?

A I don't have a clear recollection, not as clear as I'

Q Okay, with regard to motives, have you been involved situations where contractors have said I'm not going to do t

make me do this -- has that happened before?

A Not like this, no.

Q Well, you say not like this, did you think that Mr.

didn't intend to service the route?

A I thought when we made him whole, that he would deli

52 boxes.

Q Okay.

A That was the intent of making him whole.

Q In your other experience, when contractors complain

about the money?

A Yes.

Q So you had no frame of reference for somebody who sa

was a matter of principle?

A It usually is about the money.

Q Well, was that your belief?

A Yes.

Q With regard to the P-5 manual, if you could take a l

4-B, that front page.

A Okay.

Q Is that document in fact distributed to everybody w

anything to do with the transportation of -- anything to d

distribution of mail?

A The distribution of mail?

Q Yes. As you understand it. Is this distributed -- said widely. I want to know how widely is it distributed, if

A This would be distributed -- would be appropriate to this to administrative officials who administer highway contr not be appropriate to administer -- to send this to the plan the Dallas bulk mail center, who would have no dealings with contract route box delivery route.

Q I'd like to ask you if there is an understanding of where it says "Being distributed directly to all areas". Wh that to mean, if you know? As the language is used on the within the Postal Service.

A All areas being, in this case the Southwest Area; could be the Arkansas District; processing and distribu centers/facilities could be the main processing and distribu Little Rock; and administrative officials would be those w highway contracts out of their office.

Q Based on your understanding of how the Postal Serv works, do you believe that distribution to an area is to ev works in that area?

A No.

Q Is it to some subset of the people who work in that a

A Yes.

MR. COLTON: Nothing further.

THE COURT: Thank you.

MR. CARTER: No further questions, Your Honor.

THE COURT: Thank you, Mr. McCague, for coming.

(Witness excused.)

MR. COLTON: Your Honor, before the next witness, m. we have a brief break?

THE COURT: You may, I was sitting here thinking ab offering it. So since you've asked, of course. We can take break.

(A short recess was taken.)

THE COURT: We're back on the record.

Mr. Carter, do you wish to call your next witness?

MR. CARTER: Your Honor, we call Mr. E.N. Rodriguez.

THE COURT: Good morning. Would you state your name the record, please?

MR. RODRIGUEZ: Eracio Nunez Rodriguez.

THE COURT: Would you raise your right hand, Mr. Rodriguez?

Whereupon,

ERACIO NUNEZ RODRIGUEZ

appeared as a witness herein and, having been first duly sw examined and testified as follows:

THE COURT: Thank you. Be seated, please.

THE REPORTER: Mr. Rodriguez, can I get you to spell
name for me, please?

THE WITNESS: Yes, ma'am. First name is E-r-a-c-i-

middle name, Nunez, N-u-n-e-z --

THE REPORTER: Two n's? N-u-n-n?

THE WITNESS: N-u-n-e-z.

THE REPORTER: Thank you.

THE WITNESS: It's an N with a little squiggly over it.

DIRECT EXAMINATION

BY MR. CARTER:

Q Mr. Rodriguez, if you would, tell the Court where yo

how you're currently employed.

A Currently employed with the United States Postal Ser

Manager of Transportation Contracts and I live in Rockwall, T

Q And how long have you been employed with the United S
Postal Service?
A With the United States Postal Service, I've been em

roughly about 31, 32 years.

Q You've had the advantage of sitting in the courtroo

you've heard testimony of Linda Orr, is that correct?

A Yes, sir.

Q Jeanette Wofford.

A Yes.

Q Mark McCague.

A Yes, sir.

Q And these four individuals connected with Mr. Keeter

worked for the Postal Service for in excess of 25 years.

A That's correct.

MR. COLTON: I heard a statement, I didn't hear a que

THE COURT: Mr. Carter has a habit of his questions like statements and you can only tell if he'll put the infle as going up to know that it's a question. So Mr. Carter, yo

to emphasize that inflection a little bit more at the end of

make it a formal question.

BY MR. CARTER:

Q Mr. Rodriguez, in 2003, 2004, were you the Manager
Transportation Contracts at the Southwest Region of the Unit
Postal Service?

A Yes, sir.

Q And what -- briefly -- and we have part of it in th
already, but briefly what does the Manager of Transportation

do?

A A lot. The Manager of Transportation Contracts is b

responsible for all the contracts that are in the Southwest

contract box delivery or supply routes, what we call supply
oversee a lot of decision-making, I'm responsible for trai
responsible for the work being completed in the office and t

nature.

Q And as part of those duties, did you prepare a docu

which I have marked as Plaintiff's Exhibit 19-B?

A It's in this book?

Q The other one, the plastic binding.

A Exhibit what?

Q 19-B.

(The witness reviews a document.)

A Yes, that's my signature, that I signed this letter,

Q You did not actually type this up.

A No.

Q Did you dictate it? Is that your normal procedure, t

letter like this?

A No, my staff is responsible for getting the facts

information onto the letter, which I think in this case is

standard response for writing to a supplier.

Q Okay. Do you consult -- are attorneys involved in th

A No, not to my knowledge.

Q Okay. If you look at the first page of your letter,
eight things that Mr. Keeter was requesting from you; is that
A It's been awhile, I need to read it. Are you saying

paragraph?

Q No, at the very bottom of the first page.

A The listing 1 through 8?

Q Yes.

A Okay.

Q You would agree with me that the first listing was '

that the USPS breached contract 72665."

A That's correct.

Q And if you turn to the second page, you have listed

USPS Breach." Could you read to the Court the first sentence

A "I need not decide the issue of whether the USPS bre

the contract."

Q So the facts and issues raised by Mr. Keeter, you ju
going to consider.

MR. COLTON: Objection to the characterization. I'll

it.

THE WITNESS: State your question again.

BY MR. CARTER:

Q The facts and issues raised by Mr. Keeter and his at
you just were not going to consider.
A At this point I think this is where the letter was

termination, I think April 28. Let's see. If I recall cor read it, it's basically responding to his letter on each ins this letter was stating to us.

Q Okay. And that's in accordance with what I would c
appeals process?

A Yes, to me.

Q Then you recall giving a deposition on October 16, 2C
A Yes.
Q I'll show you page 11 of that deposition. Have you

opportunity to review the deposition?

A Yes.

Q Would it be fair to say that your connection with Ke

largely revolved around Plaintiff's Exhibits 19- A and 19-B

Mr. Rodriguez was called in to make decisions and deal with r

A Yes.

Q And in terms of the deposition, would it be a f
characterization that you admitted you had not reviewed the
could not give a deposition?

A Right.

MR. CARTER: Judge, that's all the questions I have.

CROSS EXAMINATION

BY MR. COLTON:

Q Mr. -- may I proceed, Your Honor?

THE COURT: Oh -- yes, please.

BY MR. COLTON:

Q Mr. Rodriguez, as we sit here today, do you have any recollection of your involvement in the events up to the tim

the letter that counsel just asked you about in which you requests that were made on his behalf? Do you have a spe recollection?

A No, I don't.

Q Do you know whether or not as these events were goin
you were being kept informed by anyone on your staff about

controversy?

A Yes, Mr. McCague kept me informed.

Q So even though you know he kept you informed, you sti

recall details?

A No, I don't.

Q Okay. Did anything that Mr. McCague told you cause

say you can't do that or you shouldn't do that -- do you reca

A No.

Q In the course of performing your job, do you revie

underlying file materials for every recommendation that's mac
a support staff person?

A Not in all cases.

Q Do you on occasion rely upon summaries of informatio
situations as opposed to underlying sort of transactional doc
A Yes.

Q Do you rely upon your staff; that is, do you trust th
to you accurately?

A Absolutely.

Q Would it be possible to do your job, to handle your w
you did not do that?

A No.

Q How many contracts are you responsible for, as of le
early 2004?

A I'm going to say somewhere around 2280, 2270, somewh

around there.

Q Twenty two hundred and something?

A Yes.

Q Okay, two thousand two hundred and something. What
dollar value of those contracts as of that time, roughly?
A I'm going to say roughly around $250 million.

Q Per year?

A Yes.

Q You have to articulate.

A Yes.

Q How many specialists are subordinate to you in your at that time, in 2004?

A I had a staff of 15 specialists and they're composed
transportation -- contract transportation specialists and se
transportation specialists.

Q How many other offices like yours are there in the Service?

A Ten.

Q Ten, so -- ten others plus yours?

A Yes.

Q Does each office draft its own contract independentl

others?

A No.

Q Is any centralized guidance provided as to the ter

contracts?

A Yes.

Q Is any centralized guidance provided as to the mean

those terms?

A Yes.

Q Is there guidance provided for every term in the cont

A No.

Q The term or the acronym, HCR has been used, and just clear, what is HCR contracting?

THE COURT: Excuse me, could you --

MR. COLTON: HCR.

THE COURT: HCR.

MR. COLTON: H.

THE COURT: Thank you.

MR. CARTER: I heard it as each CR.

MR. COLTON: It comes out frequently as that.

THE COURT: HCR.

MR. COLTON: Host-cat-roger.

THE COURT: Thank you.

BY MR. COLTON:

Q What is an HCR contract?

A An HCR contract stands for highway contract route.

Q Okay are -- was the contract we've been talking abo
Keeter, Inc. held, was that an HCR contract?

A It is.

Q Or was.

A Was.

Q Are all contracts that you deal with HCR contracts?

A Yes, they are.

Q Are all of them box delivery contracts?

A No, they're not.

Q So the fact that something is an HCR contract doesn'

it's a box delivery.

A That's correct.

Q Is this a choice you make or is this something you fo

A No, it's something that's directed on the type of co

is.

Q Has it been that way as long as you've been involve

contracting?

A So long as I've been there.

Q Would you take a look at Defendant's Exhibit Number

thumb through it so you have a sense of what it contains.

(The witness reviews a document.)

Q I don't want you to read the exhibit, just familiar

Have you seen this document before?

A Yes.

Q Had you seen it before preparation for this trial?

A Yes.

Q What is this document?

A This document is a document that's put out by our c

called Administrative Official's Manual or Handbook that ha

different parts of different guidelines and forms to do tra
administrative officials.

Q Do you know when it was prepared, this version of it?

A No, I don't.

Q Was this meant to be -- well, you said it was trai
administrative officials?

A That is correct.

Q What was the purpose of them having this, as far as
know?

A As a guideline.

Q A guideline for what?

A For dealing with administrative responsibilities for

under their control.

Q There are various pages in here. Were all of the pa

are in this exhibit created in your office; that is, original

office?

A No.

Q Where did they come from?

A They're either coming from headquarters, either the P-5, which was its replacement.

Q Would you please try not to use just acronyms. Just

description of whatever you're talking about.

A Okay, they were taken from different manuals that we

guidelines, as well as forms that we use, and instructions t

sent out from let's say headquarters.

Q What was your view as to the significance of those g

that came from headquarters? What were you supposed to do

them?

A Well, we distribute them as well as put them into ef

their distribution. We are to inform our administrative off

one that assigns administrative officials to the contract --
them with information and training in order to give them a
understanding on how to administer highway contracts or box c

Q When you received an instruction from headquarters, consider that you were supposed to follow it?

A Absolutely.

Q Did you ever receive documents that said here's wha
contract term means?

A Yes.

Q And did you accept what you were told by headquarters

A Yes.

Q Did you believe you were required to accept it?

A Yes.

Q Would you take a look at Exhibit 5, page -- it's 32 o

pages and it's got 32/50 in the upper right and bottom right

A 32/50?

Q Yes, 32 out of 50 pages.

A Okay.

Q Do you have Policy on Additional Enroute Boxes in fr
you? Is that what it says?

A Yes.

Q Okay. Now do you believe that this page was includ
these materials when they were distributed for training purpo

A Yes.

Q All right. Would you look over to Exhibit 6, please?
A Okay.
Q I believe that 32 of 50 and Exhibit 6 are the same p

that your understanding? I think they're word- for-word the

A That's correct.

Q Did you have awareness of the document, Exhibit 6?

A Yes.

Q Well, I'm going to ask as to a time frame. You saic
did you have awareness of it prior to December of 2003?

A Yes.

Q Do you know when you first became aware of the parti
document?

A I don't remember specifically when. I know how.

Q Well, all right, how did you become aware of it?

A Through my previous contracting officer.

Q Who was that?

A Which was Alexander T. Mills.

Q Well, knowing that it was your prior contracting off

that give you a date range?

A Probably somewhere around -- Alexander had been the

quite some time, since '91, '92, even previous to that, so he

contracting officer for several years.

Q How long did you and Mr. Mills overlap in the same

from what year to what year?

A When you say overlap?

Q Working on contracts and him being there.

A Oh, let me think. I reported to that office in 1990

in that office ever since and Alexander T. Mills was the cont
at that time.

Q So you're confident that however you became aware of

was before you had any knowledge of Mr. Keeter.

A Oh, yes.

Q And Mr. Keeter's contract. Therefore, before 2002.

A Yes.

Q Has anything caused you to believe that the document Defendant Exhibit 6 has been revoked as of January -- or Dec

2003?

A No.

Q Did you discuss with any person prior to December of

what the purpose of the policies stated in Defendant's Exhib

A Yes.

Q Do you recall with whom?

A I would -- I don't want to say exactly who, to my off

Q Did it cause you to have an opinion as to what the p
that exhibit was?

A Yes.

Q And would you accept the characterization that it ta

the box formula?

A Yes.

Q And its application or not application?

A That's what I understand, yes.

Q What was your understanding as of December of 2003 o
purpose of the language regarding the formula found in some c

MR. CARTER: Your Honor, I'm going to object to the

some contracts, we've already had testimony that it's in all

MR. COLTON: Well, I will accept that it probably is

want to know the purpose and I didn't want to be overly broad

We know it's in some contracts and it's probably i
contracts, and it certainly was in Mr. Keeter's contract. I
that acceptable?

MR. CARTER: That's fine.

MR. COLTON: With that understanding may I proceed?

THE COURT: You may.

MR. COLTON: Thank you.

BY MR. COLTON:

Q What was your understanding of the purpose of that pr

in the contract?

A This document specifically, if you look at the top, HCR Box Delivery Contracts.

Q Now I hope you were starting to -- your understandin
document says whatever it says.
A Yes.

Q I'd like you to relate your understanding as of that

A Okay, as to my understanding, I'm just stating that

is for box delivery, not supply routes. And in looking at t

didn't specifically state that I was required to apply the fo

Q Now apart from that document, did you have an opinio

whether or not you were required to apply that formula in t

that eventuated with regard to Keeter?

A No.

Q You didn't have an opinion? I asked did you have an

A I had an opinion as to what this document was telling

Q Okay. And I'm asking you did you have an opinion as
you were required to do, or not required to do?

A Yes.

Q Just asking if you have an opinion?

A Yes.

Q What was your opinion?

A My opinion was that the formula did not have to be a

that transaction.

Q Was that opinion based at least in part on this doc
Defendant's 7 -- 6, excuse me?

A Yes.

Q Was it based on anything in addition to that document

A My training, working with the previous CO.

Q That's Mr. Mills who you referred to?

A Mr. Mills, senior specialists.

Q Now do you know if this document was circulated with

office, the Southwest District Office, at any time while you

CO or before you were CO?

A Yes.

Q Did you cause it to be circulated?

A No.

Q Did you draft any of the language involved with the f

A No.

Q I'd like to ask you -- it's a hypothetical but I c
speculation. You're aware that there's a dispute about the
interpretation -- there has been a dispute. You know that.

A Yes.

Q And you are aware that the Judge has ruled against th

Service with regard to contract interpretation.

A Yes.

Q You know that now. And you found that out after -

happened after these events.

A That's correct.

Q If Mr. Keeter had been provided negotiation prior

implementation of the order that he add those 52 boxes, and

even if you pay me the contract full amount used by the form
want to do the boxes, I won't. Now that's the hypothetical
state with certainty whether or not you would have said --

MR. CARTER: Your Honor, I'm going to object. He's a
hypothetical and now he wants him to state with certainty.
to object to the form of the question as improper.

MR. COLTON: Your Honor, I'm asking if, given those he can state with certainty what would have happened. This supposed horrible damage. I want to know if he knows for su

he's not certain, I don't want him to say.

THE COURT: If he knows for sure what?

MR. COLTON: What decision he would have made, what

would have been the consequence in his decision process. Es

Your Honor, isn't it quite relevant to know that what Mr. Ke

for, I was entitled to say no. If it had gotten to that po

have, if he had gotten his negotiation, what happened becaus

I can show that. What would have happened, given what he s

Court, with absolute specificity, because there's no doubt a

THE COURT: You're asking the contracting officer to interpretation of the contract provisions?

MR. COLTON: No. What he would -- Mr. Keeter says --

THE COURT: That's all he could base his decision on be the -- that would be the basis for his decision, would Colton?

MR. COLTON: No, Your Honor. He -- yes, it would be on his belief but he has to make a decision given a set of f what contracting officers do. And I want him to say, given

a set of facts that Mr. Keeter says should have happened a

supposedly wouldn't be here. Okay?

THE COURT: If you phrase it as to what his belief or

interpretation --

MR. COLTON: Okay. Well --

THE COURT: -- or his determination would have been.

MR. COLTON: Your Honor, may I ask --

THE COURT: Because you're stating it as a hypothetic

MR. COLTON: I mean it as a hypothetical just becau

didn't happen. But he says it's not just what I think, if h

what he would have done. And that's what I'm getting at. W

happen.

THE COURT: I think it's six of one and half a dozen other, because --

MR. COLTON: No, Your Honor -- I'm sorry.

THE COURT: -- it can only be his belief as to what

have done. Because that is what a hypothetical situation inv

MR. COLTON: Okay, and he can qualify how strong his

is I guess. And that's all.

THE COURT: That's fine.

BY MR. COLTON:

Q All right, the hypothetical is that Mr. Keeter has b
negotiating session and the order to service those 52 boxes
been signed. All right? Now would you offer him any amount

believe that you would have been willing to authorize any a excess of what the formula prescribed to get him to service t

A No.

Q Can you state that with confidence?

A Yes.

Q If Mr. Keeter had said I don't want to serve those k

not the money, I just don't want to do that. Can you sta
substantial confidence whether or not you would have said ol
forget about it and let him continue on the contract as it w

2002 -- can you state that with certainty?

THE COURT: Is this question that you're asking -- I

getting a little confused because I thought that the testimo

I don't want to serve the contract, it's that I don't want to

not a part of my contract. The way that you're phrasing it i

BY MR. COLTON:

Q Without regard to why he didn't want to do it, what
reason, it's not part of my contract -- do you know what you
done then?

A Yes.

Q What would you have done?

A Given the case that we got to an impasse, a point wh

states to me specifically that he is not going to do this w

move to a termination for convenience.

Q What is the effect of doing so?

A The effect gives me the ability to go ahead and buy
contract for -- depending on the year that it was, I would p
and let -- dissolve the contract, in order for me to reprocu

that I need.

Q Would you have done that in order to punish Keeter, I

A No.

Q Would you have done it with an intent to harm Keeter,

A No.

Q For whose benefit would you be doing it? If you ma

decision, what -- give me some reasons, can you summarize wh
purpose would have been?

A Well, the purpose in my mind is that I've got to pr

service. I have to rely on the administrative official in t there day to day operations delivering the mail, and she's source for giving me the requirements that are needed for d

mail in that specific area. So for the benefit of the Postal best interest to the customer, I would have to reprocure the get the delivery made the way we had the requirements present

Q In your experience as a contracting officer or a c
specialist, has the Postal Service ever decided to undo a de
made about structuring a route because a contractor preferre

it?

A No.

Q Do you have any opinion as to whether there is a pol

how the Postal Service responds to contractors who don't wan
service that we want them to do?

A My own opinion is that I cannot have a supplier telli

they're not going to provide service of requirements that I with.

Q Who -- I'm sorry.

A The contract specifically gives us the opportunity t
service because of the needs of the service for growth, nev
coming into the community and so forth. So in this case,

delivery, we have to get the service to the customer. So I w in moving to a T for C, or termination for convenience, if I supplier to do the work.

Q Who decides what the needs of the Postal Service are

general way?

A The administrative official.

Q Well, you're referring to in this instance box contr
the Postal Service permit anyone outside of the Postal Serv
Congress -- to say what its needs are?

A No.

Q As far as you are concerned, was the issue --

(Cellphone rings.)

MR. COLTON: Oh, my.

THE COURT: That must be Mr. McCague.

BY MR. COLTON:

Q Was the issue that you were presented with concernin
Keeter, as far as you remember it, one of making him perform
we've got to make sure that people do what we tell them to do

A When I got involved with this, it specifically was b
the service not being provided at all.

Q Do we accept contractors refusing to perform service

again, the Court has ruled that we breached the contract an Keeter. You didn't know that -- or did you know that that wa the result, in 2004?

A No.

Q Did you believe you were right in 2004?

A I did.

Q As of today when we sit here, having heard everythin
heard and all you've learned about this case, has anything t
heard caused you to think that either Mr. McCague or Mr. Wof

Orr acted inappropriately?

A No.

Q Has anything caused you to believe that in making

recommendation that ultimately you were responsible for, th
acting out of personal motives or agendas?

A No.

Q Has anything suggested that they were acting in orde
Mr. Keeter?

A No.

Q Has anything that you have heard caused you to belie they were acting to help Ms. Orr do a favor to somebody?

A No.

Q By the way, prior to the events that have culminated
proceeding; that is, prior to 2003 -- 2004, did you know Ms.
A Yes.

Q In what context?

A Well, in 1987 to 1990, I was a specialist in the M
Tennessee area and I had met Ms. Orr doing reviews and she

worked at the Southern Region area, is basically where I m
through the contracting officer there.

Q Did you make any decisions regarding Keeter, Inc. as

to Ms. Orr?

A No.

Q Are you aware that Ms. Orr prepared Forms 5500 on mu

occasions when Keeter, Inc. did not deliver to those 52 mailb

A I was aware of them, but I did not see them.

Q Okay. Would there be anything inappropriate about he

so every day?

A No.

Q Would she be expected to do so every day?

A Yes.

Q Is this something that as contracting officer, you

specifically of the people who report up to you regarding

administration?

A I do.

Q Similarly, was there anything inappropriate about he

those slips that said deduct X dollars -- whether or not you
would it be inappropriate for her to have done so?

A No.

Q Would she be expected to do so?

A Yes.

Q Part of her duties?

A Yes.

Q Are those documents used to intimidate suppliers? Is
purpose of them?

A No.

Q Was she under any obligation to discuss with Mr. Kee
objection to interpretation of the contract?

A Yes, I think so. In respect to if she's writing a 5
to make sure that he gets it and he's got the response. But
in his response, no.

Q Is she authorized to talk to Mr. Keeter about con
interpretation? That is to say, her own opinion?

A No.

Q If she is told something from your office, is she al
a contractor something different about the meaning of a contr
A We strongly discourage anything like that.

Q Anything meaning -- what do you mean?

A No talking about contract issues.

Q Who is supposed to speak for the DNO regarding that?

A My specialists and myself.

Q Regarding how contracts are awarded in general, I th

heard some testimony, some questions from the Court yesterday

know what FAR means, those initials F-A-R?

A No, I do not.

Q Do you consult something that's got those initials

context of performing your services -- your duties?

A Not to my knowledge.

Q Who creates the rules and policies for the Postal Se

how they're going to contract?

A Headquarters.

Q Headquarters of what?

A Washington, D.C. for surface transportation specifica

Q Postal Service headquarters?

A Postal Service headquarters.

Q Do you know whether or not the Postal Service opera
under the same general set of acquisition rules that most of
the federal government operates under?

A No.

Q You don't know?

A No, they do not.

Q Have you ever heard of a purchasing manual?

A Yes, I have.

Q Okay. What is that document?

A A purchasing manual was a guideline specifically giv
on how to administer highway contract routes.

Q Who creates the purchasing manual?

A Headquarters, Washington, D.C.

Q Am I correct that as we stand here today, it's no l
effect?

A It's not.

Q Do you recall when it was -- went into effect?

A When the purchasing manual was put into effect?

Q Yes.

A No, I do not.

Q Was it prior to the events here involved?

A Yes.

Q As far as you are aware, was anything that was done
regard to Mr. Keeter inconsistent with the purchasing manual?

A No.

Q You don't know or it was not?

A It was not.

Q As of 2003 and 2004, was the Postal Service required
seeking a contract, to accept the bid of the lowest qualifie
A No.

Q Who got to decide what bid would be accepted?
A The way that it was --
Q Whose job was it?

A It's my specialist to look at the documents, ultimat
a recommendation to me.

Q Is it a contracting officer's job to make the decisio

A Yes.

Q Have you ever heard the phrase best value?

A Yes.

Q What does that mean?

A Best value could depend on the solicitation. It co
past practice, equipment, experience, a variety of different

Q Okay. With regard to the Forms 5500 that were writ
concerning Keeter, Inc., as far as you know, did they play a
in your decision to terminate this contract -- the Court says

terminated before that, but when you thought you were termi
were those 5500s a factor in your decision?

A No.

Q What was the reason for termination?

A The reason for termination in this case was that we

issued -- we, the office -- had issued a cure letter because

had abandoned the services and he did not respond to my cure my view, that was not responding to the contracting officer' and that deemed an event for default.

Q In your experience either as contracting officer or
as a specialist, can you think of any instance in which a s
stated that it would not perform, has ceased performance a

refused to resume performance after getting a cure letter, i
contract has not been terminated for default?

A No.

Q Would that be policy?

A Yes.

Q Was Mr. Keeter treated more harshly, more -- more ha

than any other contractor in that situation would have been?

A No.

Q Now did you have any reason to believe at the time

these decisions were made that it was actually the Postal Se
had breached the contract?

A I did not.

MR. CARTER: Your Honor, I'm going to object to th

question. The reason I'm going to object to the question i

Rodriguez had an opportunity to fully explain it and his res

choose not to decide whether USPS breached the contract. '
already into evidence. And now Mr. Colton is attempting to
that and say well, if they had. That's the basis of my objec

MR. COLTON: Your Honor, cross examine -- his answe

wasn't to the same question. In fact, whether or not he st

letter if he's got one reason, he doesn't need to talk abo

reason.

THE COURT: I thought Mr. Carter's objection was tha

letter stated that the contracting officer wasn't going to ac

wasn't a matter of choosing different reasons.

MR. COLTON: Well, Your Honor, he said I don't need

address it. Could we look at the letter? In any event,

objection to evidence, it might be a ground for cross exami

here we've got a letter written long after these events tha

need to do that because this.  I'm asking him did he believe

he wrote here. He said I don't need to answer here. Tha inconsistent and it's certainly not a ground for not permitt I mean, Mr. Carter can question him about it. It's not an

introduction of evidence, Your Honor. That's not reasonable

MR. CARTER: Your Honor, I disagree with Mr. Colto

analysis that that's not the reason to do it here. That was

that's the whole purpose, that's the process. You have a
terminated and you appeal it. It was clearly set out that th
contesting and he said I choose not to answer it, I'm not goi

THE COURT: What is the relevance --

MR. COLTON: None at all.

THE COURT: -- at this hearing today about the term

for default?

MR. COLTON: Your Honor, I'm closing off all the loo

anything done that he knew was wrong, that he thought was

because that's what the cases talk about. Here we've got interpretation in which he says I don't need to answer that. did you do that thinking that you were violating your duties

breaching the contract. This is what the bad faith is abou doing the wrong thing.

THE COURT: And he chose not to answer it. I will a

response.

MR. COLTON: Okay.

BY MR. COLTON:

Q Did you think when you said -- when you wrote this
need not decide the issue whether the USPS breached the cont
you believe that was true when you signed the letter? You d

address it.

A I did.

Q Did you think at the time you signed that terminatio

the Postal Service had actually breached the contract?

A No.

Q Okay. Now let's be clear, this letter that we've j

referring to, which is Plaintiff's Exhibit 19-B, is this lett as an appeal?

A No, this is a response to his letter. The final de written on the termination. This is giving a final decision

Q We've heard the term final decision, the term appeal do you understand an appeal to be in the context of contract What is an appeal?

A An appeal is when we give the supplier the opportunit it to the next higher level of authority to look at what's go

Q Now is an appeal taken from a final decision?

A Yes.

Q Okay. So who does the contractor take an appeal to, understand it?

A Federal Claims Court or Board of Contract Appeals.

Q So let's take a look at that letter. Now there's la bottom of the second page and the top of the third page and about you can do so and so with the Board of Contract Appeal Court of Federal Claims. Did you mean to inform Mr. Keeter you disagree with me, here's what you're supposed to do?

A Correct.

Q You understand that you are not -- do you have a understanding of whether or not you are the final decider o contract means?

A I don't understand the question.

Q Who gets to say what a contract means -- final word?

A Courts.

Q As of the time these events came up, had you been in in any dispute with a contractor about application of that formula?

A No.

MR. COLTON: If you'll give me a moment to review, Honor, I think I'm done.

(Brief pause.)

MR. COLTON: Nothing further.

THE COURT: Thank you.

REDIRECT EXAMINATION

BY MR. CARTER:

Q Mr. Rodriguez, if you would look at Defendant's Ex Number 6, this is the policy on additional en route boxes.

A Yes, sir.

Q If we look at that last sentence in the third paragr about insignificant changes and $1000, does it not?

A Yes.

Q That would indicate that this form is old.

A Yes.

Q As we stand here on April 24, 2008, as I understan

insignificant changes have been increased to $5000.

A Today, yes.

Q And back in December of 2003, it was $2500.

A That's correct.

Q If you look at the fifth paragraph, the last really l

the last sentence in there talks about good faith bargaining,

A Yes, it does.

Q And isn't that the policy of the United States Postal

engage in good faith bargaining?

A Absolutely.

Q Then why did you tell Mr. Colton, we cannot have a s

telling us what to do?

MR. COLTON: Objection to the characterization.

MR. CARTER: Your Honor, I jotted that down word- for

MR. COLTON: It was context, Your Honor, it was abo

design of the routes.

THE COURT: It was about what?

MR. COLTON: It was about the design of the routes,

our needs are, how we're going to do it. It wasn't can't te

was about that.

THE COURT: Mr. Carter, could you place it in some co

BY MR. CARTER:

Q Why can a supplier not tell you anything about the r

the Postal Service has decided to redesign?

A He can.

Q Well, you said you cannot have them telling us.

A No, my statement saying that, is that I cannot have from a position of a supplier tell the United States Postal not going to do work that we have put into his contract.

Q But if it is a major change requiring negotiation, y this Court you will not engage in good faith negotiations?

A Well, good faith to us was that we were looking at document and although, as you stated, the numbers changed, t did not. So we're looking at a supplier -- box delivery ro additional hours, had more time in it than we needed to add context of adding 52 boxes, that was an in-line adjustment. specialist, by the recommendation of the administrative offi our eyes and ears out in the rural area, stated that this is need to add to the contract. By design, we're looking at w take to deliver this mail.

Q But Mr. Colton's question and my question is on ge principles, that if it's a major change and the supplier doe it, you're going to terminate the contract for convenience.

A Not necessarily. I mean there was an alternate way t this while the service is still running. If he wanted to ap he could have gone while continuing to do the service, eleva

next higher level or, you know, if that was where we were at then he would have had an appeal process to my decision. B wasn't the situation, he walked off the route.

Q You're still not answering my question. Mr. Colton w to you about hypotheticals to elicit that answer and I am a there was a major change in a contract and a contractor did accept it, as I understand your answer, you're telling this United States Postal Service would terminate that person convenience.

A It's a confusing question in respect to, first of a negotiated change above that rate that you're specifically about. In our view, it was not.

Q I'm not talking about Mr. Keeter, do you understand Colton asked you a hypothetical. I'm asking you a hypotheti

A Okay, will you restate it again?

Q If there -- a contractor from Oklahoma, you suggest change that involves $3300 and he says I don't want to do th Are you telling this Court that instead of negotiating with terminate the contract for convenience?

A If we reached a point where he specifically tells me going to do that work. I have to have the work done, so if impasse and the supplier tells me no, I'm not going to do t have to reach a finalization of that decision of that suppli

me to reprocure services.

Q Now if we move to Mr. Keeter's situation, you had co

place on December 23 of 2003, covering every box coming out

Yellville area; did you not?

A Yes.

Q Therefore, there was no reason to think that the se

not going to be performed, because you had a contract to d

somebody.

A Sir, on every -- I'm going to say not every day, but

often, we do route splits and we move boxes from one contr

another. We are not met with this kind of challenge on a no

Q If we get back to Defendant's Exhibit Number 6, thi

not part of Mr. Keeter's contract, is it?

A No.

Q It is not part of the Highway Contract Route Box De

Service, the P-5 booklet, is it?

A No.

Q This form is not available on line at www.usps.gov,

A No.

Q You've had an opportunity to listen to the testimony

witnesses. Would it be fair to say that even today, it's th

United States Postal Service that we came up with a change

whether it was in agreement with Mr. Keeter's contract or n

going to do it or we were going to get rid of him?

A Is that a fair statement to say?

Q Yes.

A Yes.

MR. CARTER: Judge, I have no further questions.

RECROSS EXAMINATION

BY MR. COLTON:

Q Mr. Rodriguez, have you ever been engaged in negotia
with a supplier because a major change was proposed?

A Yes.

Q Have you ever agreed that the Postal Service would re
routes because a contractor did not wish to do the work?

A No.

Q What do you negotiate about?

A Usually the negotiation is a difference in pay or
something that has to do with a value to the contract.

Q When you go into a negotiation, is -- do you consid
you've got to do whatever it is the contractor wishes?

A No.

Q What interest are you trying to serve in negotiation
you trying to accomplish?

A The delivery of the mail.

Q Now if Mr. Keeter said he didn't want to do it, wo

consider that reason for punishing him?

A No.

Q If the Postal Service has decided what its route sho
you think that negotiations should then be -- in your vie
negotiation then supposed to be about what the route should b

A Absolutely.

Q No, I'm sorry, did I say that -- I need to withdraw
it again, I didn't say it right.

MR. CARTER: I'm not sure he can -- he can withdraw
question --

THE COURT: How do you withdraw an answer.

MR. COLTON: I'm not. I'm going to withdraw it bec
don't -- I can't remember the way I phrased it.

THE COURT: He's answered the question, Mr. Colton.

MR. COLTON: Is there any way of finding out the wa
asked it? Because I'm not sure.

THE COURT: I don't think so, the way the court rep
works. You can move on.

MR. COLTON: I'd like to know what the witness ju
answered, or I'll ask a different question.

BY MR COLTON:

Q With regard to box delivery contractors, in your exp
has there ever been any, other than Mr. Keeter, who said he

to do the work and it wasn't about money?

A No.

MR. COLTON: Your Honor, we had some stipulated information. As you recall, I believe, we were required ar provide Defendant's Proposed Stipulated Facts regarding Bacl and Function of Witnesses. And Mr. Carter accepted it. An something I would like to question the witness about, what I be a stipulation. Would you like me to present it to Your H it's already part of the record, that's what a stipulation is

MR. CARTER: It is, Your Honor.

MR. COLTON: Okay.

MR. CARTER: I referred to it a number of times, whic I've not gone into that great detail about --

MR. COLTON: Well, it's --

THE COURT: What is it?

MR. COLTON: It's one particular part of what's b stipulated with regard to Mr. Rodriguez that I want to ask hi I just want to know whether I should read it into the record get it without asking him the same thing we've already stipu has to do with scheduling, has to do with drawing of routes.

THE COURT: We'll go off the record for a minute. Ap

(Discussion off the record.)

THE COURT: Back on the record.

MR. COLTON: Thank you, Your Honor.

BY MR. COLTON:

Q Mr. Rodriguez, part of the record of this case -- I' to read a sentence to you. Part of the record says, "The hi for the DNO is to achieve maximum reliability of service, bo doing so is Defendant's public mandate and because the effic the normal national mail processing system depends on predi tightly scheduled work flow." Now I've read that. Do you ag first?

A I do.

Q Does your attitude as to whether or not it's approp negotiate over the design of a route, the layout of a route, Keeter's, have anything to do with that statement?

A Yes, it does.

Q Explain why.

A Because we have a responsibility to make sure that service the customer. First of all, we have service standa operate under, we have mandates from the area vice president a standardized delivery of the mails that need to be taken customer in specific time frames. And all of that relates t have a reliable service provider to make sure that mail gets supposed to go in a timely manner.

Q Nationwide, how many HCR contracts are there?

A I would approximate at least 17,000.

Q Do box delivery contracts -- I don't mean taking the specific location, but does the mail that is moved by those intercept with other mail that doesn't get finally distribu with other kinds of HCR contracts, highway contracts?

A At some point, yes.

Q Is any part of the system that you know of detachabl you can look at it just by itself?

A No.

Q So does that have any -- what you just answered, doe have anything to do with the Postal Service policy with re negotiating over what a route is?

A That is correct, we cannot change our requirements to supplier, based on his needs. We are seeking the needs of t Service.

Q If you confronted a contractor who just wouldn't do s would what you have just discussed enter into the decision you should handle it?

A Yes.

Q And does that have anything to do with what you test earlier about you terminate for convenience?

A Yes.

Q What does it have to do with it?

A It has to do with it because we've reached an impasse cannot get the supplier to agree to the requirements that we of him. At that point we cannot allow the service to be cha the supplier. We have to meet the needs of the Postal Servic

MR. COLTON: Nothing further.

MR. CARTER: Your Honor, I only have two or three questions.

THE COURT: Actually I have a question, so let me as question.

Mr. Rodriguez, counsel can correct me if I'm wrong, believe that Mr. McCague testified that in this instance, i contract, award was made to the responsive responsible contr the lowest bid. Is that your understanding?

THE WITNESS: To my knowledge, as far as I can rememb yes, ma'am.

THE COURT: Okay. Does the Postal Service have a po that -- well, let me back up. Is there anything in the type Mr. Keeter has that would preclude the supplier from coming his work done early, coming in early and getting his work don

THE WITNESS: No.

THE COURT: And is there a Postal Service policy tha that customers are supposed to get -- should get their mail time every day?

THE WITNESS: I cannot reference the policy, but it
intent to get the mail to that individual at the same time ev

THE COURT: I've never gotten my mail at the same tim
there is a Postal --

THE WITNESS: In Arkansas?

THE COURT: When I lived in Arkansas, I didn't either
I'm in Washington, D.C.

But my question is -- to be sure I understand --

THE WITNESS: It's in transportation windows. So ba
when we look at the contract, and understand that a set of r
are given to us -- there's two sides to my house, there's r
and there is contracts, purchasing. So the requirements are
requirements section that says okay -- in this case, the ad
official -- okay, we have a set of rules or guidelines that s
the route that we need to have mail delivered. So we take
requirements.

If I'm going to solicit those requirements, I will ta
the line of travel and the vehicle requirements, the times th
So we take it and we solicit it. At that point, we receive
and as a request for proposal, we will go through each indiv
and look at cost as a value, --

THE COURT: What are you talking about now? You've g
beyond, way beyond my question to you.

THE WITNESS: Okay.

THE COURT: My question was about the Postal Servic

policy with regard to customers and if there is like -- I gu

time to try to get it to them or a window or how does that

know?

THE WITNESS: Yes, ma'am. We are rated based on th

delivery of the mails. So I mean in a different hierarchy, check and some of the things that we do are reflected by th delivery of the mails.

THE COURT: Timely, but are you using that to say I
Postal Service customer and I expect to get my mail at 2:0
afternoon and if it gets there at 1:00, that's not acceptabl

there at 12:30?

THE WITNESS: Well, in that short time frame, no; b

normally you get your mail at 10:00 in the morning and you

getting it at 4:00, there's a problem. Why is that? So w
maintain some reasonability of that mail --

THE COURT: So why?

THE WITNESS: -- service from the processing plant to

which I call an administrative official office, to the suppli

THE COURT: So if there were wide differences, that

be a problem?

THE WITNESS: Yes, ma'am.

THE COURT: Okay. Thank you. Mr. Carter, you car

proceed.

MR. CARTER: Thank you, Your Honor.

RE-REDIRECT EXAMINATION

BY MR. CARTER:

Q Mr. Rodriguez, you don't have any information that Mr

didn't deliver the mail at the same time every day?

A No.

Q In response to a question of Mr. Colton, you indicate

United States Postal Service needs reliable service providers

A That's correct.

Q And would you agree with me that a reliable service
would be an individual who reads and understands his contrac

would be part of being a reliable service provider, is that c

A I would yield to you; that's part of it, yes.

Q That a reliable service provider would, further, fo

contract.

A Yes, in effect.

Q And the Postal Service is very concerned about -- an

look at Defendant's Exhibit 6, it's the very last sentence,
Service is concerned about other people influencing contracto
contractors to do things that they're not supposed to do a

contractors are only supposed to go up their chain of comman
correct?

MR. COLTON: Your Honor, it's a compound question.

MR. CARTER: Let's scratch that.

BY MR. CARTER:

Q If you look at Defendant's Exhibit 6, the last senten

could you read that to the Court?

A "The administrative officials are reminded that they

authorized to negotiate changes or otherwise amend contracts

influence contractors regarding the contractor's applicatio adjustment or claims against the Postal Service."

Q And in keeping with that, you expect your contractors

their contracts.

A Specifically when I give him a change, yes.

Q So you don't want them to follow their original cont

only want them to follow changes?

A No, that's not what I said. I said specifically whe

a change, that means that when an administrative official is

to change the contract, that means that at some point if
administrative official tells him okay, I want you to start
other route too, without coming through my office, that is f

in this case, where we're looking at -- you're asking me if I
to abide by his contract; yes. And that includes changes.

MR. CARTER: Judge, I have no further questions.

THE COURT: Now we're going back and forth, so this s
be it.

MR. COLTON: Two questions, really.

RE-RECROSS EXAMINATION

BY MR. COLTON:

Q In your opinion, Mr. Rodriguez, is a reliable cont

contractor that follows its own interpretation of the contr
have instructed that contractor otherwise?

A No.

Q Would you turn to Exhibit 4-B, that's the handbook.

THE COURT: Is this Defendant's?

MR. COLTON: Defendant's 4-B.

BY MR. COLTON:

Q And look to page 29 and the page is a p. 29 at the b

the page --

A I'm in Section 4?

Q It's in Section 4 of Defendant's Exhibits and the fi
and then there's 4-B, it says at the bottom of the page.

A Oh, okay, 4-A, 4-B. And one more time, I'm supposed
where?
Q It's on page 29.

A I'm sorry, I'm having difficulty with this. I'm in
supposed to be in Section B of 4?
Q It's 4-B, it's toward the back of that stack of docum

A And page --

Q This page, 29. Got it?

A Yes.

Q Okay, would you look down, please, to the section th
331.2 Regular Service.

A Okay.

Q Would you read that aloud?

A "Suppliers should regulate travel to arrive at boxes

the same time each day."

Q Is this a statement of Postal Service policy as you
it?

A Yes.

Q The Judge asked you a question --

THE COURT: This is the same as what he said.

MR. COLTON: I know, this is something different now.

BY MR. COLTON:

Q The Judge just asked you a question about do we mind

supplier comes in early and does work early and you said no

correct?

A Correct.

THE COURT: That was not my -- whoa.

MR. COLTON: I'm sorry.

THE COURT: Mr. Colton, I asked if there was anything contract that prohibited it and he said no.

MR. COLTON: Okay, that's fine.

THE COURT: So you have to characterize my questio correctly.

BY MR. COLTON:

Q Do we, as policy does the Postal Service care, not coming in early, about performing along the way, the route,

the specified time, does that matter to us?

A Yes.

Q Is it something we disapprove of?

A Yes.

MR. COLTON: I'm going to leave it at that and we can that later.

I'm trying to remember if there's enough -- off the
might, Your Honor. I don't want to take more time and I'm r
decide if I have to do something.

Back on the record.

BY MR. COLTON:

Q Mr. Rodriguez, can you provide, in one or two senter

statement of why we care whether the route is performed earl

A In a case like that, for instance when Your Honor as

question about whether we care or not, I'm, in my mind, look

windows. In other words, I think I explained that if he's c
time and it varies greatly, there's a problem, because in a
travel, let's say for instance that there is a collection box

supposed to tap. They specifically have to tap that box at
because the box is posted, for instance, at 5:00 p.m., the c
be taken from this box. So at that time, that supplier ma

electronic wand that he has to swipe and it registers on that
needs to come back with that collection mail at a specific ti

THE COURT: Is that what you mean when you say tap?

THE WITNESS: Yes.

BY MR. COLTON:

Q When a box delivery contractor puts mail in a mailbo

the only responsibility that that carrier has, is that the w
them going out to put mail in mailboxes?

A No.

Q Is it correct that they also pick up mail?

A That's correct.

Q And they put it into the system?

A That's correct.

Q Is the entry of that mail into the system at all time

A Yes.

MR. COLTON: Nothing further.

MR. CARTER: You're surely, Mr. Rodriguez, not telli
people in Summit, Arkansas and Peel, Arkansas that Mr. Keete
the mail to their post offices early was a bad thing.

THE WITNESS: In that context, no.

MR. CARTER: Judge, I have no further questions.

MR. COLTON: I'm done.

THE COURT: All right.

MR. CARTER: On behalf of the Plaintiff, I would res

the Court has another question.

THE COURT: No. And I assume that there's no closin

MR. COLTON: I would like to recall Mr Keeter for ab
minutes.

THE COURT: Then we need to break for lunch and com
back this afternoon.

MR. COLTON: I do believe -- I've got the questions

out --

THE COURT: Whenever you said you had two questions, Colton, it's never been that way. So I can't -- you know --

MR. COLTON: Your Honor I'm not --

THE COURT: Excuse me?

MR. COLTON: I'm not objecting, but I really do bel

finish really quickly. I have them written down.

THE COURT: You're excused. Thank you very much, M

Rodriguez.

THE WITNESS: Thank you, ma'am.

(Witness excused.)

THE COURT: You've got two questions of Mr. Keeter.

I remind you you're under oath. Be seated, please.

Whereupon,

EDWARD KEETER

was RECALLED as a witness herein and having been reminded of earlier oath, was examined and testified further as follows:

CROSS EXAMINATION

BY MR. COLTON:

Q Mr. Keeter, do you contend that the amount of money t Postal Service deducted from your compensation made it impos you to continue to operate your route?

A Long term it would, because that much money every p check, for several days that last week I'd be working for fr can work for free.

Q Working for free?

A Well, my pay checks would be 3069 and they were tak really 361, so the last two or three days, I was working for

Q Are you stating that you couldn't cover your costs?

A My net pay after you pay all of your expenses, you'r free if they're not paying the contracted amount.

Q Have you ever told the Postal Service what your exp

were?

A I had to submit my taxes through Chris.

Is that the two questions?

Q That's an answer, I've just got to close here.

Would you look at Defendant's Exhibit book.

THE COURT: Defendant's exhibit what?

MR. COLTON: Book, Defendant's exhibits. And look

Exhibit 3-B.

THE WITNESS: Yes.

BY MR. COLTON:

Q Is this a document that you prepared?

A Is this the bid?

Q Looking at it, can you tell me if it's a document you

A Yes, it's my writing.

Q Did you submit this to the Postal Service?

A Yes, in '02.

Q And this was your statement of expenses and of contr

wages at that time, correct?

A Yes.

MR. CARTER: Your Honor, I'm going to object. The r

I'm going to object is it's a solicitation dated May 9, 2002

can agree he had not even begun to run the route at that ti

don't see any relevance at all.

THE COURT: I'm a bit befuddled as to the relevance a

MR. COLTON: Your Honor, may I address that. Are w objecting to its introduction? Because the witness has just the effect of this and his own estimate, unless we've got a information, why isn't that relevant to the impact on him?

MR. CARTER: Because, Your Honor, pursuant to the Cou instruction, we came up with stipulated figures. And so yes proposal that he put together when he submitted a bid. But the actual issues that are before the Court, it doesn't have relevance other than the fact that on May 9, 2002, he subm proposal to the United States Postal Service.

THE COURT: If we don't have the -- what we have befo is how much he was paid every four weeks and how much was b deducted. So for purposes of this hearing, those figures ar don't see the relevance of this.

MR. COLTON: Your Honor, the witness has alleged tha were trying to starve him into submission and he couldn't a the route and that is bad faith. Well, this shows more real the situation was in his own terms without any contradictor except --

THE COURT: Whether or not he could put food on his Mr. Colton -- this goes so far beyond, it really does.

MR. COLTON: Actually, Your Honor, I completely agre

not our problem, but if it's alleged that we did it with a pu

THE COURT: These figures have nothing to do with purpose.

MR. COLTON: I was responding to an allegation, but go. Last question.

BY MR. COLTON:

Q What could you have gained in negotiation had you negotiation?

A They could have abided by their contract and I would had to -- they could have abided by their contract and I wo had to take 52 boxes.

Q That means you would have been able to continue doir you had been doing before.

A And what I contracted to do.

Q That's what you think you could have obtained. That'

A Yes, because if they negotiated and abided by the co that would have been the result.

MR. COLTON: Nothing further.

THE COURT: Do you have anything, Mr. Carter?

MR. CARTER: No questions, Your Honor.

THE COURT: Okay, you are excused, Mr. Keeter.

THE WITNESS: Thank you.

(Witness excused.)

THE COURT: Thank you.

The only thing that remains in the designation of t

exhibit -- of how we're going to do the P-5. What's the pr

handling this?

MR. COLTON: Joint 1, Your Honor, is that okay?

MR. CARTER: Joint 1 is fine with the Plaintiff, Your

THE COURT: Joint 1. And the contract will be Joint

MR. COLTON: If we need to go beyond what's already

record. Well, we want to do that in any event. Instead of s

in the appendix, would you prefer, Your Honor, to give it it

label?

THE COURT: Unfortunately we don't have it here befor

I don't -- you know, unless I could see it and know as to wh

it's the entirety of the contract--

MR. COLTON: Your Honor, even though it's in the app

as a separate document, I believe it would be more convenien

burdensome in any event to provide a copy of it and call it J

THE COURT: That's fine, I will appreciate that.

MR. COLTON: Sure, no problem.

(The documents referred to were marke

for identification as Joint Exhibits

2 and received in evidence. Joint

be provided at a later time.)

THE COURT: Okay.

MR. CARTER: That's acceptable to me, Your Honor.

THE COURT: Okay, then we have nothing further.

MR. COLTON: Unless there are some closing statements

THE COURT: If you want closing statements we have adjourn for lunch and come back. If you don't want closing you're going to have post-trial briefing, so you can do it would be better served doing it there.

MR. COLTON: Finishing without a break is more impor so no closing.

THE COURT: That's fine. We are adjourned.

(Whereupon, at 12:42 p.m., the trial in the above-entitl was concluded.)

//

//

//

//

//

UNITED STATES COURT OF FEDERAL CLAIMS

REPORTER'S CERTIFICATE

I, Peggy J. Warren, reporter, hereby certify that the f transcript consisting of pages 267 through 397 is a complete accurate transcript of the testimony indicated, held on Apri Little Rock, Arkansas.

In the Matter of: EDWARD KEETER & KEETER TRADING CO., INC. v. THE UNITED STATES

I further certify that this proceeding was recorded by me, foregoing transcript has been prepared under my direction.

Date: May 19, 2008

Peggy J. Warren
Official Reporter
Heritage Reporting Corporation
1220 L Street
Washington, D.C. 20005