# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**No. 05-243 C**

| | | |
|---|---|---|
| *************************************** | ) | |
| EDWARD KEETER and | ) | |
| KEETER TRADING COMPANY, INC., | ) | |
| *Plaintiffs* | ) | **Case 1:05-cv-00243-LJB** |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| *Defendant* | ) | |
| *************************************** | ) | |

**DEFENDANT'S**
**POST-TRIAL BRIEF**

July 18, 2008

Respectfully submitted,

_/s/ Douglas J. Colton_
**Douglas J. Colton**
U.S. Postal Service
475 L'Enfant Plaza, SW
Room 6323
Washington, DC 20260-1127
Tel: (202) 268-6408
Fax: (202) 268-5287

**Counsel for Defendant**
**The United States Postal Service**

## INTRODUCTION

Plaintiff Keeter Trading Co., Inc. ("Keeter") alleges that the Postal Service acted in bad faith in the events surrounding termination of his[1] mail delivery contract. The Court ruled that the additional duties defendant ordered performed were a “cardinal change” to the Contract that was impermissible without plaintiff's consent, and constituted an anticipatory breach that entitled plaintiff to cease performance and deprived defendant of the right to declare plaintiff in default. Trial on the issue of bad faith was conducted on April 23-24, 2008.

A detailed narrative of this controversy is set out in *Defendant’s Proposed Findings of Fact,* and apart from *Findings Nos. B12 – B20* (concerning bad faith) there are no material disagreements about events. The only “facts” requiring judicial determination are plaintiff’s attributions of bad faith to conduct that is not malicious on its face. No witness except Keeter offered testimony of defendant's malice, and none of defendant's documents show or hint at *animus* towards him. Plaintiff brushes away the implausibility, illogic, and denials of his morality tale, and is certain that defendant acted in bad faith because that is how he sees it.

In this Brief, defendant examines the events enlisted by plaintiff as proof of bad faith in light of what the Record shows. This inspection reveals that the asserted “bad faith” of defendant is visible only with the aid of plaintiff's indignation that his views were ignored by defendant when he voiced them. This affront to his dignity is repackaged by

[1] Plaintiff is a corporation that acted through its owner, Edward L. Keeter. Unless otherwise indicated, “Keeter” here refers to both the plaintiff corporation and its owner. To simplify syntax, in this Brief both the corporation and its embodiment by Mr. Keeter are identified as a "*he"* rather than as an "*it."*

him into a dramatic scenario, in which plaintiff is the hero who bravely defies an uncaring and immoral foe. Instead of facts established by probative evidence, plaintiff offers a story in which he explains the true meaning of seemingly ordinary events. Whatever else it may be, this story is not a factual record on which bad faith may be found.

## I. LEGAL STANDARD

### A. Am-Pro

The legal standard for establishing bad faith by the government in dealings with contractors is set out in ***Am-Pro Protective Agency, Inc. v. United States,*** *281 F.3d 1234, 1239-1240 (Fed Cir. 2002),* with which this Court is familiar. Decisions that restate and apply the *Am-Pro* standard are included in the previously-submitted *Defendant's Contentions of Law* and need not be repeated here.

Although *Am-Pro* explains the concept of "bad faith" at length, neither that decision nor any other provides a bright-line test for distinguishing good faith conduct from bad, or for attributing intrinsic good or bad faith to actions without considering their context. Instead of creating objective rules for finding bad faith, *Am-Pro* imposes a substantial burden of proof on its proponent. *Am-Pro* essentially describes bad faith more in terms of the actor's state of mind than as a function of actions viewed in isolation. Determination of motives and intentions is left to the trier of fact, but the evidence of bad faith must be ***clear and convincing*** rather than just suggestive. This requirement prohibits finding bad faith based on ambiguous actions if there is no proof of malice as well.

Decisions finding bad faith have not been based on ambiguous facts, nor on innocuous or ordinary conduct behind which a malevolent intent has been found. They uniformly present multiple instances of conduct that is difficult to explain unless malice existed, -- conduct that the actor knew was wrong or inappropriate and that was not reasonably calculated to further legitimate goals of the government. In these decisions, contractors were subjected to arbitrary or unnecessary decisions more likely to impede their ability to perform than to fulfill governmental needs. Even without a bright-line test, bad faith is discernible from the aggregate events, and the explanations offered by the government for its questionable conduct are not credible or are contradicted by evidence, or both. Recent examples of fact patterns that warrant finding bad faith are found in this Court's decisions in ***Moreland Corporation v. United States,*** 76 Fed.Cl. 268 (2007), and ***North Star Alaska Housing Corp. v. United States***, 76 Fed.Cl.158 (2007).

## B. INFERENCES, PRESUMPTIONS, AND IMPUTATION

The body of "bad faith" decisions do not support or allow a finding of bad faith in the absence of proof of malice. Neither do they support inferring malice from conduct for which there are reasonable explanations. *See, e.g.*, ***Information Systems & Networks Corp. v. United States,*** 81 Fed.Cl. 740, 750 (May 6, 2008) in which Judge Allegra rejected an attempt to prove bad faith through an implausible story that relied on statements out of context, readily shown not to mean what the plaintiff claimed. As in that decision, the plaintiff here has not placed the slightest proof of malice in the Record, and defendant's conduct makes eminent sense without invoking harm to him as its goal. The law does not permit bad faith to be found on this Record.

Without any real evidence, plaintiff's builds his entire case from "facts" he says are established by the inferences, presumptions, and imputations of intent that he proposes. Each suggestion he offers requires acceptance of often-absurd assumptions for which there is no proof, *e.g.,* Duane Hoover's ability (and desire) to assert control over Postal Service personnel. Plaintiff's legal "theory" of bad faith is virtually a parody of what the cases actually say. His arguments do not address the label of the process being invoked to transmute speculation into evidence, and in this discussion "inferences, presumptions, and imputations" refer to similar feats of assuming facts in the absence of proof.

***PRESUMPTIONS***

A*m-Pro* did not withdraw the longstanding "presumption" that official actions by government servants are undertaken in good faith. Whether viewed as a legal presumption, or as a burden of proof to be met, the actions of government personnel are deemed well-intended absent a clear case to the contrary proven by credible evidence. The oft-repeated "well-nigh irrefragable" description of this presumption recited in *Am-Pro* and universally mentioned in similar decisions does not indicate that proving bad faith is impossible. It means that proving bad faith is meant to be very difficult.

Plaintiff is asking that this presumption of governmental good faith be inverted. He argues in effect that defendant should be presumed to have acted in bad faith because it breached the Contract, and therefore must carry the burden of proving that its faith and intentions were good. The only authority offered for this premise is an introductory clause of a sentence taken from ***Kihlberg v. United States,*** 97 U.S. 398 (1878), in which

governmental bad faith was not alleged, found, or at issue. In *dicta* (uttered while sustaining the government's contract rights), the Court posited the existence of hypothetical mistakes so *"gross . . .as would necessarily imply bad faith."* The Court neither explained nor applied the concept it rhetorically invoked, and plaintiff offers no other case in which a court found a contract error by the government to be so "gross" as to constitute, or prove, bad faith by itself.

***INFERENCES***

Plaintiff wants to establish bad faith without any direct evidence of *animus* by arguing that ordinary conduct should be seen as furtherance of the malice that caused defendant to breach the Contract. He makes no attempt to point to conduct that is explicable *only* by bad faith, rather suggesting that defendant must (be deemed to) have anticipated the eventual judicial ruling against it, and thus was ordering plaintiff to do work it knew it could not legally impose. Malice is to be inferred in the measures taken to enforce the invalid order. Plaintiff's presentation in trial was an attempt to shoe-horn the facts into this scenario, primarily by arguing with witnesses about what they "really" knew, and by characterizing actions as evidence of malice because they displeased him.

A related inference that plaintiff proposes is that because his contract interpretation was right, *and* he repeatedly told defendant it was, defendant's continuing insistence that he do work improperly added to the Contract *could not possibly have been asserted in good faith. EK:87* Defendant's unwillingness to acknowledge that it was wrong, and its treatment of plaintiff "as though he did not know his rights" supposedly demonstrate defendant's desire to harass and oppress him.

***IMPUTATION***

Plaintiff is assuming that if he can somehow attach "bad faith" to Orr, it is going to be imputed to personnel at the DNO. There is no logic or legal support for doing so. The stringent burden of proof imposed by *Am-Pro* is meaningless if malice found harbored in a distant subordinate, who lacks any contracting authority, is deemed to become as well malice on the part of contracting personnel who do not even know it exists. Plaintiff argues for bad faith by infection, without regard to the intentions of those responsible for the conduct. The disapproval of casual ascription of bad faith expressed in *Am-Pro* and its progeny does not permit bad faith to be proven through working of this legal fiction.

Under *Am-Pro,* plaintiff must satisfy a substantial burden of proof to establish that the defendant acted in bad faith. Keeter falls far short of meeting that burden, presenting neither legal authority for building a bad faith case on inferences, nor credible evidence to support that (or any other) theory. The evidence on the Record is far more than sufficient to justify a finding that "good faith" has affirmatively been proven by defendant -- but it is not defendant's burden to convince the Court that it acted without malice. It is plaintiff's burden to prove convincingly that malice was present. Plaintiff has failed to present evidence that meets his own burden, so bad faith cannot be found.

## III. ANALYSIS AND DISCUSSION

### A. Plaintiff's Case

Plaintiff offers the Court a morality play, in which defendant's conduct is revealed as expression of its underlying bad faith. The story he tells is assembled into a narrative in the following (*italicized)* paragraphs. The characters are plaintiff, and:

1. Linda Orr ("Orr"), the Yellville, Arkansas Postmaster, who was also the Contract's Administrative Official ("AO");

2. Duane Hoover ("Hoover"), another Yellville box delivery contractor, whose (alleged) jealousy over plaintiff's compensation propels the story;

3. Jeanette Wofford ("Wofford"), a Postal Service contracting specialist at SWDNO in Dallas largely responsible for administering Keeter's contract;

4. Mark McCague ("McCague"), another contracting specialist at SWDNO and Wofford's immediate supervisor; and

5. E.N. Rodriguez ("Rodriguez"), the Contracting Officer ("CO") at SWDNO responsible for the award, modification, and termination of mail transportation contracts at that office.[2]

The events described occurred in Yellville, Arkansas, or at defendant's Southwest Area Distribution Networks Office (the "DNO" or "SWDNO") in Dallas, from which the CO awards and administers "HCR" mail transportation contracts for an area that includes Arkansas. The DNO staff advises and acts on behalf of the CO, who cannot personally participate in every action undertaken on his authority. The CO works through a staff of "contract specialists" at SWDNO. DNO personnel are assisted by an

[2] Some contract specialists also have specified authority to act as CO under some circumstances. References here to the Contracting Officer, or "CO," without a name, mean whoever acted or decided as described, whether it was Rodriguez or someone else at SWDNO acting in that capacity.

"Administrative Official" ("AO"), appointed for each contract at the operating facility to which it is assigned, who supervises contract performance under directions from the DNO.

For plaintiff, the story begins on July 1, 2002 with commencement of his performance of "box delivery contract"[3] HCR 72665 ("the Contract") that SWDNO awarded to him for a route (of the same number) assigned to the Yellville Post Office. The central events involve 52 customer mail boxes, here referred to as "the AMBs," located along the route that the Contract required plaintiff to travel, but initially not included in the Contract's required work. In late December of 2003, the CO ordered the AMBs transferred from another route to plaintiff's, with service to start a month later. Ultimately, this Court ruled that defendant did not have the contractual right to require plaintiff to carry the AMBs as it had done.[4] ***Opinion (July 19, 2007)***

[3] *Nomenclature and Citation:* A box delivery contract procures mail service for customer mail boxes located along its route. The contractor must sort and otherwise process mail for route customers at the associated Post Office, as well making actual deliveries to the boxes. In Postal Service parlance, the aggregate of all services required from the supplier for a box route is called "carrying" that route, or "carrying the box[es]" on that route. Citations to trial testimony in this Brief identify the witness by initials, followed by the transcript page(s), *e.g.,* ***EK:123-125***. Trial witnesses were: *Edward Keeter--**EK;** Linda Orr--**LO;** Jeanette Wofford—**JW;** Mark McCague--**MM;** E.N. Rodriguez--**ENR;** Duane Hoover—**DH***; and *Tommy Griffin--**TG.*** Exhibits are identified by party and Exhibit number, *e.g.,* ***PX/1***, with page(s) within the exhibit in ( ) where appropriate. ***Joint Exhibit 1*** (***JX/1)*** is the Contract for HCR 72665.

[4] The acts of bad faith claimed by plaintiff primarily occurred between December 24, 2003 and plaintiff's notification that he would no longer provide any service at all, on February 20, 2004. The Court did not specify the date of the anticipatory breach, nor the date the contract ended if other than April 28, 2004 when the CO ordered the default termination that the Court held was not valid. Plaintiff says nothing about these questions. The rights of parties to a contract will most likely vary depending on whether or not their contract is in effect, and so any scrutiny of their conduct to evaluate good faith must consider the legal status of (or the parties' beliefs about) the contract when they acted. SWDNO personnel thought the Contract was in effect at least until February 20, 2004, and plaintiff's conduct corroborated that belief. Plaintiff did nothing to exercise any legal right he had to terminate before then. He nonetheless alleges bad faith

__YELLVILLE EVENTS__

*Beginning in July, 2002, Orr gave preferential treatment to Hoover, by having his contract adjusted the way he wanted. Hoover was jealous that Keeter was paid more for his route than Hoover received.* **EK:63-64, 88-90** *Hoover could control Orr because his family had influence, since both Hoover and his brother had box routes and their sister was a clerk at the Yellville Post Office.* **EK:91-93, 113** *Hoover used this influence to have Orr add casing time (thus money) to his contract in July, 2002.*

*In 2003, Hoover had Orr arrange that 52 boxes be switched from his route to Keeter's (without mileage), so Hoover could pick up 40 boxes and mileage from another route. Hoover wanted the changes because he gained more money from them than Keeter did, reducing the pay gap between them. Orr obviously could not have proposed these changes on her own, since she had to ask Hoover how many boxes were going to be transferred to plaintiff.* **EK:64, 90, 112** *Plaintiff told Orr he did not want the added work, but she proposed the changes anyway.* **EK:61-62**

*Orr's proposals to the DNO included saying that there was extra time in plaintiff's schedule. She and the DNO did not consider that he did not take time to smoke or socialize like others at the Yellville Post Office. Orr was wrong about the amount of extra time he had.*

*After the DNO approved the route changes, Orr said that if Keeter would not carry the AMBs she would fire him or get rid of him. Orr asked the DNO, three times in writing, to terminate the Contract. She would not discuss the Contract with him, and she began to write him up on USPS Forms 5500 every day for the same thing (not carrying the AMBs), despite his explanation that he could not be required to.* **EK:66, 94-95, 99** *She also wrote him up for other things to harass him. When he returned the 5500s with*

because defendant continued to act as though the Contract was still in effect during a period when he did as well. The Court did not state when or how plaintiff could exercise his right to repudiate; these questions became relevant only after the Court found the anticipatory breach. The Record shows not just that defendant *believed* at all times that it was acting within its rights, but also that due to plaintiff's conduct the Contract *was* in effect at least until February 20. If the Contract was still in effect when defendant took measures to enforce it, the good faith of defendant's belief that it could apply Contract provisions to plaintiff ought to be irrefutable.

*his explanations, she would not meet to discuss them, and she did not tell him why she "charged" 5500s to him despite his explanations.* ***EK:66-70*** *She sent the 5500s to the DNO, and the Postal Service will not expunge them from his file. EK:78*

**SWDNO EVENTS**

*Orr's recommendations to transfer the AMBs were not discussed with plaintiff by the DNO before they were approved. The DNO wanted to avoid negotiating with him about the changes, so Wofford and McCague ignored the box delivery formula and decided his compensation for the AMBs would be $1087.56, when the box formula amount was nearly $2700. They used the pretext that this was correct because of extra time in his schedule, when they knew that time does not matter. They did this because if he received the formula amount, it would be a major change requiring prior negotiation.* ***EK:89, 100-103*** *Keeter told the DNO that he knew he was entitled to the formula amount for the AMBs, so defendant had to negotiate with him and he would not accept the work. Despite being told this, the DNO continued to say that he had to carry the AMBs, and that the Contract could be terminated if he did not.* ***EK:72-74, 79-80, 87, 96*** *The DNO would not discuss the Contract with him and ignored his long letter about it.*

*Starting January 24 when plaintiff would not carry the AMBs, Orr and the DNO told him the Contract could be terminated, and Orr said he would, or might, be fired.* ***EK:75-76*** *She told him his pay would be reduced by the cost for her to carry the AMBs and his money would go to her.* ***EK:97-98*** *In a telephone call on January 28, McCague said that plaintiff's opinion did not matter, and he heard that from Orr as well.* ***EK:72, 111***

*Defendant meant these threats to coerce and intimidate him into agreeing to carry the AMBs, or into quitting the Contract. He was told by Wofford (before February 20) that pay for the AMBs was being increased by about $1600 to the box formula amount, but she still did not offer to negotiate about the change even though its value was obviously now more than $2500. Plaintiff was entitled to negotiate about this work before it was added to the Contract.* ***EK:82-83, 112*** *For him, the issue was not about money, it was a matter of principle.* ***EK:85-87*** *If the Postal Service was required to negotiate about the added work, plaintiff would be able to turn it down. Defendant would*

*then have to take back its changes to the Contract and put the AMBs back on Duane Hoover's route. Plaintiff would continue to do the work he had agreed to when he entered the Contract. That was his choice, and it was a life-style matter for him.* ***EK:61***

*When defendant took $361 of Linda Orr's costs from his February 20 (2004) pay, plaintiff could not keep operating the Contract. One-third of his pay would be deducted and he would end up working free.*[5] *This was used by defendant to get rid of him and force him off his route. He had to stop performing entirely. It was bad faith for defendant to deduct Orr's charges when he was not required to carry those boxes in the first place.* ***EK:76, 85, 87, 99, 115-17*** *Obviously, the Contract was terminated in bad faith because he refused to carry the AMBs.*

*Defendant still has not apologized or admitted that it was wrong and he was right. That is the ultimate proof that its actions were in bad faith.* ***EK:74, 78***

---

**5** The deduction was about $63 more, to offset inadvertent prior payment for the AMBs when plaintiff did not carry them. The numbers used here are from plaintiff's testimony. His regular pay was $3069 -- of which $361 would be less than 12%, not one-third. Plaintiff added the costs reported in Orr's notes (tho not at the time, since he first received them later in discovery) to a total of $1093. He seemed in testimony to be saying that the Postal Service was going to deduct that much from each Contract payment to him -- and that would be one-third of his 4-weekly pay. Defendant did not deduct $1093 on February 20, and this prediction makes little sense either mathematically or logically. It does serve to dramatize plaintiff's plight and defendant's perfidy, but it is not true. Plaintiff was not "forced" to cease performance: he chose to.

## B. WHAT THE EVIDENCE ACTUALLY SHOWS

Almost all of the conduct in which plaintiff finds bad faith was part of a sequence of unremarkable steps that were undertaken in the course of defendant's administration of the Contract. These acts all clearly were means to further accomplishing defendant's responsibility to deliver the mail; plaintiff was treated no differently than would be any supplier under the circumstances. To plaintiff, these actions failed to accord him (and his opinions) their due respect.[6] He is wrong about this -- but even were he not, failure to show sufficient respect cannot substitute for proof that defendant acted in bad faith.

### 1. *Events In Yellville Prior to Contract Modification*

As Administrative Official for the box routes assigned to Yellville, Orr proposed a restructuring that in 2002 resulted in creation of two new box routes that were awarded to Keeter and Hoover and operated started July 1 of that year. Orr sought by her proposals to balance workloads between routes, to eliminate an "auxiliary" route, and to adopt a route structure better suited to defendant's needs than the one she recommended be replaced. ***LO:137-39, 141, 176-77***

Soon after the new routes began on July 1, 2002, Orr realized that the schedule for Hoover's allowed insufficient time for morning "casing" of the mail in preparation for its delivery; Hoover said he needed more time. ***LO:136, 177-78; DH:12, 16*** It would be self-defeating, as well as unfair, for defendant to insist that suppliers adhere to unrealistic schedules. Orr recommended, and the DNO approved, additional casing time (and

---

[6] *See, e.g.,* ***EK:99-104*** Plaintiff's indignation is not as evident from printed words in the Transcript as from observing his live testimony, but appears in his repeated complaint that defendant did not admit that it was wrong *even after he made it clear that he knew his rights.* What plaintiff calls "bad faith" seems mostly to have been defendant's failure to acknowledge his intelligence and moral grit.

associated pay) in the schedule for Hoover's route. ***LO:132*** This minor correction was made so the route would be realistic and workable, and thus could reliably be performed. This served the interests of the Postal Service. The change was not accomplished through pressure from Hoover or anyone else, and it was not proposed or granted as a favor or to placate him. ***LO:177-78, 185-86; DH:26, 29***

During 2003, Orr concluded there was an imbalance between Keeter's route and Hoover's. She personally noted that Keeter regularly had extra time during the period covered by his schedule, while Hoover was constantly busy and possibly overloaded. ***LO:136-37*** Orr knew that local growth would occur in the area served by Hoover's route more than in Keeter's. This could lead to service problems that were avoidable by making appropriate route modifications. Orr eventually decided that the best, and least expensive, way to address this concern would be to transfer responsibility for a group of boxes, located along a road segment traveled by both suppliers, from Hoover's route to Keeter's. That would make it possible to add other boxes elsewhere to Hoover's route. ***LO:136-38, 149, 177-80; DH:22-23***

Hoover was of course familiar with the route he carried, while Orr was not, so she asked him to determine the most logical place and box group to split from his route and transfer to Keeter's without transferring mileage. ***DH:19-21, 26-28*** Hoover provided Orr the requested information, and with it she formulated recommendations to SWDNO. ***DX/1*** There is no evidence that Hoover suggested anything other than the most logical choice for accomplishing the AO's goals. ***DH:29***

Orr mentioned the changes she was considering to Keeter at some time before her recommendations were approved by SWDNO. Plaintiff said he did not want any

added work. ***LO:142, 150*** Orr's submission to the DNO included her observation (and that of an other postmaster) of extra time in the schedule for Keeter's route, and noted that one of the current supplier's whose route would be affected (plaintiff) did not support the change. ***LO:143; DX/1(at pp. 2, 5)***

Hoover did not ask for these changes, either, and his family did nothing to obtain them. ***LO:185-86; DH:18, 26, 29*** Orr held no animosity towards plaintiff, and had no desire to harm him. Her actions were based solely on her conclusions and beliefs about what was in the best interests of the Postal Service. ***LO:176-81, 185-86, 193-94***

2. *Establishing Intent at SWDNO*

The bad faith ascribed to Orr may lack any evidence or plausibility, but plaintiff at least describes it and tries to give a reason for it -- the conjectural Hoover family influence. But it was not Orr who made the Contract decisions that supposedly express defendant's bad faith. Those required action by the CO and staff at SWDNO. Plaintiff's considerable effort to attribute *animus* to Orr did not include a way to connect such ill-will in Yellville with the actions of personnel at SWDNO.

Adoption by the DNO of Orr's recommendations for route changes cannot provide such proof of malice. Orr's suggestions carried no facial (or other) taint of hostility, and their supporting information was neither false nor inaccurate. Her justifications were consistent with Postal Service goals, and Wofford verified the recommendations and information to her own satisfaction. ***JW:204-205, 212*** Plaintiff vaguely hints that Orr's recommendations were pretextual but does not directly make the allegation, much less offer proof of it. Without evidence to the contrary, the Court must accept, as the DNO

did, that the route change recommendations were legitimate business choices made for appropriate reasons.

Plaintiff offers no direct evidence of malice at the DNO, whatever the origin: there are no statements, writings, overheard conversations, or other tell-tale disclosures of private agendas or expressions of hostility by the SWDNO personnel towards him. Even if Orr did entertain malice towards plaintiff, *Am-Pro* requires him to explain and prove the mechanism by which her hostility infected, or affected, Wofford, McCague, and Rodriguez. Plaintiff suggests no reason to suppose that any of them felt hostility towards him sufficient to animate acts meant to do him harm. They deny sharing or acting from any such hostility, just as Orr denies either having or imparting any such attitude to anyone else. The contracting personnel equally deny holding *animus* themselves. In the face of these denials plaintiff needs compelling proof that Orr's attitude, no matter how hostile, actually mattered or lead to anything worse than hurt feelings.

Plaintiff's efforts to attribute malice to Orr demand that he convincingly connect her *animus* to bad faith by SWDNO. He fails even to try. The actions of the contracting personal do not provide any alternative proof to satisfy plaintiff's burden.

3. *Approval of the Modification*

. At SWDNO, Wofford reviewed Orr's recommendations for route changes and made inquiries about them as she thought appropriate. She concluded that the changes were beneficial to defendant and substantiated, so she prepared the documents needed to have them approved. McCague went over her work and agreed with her. ***JW:204-5,***

***212-15; MM:283, 291-2*** The route modifications, including addition of the AMBs to plaintiff's contract, were embodied in a Route Service Order issued on December 24, 2003 for service to start on January 24, 2004. ***DX/2*** Plaintiff and Orr were so notified.

Based on the available information Wofford concluded, with McCague's concurrence, that the AMBs should be added to the Contract with additional compensation for plaintiff of about $1100 per year. ***JW:209-12; MM:290-92*** Wofford and McCague knew that this amount was not derived from the box formula, that would yield a figure of nearly $2700 for the work. To plaintiff, it is beyond dispute that the box formula was intentionally ignored and an artificial low value was assigned instead, specifically so that defendant would not have to negotiate with him about performing the work. Since he cannot conceive of any other reason to do so, he concludes that the Postal Service must have acted in bad faith.

The specialists who personally evaluated Orr's recommendations expressly deny any malice or intent to harm plaintiff. ***JW:232-4; MM:305-07*** They explained why they believed that their decisions were consistent with the Contract: they acted in compliance with a directive that SWDNO received from Postal Service Headquarters ("HQ") covering the situation that Orr's recommendations presented. ***DX/6*** Under that directive, they were confident that the proper method for assigning a value to the AMBs when added to plaintiff's route was substantially different than Keeter assumes.

4. *The Box Formula and the HQ Directive*

Postal Service DNOs award and administer contracts incorporating standard language that is generated, distributed, and sometimes explained, by Postal Service Headquarters ("HQ"). Standard provisions are not subject to revision by a DNO, and

DNO personnel may not substitute their own understanding of those provisions for instructions provided by HQ. Contracting personnel at the DNO level are not acting unreasonably if they credit HQ drafters of the standard contract provisions with knowing what their chosen words accomplish.[7] The SWDNO personnel who dealt with the Contract did no more than take the HQ directive at face value when it said that use of the box formula was not mandatory.

***DX/6*** was received at SWDNO long before plaintiff was awarded a postal contract. Its contents became part of the institutional knowledge of that office. ***JW:230; MM:293-94; ENR:345-353*** No evidence suggests that the directive had been revoked or materially revised as of early 2004. Although plaintiff scoffs at reliance on the directive because it was "old" by 2004, the box formula language that the directive explains was at least as old and it was still in use: why not the directive too? Plaintiff proves no reason for SWDNO *not* to consider ***DX/6*** applicable.

The directive indicates that (for these purposes) application of the formula *is not mandatory.* It tells contracting personnel to consider instead available information to determine the time that added boxes really require from the supplier. The added time can then be used to assign appropriate pay for the added work. That is what Wofford did. Using information provided by Orr, as augmented by her own inquiry and review,

[7] Unfortunately, of course, words used in contracts do not always accurately express what the drafters think they are saying -- as a mountain of legal rulings attest. Defendant is not arguing that this Court should give any deference to the legal position embodied in ***DX/6.*** However, clumsy drafting of a contract provision does not prove that its drafters realized their handiwork did not clearly convey their intentions. Plaintiff offers only his incredulity to support the premise that DNO personnel could not possibly have adopted their employer's contract reading (rather than his) *unless* they were acting in bad faith. That is not proof.

Wofford concluded that carrying the AMBs would increase plaintiff's work by 76 hours per year (15 minutes a day) after offsetting the available time in his schedule. ***JW: 243-4*** **A**t the hourly rate for his services (from ***DX/3B***), Wofford calculated that $1087.56 was appropriate compensation for carrying the AMBs. ***JW:243***

This conclusion did not spring from a desire to avoid negotiation, and Wofford did not see it as inconsistent with the Contract. ***JW:229-30, 240, 261*** Her supervisor, McCague, also understood that the amount was not derived from the box formula, but he too believed that application of the formula was not required. ***MM:293-94*** Wofford's proposal, approved by McCague, became the Route Service Order signed by the CO on December 24, 2003. ***DX/2***

### C. After the Change Was Ordered

#### 1. *Events in Yellville*

Orr had no authority to negotiate, amend, revise, terminate, or even discuss the terms of the contracts that she supervised as AO, and certainly could not interpret them independently of directions from the DNO. Her job as AO was to oversee suppliers in order to obtain reliable performance of their contracts, under direction by the DNO. ***LO:144, 147-8, 160, 168-71, 180; ENR:360-63***; *see,* ***DX/4B*** When plaintiff would not carry the AMBs, mail for customers in the Yellville area was not going to be delivered. Both as Postmaster and AO, Orr was responsible for ensuring that the mail was delivered to the customers in her service area. To be sure of continuous service if plaintiff would not carry the AMBs, Orr would have to do the work herself. ***LO:158***

This was not Orr's regular job, and doing it diverted her from the work she was assigned and paid to perform. It was work intended by the DNO to be performed by a

contractor who would carry the complete route. ***LO:166-7*** Three times during February Orr asked the DNO to terminate plaintiff and replace him with someone who would do the work so she could stop. ***LO:156-9,, 175-6; PX/9, 10, 13*** The DNO did not act on her requests: Wofford and McCague still hoped to obtain plaintiff's performance and to avoid having to replace him as route supplier for HCR 72665.

Orr may have told plaintiff that the Contract could be terminated if he did not carry the AMBs, (***TG:44***), but the DNO had been telling him that since early January. Wofford had explained to Orr the procedures and documents required to show that a contract termination was justified, indicating that no decision to do so had yet been made. ***LO:157, 182*** No ill-will by Orr is required to account for her request for termination, or warning plaintiff about it. She needed the DNO to procure a supplier who would carry the entire route, not just the parts he wanted. Orr had no responsibility for the decision, but she certainly knew that defendant cannot and does not indefinitely permit a supplier to turn down assigned work. There was nothing improper about Orr's statements, and nothing in them that plaintiff should not have been told.

Orr sent SWDNO a note for each day when she carried the AMBs, by which she reported the cost to defendant of her doing so (based on her annual salary at an hourly rate, plus expenses). She did not seek, expect, or receive payment for this work beyond her regular salary. She advised the DNO of the costs associated with this work so plaintiff could be charged for them. There is no evidence that any of these costs were unnecessary or false. ***LO:155-6, 174-5***

Orr also prepared a USPS Form 5500 for each day on which plaintiff refused to carry the AMBs, and for a few occasions when she noted other possible infractions by

him. The 5500s are standard Postal Service forms used in contract administration, and preparation of them is an AO duty. ***LO:151-4, 172-4*** They sometimes are considered by a contracting officer in deciding whether to terminate a contract, but were not used for that purpose regarding plaintiff: the 5500s played no role in any decisions concerning him. ***JW:256-7; MM:322; ENR:365*** There is no evidence showing that 5500s prepared by Orr were factually inaccurate or improperly motivated. ***EK:94***

The Contracting Officer testified that the actions and decisions of Orr concerning Keeter were proper and authorized. He said that the conduct of Orr that plaintiff alleges shows malice towards him (and favoring Hoover) was appropriate performance of AO duties, specifically including: recommending route modifications, requesting termination of plaintiff's' Contract, and preparing Forms 5500 and records of her costs when she carried the AMBs herself.[8] ***ENR:360-62, 366, 381-3, 386-9*** These were actions that as CO he expected from an Administrative Official. No evidence supports existence of the improper motives that plaintiff attributes to Orr. The bad faith that plaintiff attributes to her exists only in his imagination.

2. *Events at SWDNO*

The parties were in frequent contact and reiterated their positions throughout January of 2004. On January 28, plaintiff spoke with Wofford and McCague, who

[8] The AO is to prepare a Form 5500 "***Contract Irregularity Report***" documenting apparent contract infractions for each day when any are observed: omission of service is such an event. Plaintiff claims bad faith in Orr preparing a 5500 for omitted service *every* day, when he had explained that he did not have to carry the AMBs at all. He similarly sees bad faith in her failure to discuss his written responses to the 5500s, or to tell him why they were nonetheless charged to him. Defendant does not require an AO to do any of those things, and plaintiff has no basis for expecting them. Orr prepared and processed the 5500s in the manner her employer directed. *See* ***DX/4B***, a Manual that provides guidance to AOs regarding their duties. This is an internal Postal Service document that does not create enforceable rights for suppliers.

Wofford asked to participate in hopes he could help her persuade plaintiff to carry the AMBs. Each side again asserted its understanding of the other's obligations, and plaintiff was reminded that he could put his position in writing for additional review. On January 31, plaintiff did submit a grievance letter, ***DX/7,*** and it was taken seriously at SWDNO. Within several weeks, Wofford and McCague decided to increase compensation for plaintiff to carry the AMBs to the box formula amount; that appeared to be the only way plaintiff would be willing to do the work. ***JW:210-15; MM:283-4, 294-6***

3. *Defendant's Options*

Plaintiff asserted that he could refuse to do the added work without risking termination, but the contracting personal assumed he was posturing for more pay -- because that is what supplier disputes always are about.[9] Had it been understood that plaintiff actually viewed the dispute to be a matter of "principle" rather than of money, and that he would not carry the AMBs regardless of the pay, there can be no doubt that the Contract would have been terminated for convenience. ***ENR:358-59*** At trial it was evident that plaintiff did not understand that this was defendant's right. ***EK:394*** However, Rodriguez testified without qualification that he would not have paid plaintiff *more* than the box formula amount, and he would not have withdrawn the already-implemented route changes. ***ENR:356-59, 366, 372*** If plaintiff was not willing to carry the AMBs, termination of the Contract on one basis or another was inevitable.

The contracting personnel knew that insisting that plaintiff comply with their instructions did not deprive him of the right to establish that he was correct about what the Contract required. Plaintiff was entitled to contest the DNO order before an impartial

---

9 ***MM:295-296, 299-300, 332-333; JW:217-219; 239-240***

tribunal, without needing first to cease performance just to protect his legal position.[10] He could carry the AMBs pending appeal and the ultimate determination of what Contract meant would rest with the court. ***ENR:372-74*** The contracting personnel at SWDNO could not postpone obtaining service for the AMBs while they debated with plaintiff to his heart's content about a decision they were confident was right. The debate could be conducted elsewhere, in a forum suited to it, but at the DNO the highest priority was making sure that the mail would be delivered.

The DNO personnel certainly also knew that the Contract could be terminated for convenience with payment of a specified indemnity to plaintiff. An incumbent contractor cannot thwart changes to its contract and still be its supplier, if defendant concludes that other work is needed and should be grouped with the supplier's existing tasks. Termination for convenience might create costs and burdens, but because that alternative was available SWDNO had no cause to invent a way to avoid negotiating with plaintiff over the AMBs. In retrospect, the conclusion that adding the AMBs to plaintiff's route was a minor contract change was certainly unfortunate and evidently wrong, but it was not reached through malice or to further improper goals or with knowledge that it was wrong. The directive gave the imprimatur of Postal Service HQ to their conclusion; offsetting the "extra" time in plaintiff's schedule was consistent with the policy that SWDNO understood the directive to state (although the document itself was not reviewed). With the options available there was no reason to pretend that the box formula did not apply if the believed that it really did.

SWDNO personnel could not recall any prior problems or disputes involving

---

[10] In his testimony, Keeter indicated his lack of familiarity of the rights he ignored when he characterized them as futile and "a waste of time." ***EK:117, 126***

application of the box formula or the directive. ***JW:261; ENR:366*** There was no reason for them to disregard what the directive instructed. Although this Court later rejected their reading of contract terms[11] in 2007, in late 2003 the DNO personnel could scarcely be charged with foreknowledge of this outcome just because plaintiff told them they were wrong.

The SWDNO personnel accordingly had good faith bases for believing that plaintiff really was obligated to carry the AMBs, and to continue performing the Contract with the AMBs despite his disagreement with them.

5. *Responding to Plaintiff*

At some time before February 19, as mentioned Wofford recommended (and McCague approved) increasing compensation for the AMBs to essentially the box formula amount. She did not do so because she thought she had been wrong the first time, but because something had to be done to induce plaintiff to do the work. ***JW:213, 217-19, 232-33, 239-40*** She told plaintiff about this decision, but he apparently still wanted to negotiate – just to tell the CO that he still did not accept the work. Keeter did not explain this to Wofford. From defendant's perspective, there was nothing to negotiate about.[12] ***ENR:372-73***

Plaintiff had been advised that he would be liable to defendant for the cost of alternative service while he refused to carry the AMBs. Some part ($361), but not all, of

---

[11] Apparently including, without discussion, applicability of the box formula

[12] If the box delivery formula *is* mandatory, as plaintiff asserts, it preempts price negotiations. The CO considered the formula to set the upper limit on pay for added boxes. Defendant will not negotiate about whether or not route changes should b e made. Thus, from defendant's perspective there were no issues open for negotiation.

the cost of having Orr carry the boxes was set off against plaintiff's February 20 Contract payment. ***JW:250; MM:301-06, 325-6, 332*** Plaintiff characterizes this as economic coercion and says that the warnings he was given were threats, intimidation, and harassment of him, manifesting defendant's bad faith.[13] These warnings were all of potential actions authorized by the Contract and available under the circumstances encountered by the DNO. ***JW:232-33; MM:306-08, 321-22, 332*** Plaintiff's only explanation of why these acts demonstrate bad faith is to reiterate that they were intended to compel performance of a contract modification that SWDNO ***had*** to have known was invalid.

6. ***Contract Termination***

Plaintiff believes that defendant's bad faith culminated in his termination for default because of his refusal to carry the AMBs, despite SWDNO knowing that he was correct in his statements about what the Contract required. This belief is mistaken. ***JW:255-58*** Plaintiff's failure to carry the AMBs started on January 24, but until February 20 he still carried the rest of his route, and defendant did not declare a default. The DNO kept telling him that performance was expected, and instead of terminating SWDNO tried to salvage the Contract by increasing pay for the AMBs to the amount they thought plaintiff

**13** Plaintiff also repeatedly asserted that defendant sought to "force" him into submission, particularly by deducting $361 from his February 20 payment and thereby making it "impossible" for him to operate the route. The motive he ascribes is fiction, and the consequence he claims is gross exaggeration. The deduction made was for less than the full amount recorded by Orr, and was less than 12% of his regular payment of $3069. Offsets for omitted service are authorized by the Contract. No bad faith inheres in exercise of this contractual right. Plaintiff also raised at trial a supposed charge of $95/day, shown in ***PX/20***, but he was confusing the reprocurement costs reflected in that document with charges for omitted service. *See,* ***MM:325-330***

was demanding. ***JW:232-5, 240; MM:300, 333.*** Even when plaintiff stopped performing at all on February 20, defendant refrained from declaring him in default. Instead, plaintiff was sent a cure notice urging him to resume service. The final decision to terminate for default was not issued until April 28, 2004. Rather than punishing plaintiff for refusing to carry the AMBs, defendant was trying to find a way to keep him as the route's supplier.

Defendant's purported intention to end the dispute by "getting rid" of him (and the Contract), claimed as further proof of bad faith, is contradicted by unrefuted evidence showing that the intention did not exist. Defendant was reluctant to end the Contract, and ultimately did so only when plaintiff left it no choice. Defendant could not expect Orr to carry the AMBs indefinitely, so if no other way to break the impasse was found the Contract would be terminated and Keeter replaced. Even so, until he totally abandoned the route defendant demonstrated forbearance that is inconsistent with the intention plaintiff alleges.

Invalidity of the change was not then known, and the actions complained of were the ordinary and routine means by which defendant enforces its contracts. The Postal Service cannot just shrug and indulge a supplier's decision not to perform assigned work. If a supplier cannot be persuaded to do work that the Postal Service needs, the contract with that supplier will be terminated, either for default or for convenience, and a more cooperative supplier will be obtained. Defendant said nothing to Keeter about termination without having good reason to believe it was both true and appropriate when stated.[14]

[14] Keeter plainly considers defendant's refusal to abandon its position and to acknowledge that he was right an insult to his intelligence. Defendant doubts that the soulless, incorporeal legal fiction that is a corporation has intelligence that can be insulted, or is entitled to judicial sympathy because its feelings have been hurt. Insults to

The April 28 termination notice recites as its basis plaintiff's abandonment of the route on February 20, and describes the conduct by which plaintiff announced his intention to quit. ***PX/19A*** This and the rest of the Record establish that termination occurred because plaintiff refused to service his route at all. Keeter would rather proclaim that he was punished for standing up for his rights, by being deprived of his work, because in morality plays the hero pays a steep price for his refusal to surrender. This portrayal may satisfy plaintiff, but in the real world defendant did not tell plaintiff to go until he was already gone. Orr did the work that plaintiff refused, and defendant kept trying to change his mind, until Keeter escalated the dispute from boycotting the AMBs to boycotting the entire Contract. When he did, the ensuing default termination was merely acknowledgment of a choice that Keeter had made for himself.

## IV. SUMMARY

intelligence are not mentioned in any known decision as evidence of bad faith, and the alleged affronts to Mr. Keeter's intellectual pride present no compelling need to expand the scope of "bad faith" doctrine.

Plaintiff first asks the Court to believe that all the events of this dispute stem from the gnawing jealousy of Duane Hoover that Keeter was making more money from delivering mail than he was. Without this premise, even plaintiff has no way to explain subsequent as expressions of malice. Hoover's jealousy is no more than a silly pastiche of hearsay and speculation that plaintiff pretends is fact. Then, too, the Postal Service employees who would have had to be a part of, or least to have known about, any ill-will and intent to harm plaintiff in order for it to be exhibited through defendant's actions each deny that the *animus* existed.[15]

At the heart of this claim is Mr. Keeter's certainty that the Postal Service could not possibly have maintained its Contract interpretation in good faith, because he clearly and repeatedly pointed out that it was wrong. *EK:87, 104* Defendant's continued insistence that he comply with the CO's instruction and perform work that he disputed is proof to plaintiff that defendant acted in bad faith.

Plaintiff wants this Court to cast off the judicial restraint counseled by *Am-Pro* and assume malign intentions based on his word alone. His story demands belief that the actions of a local postal official were dictated by plaintiff's jealous rival, who exploited his power over her in pursuit of his desire to be paid as much to deliver mail as plaintiff already got. The Court must also assume that other postal officials at a different office were wiling knowingly to breach plaintiff's contract to help plaintiff's rival achieve his ambition. And all of this all should be taken as true because the Court already found that defendant breached the Contract, just as plaintiff had been saying all along.

[15] ***LO:167, 173, 180-81, 186; JW: 232-33; MM:306-309; ENR:360-61***

*Therefore*, the Court should conclude that the Postal Service intended to deprive plaintiff of his Contract, and that was bad faith. . . . . . .

In place of the established presumption of defendant's good faith, plaintiff introduces a presumption of venality and petty malice. He creates his supporting facts from fables and strings them together into implausible chains of non sequiturs. He asks the Court to accept the resulting story as proving defendant's bad faith, because that makes sense to him.

For this Court to find bad faith, it will need to discount the veracity of Orr, Wofford, McCague, Rodriguez (and probably Duane Hoover too), even though none of their testimony was impeached on examination nor contradicted by evidence from any source – except by Keeter. He offers his assumptions as indisputable facts, undeterred by their lack of corroborating evidence and unimpressed by the sworn denials of them. *See*, ***EK:88-93*** Unless the Court believes these witnesses all perjured themselves at trial, plaintiff’s story is simply absurd.

## CONCLUSION

Keeter testified indignantly that defendant paid no attention to him[16] and ignored his views. He resented being treated as though he did not know his rights. In sum, he was not accorded the respect he deserved. To him, this disdain for his opinion was so wrong that it must bespeak malice, and from that malice bad faith must be found.

As fervently as Mr. Keeter believes he is entitled to this vindication, the law does not permit it. The evidence before the Court does not warrant even a suspicion that defendant held ill-will towards plaintiff or acted to harm him.

Therefore, the claim for bad faith damages must be denied. Defendant respectfully asks the Court to make it so.

July 18, 2008

Respectfully submitted:

/s/ Douglas J. Colton
DOUGLAS J. COLTON
475 L'ENFANT PLAZA SW RM. 6323
WASHINGTON, D.C. 20260-1127
TEL. 202.268.6408
FAX. 202.268.5287

**COUNSEL FOR DEFENDANT**
**THE UNITED STATES (POSTAL SERVICE)**

[16] Plaintiff's was one out of nearly 2,300 contracts SWDNO administered, accounting for approximately 0.016% of its annual contracting expenditures. Every supplier is entitled to good faith treatment by defendant -- but good faith cannot be defined by the amount of attention the supplier feels entitled to receive. McCague may have told plaintiff that his opinion did not matter, and in context it did not even if saying so was rude. In any event, the exasperated comment attributed to McCague neither requires nor proves the slightest malice or intent to harm plaintiff. ***ENR:342-43***